**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.:

PEACE OFFICERS' ANNUITY AND BENEFIT FUND OF GEORGIA, Individually and on Behalf of All Others Similarly Situated,

      Plaintiff,

v.

DAVITA INC.,
KENT J. THIRY, and
JAMES K. HILGER,

      Defendants.

---

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL**
**SECURITIES LAWS AND JURY TRIAL DEMAND**

---

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ................................................................................. 1

II.     JURISDICTION AND VENUE ........................................................................... 6

III.    PARTIES ............................................................................................................. 7

IV.     SUBSTANTIVE ALLEGATIONS ..................................................................... 8

        A.      Background .......................................................................................... 8

        B.      Defendants' Materially False and Misleading Statements.................... 9

        C.      The Truth Is Revealed........................................................................ 17

        D.      Post-Class Period Developments ....................................................... 25

V.      CLASS ACTION ALLEGATIONS .................................................................. 26

VI.     UNDISCLOSED ADVERSE FACTS ............................................................... 28

VII.    LOSS CAUSATION.......................................................................................... 29

VIII.   SCIENTER ALLEGATIONS............................................................................ 31

IX.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-
        MARKET DOCTRINE ..................................................................................... 31

X.      NO SAFE HARBOR ......................................................................................... 33

XI.     COUNTS AGAINST DEFENDANTS............................................................... 33

        COUNT I ......................................................................................................... 33

        COUNT II ........................................................................................................ 37

XII.    PRAYER FOR RELIEF .................................................................................... 39

XIII.   JURY TRIAL DEMANDED............................................................................. 39

Plaintiff Peace Officers' Annuity and Benefit Fund of Georgia ("Georgia Peace Officers" or "Plaintiff"), by and through its attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes without limitation: (a) review and analysis of public filings made by DaVita Inc. ("DaVita" or the "Company") and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, conference call transcripts, and postings on DaVita's website concerning the Company's public statements; and (d) review of other publicly available information concerning DaVita and the Individual Defendants.

## I.   NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all persons or entities that purchased or otherwise acquired DaVita securities between August 5, 2015 and October 21, 2016 (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     DaVita provides kidney dialysis services for patients suffering from chronic kidney failure or end-stage renal disease ("ESRD").  The Company operates kidney dialysis centers and provides related lab services in outpatient dialysis centers, and provides acute inpatient dialysis services in approximately 900 hospitals and related laboratory services in the United States.

3.     This action involves a fraudulent and illegal scheme by DaVita and its senior executives to artificially inflate DaVita's stock price by steering patients with government-subsidized health insurance into private health insurance plans to maximize its own profits. Because Medicaid and Medicare pay DaVita reimbursement rates of only $300 or less for one session of dialysis rendered to ESRD patients, DaVita began to systematically target these patients and, through deception and unlawful means, convince them to drop or reject their affordable government insurance options and enroll in private, commercial insurance. DaVita typically bills commercial insurers more than $4,000 for the same services being rendered to Medicaid and Medicare-eligible patients. Therefore, DaVita's profitability is heavily dependent on revenues derived from private insurance companies.

4.     Although only 34% of DaVita's total dialysis services revenue in 2015 was generated from patients who had commercial health insurance, nearly all of the Company's profit derived from commercial payors. DaVita's executives were thus highly motivated to steer patients on Medicare and Medicaid into commercial insurance plans.

5.     In order to convince patients currently enrolled in Medicare and Medicaid to obtain private insurance, DaVita informed patients that the American Kidney Fund ("AKF"), a third party charitable 501(c)(3) payor, would cover their monthly health insurance premiums in order for them to gain coverage that was typically out of reach financially. DaVita and its competitors were only able to accomplish this feat by illegally funneling money to the AKF, who would then utilize the proceeds to reimburse patients' health care premiums. Notably, the AKF only funds insurance for dialysis (from which DaVita would benefit) and not insurance for

alternative treatments for patients with ESRD, such as kidney transplants (from which DaVita would not benefit).

6.      On July 1, 2016, UnitedHealth Group, Inc. ("UnitedHealth") sued one of DaVita's competitors, kidney-care chain American Renal Associates Holdings, Inc. ("American Renal"), accusing American Renal of fraud.  UnitedHealth asserted that American Renal had engaged in a fraudulent and illegal scheme, in violation of various state anti-kickback and insurance fraud statutes, by convincing Medicare and Medicaid-eligible patients to enroll in UnitedHealth plans by referring them to the AKF.  According to UnitedHealth's complaint, American Renal was incentivized by UnitedHealth's out-of-network reimbursement rate for dialysis services, which dwarfed the rates paid by Medicare and Medicare.

7.      DaVita's fraud began to collapse shortly thereafter, as investors began to realize that DaVita was engaging in the same illegal practices as American Renal through its relationship with the AKF.

8.      On August 18, 2016, The Centers for Medicare & Medicaid Services ("CMS") issued a public request for information regarding alleged steering of Medicare and Medicaid beneficiaries into other plans in order to earn higher reimbursement rates.  As part of this request, CMS sent letters to all Medicare-enrolled dialysis centers (including DaVita) informing them of its announcement.  The CMS request for information and letters was aimed at situations where Medicare and/or Medicaid patients were steered into Affordable Care Act-compliant plans which could have resulted in the disruption of care associated with a change in network providers.

9.      In addition to the requested information, CMS asserted it was weighing imposing financial penalties on dialysis providers that were found to have steered individuals eligible for

Medicare into Affordable Care Act ("ACA") plans.  CMS also indicated that it was considering banning or limiting premium payments for ACA plans by health care providers and changes to Medicare and Medicaid's provider enrollment rules.

10.     In reaction to the disclosure about the CMS inquiry into the industry and the potential rule changes, DaVita's stock price dropped $3.17 per share, or 4.69%, on unusually heavy trading volume from $67.65 per share on August 18, 2016 to $64.48 per share on August 19, 2016, wiping out approximately $625 million of the Company's market capitalization in one day.

11.     On Sunday, October 23, 2016, the *St. Louis Post* published an article entitled "DaVita encouraged some low-income patients to enroll in commercial plans" that accused DaVita directly of steering clients to private insurers and utilizing its own money to pay for health insurance premiums through the AKF.  The article stated that internal e-mails from DaVita showed that the Company targeted patients in a campaign to get them to purchase insurance they did not necessarily need, saying that their monthly premiums would be paid by a nonprofit foundation (the AKF).

12.     The *St. Louis Post* article called the Company's efforts "coordinated" and noted that DaVita was financially incentivized to steer patients away from social health care programs and into private insurers.

13.     In reaction to the disclosures in the *St. Louis Post* article, DaVita's stock price dropped $2.86 per share, or another 4.69%, from $60.96 per share on Friday, October 21, 2016 to $58.10 per share on Monday, October 24, 2016, wiping out an additional $565 million in Company market capitalization.

4

14.     Tellingly, only one week later, on October 31, 2016, DaVita issued a press release announcing that it was suspending support for applications to the AKF for charitable premium assistance by patients enrolled in minimum essential Medicaid coverage effective immediately. The Company estimated that a policy change that prevented patients with minimum essential Medicaid coverage from accessing charitable premium assistance would result in a reduction to its annualized operating income of up to approximately $140 million before any offsets – close to 12% of DaVita's 2015 operating income.

15.     Then, on January 6, 2017, *The Wall Street Journal* reported that investigators from the U.S. Department of Justice "are probing a controversial arrangement under which kidney-care companies support charitable efforts to help patients pay health-insurance premiums, according to disclosures from major dialysis providers."  As part of the investigation, the U.S. Attorney's Office for the District of Massachusetts had subpoenaed DaVita and the AKF seeking information relating to its charitable premium assistance.

16.     As further detailed below, throughout the Class Period, Defendants made false and/or misleading statements, and/or failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company and its senior executives purposefully steered patients into unnecessary insurance plans in order to maximize profits; (2) the Company was using AKF as a vehicle to facilitate these improper practices; (3) as a result, DaVita's revenues and profits were illegally obtained; (4) in turn, DaVita lacked effective internal controls over financial reporting; and (5) as a result of the foregoing, Defendants'

statements about DaVita's business, operations, and prospects were false and misleading and/or lacked a reasonable basis.

17.     As a direct result of Defendants' wrongful actions, DaVita's common stock traded at artificially inflated prices throughout the Class Period.

18.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and the other Class members have suffered significant losses and damages.

## II.     <u>JURISDICTION AND VENUE</u>

19.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

21.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).   A substantial portion of the acts in furtherance of the alleged fraud, including the preparation and dissemination of materially false and misleading information and the effects of the fraud, have occurred in this Judicial District. In addition, the Company's principal executive offices are located within this Judicial District.

22.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.   PARTIES

23.    Plaintiff Peace Officers' Annuity and Benefit Fund of Georgia, as set forth in the accompanying certification, incorporated by reference herein, purchased DaVita common stock during the Class Period, and suffered damages as a result of the federal securities law violations and the false and/or misleading statements and/or material omissions alleged herein.

24.    Defendant DaVita Inc. is a Delaware corporation with its principal executive offices located at 2000 16th Street, Denver, CO 80202.  DaVita's securities are traded on the New York Stock Exchange ("NYSE") under the symbol "DVA."

25.    Defendant Kent J. Thiry ("Thiry") was, at all relevant times, Chief Executive Officer ("CEO") of DaVita.

26.    Defendant James K. Hilger ("Hilger") was, at all relevant times, Interim Chief Financial Officer ("CFO") and Chief Accounting Officer ("CAO") of DaVita.

27.    Defendants Thiry and Hilger are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of DaVita's reports to the SEC, as well as its press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive

7

representations which were being made were then materially false and/or misleading.   The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, and were the result of the collective actions of the Individual Defendants.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Background

28.   Headquartered in Denver, Colorado, DaVita provides kidney dialysis services for patients suffering from chronic kidney failure or end-stage renal disease.   The Company operates kidney dialysis centers and provides related lab services in outpatient dialysis centers, and provides acute inpatient dialysis services in approximately 900 hospitals and related laboratory services in the United States.   As of September 30, 2016, DaVita provided dialysis services to a total of approximately 199,000 patients at 2,457 outpatient dialysis centers, of which 2,318 centers were located in the United States and 139 centers were located in 11 countries outside of the United States.

29.   DaVita operates through two divisions: Kidney Care and HealthCare Partners.   Kidney Care provides dialysis services to patients with chronic kidney failure or ESRD.   HealthCare Partners manages and operates medical groups and affiliated physician networks in California, Nevada, New Mexico, Florida, Colorado and Washington.

30.   DaVita, in an effort to artificially inflate the Company's financials, unlawfully targeted patients whose dialysis treatments were currently covered under Medicare and Medicaid in an effort to get them to purchase private insurance by promising that their monthly insurance premiums would be paid by a nonprofit foundation.   Private insurers pay DaVita as much as

$4,000 per dialysis session, whereas government plans such as Medicaid and Medicare pay $300 or less per dialysis session.  By funding a nonprofit foundation to help individuals obtain private health insurance, DaVita was able to steer patients to commercial plans, such as the individual coverage under the Affordable Care Act.

**B.     Defendants' Materially False and Misleading Statements**

31.     Throughout the Class Period, DaVita's press releases, investor presentations and public filings made with the SEC included material misstatements and/or omissions concerning the Company's financial results, which included revenue derived from insurance plans in which an industry-funded non-profit entity was improperly paying for patients' health care premiums. These false and misleading statements created a false impression of DaVita's business and operational status and future growth prospects, as the Company was relying on unethical and/or illegal business practices to boost profitability.

32.     On August 4, 2015, after the close of the U.S. securities markets, DaVita issued a press release announcing its financial results for the second quarter ended June 30, 2015.  For the quarter, DaVita reported adjusted net income of $207 million, or $0.95 per share, and consolidated net revenues of $3.44 billion.  The press release, in relevant part, stated:

> DaVita HealthCare Partners Inc. (NYSE: DVA) today announced results for the quarter ended June 30, 2015. Adjusted net income attributable to DaVita HealthCare Partners Inc. for the three months ended June 30, 2015 was $207 million, or $0.95 per share, excluding after-tax debt redemption charges of approximately $29 million, or $0.13 per share, and a tax adjustment related to the settlement of the Vainer private civil suit (the Vainer suit) of approximately $8 million, or $0.04 per share. Net income attributable to DaVita HealthCare Partners Inc. for the three months ended June 30, 2015 including these items was $170 million, or $0.78 per share.

* * *

**Outlook**

- We are updating the low end of our consolidated operating income for 2015 to now be in the range of $1.825 billion to $1.925 billion.

    Our previous consolidated operating income guidance for 2015 was in the range of $1.800 billion to $1.925 billion.

- We are also updating the low end of our operating income for Kidney Care for 2015 to now be in the range of $1.600 billion to $1.650 billion.

    Our previous operating income guidance for Kidney Care for 2015 was in the range of $1.575 billion to $1.650 billion.

- We still expect our operating income for HCP for 2015 to be in the range of $225 million to $275 million.

- We are updating our consolidated operating cash flow for 2015 to now be in the range of $1.600 billion to $1.750 billion.

    Our previous consolidated operating cash flow for 2015 was in the range of $1.500 billion to $1.700 billion.

33.    In addition, the Q2 2015 Form 10-Q (and each of DaVita's subsequent quarterly and annual reports filed with the SEC described herein) contained certifications signed by Defendants Thiry and Hilger pursuant to §302 of the Sarbanes-Oxley Act of 2002 ("SOX"), along with certifications signed solely by Defendant Thiry as CEO, pursuant to §906 of SOX, attesting that the financial information contained in the filing was true, did not omit material facts, and that the Company's internal and disclosure controls were effective.

34.    For instance, Defendants Thiry and Hilger certified in the Q2 2015 Form 10-Q (and each of DaVita's subsequent quarterly and annual reports filed with the SEC described herein) that:

    [T]his report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the

circumstances under which such statements were made, not misleading with respect to the period covered by this report.

35.     With respect to DaVita's reported financial information, Defendants Thiry and Hilger certified in the Q2 2015 Form 10-Q that:

> Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

36.     With respect to DaVita's internal controls, Defendants Thiry and Hilger certified in the Q2 2015 Form 10-Q (and each of DaVita's subsequent quarterly and annual reports filed with the SEC described herein) that they were personally: (i) responsible for establishing and maintaining disclosure controls and procedures; (ii) designed or caused DaVita's controls or procedures to be designed to ensure that material information relating to DaVita and its consolidated subsidiaries was made known to them by others within those entities; (iii) designed or caused DaVita's controls over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP; (iv) evaluated the effectiveness of the DaVita's disclosure controls and procedures, and (v) presented in DaVita's quarterly and annual filings their conclusions about the effectiveness of the disclosure controls and procedures.

37.     On November 3, 2015, DaVita issued a press release announcing its financial results for the third quarter ended September 30, 2015.  For the quarter, DaVita reported net income of $216 million, or $1.00 per share, and consolidated net revenue of $3.53 billion.  The press release, in relevant part, stated:

> DaVita HealthCare Partners Inc. (NYSE: DVA) today announced results for the quarter ended September 30, 2015. Net income attributable to DaVita HealthCare

11

Partners Inc. for the three months ended September 30, 2015 was $216 million, or $1.00 per share.

Adjusted net income attributable to DaVita HealthCare Partners Inc. for the nine months ended September 30, 2015 was $610 million, or $2.80 per share, excluding after-tax debt redemption charges, after-tax settlement charge related to the Vainer suit and a related tax adjustment. Net income attributable to DaVita HealthCare Partners Inc. for the nine months ended September 30, 2015 including these items was $276 million, or $1.27 per share.

* * *

**Outlook**

- We are updating our consolidated operating income for 2015 to now be in the range of $1.870 billion to $1.915 billion.

    Our previous consolidated operating income guidance for 2015 was in the range of $1.825 billion to $1.925 billion.

- We are also updating our operating income for Kidney Care for 2015 to now be in the range of $1.630 billion to $1.655 billion.

    Our previous operating income guidance for Kidney Care for 2015 was in the range of $1.600 billion to $1.650 billion.

- We are updating our operating income for HCP for 2015 to now be in the range of $240 million to $260 million.

    Our previous operating income guidance for HCP for 2015 was in the range of $225 million to $275 million.

- We are updating our consolidated operating cash flows for 2015 to now be in the range of $1.675 billion to $1.775 billion.

    Our previous consolidated operating cash flow for 2015 was in the range of $1.600 billion to $1.750 billion.

38.    The Q3 2015 Form 10-Q represented that those financial results were accurate and presented in accordance with GAAP and that the Company's internal controls were effective and disclosed any material changes to the Company's internal controls over financial reporting.

The Q3 2015 Form 10-Q included Defendants Thiry and Hilger's certifications pursuant to SOX, identical in all material aspects to the certifications quoted in ¶¶34-36.

39.     On February 11, 2016, DaVita issued a press release announcing its financial results for the fourth quarter and full year 2015.   The press release, in relevant part, stated:

> DaVita HealthCare Partners Inc. (NYSE: DVA) today announced results for the quarter and year ended December 31, 2015. Adjusted net income attributable to DaVita HealthCare Partners Inc. for the quarter ended December 31, 2015 was $214 million, or $1.01 per share, excluding estimated non-cash goodwill and other intangible asset impairment charges, as discussed below, and an estimated accrual for damages and liabilities associated with our pharmacy business, all after-tax. Net loss attributable to DaVita HealthCare Partners Inc. for the quarter ended December 31, 2015 including these items was $(6) million, or $(0.03) per share.
>
> Adjusted net income attributable to DaVita HealthCare Partners Inc. for the year ended December 31, 2015 was $828 million, or $3.83 per share, excluding estimated non-cash goodwill and other intangible asset impairment charges, an estimated accrual for damages and liabilities associated with our pharmacy business, debt redemption charges and a settlement charge related to the Vainer private civil suit, all after-tax. Net income attributable to DaVita HealthCare Partners Inc. for the year ended December 31, 2015 including these items was $270 million, or $1.25 per share.
>
> * * *
>
> **Outlook**
>
> - We expect our consolidated operating income for 2016 to be in the range of $1.800 billion to $1.950 billion.
>
> - We expect our operating income for Kidney Care for 2016 to be in the range of $1.625 billion to $1.725 billion.
>
> - We expect our operating income for HCP for 2016 to be in the range of $175 million to $225 million.
>
> - We expect our consolidated operating cash flows for 2016 to be in the range of $1.550 billion to $1.750 billion.

40.     With regards to the AKF, DaVita's 2015 Form 10-K indicated that "[s]ome

patients who do not qualify for Medicaid, but otherwise cannot afford secondary insurance, can apply for premium payment assistance from charitable organizations through a program offered by the American Kidney Fund. We and other dialysis providers support the American Kidney Fund and similar programs through voluntary contributions."

41.     The statements referenced in ¶40 were materially false and/or misleading because they misrepresented the full extent of DaVita's relationship with the AKF and failed to disclose that the Company's substantial contributions to the AKF were intended for the sole purpose of steering patients away from Medicare and Medicaid and into commercial insurers.

42.     With regards to its financial performance, DaVita's 2015 Form 10-K stated:

Our overall financial performance was once again strong for 2015, excluding certain non-GAAP items, and was characterized by solid treatment volume growth, primarily from non-acquired growth at existing and new dialysis centers, cost control initiatives, and productivity and payor mix improvements in our dialysis business, and solid growth in HCP's adjusted operating income.

43.     The statements referenced in ¶42 were materially false and/or misleading because DaVita's strong financial performance in 2015 was driven, in large part, by the Company's illegal efforts to steer patients on Medicare and Medicaid into commercial insurers for the sole purpose of increasing the Company's profits.

44.     The 2015 Form 10-K represented that those financial results were accurate and presented in accordance with GAAP and that the Company's internal controls were effective and disclosed any material changes to the Company's internal controls over financial reporting. The 2015 Form 10-K included Defendants Thiry and Hilger's certifications pursuant to SOX, identical in all material aspects to the certifications quoted in ¶¶34-36.

45.     On February 11, 2016, DaVita held a conference call with analysts and investors

14

to discuss the Company's Q4 2015 results.   During the conference call, Defendant Thiry emphasized that full year 2016 guidance was hampered by the "unfortunate fact" that Medicare reimbursements would remain flat for the third straight year.   To that effect, Defendant Thiry emphasized:

> We anticipate in 2016 another solid year, $1.625 billion to $1.725 billion. Of course, there's always risk, we'll fall short and there's always hope that we will exceed. This guidance, per our normal customs, does include the international economics, and *it also includes the unfortunate fact of flat Medicare reimbursement for the third straight year*.
>
> *The uncertainty in our 2016 performance, as in many recent years, centers on revenue and revenue per treatment.* We anticipate our performance in the first half of the year with respect to [revenue per treatment] to be positive, but we have a lot less visibility into the second half of the year, hence the broadness of the range*.*

46.   Also during the call, Kevin K. Ellich from Piper Jaffray & Co. asked Defendant Thiry what it would "take to get growth reaccelerating" after years of inconsequential growth. Defendant Thiry responded: "A very fair question, Kevin, and one that we are pretty intense about on the inside. On the Kidney Care front, with that flat Medicare reimbursement that's just a real problem that we've got to get addressed."

47.   On May 4, 2016, DaVita issued a press release announcing its financial results for the first quarter ended March 31, 2016.   For the quarter, DaVita reported net income of $190 million, or $0.92 per share, and consolidated net revenue of $3.58 billion.   The press release, in relevant part, stated:

> DaVita HealthCare Partners Inc. (NYSE: DVA) today announced results for the quarter ended March 31, 2016. Adjusted net income attributable to DaVita HealthCare Partners Inc. for the quarter ended March 31, 2016 was $190 million, or $0.92 per share, excluding a goodwill impairment charge, as discussed below, and an estimated accrual for damages and liabilities associated with our HCP Nevada hospice business, all net of tax. Net income attributable to DaVita

15

HealthCare Partners Inc. for the quarter ended March 31, 2016 including these items was $97 million, or $0.47 per share.

\* \* \*

**Outlook**

- We still expect our consolidated operating income for 2016 to be in the range of $1.800 billion to $1.950 billion.

- We still expect our operating income for Kidney Care for 2016 to be in the range of $1.625 billion to $1.725 billion.

- We still expect our operating income for HCP for 2016 to be in the range of $175 million to $225 million.

- We still expect our consolidated operating cash flow for 2016 to be in the range of $1.550 billion to $1.750 billion.

48.    The Q1 2016 Form 10-Q represented that those financial results were accurate and presented in accordance with GAAP and that the Company's internal controls were effective and disclosed any material changes to the Company's internal controls over financial reporting. The Q1 2016 Form 10-Q included Defendants Thiry and Hilger's certifications pursuant to SOX, identical in all material aspects to the certification quoted in ¶¶34-36.

49.    The statements referenced in ¶¶32-48 were materially false and/or misleading because they misrepresented and failed to disclose material adverse facts pertaining to the Company's business and operations, which were known to Defendants or recklessly disregarded by them.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company and its senior executives purposefully steered patients into unnecessary insurance plans in order to maximize profits; (2) the Company was using AKF as a vehicle to facilitate these improper practices; (3) as a result, DaVita's revenues and profits were illegally obtained; (4) in turn, DaVita lacked effective internal controls over financial reporting;

16

and (5) as a result of the foregoing, Defendants' statements about DaVita's business, operations, and prospects were false and misleading and/or lacked a reasonable basis.  As a result of this fraudulent scheme, Defendants were able to artificially inflate the Company's financials throughout the Class Period.

### C.    The Truth Is Revealed

50.    On July 1, 2016, UnitedHealth sued kidney-care chain American Renal for fraud. The complaint, filed in federal court in the Southern District of Florida, accused American Renal of engaging in an illegal scheme to unlawfully obtain benefit payments from UnitedHealth for dialysis services rendered to vulnerable patients suffering from chronic kidney disease or ESRD. The complaint alleged that American Renal systematically targeted Medicaid and Medicare-eligible patients and, through deception and unlawful means, convinced them to drop or reject their affordable government insurance options and enroll in UnitedHealth's commercial plans. UnitedHealth then alleged that American Renal charged $4,000 a treatment for some of its patients when the typical reimbursement for Medicare and Medicaid plans is less than 10% of that rate.  Specifically, UnitedHealth's complaint alleged:

> 1. This action involves a fraudulent and illegal scheme by ARA – one of the country's largest providers of dialysis services – to unlawfully obtain benefit payments from United for dialysis services rendered to vulnerable patients suffering from chronic kidney disease.
>
> 2. ARA has directed its deceptive conduct at United and United's commercial health insurance plans, and has caused United to make substantial payments to ARA that United would not have made had ARA acted truthfully and lawfully. ARA has preyed upon some of Florida's and Ohio's most vulnerable patients – ones suffering from end-stage renal disease ("ESRD") – converting them from patients to pawns in a scheme to maximize ARA's profits.
>
> 3. In fact, since the beginning of the year, ARA has systematically targeted these Medicaid- and Medicare-eligible patients and, through deception and unlawful

means, has convinced them to drop or reject their affordable government insurance options and enroll in United's commercial plans.

4. The lone motivating factor behind ARA's patient conversion efforts is ARA's desire to maximize its own profits.

5. Medicaid and Medicare pay ARA a reimbursement rate of $300 or less for one session of dialysis services rendered to an ESRD patient (the Medicaid rates in Florida and Ohio are less than $200 for one session of dialysis services).

6. ARA is an out-of-network provider, rather than an "in-network" provider, for United's commercial plans. This means ARA does not have a contractually agreed upon rate for dialysis services rendered to patients insured under those plans. As an out-of-network provider, ARA believes it can bill United at rates that are as much as twenty times the rates it would receive from Medicaid and/or Medicare. As described below, ARA's out-of-network status has made United's commercial plans a particularly attractive target for ARA's scheme.

7. Knowing of its out-of-network status with United plans, and believing that it can bill United more than $4,000 *for the same services* being rendered to Medicaid- and Medicare-eligible ESRD patients, ARA has endeavored to cause those patients to drop their government insurance and enroll in United's commercial plans. For at least the past year, ARA has succeeded, causing many ESRD patients to move off of or away from Medicaid and/or Medicare and onto a commercial plan offered by United. ARA has then submitted charges to United seeking to be paid benefits for dialysis services rendered to those patients that exceed by a factor of more than twenty times the reimbursement amount ARA would receive were it to bill certain government insurance plans for those services.

8. To implement its scheme against United, ARA needed to overcome the financial limitations of the vulnerable patient population ARA wanted to use to increase its profits. Specifically, ARA needed to figure out how to convince ESRD patients (many of whom are indigent, and who, under their Medicaid and Medicare plans, had little to no personal financial responsibility for their medical and pharmaceutical benefits) to take on the premium, copay, coinsurance and deductible obligations associated with United commercial plans.

9. The solution ARA implemented was deceptive, fraudulent, and illegal.

10. *First*, ARA secured premium assistance from a third-party, the American Kidney Fund ("AKF"), to cover the patients' commercial plan premiums. Upon information and belief, AKF's financial assistance was funded by earmarked donations ARA made to the 501(c)(3) organization for this very purpose.

11. *Second*, ARA counseled patients and assisted them with enrollment in the commercial plans that were most favorable to ARA—*i.e.*, plans that would result in the highest out-of-network reimbursement to ARA.

12. *Third*, ARA illegally, and in violation of the language of the applicable commercial plans, waived the patients' copay, coinsurance and deductible obligations to ARA.

13. Patients suffered in two ways as a result of ARA's scheme. *First*, upon information and belief, ARA intentionally failed to inform patients that AKF's premium assistance program was only available for patients receiving dialysis treatments and, consequently, none of the patients knew that they would be ineligible for premium assistance if they sought to cure their condition through a kidney transplant. *Second*, while *ARA* illegally agreed to waive the copays, coinsurance and deductibles patients owed to it, it could not guarantee that the patients' doctors, pharmacists, medical equipment suppliers, and other service providers would similarly break the law by doing the same.

14. ARA's actions violated several important criminal and civil laws, including Florida's prohibitions on false and fraudulent insurance claims (Fla. Stat. § 817.234), Florida's Patient Brokering Act (Fla. Stat. § 817.505), Florida's Anti-Kickback Statute (Fla. Stat. § 456.054), and Florida's Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.201 *et seq.*) ("FDUTPA").

15. Because ARA used unlawful means to move vulnerable ESRD patients onto commercial United plans, the services and treatments ARA provided to these patients after it implemented its scheme were not lawful when rendered and were, therefore, ineligible for reimbursement.

16. United has already paid millions of dollars in benefits to ARA for claims ARA submitted as part of its illegal and unethical conversion and billing scheme.

51.     Thus, part of the alleged scheme involved a purported charitable foundation called the American Kidney Fund.  American Renal secured premium assistance from AKF to cover certain low income patients' commercial plan premiums and AKF's financial assistance was funded by earmarked donations American Renal made to AKF for this very purpose.  American Renal reportedly went as far as to counsel and assist patients with enrollment in the commercial plans that were most favorable to American Renal and waived the patients' copay, coinsurance

and deductible obligations to American Renal, which was in violation of the language of the applicable commercial plans.  In turn, UnitedHealth would have no choice but to pay American Renal inflated out-of-network charges.  American Renal's business practice of targeting patients already on dialysis into UnitedHealth insurance policies skewed the insured patient population and made it impossible for UnitedHealth to establish premiums based on its assessment of the general population's need for dialysis.  American Renal's fraudulent practices, hence, increased health care costs for all insured patients.

52.     DaVita was not party to the UnitedHealth/American Renal lawsuit.  However, American Renal is an industry peer of DaVita and DaVita made substantial contributions to AKF.  Notably, the Chair of the AKF Board of Trustees, Gail S. Wick, served as vice president for nursing services at DaVita, where she was responsible for nursing manpower, care and practice for more than 540 dialysis facilities throughout the United States.

53.     On July 1, 2016, *The New York Times* discussed the lawsuit against American Renal, highlighting "[t]hat gaping price difference was the motivation for a scheme, orchestrated by a for-profit dialysis chain, that illegally pushed poor people . . . out of inexpensive government programs and into expensive private plans sold by UnitedHealthcare."  Regarding the AKF, the article noted that:

> ***The [AKF] has close ties to the dialysis industry: It acknowledges that dialysis companies pay for its premium-assistance program, and in 2015, 78 percent of its $264 million in revenue came from two companies, according to its financial disclosures. The kidney fund declined to name the companies. The organization's chairwoman is a former executive at DaVita and Fresenius Medical Care, the nation's two leading dialysis chains.***

> Those industry ties expose the profit motive that underpins the programs, according to Patrick Burns, executive director of Taxpayers Against Fraud, a whistle-blower advocacy group.

"There is a bottom line here, and the people who manage these programs are well aware of it, on both sides," he said.

54.     On August 8, 2016, DaVita issued a press release announcing its financial results for the second quarter ended June 30, 2016.  For the quarter, DaVita reported net income of $53 million, or $0.26 per share, and consolidated net revenue of $3.72 billion, both of which topped analyst expectations.   The Company, however, slashed its full-year consolidated operating income guidance to the range of $1.785 billion to $1.875 billion from earlier forecasts of $1.800 billion to $1.950 billion.

55.     On August 8, 2016, DaVita held a conference call with analysts and investors to discuss the Company's Q2 2016 results.  During the conference call, Javier J. Rodriguez, Kidney Care's Chief Executive Officer, indicated that the Company has been donating money to the AKF "to help patients with end-stage renal disease for decades in order to be assisted with their premium."  During the conference call, the following exchange regarding the AKF took place:

**John W. Ransom - Raymond James & Associates, Inc.**

That's a great answer, and I've a follow up for Javier. Just to push back a little bit on this foundation issue. I mean, these patients, would be covered by Medicare. It's not as though they would be bereft to health insurance or then – I think, I've read 5,500 or so patients are now on exchanges, being paid full by the foundations. I mean, aren't you arguing that United Healthcare and Anthem should take, I don't know, $5,000-$10,000 in premium and have a fair cost of over $100,000?

I mean, how can we make that argument to these plans, when they could be covered under the public plans that's and I would assume, you guys have your proportional share of the 5,500, just stepping back from kind of a public policy standpoint. How do you, at a time when the plans are losing money in the exchanges, how do you argue to them that they should cover people that could be covered for a fraction of the cost under Medicare?

21

**Kent J. Thiry - Chairman & Chief Executive Officer and Chief Executive Officer, HealthCare Partners**

Yeah. A couple of things. If you're on Medicare, you're not eligible, as we go on the exchange. And so, that is the benefit that you have. For the patients, that switch, I don't know, if the number you cited is right or not, we haven't disclosed those numbers. It is a very personal decision that is based on access to specialists, drugs, and other things. So, the patient actually do get differentiated care.

And so the reality of this thing is that the system, set it up for individuals to make a choice as to what their best coverage is and so patients made that choice, and it's a very personal decision that I can't decide whether that's right or wrong for the system, but rather they get to make the choice.

56.     In reaction to the August 8, 2016 disclosures, DaVita's stock price dropped $3.05 per share, or 4.05%, from $75.36 per share on August 8, 2016 to $72.31 per share on August 9, 2016 on unusually heavy volume.   On August 10, 2016, DaVita's stock price dropped an additional $2.20 per share, or 3.04%, as the market continued to digest the news.   These declines wiped out approximately $1.36 billion in Company market capitalization.

57.     On August 18, 2016, following the close of the financial markets, news outlets began to report that the CMS had issued a "Request for Information" concerning "Inappropriate Steering of Individuals Eligible for or Receiving Medicare and Medicaid Benefits to Individual Market Plans." Specifically, CMS's request for information sought public comment:

regarding concerns about health care providers and provider-affiliated organizations steering people eligible for or receiving Medicare and/or Medicaid benefits to an individual market plan for the purpose of obtaining higher payment rates. CMS is concerned about reports of this practice and is requesting comments on the frequency and impact of this issue from the public. *We believe this practice not only could raise overall health system costs, but could potentially be harmful to patient care and service coordination because of changes to provider networks and drug formularies, result in higher out-of-pocket costs for enrollees, and have a negative impact on the individual market single risk pool (or the combined risk pool in states that have chosen to merge their risk pools).* We are seeking input from stakeholders and the public regarding the frequency and impact of this practice, and options to limit this practice.

22

58.     The CMS request for information and letters was aimed at situations where Medicare/Medicaid patients were steered into Affordable Care Act-compliant plans which could have resulted in the disruption of care associated with a change in network providers.  "We are concerned about reports that some organizations may be engaging in enrollment activities that put their profit margins ahead of their patients' needs," said CMS Acting Administrator Andy Slavitt. "These actions can limit benefits for those who need them, potentially result in greater costs to patients, and ultimately increase the cost of Marketplace coverage for everyone."

59.     In addition to its information request, CMS was reportedly mulling its regulatory and operational options to prohibit or limit premium payments and routine waiver of cost-sharing for qualified health plans by health care providers, revisions to Medicare and Medicaid provider enrollment rules, and the imposition of civil monetary penalties for individuals who fail to provide correct information about consumers enrolled in a plan.  CMS also anticipated potential changes allowing insurers to limit their payment to health care providers to Medicare-based amounts for certain services and items of care.

60.     In reaction to the disclosure about the CMS inquiry into the industry and the potential rule changes, DaVita's stock price dropped $3.17 per share, or 4.69%, on unusually heavy trading volume from $67.65 per share on August 18, 2016 to $64.48 per share on August 19, 2016, wiping out approximately $625 million in Company market capitalization in one day.

61.     Then, on Sunday, October 23, 2016, the *St. Louis Post* published an article entitled "DaVita encouraged some low-income patients to enroll in commercial plans" that accused DaVita directly of steering clients into private insurance providers.  The article stated that internal e-mails from DaVita showed that the Company targeted some patients in a

23

campaign to get them to buy insurance they did not need, saying that their monthly premiums

would be paid by a nonprofit foundation – the AKF.  The article, in part, asserted:

> Internal emails from DaVita HealthCare Partners Inc. show the Denver-based company targeted some patients in a campaign to get them to buy insurance they didn't necessarily need, saying their monthly premiums would be paid by a nonprofit foundation.
>
> DaVita, one of the nation's largest dialysis providers, with a major presence in St. Louis, had a financial incentive to get certain Medicaid-eligible dialysis patients to enroll in private insurance. Medicaid, the government-run health insurance program for low-income Americans, pays significantly less than traditional commercial insurance for dialysis treatment.
>
> * * *
>
> Based on the company's internal emails, the difference between "steering" and "educating" is a subtle one. Those communications, sent during last year's open enrollment period, outline a systematic approach to "educate" hundreds of area patients — and thousands across the country — about individual health plans.
>
> Those emails show that patients were told by DaVita dialysis center employees — either social workers or insurance counselors — that the American Kidney Fund would pay their monthly health insurance premiums so they could gain coverage that is usually out of reach financially. The DaVita employees were instrumental in helping patients enroll by helping complete applications for the plans and for the American Kidney Fund's health insurance premium assistance program. The initiative was referred to as the "Medicaid Opportunity" in internal emails.
>
> In regulatory filings, DaVita says it contributes to the American Kidney Fund, but doesn't specify how much. In 2015, the fund provided about $255 million worth of patient assistance to 93,000 kidney failure patients, according to its most recent filing with the Internal Revenue Service.
>
> DaVita's dialysis center employees were given information on which patients to target for the program. From there, they were supposed to engage Medicaid patients in a conversation about new coverage options and the employees' progress was closely tracked.
>
> * * *
>
> The internal emails from last fall's open enrollment tally each region's performance. The emails show regions were tracked by how many patients were

24

interested in commercial coverage and the percentage of those that had been talked to by employees about their options.

"Hooray! The Village has completed over 75% of interest conversations, and over 7,200 patients will receive enrollment education on the specific plans available in their market," an email said. (Village is the company's term for itself.)

The goal outlined in the emails was to hit 100 percent of "interest conversations" by late October.

However, "disinterested" patients were also tracked and their cases were reviewed by division vice presidents and regional operational directors, according to the emails.

The emails instructed that division leadership teams should conduct weekly or biweekly calls to discuss "validation" for patients who are not interested in this opportunity.

62.     In reaction to the *St. Louis Post* article, DaVita's stock price dropped $2.86 per share, or another 4.69%, from $60.96 per share on Friday, October 21, 2016 to $58.10 per share on Monday, October 24, 2016 — wiping out an additional $565 million in Company market capitalization.

### D.     Post-Class Period Developments

63.     On October 31, 2016, DaVita issued a press release announcing that it was suspending support for applications to the AKF for charitable premium assistance by patients enrolled in minimum essential Medicaid coverage, effective immediately.   The Company estimated that a policy change that prevented patients with minimum essential Medicaid coverage from accessing charitable premium assistance would result in a reduction to its annualized operating income of up to approximately $140 million before any offsets.   That number would be higher by up to another $90 million if CMS issued a broader ruling that made access to charitable premium assistance unavailable to all patients.

25

64.    On January 6, 2017, DaVita announced that it had received a subpoena from the U.S. Attorney's Office for the District of Massachusetts "seeking the production of information related to charitable premium assistance."  On that same day, *The Wall Street Journal* reported that the U.S. Department of Justice is "probing a controversial arrangement under which kidney-care companies support charitable efforts to help patients pay health-insurance premiums, according to disclosures from major dialysis providers."  The article disclosed that Fresenius Medical Care North America and the AKF had also been subpoenaed.

## V.    CLASS ACTION ALLEGATIONS

65.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired DaVita securities during the Class Period and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of DaVita and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

66.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Throughout the Class Period, DaVita's securities were actively traded on the NYSE, an open and efficient market, under the symbol "DVA."  Millions of DaVita shares were traded publicly during the Class Period on the

NYSE.  As of October 31, 2016, DaVita had 197.4 million shares of common stock outstanding. Record owners and the other members of the Class may be identified from records maintained by DaVita and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

67.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

68.     Plaintiff will fairly and adequately protect the interests of the other members of the Class, and has retained counsel competent and experienced in class and securities litigation.

69.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b)    whether Defendants participated in and pursued the common course of conduct complained of herein;

c)    whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, and prospects of DaVita;

     d)       whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of DaVita;

     e)       whether the market price of DaVita common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

     f)       the extent to which the members of the Class have sustained damages and the proper measure of damages.

70.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VI.   UNDISCLOSED ADVERSE FACTS

71.    The market for DaVita's securities was an open, well-developed and efficient market at all relevant times.  As a result of these materially false and misleading statements and failures to disclose described herein, DaVita's securities traded at artificially inflated prices during the Class Period.  Plaintiff and the other members of the Class purchased or otherwise acquired DaVita's securities relying upon the integrity of the market price of the Company's securities and market information relating to DaVita, and have been damaged thereby.

72.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of DaVita's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, as well as its business, accounting, financial operations and prospects, as alleged herein.

73.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about DaVita's financial well-being and prospects.

74.     These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements made during the Class Period resulted in Plaintiff and the other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## VII.   LOSS CAUSATION

75.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of DaVita's securities and operated as a fraud or deceit on Class Period purchasers of DaVita's securities by

failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information. When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of DaVita's securities fell precipitously as the prior inflation came out of the Company's stock price. As a result of their purchases of DaVita's securities during the Class Period, Plaintiff and the other Class members suffered economic loss.

76. By failing to disclose the true state of the Company's financial statements, investors were not aware of the true state of the Company's financial status. Therefore, Defendants presented a misleading picture of DaVita's business practices and procedures. Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused DaVita to conceal the truth.

77. Defendants' false and misleading statements had the intended effect and caused DaVita's common stock to trade at artificially inflated levels throughout the Class Period. The stock price drops discussed herein caused real economic loss to investors who purchased the Company's securities during the Class Period.

78. The decline in the price of DaVita's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of DaVita's common stock price declines negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate

the prices of DaVita's securities and the subsequent decline in the value of DaVita's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII. SCIENTER ALLEGATIONS

79. As alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

80. As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding DaVita, their control over, receipt and/or modification of DaVita's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning DaVita, participated in the fraudulent scheme alleged herein.

## IX. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

81. At all relevant times, the market for DaVita's securities was an efficient market for the following reasons, among others:

    a) DaVita securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market;

    b) As a regulated issuer, DaVita filed periodic public reports with the SEC and the NYSE;

c)      DaVita securities were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

d)      DaVita regularly issued press releases which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

82.     As a result of the foregoing, the market for DaVita's securities promptly digested current information regarding DaVita from all publicly available sources and reflected such information in DaVita's stock price. Under these circumstances, all purchasers of DaVita's securities during the Class Period suffered similar injury through their purchase of DaVita's securities at artificially inflated prices and a presumption of reliance applies.

83.     A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiff's fraud claims are grounded in Defendants' omissions of material fact of which there is a duty to disclose. As this action involves Defendants' failure to disclose material adverse information regarding DaVita's business practices, financial results and condition, and the Company's internal controls—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable

investor might have considered such information important in the making of investment decisions.

## X.   NO SAFE HARBOR

84.   The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

85.   In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of DaVita who knew that the statement was false when made.

## XI.   COUNTS AGAINST DEFENDANTS

### COUNT I
**Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against All Defendants**

86.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against all Defendants.

87.     During the Class Period, DaVita and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of DaVita securities; and (iii) cause Plaintiff and the other members of the Class to purchase DaVita securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

88.     These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for DaVita securities in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued herein as controlling persons of DaVita, as alleged herein.

89.     In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-X (17 C.F.R. § 210.01, *et seq.*) and S-K (17 C.F.R. § 229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and

performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

90.     DaVita and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of DaVita as specified herein.  These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of DaVita's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts, and omitting to state material facts necessary in order to make the statements made about DaVita and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of DaVita's securities during the Class Period.

91.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial projections and/or reports; (iii) the

Individual Defendants enjoyed significant personal contact and familiarity with each other, and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

92.     These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly, and for the purpose and effect of concealing DaVita's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

93.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of DaVita securities was artificially inflated during the Class Period.  In ignorance of the fact that the market price of DaVita shares was artificially inflated, and relying directly or indirectly on the false and

misleading statements made by Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by these Defendants during the Class Period, Plaintiff and the other members of the Class acquired DaVita securities during the Class Period at artificially inflated high prices and were damaged thereby.

94.     At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of DaVita, which were not disclosed by Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired DaVita securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

95.     By virtue of the foregoing, DaVita and the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

96.     As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

### COUNT II
**Violation of Section 20(a) of the Exchange Act**
**Against The Individual Defendants**

97.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

98.     The Individual Defendants were and acted as controlling persons of DaVita within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

99.     In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

100.     As set forth above, DaVita and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

    a)    Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

    b)    Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

    c)    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

    d)    Awarding such other relief as this Court deems appropriate.

## XIII.    JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: February 1, 2017                Respectfully Submitted,

                                  */s/ Rusty E. Glenn*
                                  Rusty E. Glenn
                                  **THE SHUMAN LAW FIRM**
                                  600 17th Street, Suite 2800 South
                                  Denver, CO 80202
                                  Telephone: (303) 861-3003
                                  Facsimile: (303) 536-7849
                                  Email: rusty@shumanlawfirm.com

                                  Kip B. Shuman
                                  **THE SHUMAN LAW FIRM**
                                  Post-Montgomery Ctr.
                                  One Montgomery Street, Ste. 1800
                                  San Francisco, CA 94104

Telephone: (303) 861-3003
Facsimile: (303) 536-7849
Email: kip@shumanlawfirm.com

*Local Counsel for Plaintiff*

**SAXENA WHITE P.A.**

Maya Saxena
Joseph E. White, III
Lester R. Hooker
5200 Town Center Circle
Suite 601
Boca Raton, FL 33486
Telephone: (561) 394-3399
Facsimile:  (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com
-and-
Steven B. Singer
4 West Red Oak Lane, Suite 312
White Plains, New York 10604
Telephone: (914) 437-8551
Facsimile:  (888) 631-3611
Email: ssinger@saxenawhite.com

***Counsel for Plaintiff Peace Officers' Annuity and Benefit Fund of Georgia***

## CERTIFICATION AND AUTHORIZATION OF LEAD PLAINTIFF

I, Roger Garrison, on behalf of the Peace Officers' Annuity and Benefit Fund of Georgia ("Georgia Peace Officers"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.  I am authorized in my capacity as Chairman of the Georgia Peace Officers to initiate litigation and to execute this Certification on behalf of the Georgia Peace Officers. I have reviewed the Complaint For Violations of the Federal Securities Laws in this matter and authorize its filing by counsel.

2.  Georgia Peace Officers did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3.  Georgia Peace Officers is willing to serve as a representative party on behalf of the Class, including by providing testimony at deposition and trial, if necessary.

4.  Georgia Peace Officers' transactions in DaVita Inc. common stock are set forth in the Schedule A attached hereto.

5.  Georgia Peace Officers has sought to serve and was appointed as lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification: *None*

6.  Georgia Peace Officers has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff, was not appointed lead plaintiff or the lead plaintiff decision is still pending: *None*

7.  Georgia Peace Officers will not accept any payment for serving as a representative party on behalf of the Class beyond Georgia Peace Officers' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this ⟨5⟩ day of ~~January~~, 2017.
FEBRUARY

Peace Officers' Annuity and
Benefit Fund of Georgia

Roger Garrison, Chairman

Roger Garrison, Chairman

## SCHEDULE A
### Peace Officers' Annuity and Beneift Fund of Georgia
### Transactions in DaVita Inc.

| Common Stock Purchases | | |
| --- | --- | --- |
| Date | Shares | Price |
| 07/07/16 | 16,060 | $76.82 |

| Common Stock Sales | | |
| --- | --- | --- |
| Date | Shares | Price |
| 08/19/16 | 6,780 | $64.36 |
| 08/24/16 | 9,280 | $64.70 |