**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 1:17-cv-00304-WJM-CBS

PEACE OFFICERS' ANNUITY AND BENEFIT FUND OF GEORGIA, Individually and on
Behalf of All Others Similarly Situated, and
JACKSONVILLE POLICE AND FIRE PENSION FUND, Individually and on Behalf of All
Others Similarly Situated,

      Plaintiffs,

v.

DAVITA INC.,
KENT J. THIRY,
JAMES K. HILGER, and
JAVIER J. RODRIGUEZ,

      Defendants.

---

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS AND JURY TRIAL DEMAND**

---

## TABLE OF CONTENTS

I.    NATURE OF THE ACTION ............................................................1

II.   SYNOPSIS OF THE FRAUD .........................................................2

III.  JURISDICTION AND VENUE .......................................................9

IV.  THE PARTIES..............................................................................10

    A.   Lead Plaintiffs........................................................................10

    B.   Defendants .............................................................................11

        1.   DaVita ...........................................................................11

        2.   The Individual Defendants...........................................11

V.   OVERVIEW OF THE DAVITA FRAUD .......................................13

    A.   DaVita's Business and Its Long History of Multi-Million Dollar *Qui Tam* and Government Settlements for Various Alleged Unlawful Schemes.................13

    B.   History of Dialysis Care in the United States ......................................16

    C.   Defendants Fraudulently Increased DaVita's Commercially Insured Patient Count By Illicitly Funneling Funds For Their Commercial Premiums Through the American Kidney Fund.......................................18

    D.   DaVita Illegally Funnels Funds Through The AKF In Order To Pay For Its ESRD Patients' Commercial Premiums ............................................20

    E.   The Accounts of Numerous DaVita Former Employees and Internal Company Documents Confirm the Illicit Steering Scheme................................21

        1.   Internal Company Documents Show That DaVita Had a Singular Focus on Increasing Its "Private Pay" Patients By Any Means Necessary—Which Soon Led to Patient Steering .....................................22

            i.    The Company Closely Tracked the Acquisition of "Private Pay" Patients at Each of Its Facilities—Including Patients Acquired Through Steering...........................................22

            ii.   The Company Incentivized Patient Steering..................................25

            iii.  The Company Prepared Materials Training Employees to Disparage Government Programs While Emphasizing the Purported Benefits of Private Insurance to Patients—*i.e.*, to Steer Patients.......................................................27

2.    By 2015, DaVita's Company-Wide Directive to Steer Patients Into Commercial Plans for Financial Gain Was Explicit, and Internally Referred to As The "Medicaid Opportunity"...........................................32

3.    Former Employees Confirm that, During the Class Period, Patient Steering at DaVita—For the Express Purpose of Obtaining Higher Insurance Reimbursements—Was "Second Nature" at the Company.........................................................................................................38

4.    Former Employees Confirm DaVita's Upper Management Closely Tracked The Acquisition of "Private Pay" Patients, Including the "Steering" of Patients Into Commercial Plans and Away from Medicaid or Medicare...............................................................................42

F.    DaVita's Scheme Slowly Unravels......................................................................44

1.    By August 2016, Public Scrutiny of DaVita's Practices Intensified, and Was Met By Defendants' Emphatic Denials.......................................44

2.    Defendants Emphatically Denied the Steering Allegations in the CMS RFI and Subsequent Investigative Reports Further Exposing The Company's Unlawful Practices................................................................49

3.    DaVita Announces The Suspension of AKF Assistance for its Medicaid Patients and Downplays the Potential Financial Impact to the Company.........................................................................................................50

4.    CMS Issues An Interim Rule, Leading To Ramped Up Scrutiny of DaVita's Relationship With The AKF......................................................53

5.    The Company's Full Exposure to its AKF Relationship Emerges............56

6.    The Full Magnitude of Defendants' Steering Fraud is Revealed..............58

VI.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS...........................................................................................................60

A.    Statements Regarding 2014 Annual Results.........................................................61

B.    DaVita's Code of Conduct....................................................................................62

C.    Statements Regarding 2015 Second Quarter Earnings.........................................63

D.    Statements Regarding Third Quarter 2015 Earnings............................................64

E.    Statements Regarding Fourth Quarter 2015 and Full Year 2015 Earnings...........65

F.    Statements Regarding First Quarter 2016 Earnings..............................................67

G.    Statements Regarding 2016 Second Quarter Earnings ..........................................69

H.    DaVita's Response to the CMS RFI ...................................................................73

I.    October 31, 2016 DaVita Press Release ..............................................................76

J.    Statements Regarding 2016 Third Quarter Earnings ...........................................79

K.    Statements Regarding 2016 Fourth Quarter and Full Year Earnings ...................82

L.    2017 Capital Markets Day ....................................................................................84

VII.   ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ..............................85

VIII.  LOSS CAUSATION...........................................................................................................98

IX.    PRESUMPTION OF RELIANCE ..................................................................................103

X.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE
       BESPEAKS CAUTION DOCTRINE .............................................................................104

XI.    CLASS ACTION ALLEGATIONS ...............................................................................105

XII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT...........................................107

       COUNT I ........................................................................................................................107

       COUNT II .......................................................................................................................109

XIII.  PRAYER FOR RELIEF ..................................................................................................110

XIV.   JURY DEMAND .............................................................................................................111

## I.   NATURE OF THE ACTION

1.      Lead Plaintiffs, The Peace Officers' Annuity and Benefit Fund of Georgia and Jacksonville Police and Fire Pension Fund (together, "Lead Plaintiffs"), bring this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of themselves and all persons or entities who purchased or otherwise acquired the common stock of DaVita Inc. ("DaVita" or the "Company") during the period between February 26, 2015 and October 6, 2017, inclusive (the "Class Period"), and were damaged thereby (the "Class").

2.      Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.  Lead Plaintiffs' information and belief are based upon the independent investigation of their undersigned counsel, which included the review and analysis of:   (i) internal Company documents, including, among many other materials: internal emails between high-level DaVita employees discussing the implementation and oversight of the fraud; widely circulated internal spreadsheets that documented the progress of Defendants' scheme; and internal employee training materials and PowerPoint presentations that explicitly detailed and incentivized the fraud; (ii) interviews with numerous, high-level former employees of DaVita, including executives directly responsible for the oversight and management of DaVita dialysis clinics across the country, and who were present at large-scale Company meetings, conference calls and training sessions where the scheme was explicitly discussed and implemented; (iii) DaVita's public filings with the Securities and Exchange Commission (the "SEC"); (iv) research reports by securities and financial analysts; (v) transcripts of DaVita's conference calls with analysts and investors; (vi) presentations, press releases, and reports regarding the Company; (vii)

consultations with relevant experts; (viii) news and media reports concerning the Company and other facts related to this action; and (ix) data reflecting the pricing of DaVita common stock.

3.      Counsel's investigation into the factual allegations continues, and many of the additional relevant facts are known only by the Defendants or are exclusively within their custody or control.   Lead Plaintiffs believe that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## II.   SYNOPSIS OF THE FRAUD

4.      DaVita is one of the country's two largest dialysis providers, treating patients who have end-stage renal disease ("ESRD").   Throughout the Class Period, DaVita's dialysis business consistently reported strong financial results that Defendants specifically attributed to the Company's improving "commercial mix"—meaning the number of patients whose dialysis treatments were paid for by private insurance, as opposed to Medicare or Medicaid.   Indeed, Defendants made clear to investors that 100% of DaVita's dialysis profits were dependent upon the 10% of its ESRD patients who were commercially insured, as the Company typically charged commercial insurers prices that were more than ten times greater than the amounts billed to Medicare or Medicaid for the exact same dialysis treatments.   Due to this dramatic disparity, DaVita was profoundly incentivized to maximize the number of commercially-insured patients it treated.   For this reason, Defendant Kent Thiry, DaVita's Chief Executive Officer, repeatedly referred to the Company's commercially-insured ESRD patients as its "economic lifeline."

5.      As was ultimately revealed, however, the strong commercial mix growth that DaVita reported during the Class Period was a fiction, a mirage that was attributable to a variety of illicit and improper practices that violated regulations implemented by the Centers for

Medicare and Medicaid Services ("CMS") and federal anti-kickback laws. Specifically, Defendants engaged in an unlawful practice called "steering," which CMS defines as "steering people eligible for Medicare or Medicaid benefits" to a commercial insurance plan "for the purpose of obtaining higher payment rates." As set forth in detail below—and as confirmed by internal Company documents and numerous high-ranking former DaVita employees—during the Class Period, Defendants implemented a Company-wide scheme whose entire purpose was to "steer" every single one of DaVita's Medicare and Medicaid patients to commercial insurance, thereby inflating the Company's profits by hundreds of millions of dollars.

6.      Moreover, because ESRD patients typically could not afford the premiums for commercial insurance, and anti-kickback statutes prevented DaVita from directly paying its patients' premiums, DaVita developed a fraudulent scheme designed to evade those regulations. Specifically, DaVita engaged in a "quid pro quo" relationship with the American Kidney Fund ("AKF"), a purportedly independent 501(c)(3) non-profit. Pursuant to this relationship, DaVita ostensibly "donated" hundreds of millions of dollars to the AKF, and in turn, the AKF used those proceeds to pay the commercial insurance premiums for DaVita's patients. DaVita then billed commercial insurers multiples of what it donated. This scheme proved highly lucrative to DaVita. Indeed, unbeknownst to investors, during the Class Period, more than 75% of the Company's profits were derived from private insurance policies paid for by the AKF. Tellingly, DaVita refused to disclose, and in fact materially misrepresented, the true nature and extent of its relationship with the AKF. In fact, the Company's SEC filings falsely claimed that only "some patients who do not qualify" for government programs could apply for AKF assistance, when in reality DaVita specifically targeted all current and prospective patients for AKF assistance— including those who were already enrolled, or eligible to enroll, in Medicare or Medicaid.

7.     Significantly, key internal Company documents confirm that, throughout the Class Period, DaVita's most senior officers directed the Company's dialysis facilities across the country to steer patients off government plans and onto AKF-backed insurance plans.  For instance, DaVita emails, presentations and marketing plans show that, in 2014, shortly before the start of the Class Period, the Company implemented "Private Pay Incentive Programs" and other inducements that awarded substantial bonuses of up to $10,000 for employees who <u>converted the most patients to "private pay</u>."  Indeed, a March 2014 letter from a DaVita Vice President to regional Facilities Administrators noted that "Private Pay growth" was a "top initiative for 2014," and DaVita repeatedly emphasized to Facilities Administrators and Home Program Managers[1] that "<u>Great bonuses and recognition available to HPMs and FAs that exceed private pay growth…Check it out and go for it</u>!"  DaVita also disseminated Company-wide "Village Announcements" to employees, informing them that getting patients to obtain private insurance was "most important," and instructing them to "submit your ideas around specific ways to <u>increase our number of patients with private pay insurance</u>." Moreover, DaVita maintained detailed spreadsheets tracking just how effectively its employees "steered" patients off Medicare and Medicaid, including statistics for each facility showing what the Company called "Wins" and "Win Ratios"—meaning the rates at which employees and facilities converted Medicaid or Medicare patients to private insurance.

8.     Internal Company documents also make clear that, during the Class Period, DaVita adopted and implemented Company-wide initiatives that were specifically aimed at steering patients on Medicare and Medicaid to switch to private insurance using the AKF as a

---

[1] Facilities Administrators at the Company managed outpatient dialysis clinics in a given region (with each usually managing several at a time), while Home Program Managers were in charge of the Company's home dialysis business.

conduit.  For example, during the summer of 2015, the Company rolled out a program that was explicitly called the "Medicaid Opportunity."  Internal documents prepared in connection with that "Medicaid Opportunity" and disseminated to all DaVita employees demonstrate that the singular focus of the initiative was to steer all of the Company's government-insured dialysis patients on to AKF-backed commercial plans.  Indeed, as a November 2015 document entitled "Medicaid Opportunity Update" provided, DaVita's employees were to "support AKF application for **all** enrolled patients."  To make employees' responsibilities crystal clear, and to leave no doubt that this "Medicaid Opportunity" was to be fulfilled, the document included a specific "Plan of Action" that meticulously detailed the responsibilities for each clinic employee in obtaining AKF applications from patients.  For example, the document instructed Insurance Counselors to "perform" and "track" AKF enrollment conversations with patients, while Social Workers were to "be a resource" and "provide support in areas with limited capacity for AKF process[ing]."   The document also specifically ordered Facilities Administrators—those employees who were directly in charge of the dialysis facilities—to "ensure AKF management in your facility is being done," and to "have a solid process for AKF application submission."

9.     The independent accounts of former high-ranking DaVita employees further confirm Defendants' scheme.  For instance, a former Facilities Administrator who worked at DaVita for four years until 2016, and who was in charge of five DaVita clinics in California, recalled that through the "Medicaid Opportunity" initiative, "anybody who was on Medicare or Medicaid was asked to sign up for the AKF programs." This former Facilities Administrator further recalled that DaVita employees were "hounded" and "pressured to get these people signed up for the AKF programs."  Similarly, a former Insurance Counselor who worked at DaVita for four years until 2016, and who was responsible for several DaVita facilities in New

York, recalled a July 2015 regional meeting in North Carolina, during which Company executives specifically discussed the "Medicaid Opportunity" initiative and instructed attendees to "get [the] American Kidney Fund to pay for exchange plans." Another former Insurance Counselor for facilities in Texas attended a two-week training program in August 2015 at the Company's Denver headquarters, which included sessions teaching "steering" techniques that made clear that it was "important for us to get [the patients] onto private insurance. Even if they qualified for Medicare or Medicaid, you were encouraged to get them on private insurance."

10.     As a direct result of Defendants' fraudulent scheme, DaVita reported consistently strong financial results during the Class Period that the Company specifically stated were "driven by improvements in our commercial payor mix." At every turn, the Individual Defendants reinforced the significance of the growth in this metric. For instance, during an August 2015 earnings conference call, Defendant Thiry emphasized that "the biggest good news is that our commercial mix and our rates, both went up." During the same call, Defendant Hilger reiterated that the Company's financial growth was "due to improved commercial mix."

11.     In the summer of 2016, however, DaVita's scheme began to unravel. On August 18, 2016, CMS issued a formal Request For Information ("RFI") regarding allegations that DaVita and other dialysis companies had engaged in steering, emphasizing that it was "improper to influence people away from Medicare or Medicaid coverage for the purpose of financial gain," as it would violate both the Social Security Act and federal anti-kickback laws. In response to the RFI, former DaVita employees, industry participants, and commercial insurers who had contracted with the Company provided detailed accounts confirming that steering was a rampant and widespread practice at DaVita. Nonetheless, in its own response to the RFI, DaVita emphatically, repeatedly and unequivocally asserted: "We do not steer."

12.    Notwithstanding DaVita's public denials about its steering scheme, the truth about the Company's illicit practices, and the impact of these practices on its financial results, continued to leak out.  On October 23, 2016, the *St. Louis Post-Dispatch* published a detailed investigative report on the Company stating that, based on its review of internal Company emails, documents and interviews with former employees, DaVita had been deliberately steering patients into commercial plans by funneling "donations" through the AKF.  Just one week later, on October 31, 2016, DaVita issued a press release announcing that, effective immediately, it was "temporarily" suspending support for applications to the AKF for 2,000 patients enrolled in minimum essential Medicaid coverage, and that such suspension could reduce the Company's annual operating income by as much as $140 million before any offsets, an amount equal to approximately 16% of its 2016 profits.

13.    Significantly, however, even after DaVita suspended its AKF donations for certain Medicaid patients, it continued to deny that it steered patients to private insurance, and materially misrepresented how much of the Company's profits depended on AKF "support."  In fact, when analysts directly questioned Defendant Thiry about the Company's AKF exposure after the Company announced the suspension, Thiry refused to respond, remarkably telling investors "that disclosing that is not in your best interests."

14.    Unfortunately for Thiry, regulators, analysts and the media disagreed.  On December 25, 2016, *The New York Times* published an investigative report highlighting that the AKF intentionally favored DaVita by giving premium assistance to its patients, while denying such assistance for patients of dialysis companies who did not donate to the fund.  On January 6, 2017, *The Wall Street Journal* reported that the U.S. Department of Justice had commenced a probe into DaVita's relationship with the AKF and, as part of the investigation, the U.S.

Attorney's Office for the District of Massachusetts had issued a subpoena seeking information relating to the Company's AKF donations. Then, on August 1, 2017, the Company reported that its second quarter 2017 earnings dropped 15% when compared to the same period the prior year, precisely because it had suspended AKF assistance for a portion of the Company's commercially-insured patient base, leading to a 9% drop in DaVita's stock price.

15. The full truth regarding Defendants' fraud was not fully disclosed until October 9, 2017, when the truth about DaVita's relationship with the AKF was revealed. Although DaVita had steadfastly refused to disclose how many of its commercial patients received AKF premium payments, the AKF's own disclosures revealed that it provided such assistance to approximately 21,000 non-ACA patients. Thus, on October 9, 2017, J.P. Morgan issued a report downgrading DaVita's stock because of the AKF's "updated disclosures," estimating that an astonishing "60-80% plus of DVA's earning power is derived from its AKF relationship," while questioning the "legal legitimacy" of the Company's AKF relationship. As a result of these disclosures, the Company's stock price plummeted $5.93, or 10%, to close at $53.89.

16. The following day, Defendants were finally forced to acknowledge the full magnitude of their fraud. Specifically, on October 10, 2017, the Company disclosed that, in addition to the previously-acknowledged 2,000 patients that used AKF assistance to enroll in ACA plans, almost 6,000 other commercially-insured patients also received AKF assistance, which could result in an additional loss in operating income of approximately $540 million. All told, DaVita confirmed that a staggering $680 million of its earnings were reliant upon its illicit relationship with the AKF—more than 75% of the $880 million in net income that the Company reported in 2016.

17.     The fallout from Defendants' fraud continues to this day.  As of the filing of this complaint, the DOJ and regulatory investigations of DaVita remain ongoing.  Upon learning of the scheme, insurers refused to cover ESRD patients receiving AKF assistance, leading to a dramatic decline in DaVita's earnings.  Investors who purchased DaVita common stock at artificially-inflated prices during the Class Period have suffered substantial losses from Defendants' violations of the federal securities laws.  This action seeks redress on behalf of these aggrieved shareholders.

## III.     <u>JURISDICTION AND VENUE</u>

18.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

20.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

IV.     **THE PARTIES**

   A.     **Lead Plaintiffs**

   21.     Lead Plaintiff The Peace Officers' Annuity and Benefit Fund of Georgia ("Georgia Peace Officers") is a public pension system based in Griffin, Georgia that was created by Act of the General Assembly and signed into law by Governor Herman Talmadge on February 1, 1950.  The stated purpose of the Act was to provide revenue and a source of revenue for the purpose of paying annuities and benefits to the peace officers of the State of Georgia.  As of November 2017, Georgia Peace Officers oversaw more than $700 million in assets.  As set forth in its certification submitted concurrently herewith, Georgia Peace Officers purchased DaVita common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.  On November 6, 2017, the Court appointed Georgia Peace Officers as Co-Lead Plaintiff for the Class pursuant to 15 U.S.C. § 78u-4(a)(3)(B).  *See* ECF No. 30.

   22.     Lead Plaintiff Jacksonville Police and Fire Pension Fund ("Jacksonville P&F") is a single-employer contributing defined benefit pension plan covering all full-time police officers and firefighters of the Consolidated City of Jacksonville.  The Fund was created in 1937 and is structured as an independent agency of the City of Jacksonville.  As of December 2017, Jacksonville P&F oversaw more than $1.9 billion in assets.  As set forth in its certification submitted concurrently herewith, Jacksonville P&F purchased DaVita common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.  On November 6, 2017, the Court appointed Jacksonville P&F as Co-Lead Plaintiff for the Class pursuant to 15 U.S.C. § 78u-4(a)(3)(B).  *See* ECF No. 30.

### B.     Defendants

#### 1.     DaVita

23.     Defendant DaVita is one of the country's largest providers of inpatient and outpatient dialysis services.  DaVita is a Delaware corporation with its principal executive offices located at 2000 16th Street, Denver, CO 80202.  DaVita's securities are traded on the New York Stock Exchange ("NYSE") under the symbol "DVA."

#### 2.     The Individual Defendants

24.     Defendant Kent J. Thiry ("Thiry") was, at all relevant times, Chief Executive Officer ("CEO") of DaVita.  Thiry has been CEO since October 1999 and chairman of the Board since June 2015 and from October 1999 until November 2012.  Thiry was highly involved in DaVita's day-to-day business and in interfacing with its employees.  Thiry notoriously refers to the Company as the "Village," himself as the "Mayor," and DaVita employees as "teammates" or "citizens."  Media articles profiling Thiry have also described his unconventional leadership tactics, including dressing up like a Musketeer and zip-lining into "Villagewide" meetings (annual Company-wide meetings) or riding into them on horseback, engendering "a savior's devotion" or "evangelical loyalty" from some DaVita employees.

25.     During the Class Period, Defendant Thiry made materially false and misleading statements and omissions during earnings calls, investor conferences and industry presentations, including on August 4, 2015, February 11, 2016, November 2, 2016, and May 25, 2017.  Defendant Thiry also reviewed, approved, signed and certified DaVita's quarterly and annual filings with the SEC on Forms 10-Q and 10-K, including on February 26, 2015, August 4, 2015, November 4, 2015, February 26, 2016, May 4, 2016, August 8, 2016, November 2, 2016, and February 24, 2017, which contained materially false and misleading statements and omissions.

26.     Defendant James K. Hilger ("Hilger") was DaVita's Interim Chief Financial Officer ("CFO") and is the Company's Chief Accounting Officer ("CAO"). Specifically, Hilger has served as CAO since April 2010. Prior to April 2010, Hilger served as DaVita's vice president and controller since May 2006, after having served as Vice President, Finance beginning in September 2005. Hilger was acting CFO from November 2007 through February 2008, from April 2012 through November 2013, and from March 2015 through March 2017.

27.     During the Class Period, Defendant Hilger made materially false and misleading statements and omissions during earnings calls, investor conferences and industry presentations, including on August 4, 2015 and May 4, 2016.  Defendant Hilger also reviewed, approved, signed and certified DaVita's quarterly and annual filings with the SEC on Forms 10-Q and 10-K, including on February 26, 2015, August 4, 2015, November 4, 2015, February 26, 2016, May 4, 2016, August 8, 2016, November 2, 2016, February 24, 2017, which contained materially false and misleading statements and omissions.

28.     Defendant Javier J. Rodriguez ("Rodriguez") was, at all relevant times, CEO of DaVita's Kidney Care Division. Rodriguez became DaVita's CEO, DaVita Kidney Care in March 2014.  Since joining the Company in 1998, Rodriguez has served in a number of different capacities.  From February 2012 to March 2014, he served as DaVita's President.  From April 1, 2006 through February 2012, he served as the Company's Senior Vice President.  Before that, from 2000 to 2006 he served as a Vice President of Operations and Payor Contracting. Rodriguez joined the Company in 1998 as a Director of Value Management.

29.     During the Class Period, Defendant Rodriguez made materially false and misleading statements and omissions during earnings calls, investor conferences and industry presentations, including on August 8, 2016 and November 2, 2016.

12

30.     Defendants Thiry, Hilger and Rodriguez are collectively referred to herein as the "Individual Defendants."

## V.     OVERVIEW OF THE DAVITA FRAUD

### A.     DaVita's Business and Its Long History of Multi-Million Dollar *Qui Tam* and Government Settlements for Various Alleged Unlawful Schemes

31.     DaVita is one of the largest dialysis companies in the United States.  During the Class Period, the Company had two major lines of business:  Kidney Care, which is comprised of the Company's dialysis and dialysis related services, and DaVita Medical Group ("DMG," formerly HealthCare Partners), which serves as a healthcare management company.  The Kidney Care division is by far DaVita's largest line of business, providing dialysis services to over 190,000 of the approximately 480,000 ESRD patients in the United States (amounting to a 40% market share), through a network of approximately 2,350 outpatient dialysis centers in 46 states and the District of Columbia.  During the Class Period, the Kidney Care division was the source of virtually all of DaVita's earnings, accounting for 97% of its earnings in 2015, and 100% in 2016.  The success of the Kidney Care division was therefore crucial to DaVita's business.

32.     Although DaVita has been highly profitable in recent years, its Kidney Care business has been found to have intentionally violated federal and state laws on numerous occasions.  Indeed, DaVita has been the subject of numerous *qui tam* lawsuits and government investigations in recent years, all of which have a common theme: namely, that the Company artificially boosted its profits through a variety of fraudulent and illicit means.  Since 2012, the Company has paid more than one billion dollars to settle these lawsuits and investigations, and its business practices have been harshly criticized by numerous regulators.

33.     For example, in 2014, DaVita paid $389 million to settle federal charges that the Company paid illegal kickbacks to doctors in exchange for patient referrals.  The investigation

found that, for nearly a decade, DaVita offered lucrative opportunities to renal disease physicians and physician groups to partner with DaVita by acquiring and/or selling an interest in dialysis clinics to which their patients would then be referred for treatment.  This practice, which essentially amounted to illegally paying doctors to refer dialysis patients to DaVita, violated the federal False Claims Act.  As the Department of Justice stated in its press release announcing the settlement: "This case involved a <u>sophisticated scheme</u> to compensate doctors <u>illegally</u> for referring patients to DaVita's dialysis centers…When a company pays doctors and/or their practice groups for patient referrals, <u>the company's focus is not on the patient, but on the profit to be extracted from providing services to the patient</u>."[2]  In 2015, DaVita paid an additional $22 million to settle related claims by five states—Colorado, California, Florida, Kentucky and Ohio.

34.    In 2015, DaVita settled a whistleblower lawsuit for $495 million regarding claims that DaVita deliberately wasted medicine in order to reap hundreds of millions of dollars in extra payments from Medicare.  At the time of the alleged scheme, Medicare would still reimburse a dialysis provider for medicine it did not use when treating patients.  According to the whistleblowers, DaVita purposely devised dosages to its patients to maximize the amount discarded, and thus maximize the Medicare reimbursement.  Once again, the Department of Justice harshly criticized DaVita's practices, stating that the Company engaged in "<u>knowingly wasteful dosing practices designed simply to increase profits and improperly drain the government's resources</u>."[3]  The government further credited the whistleblowers with returning

---

[2] *See* Department of Justice Office of Public Affairs, *DaVita to Pay $350 Million to Resolve Allegations of Illegal Kickbacks* (Oct. 22, 2014), *available at* https://www.justice.gov/opa/pr/davita-pay-350-million-resolve-allegations-illegal-kickbacks

[3] *See* Department of Justice Office of Public Affairs, *DaVita to Pay $450 Million to Resolve Allegations That it Sought Reimbursement for Unnecessary Drug Wastage* (June 24, 2015),

"hundreds of millions of dollars to the treasury that had been <u>improperly obtained by DaVita</u> <u>through these wasteful practices.</u>"[4]

35.    In 2017, DaVita resolved claims that DaVita Rx billed government healthcare programs like Medicare and Medicaid for medications that were never shipped, that were later returned, or that did not comply with documentation requirements.  The $63.7 million settlement also resolved claims that DaVita Rx violated the federal Anti-Kickback Statute by paying unlawful financial inducements to patients covered by federal healthcare programs.  Those inducements included accepting manufacturer co-payment cards to lower patients' payment responsibilities, and writing off debt of people covered by Medicare and Medicaid, including for unpaid copays and coinsurance.  In commenting on the settlement, the Department of Justice stressed that "[p]roviders <u>should not make patient care decisions based upon improper financial</u> <u>incentives or encourage their patients to do the same</u>," and "[i]mproper billing practices and <u>unlawful financial inducements</u> to health program beneficiaries can drive up our nation's health care costs."

36.    As set forth herein, following in this pattern of fraudulent behavior, DaVita and the Individual Defendants engaged in a widespread scheme to substantially boost the Company's financial results during the Class Period.  Specifically, Defendants obtained higher insurance reimbursements for the Company's dialysis treatments by illegally "steering" as many of its Medicaid and Medicare-eligible Kidney Care patients as it could into more lucrative commercial insurance plans.  DaVita lured these patients to switch to commercial plans by illicitly paying their commercial plan premiums for them, under the guise of making "donations" to the AKF, a

_available at_ https://www.justice.gov/opa/pr/davita-pay-450-million-resolve-allegations-it-sought-reimbursement-unnecessary-drug-wastage

[4] _Id._

supposedly independent non-profit charity.   In so doing, DaVita artificially inflated the Company's financials, to the detriment of its investors.

       **B.**    **History of Dialysis Care in the United States**

       37.    End-stage renal disease ("ESRD"), or kidney failure, is the ninth leading cause of death in the United States.   ESRD causes a life-threatening accumulation of toxins in the body, requiring a manual filtration process known as dialysis.   ESRD patients typically must undergo dialysis three times a week, for four hours per session.   During that time, they are hooked up to a large machine through which their blood is externally circulated and filtered.   Dialysis does not restore kidney function, but rather manually filters toxins to keep ESRD patients alive longer. The only way to restore kidney function is through a life-saving kidney transplant.   The five-year survival rate for ESRD patients on dialysis is 35.8%, with 25% of patients dying within the first year of dialysis treatments.   In contrast, the five-year survival rate for ESRD patients who receive a kidney transplant is 85.5%.

       38.    Due to the gravity of their condition, and the frequent, lengthy and exhausting dialysis sessions, ESRD patients often find it extremely difficult to work, or to find employment. To alleviate this problem, in 1972, Congress passed a law that made ESRD patients universally eligible for Medicare (which is usually restricted to those age 65 and older) at any age, and regardless of financial circumstances.   As DaVita states in its public filings with the SEC: "ESRD is the first and only disease state eligible for Medicare coverage both for dialysis and dialysis-related services and for all benefits available under the Medicare program."

       39.    Medicare covers 80% of ESRD patients' dialysis treatments and, most critically, Medicare also covers a life-saving kidney transplant and the crucial aftercare for the transplant.

ESRD patients are largely eligible for state-run Medicaid programs for the remaining 20% of dialysis costs that Medicare does not cover.

40.     Thus, because ESRD patients are usually unable to work—and because, under the 1972 law, they are automatically eligible for Medicare—the vast majority of ESRD patients are insured by Medicare and/or Medicaid.  Moreover, while the few ESRD patients who are able to work may be insured by private group plans, pursuant to a rule issued by CMS, these plans serve as these patients' primary insurer only for a 30-month "coordination" period, during which period Medicare is their secondary insurer.  After that period is over, Medicare becomes these patients' primary insurer (with their private insurance becoming secondary).  This rule was specifically designed to alleviate the substantial impact of expensive ESRD patients on commercial insurers, and on their insureds, as ESRD patients' need for frequent and high-cost dialysis treatments dramatically raises costs and premiums for the entire insurance risk pool.

41.     However, as a result of the passage of the Affordable Care Act (the "ACA")—which went into effect in January 2014—ESRD patients acquired the option to enroll in individual marketplace (or "exchange") plans, which under the ACA, could no longer deny coverage on the basis of a "pre-existing condition."  Even so, for ESRD patients, who, again, typically have a difficult time working, affording premiums for ACA plans was challenging—and unnecessary.  As stated above, the vast majority of ESRD patients are automatically eligible for low-cost Medicare and/or Medicaid programs, which covers both their essential care and a life-saving kidney transplant.   Indeed, the National Kidney Foundation's own website specifically informs ESRD patients that: "There is [] no reason for you to obtain a health insurance plan in the Marketplace as it is unlikely to offer you additional benefits above what Medicare covers."

**C.** **Defendants Fraudulently Increased DaVita's Commercially Insured Patient Count By Illicitly Funneling Funds For Their Commercial Premiums Through the American Kidney Fund**

42.     DaVita's Kidney Care profits—which, again, constituted 100% of the Company's earning power—were entirely dependent on its commercially insured ESRD patients.  Indeed, DaVita charged commercial insurers rates for dialysis treatments that were often more than <u>ten times higher</u> than Medicare or Medicaid reimbursement rates—*i.e.*, up to $4,000 per treatment, as opposed to only $300 per treatment.  For this reason, Defendant Thiry described "commercial lives"—or DaVita's commercially insured ESRD patients—as the Company's "economic lifeline."  As Thiry explained to investors:  "[W]e face the same quandary we've faced for 15 to 16 years, which is that . . . <u>we lose money on 90% of the patients we take care of</u>," meaning those insured by Medicare or Medicaid.

43.     From 2007 through 2014, DaVita experienced a steady decline in its commercially insured dialysis patients, from 13% in 2007 to 10% in 2013.  The percentage of revenues attributable to its commercially insured ESRD patients, or its "commercial mix," also declined: from 36% to 34%.  Even after the ACA went into effect on January 1, 2014, this decline continued, with the "commercial mix" for year-end 2014 dropping to 33%, and the overall percentage of commercial dialysis patients remaining flat at 10%.

44.     This 3% decline in the Company's commercial mix had a significant impact on its earning power.  For example, in 2007, when DaVita's commercial mix was at its peak at 36%, the Company earned an average of approximately $49,160 per patient in net revenues.  In 2014, when DaVita's commercial mix dropped to 33%, the Company earned approximately $47,400 per patient—which, on aggregate, amounted to $300 million less (or nearly 40% of its profits that year) than what DaVita could have earned if its commercial mix had been at the 2007 level.

45.     Desperate to reverse this alarming decline, during the Class Period, DaVita and the Individual Defendants conceived of a fraudulent scheme to illicitly increase the Company's commercial patient count—and therefore its bottom line.  Specifically, despite the near universal eligibility of ESRD patients for lower-cost Medicare and/or Medicaid benefits, DaVita engaged in a widespread scheme to illegally "steer" as many of its ESRD patients as it could to enroll in commercial plans—for the sole purpose of profiting off the much more lucrative commercial reimbursement rates.

46.     Inappropriate patient steering, as explained by the federal Department of Health & Human Services ("HHS") and CMS, involves "influenc[ing] [patients] away from Medicare or Medicaid coverage" and into commercial plans "for the purpose of financial gain."  Such illicit steering also violates the "anti-duplication" provision of the federal Social Security Act, which prohibits selling a commercial plan to Medicaid and Medicare beneficiaries (and for which there are criminal penalties), in addition to state common law.

47.     As internal Company documents and accounts by former employees show (*see* § V(E) below), DaVita and the Individual Defendants internally issued an express Company-wide directive explicitly instructing DaVita employees in its dialysis centers across the country to pressure the Company's ESRD patients to forego their Medicare and/or Medicaid benefits in favor of enrolling in commercial plans—*i.e.*, to illicitly "steer" as many patients as they could. Insidiously, DaVita did so by training its employees to disparage Medicare and Medicaid to all ESRD patients, and to convince them that those programs could not meet their medical needs.

48.     There was a key problem with DaVita's scheme, however: even if ESRD patients could be successfully steered into commercial plans, most of those patients, who were largely unable to work, could not afford commercial premiums.  DaVita's solution was to simply pay its

ESRD patients' commercial premiums itself.  Indeed, considering the Company would receive up to $4,000 per dialysis treatment—with each patient undergoing several dialysis treatments per week – the premiums were a small price for the Company to pay in exchange for the enormous profits it would receive from far more lucrative commercial reimbursement rates.

49.     Even so, DaVita could not directly pay its own patients' premiums for them without violating the federal Anti-Kickback statute, which makes it a criminal offense to offer anything of value to Medicaid and/or Medicare beneficiaries in order to induce their business. Accordingly, DaVita came up with an illicit cover-up: it would illegally funnel funds to pay its ESRD patients' commercial premiums for them through a third party—namely, the AKF, a purported independent non-profit organization—under the guise of "charitable donations."

### D.     DaVita Illegally Funnels Funds Through The AKF In Order To Pay For Its ESRD Patients' Commercial Premiums

50.     The AKF is the largest provider of third party charitable premium assistance for ESRD patients in the country.  Significantly, the AKF is funded almost entirely by major dialysis providers.  Because the AKF is funded by the dialysis industry, the AKF pays ESRD patients' insurance premiums only so long as they are on dialysis.  This means that if an ESRD patient obtains a life-saving kidney transplant, the AKF's premium assistance for that patient immediately ceases.

51.     During the Class Period, DaVita engaged in a *quid pro quo* relationship with the AKF.  DaVita substantially increased its donations to the AKF, whose chairwoman was a former DaVita executive, in exchange for that entity using those funds to pay its ESRD patients' commercial premiums.  For example, in 2015, the AKF reported over $260 million in "donations"—nearly $30 million higher than the prior year, <u>80% of which came directly from two dialysis companies according to press reports</u>: DaVita, and DaVita's main competitor,

Fresenius.  In fact, upon information and belief, DaVita donated well in excess of $100 million to the AKF that year.  In 2016, the AKF's revenues, heavily funded by DaVita, increased significantly again, by nearly $45 million.  The AKF also benefitted in other ways.  For example, in 2013, prior to DaVita's illicit scheme, Laverne Burton, the AKF's President and CEO, received approximately $420,000 in total annual compensation, with Donald Roy, its CFO, receiving $250,000.  While the size of those salaries was already surprising for a non-profit entity, by 2016, these officers' compensation jumped dramatically, with Burton receiving in excess of $580,000 in annual compensation, and Roy receiving over $330,000.

52.     At the same time DaVita was increasing its payments to the AKF, it was ramping up its patient steering efforts, instructing its employees in its dialysis centers across the country to use the AKF program to pressure as many Medicare or Medicaid eligible ESRD patients as they could to (i) choose commercial plans instead of Medicaid or Medicare in the first instance; (ii) keep their existing commercial insurance in lieu of enrolling in lower-cost Medicaid or Medicare plans; or (iii) forego their existing Medicare or Medicaid coverage for a commercial plan.  DaVita lured these patients to enroll in a commercial plan by promising that the higher premiums would be taken care of by the AKF—and, as stated above, by telling patients that Medicare and Medicaid were much worse than commercial plans.

E.     **The Accounts of Numerous DaVita Former Employees and Internal Company Documents Confirm the Illicit Steering Scheme**

53.     Plaintiffs' independent investigation of DaVita's illicit steering scheme—which included numerous interviews with former employees of DaVita's dialysis centers across the country, including upper level employees, and a review of numerous internal Company documents—confirms that DaVita intentionally and illegally "steered" as many ESRD patients as it could, including those eligible for and already receiving Medicare and/or Medicaid benefits,

into commercial plans by paying their premiums for them through the AKF. Plaintiffs' investigation further confirms that DaVita's steering scheme was ongoing throughout the Class Period, systemic, widespread, was perpetrated at the highest levels of the Company's management, and was for the purpose of profiting off much more lucrative commercial reimbursement rates for DaVita's dialysis treatments.

    **1.**  **Internal Company Documents Show That DaVita Had a Singular Focus on Increasing Its "Private Pay" Patients By Any Means Necessary—Which Soon Led to Patient Steering**

  54. DaVita's dialysis business was relentlessly focused on a singular goal: to increase its "private pay," or commercially insured, ESRD patients by any means necessary—including by illegal steering. Indeed, internal documents show that the Company (i) meticulously tracked the acquisition of "private pay" patients at each of its facilities, including "Private Insurance Wins," which measured the number of patients who had been successfully steered into commercial plans; (ii) formally incentivized patient steering, including by launching Company-wide bonus programs offering lucrative cash awards to employees that acquired the most private pay patients; and (iii) prepared recruiting materials for employees that disparaged Medicare and Medicaid, and were designed to convince patients that Medicare and Medicaid were far worse options than private insurance.

    **i.**  **The Company Closely Tracked the Acquisition of "Private Pay" Patients at Each of Its Facilities—Including Patients Acquired Through Steering**

  55. Internal documents show that the Company meticulously tracked the acquisition of "private pay" patients for each of its facilities across the county—including private pay patients who were acquired through illegal patient steering.

  56. For example, each week, senior management in the Pacific Gold Division—one of the Company's largest regions, encompassing dialysis facilities in California, Nevada and

parts of Oregon—sent detailed emails and spreadsheets that highlighted the acquisition of private pay patients, and urged DaVita employees to increase the percentage of such patients in their facilities. These emails, which were called "Active Starts," were disseminated by Divisional Vice Presidents to all Facilities Administrators and Regional Operations Directors, and made clear that the exclusive focus for these employees was to acquire more private pay patients. For example:

- A February 25, 2013 "Active Starts" email stated: "We had 7 private pay admits last week (25% of the new patients). This is significantly more than the division's current % of private pay patients. Nice trend!"

- An April 1, 2013 "Active Starts" email highlighted that "28.6% of the new patient admits last week were private pay. This is a larger percentage than our current private pay population." The email also touted "Region 4" in particular, stating: "Region 4's private pat admits last week was at 66 (4 of the 6 patients admitted – WOW!)."

- A May 6, 2013 "Active Starts" email announced that "[i]n addition to the 25 new patients that started dialysis with us last week, 8 of them were private pay patients (32%)." The email further exclaimed: "Region 4 had 3 new patients start dialysis last week….100% of them were private pay patients!"

- A June 17, 2013 "Active Starts" email stated "PG had 31 new patient starts in the division last week. 29% of those starts were private pay," and exclaimed: "Region 4 had 4 new patient starts and 3 of them were private pay (75%!)."

- An August 19, 2013 "Active Starts" email exclaimed: "Region 5 had 50% of our new patients start dialysis with private pay insurance!" The email also highlighted that "PG as a division had 18.9% of our patients start dialysis with private pay insurance."

57.     In fact, DaVita gave specific "private pay" quotas that each facility had to meet by year-end. For example, a presentation entitled "Private Pay Growth" circulated to regional Pacific Gold management in March 2014 established specific private pay goals for "Region 2," including a "New PP [Private Pay] admit goal" of 8 private pay patients per month for the rest of the year for each of the ten clinics in the region. The presentation itself left no doubt that these "goals" were mandatory, warning that the new private pay admissions would be "<u>tracked and</u>

reported out from the top down." Under a slide entitled "What can WE do?," the presentation stated, among other things: "Admit PP patients quickly."

58.     A similar presentation entitled "Private Pay Growth" was circulated by Jason Uhlman, a manager of the Insurance Management Team, working in Denver as a Senior Business Analyst, to management in the Pacific Gold Division in May 2014. This presentation tracked the acquisition of "private pay" patients in each of the Division's five regions, showing metrics such as "YTD PP NAG" [year-to-date private pay net acquisition gain], "Annual PP NAG Goal," the "Contributions to Divisional PP NAG" from each of the five regions, and PP NPG for each region. The presentation also included "Monthly Net Patient Gains Required for Remainder of Year" for each region, meaning the number of new private pay patients each region was expected to obtain per month before year-end.

59.     Significantly, in addition to tracking new "PP admits" (or private pay admissions), the presentation also included a section devoted to tracking "New Insurance," *i.e.*, patients who had recently switched from Medicaid or Medicare to commercial plans. These patients were explicitly described in the presentation as "Private Insurance Wins" – meaning patients who DaVita successfully steered from Medicare or Medicaid to private insurance. The presentation later referred to these "Private Insurance Wins" as a "leading indicator" of the Division's 2014 performance.

60.     To ensure that Facilities Administrators were implementing the Company's directive to meet private pay goals, the Company also provided each Facility Administrator with a "FA [Facility Administrator] private pay growth check list." The checklist listed as items for Facility Administrators to check off, among other things: "My entire team is aware of how private insurance and working status can positively impact a patient's quality of life"; "We

24

celebrate as a team when we make a difference for a patient on this topic"; and "<u>We have brainstormed as a team on what else we could do to support private pay growth</u>."

61.     Additionally, as former employees stated and as internal documents confirm, Insurance Counselors (*see e.g.*, ¶¶ 77-80, 84, 102), were required to regularly circulate large internal Company spreadsheets listing all "COMM 1" patients, or patients with commercial insurance as their primary insurer, that tracked which commercial insurance plan each patient had, the reimbursement rates for dialysis treatments under each plan, and how much money was collected by DaVita for each patient.  The spreadsheets also included detailed lists of "adds" or "losses" of patients with private insurance.

### ii.     The Company Incentivized Patient Steering

62.     Internal documents show that the Company adopted a number of Company-wide incentive plans, which offered employees substantial cash bonuses—as high as $10,000—if they met or exceeded private pay goals.  These incentive programs were disseminated to employees in the form of "Village Announcements" and formal programs that were entitled, among other things, "Private Pay Incentive Program," "Kidney Smart Incentive Program," and "Private Pay Bonus Program."  All of these Company-wide plans had one overarching goal: to incentivize DaVita employees to steer all ESRD patients into commercial plans.

63.     For example, a "Village Announcement" sent to all "DaVita Citizens" (*i.e.*, to all DaVita employees) on March 20, 2013 instructed employees to "[s]ubmit your ideas around specific ways to increase our number of patients with private pay insurance."  The announcement stated that "[i]deas w[ould] be reviewed by senior leaders," with winners "receiv[ing] up to $5,000 in awards in addition to being recognized at Villagewide!"

64.     Similarly, in 2014, DaVita implemented formal incentive programs for Company employees who successfully acquired the most "private pay" patients.  For example, on February

11, 2014, soon after the ACA went into effect, Bryan Gregory, the Divisional Vice President for the Pacific Gold Division, sent an email announcing a "quarterly incentive program to recognize those centers that have made <u>significant contributions to divisional Private Pay performance.</u>" The email was sent to all Facilities Administrators in the Division and the "Pacific Gold Board Team." The "key criteria" for the incentive program was listed as "<u>strong private pay growth</u>" and "<u>ongoing activities that model our Private Pay efforts</u>."

65.    A similar document was circulated to Facilities Administrators by Pacific Gold Division management in March 2014, detailing the "<u>Private Pay Incentive Program</u>," in addition to the "<u>Kidney Smart Incentive Program</u>" (with both included in the same document).   The "Private Pay Incentive Program" listed the same bonuses detailed in the official Company letter discussed above, in addition to a $1,000 bonus per quarter for Regional Operational Directors if private pay goals were met, and another $10,000 bonus at year end if the Division and region both met their private pay goals.   The "Kidney Smart Incentive Program" offered bonuses for the most Kidney Smart patients who were "educated"—*i.e.*, steered to private insurance— including $2,500 for the "Div. Champ" and $1,500 for the individual "educator."   Extra bonuses of $1,000 and $2,000 were offered for "educating" the most stage 4 and 5 ESRD patients and the most pre-ESRD patients, respectively.   The cover email stated:  "Great bonuses and recognition available to [Home Program Managers] and [Facility Administrators] that exceed private pay growth and Kidney Smart goals.  <u>Check it out and go for it</u>!"

66.    Additionally, in April 2014, an official Company letter was sent by the Group Vice President of the "Polaris" Group (of which the Pacific Gold Division was a part) to all Facilities Administrators announcing the "<u>2014 Private Pay Bonus Program</u>!"  The letter stated: "<u>This program will align incentives with one of our top initiatives for 2014 – Private Pay</u>

growth." The email stated that the goal was 9% private pay growth for the "Group," and "we need your full engagement and leadership to be successful." The email stated employees could reach out to their "divisional Private Pay Champion" for support. A series of potential bonuses were listed in the email, including a "Facility Level Bonus" of $500 for the Facility Administrator and another $500 "for a team celebration." An additional $300 bonus would be issued for achieving "your YTD private pay goal at the end of the quarter."

67.     DaVita's repeated offers of lucrative cash bonuses and Company-wide praise to employees who acquired the most private pay patients—including by patient steering—strongly incentivized employees to participate in the Company's illicit steering scheme.

> ### iii.     The Company Prepared Materials Training Employees to Disparage Government Programs While Emphasizing the Purported Benefits of Private Insurance to Patients—*i.e.*, to Steer Patients

68.     Internal documents show that DaVita prepared widely disseminated materials to train its employees, under the guise of "educating" ESRD patients about their insurance options, to urge patients to obtain the "best insurance"—*i.e.*, commercial insurance—by explicitly telling patients that Medicaid and Medicare would not meet their medical needs, and was much worse than private insurance.

69.     For example, on September 30, 2013, Fred Ford, a Regional Operations Director in the Pacific Gold Division, sent an email to all Facilities Administrators attaching a PowerPoint presentation entitled: "Private Pay Growth." The presentation included a slide labeled "Best Insurance," listing three points DaVita employees were to discuss with patients when "educating" them about their insurance options. All three points emphasized why commercial insurance was better than Medicare or Medicaid: "more comprehensive benefits"; "better access to care" and "lower total cost."

70.     While DaVita would claim that it was supposedly merely "educating" patients about their insurance options, and not steering them to private insurance, the documents show that this claim was a ruse.  Indeed, significantly, neither this slide nor any other slide in the presentation highlighted or discussed any benefits of Medicare or Medicaid.  To the contrary, the only mention of these programs was to disparage them, listing reasons why they were inferior to commercial insurance.  For example, the slide notes for the presentation included talking points that claimed, among other things, that commercial plans offered better access to specialists than Medicare, stating, "Did you know that 1 in 5 specialists today won't accept new Medicare patients?  Worse for Medicaid patients!"  The slide notes also stated:  "Any of you ever been frustrated by a Medicaid patient not being able to see a vascular surgeon to get a fistula placed or fixed?  It happens all the time."  The presentation also asserted that commercial plans were a "lower total cost" than government programs, which "may come as a surprise to you."  The slide notes also specifically instructed employees to assure patients that "for patients who need help with the [commercial] premium, many patients qualify for AKF assistance."

71.     The next slide, entitled "What's your 'Why'???," asked Facilities Administrators in the slide notes to "[g]ive your 30 second elevator pitch on why PP [Private Pay] matters to you (the more personal your story, the better)."  The slide notes stated that Facilities Administrators should "make this a powerful message your teams can rally behind; set the stage to empower them to care about private pay."  The PowerPoint continued with slides that included personal stories of patients who had benefitted from private insurance—such as a mother who had a heart attack and "needed private insurance in order to access specialist," and a "[f]ather who couldn't travel to see family in Jamaica without private insurance."  The slide also included a bullet point

stating: "Physician's 'tale of two patients' (private ins. provided better continuity of care, access)."

72.     Again, tellingly, these slides, and the entire presentation, did not "educate" patients in a balanced and unbiased way about their insurance options— instead, they exclusively promoted private insurance to all ESRD patients in order to grow "private pay."  Indeed, the presentation nowhere discussed a single benefit of Medicare or Medicaid (for any ESRD patients), nor shared personal patient stories or other points about what those programs could offer.  Instead, the only time the presentation mentioned these government programs was to disparage them in comparison to commercial plans, listing their purported shortcomings while asserting commercial plans were "best"—for all patients.

73.     Internal Company training materials sent to DaVita employees in 2014 on how to conduct Kidney Smart meetings similarly highlighted what was "best" about commercial insurance, while denigrating Medicare and Medicaid.  For example, a PowerPoint presentation circulated to regional management in the Pacific Gold Division (covering California, Nevada and Oregon) in June 2014 entitled "Kidney Smart CKD [Chronic Kidney Disease] Patient Education Program Overview," included a slide about how to "educate" ESRD patients about their insurance options during Kidney Smart meetings.  The slide claimed that "[p]rivately insured patients losing coverage over a two-year period, compared to those who remained insured, were more likely to lack a usual source of care, encounter difficulty in obtaining medical care, be very dissatisfied with their ability to obtain needed care, and report no physician visits in the previous 12 months."  As the sole support for this statement, the presentation cited a single study from over ten years ago, listed in small print on the last slide.  The slide also claimed, in bold, that "[i]ndividuals with private insurance were found to be 24% more likely than their counterparts to

be listed for renal transplantation before dialysis." The single study cited to support this claim, also listed on the last slide in small print, was over fifteen years old.

74.     The presentation also included internal "slide notes" of talking points for "educators" to discuss with patients about insurance options, which were almost identical to the talking points included in the September 30, 2013 PowerPoint presentation about the "best insurance" discussed above. As in that presentation, the slide notes included three key reasons why commercial insurance was superior to Medicare and/or Medicaid. Again, the first reason was "Better Access," stating: "Did you know that 1 in 5 specialists today won't accept new Medicare patients? Worse for Medicaid patients!" The second was "More Comprehensive," stating: "Studies show that transplant likelihood is 3x greater for patients with Private Insurance (22% vs. 7%) – for African Americans, it's actually 14x higher!" The last reason was "Lower Total Cost," claiming that while commercial premiums were higher, out of pocket costs for commercial plans were lower, "[a]nd for patients who need help with the premium, many patients qualify for AKF assistance."

75.     Again, tellingly, this presentation only included talking points about why private insurance was "best," for all patients. It did not include any information about the benefits of government programs for any ESRD patients, and in fact did not mention those programs at all— except to describe the ways in which they were inferior to commercial plans. Additionally, the claims in the slide notes about why private insurance was "best" were false, and especially the claim that privately insured ESRD patients were three times more likely to obtain a life-saving kidney transplant (or fourteen times more likely if African American). As former employees confirmed, patients enrolled in commercial plans who were reliant upon charitable premium assistance from the AKF were unlikely to be approved for a kidney transplant at all. This was

because the AKF only assisted patients as long as they were on dialysis, and upon receiving a kidney transplant, the AKF's assistance ceased.  These patients would therefore be unable to show they could afford post-transplant medications and treatments critical to the transplant's success—a prerequisite for most hospitals to approve patients for a kidney transplant.

76.    Internal Company documents also confirm that, before and during the Class Period, DaVita was directing its Insurance Counselors to actively pressure Medicaid and/or Medicare-eligible ESRD patients to forego their government benefits and apply for AKF assistance to keep their purportedly superior commercial plans—regardless of medical necessity or the patient's financial needs.  In these conversations with patients, which the Company meticulously tracked, Insurance Counselors were instructed to emphasize "the benefits of having private insurance as primary as opposed to Medicare."

77.    Specifically, internal documents show that Insurance Counselors throughout the Company had to regularly provide Facilities Administrators and Division management "patient recaps" documenting the fact that they were steering patients to private insurance.  The "recaps" consisted of spreadsheets detailing the Insurance Counselors' conversations with each patient.

78.    For example, in an email circulated to Pacific Gold Division management in May 2014, the Insurance Counselor listed three "New COMM 1 patients" on the "patient recaps" spreadsheet.  The first patient had obtained a commercial plan prior to becoming a patient at DaVita, but was struggling to pay the premiums.  The Insurance Counselor noted:  "I am currently in process of assisting patient in applying for AKF assistance.  I explained to patient that applying for Medicare would cause patient's Kaiser to become secondary and Medicare would be primary; covered the benefits of having private insurance as primary as opposed to Medicare."  Similarly, for the second "New COMM 1 patient," the Insurance Counselor made

sure to note to management that he preemptively "steered" the patient away from enrolling in Medicare. "Patient did not inquire about applying for Medicare, but I explained that this would cause patient's Kaiser to become secondary and Medicare would be primary; covered the benefits of having private insurance as primary as opposed to Medicare."

79.     For the third "New COMM 1 patient," the Insurance Counselor actually noted that he had successfully dissuaded the patient from applying to Medicare, even though "all his other physicians and medical providers are not accepting his insurance and has had to pay out of pocket for his treatments." Indeed, the Insurance Counselor noted that the patient was "considering applying for Medicare so that his treatments with other health care providers are covered." The Insurance Counselor however assured management that he had solved the problem, and was "assisting patient in applying for AKF to pay for patient's portion of the premiums."

80.     As these documents show, DaVita was relentlessly pushing its employees to enroll ESRD patients in private insurance, by coming up with any reason they could (regardless of its truth) as to why commercial insurance was "best" (for all patients) and why government programs were inferior—*i.e.*, to steer all ESRD patients away from government plans and into "private pay" by any means necessary. DaVita also urged employees to tell patients that if they could not afford the "best insurance," they need not worry: the AKF would foot the bill.

**2.     By 2015, DaVita's Company-Wide Directive to Steer Patients Into Commercial Plans for Financial Gain Was Explicit, and Internally Referred to As The "Medicaid Opportunity"**

81.     By no later than the summer of 2015, the Company was explicitly directing its employees to steer all ESRD patients into commercial plans using the AKF Company-wide. This initiative was referred to by former employees and in internal Company documents as the "Medicaid Opportunity." In sum, as DaVita's own documents provide, DaVita's employees

were instructed to pressure all Medicaid-eligible ESRD patients to enroll in commercial insurance plans, backed by the AKF, so that DaVita could profit from much more lucrative commercial reimbursement rates.   In other words, the "Medicaid Opportunity" was an "opportunity" for DaVita, to manipulate its patients' insurance choices at their expense, and for the Company's gain.

82.   For example, CW[5] 1, a former DaVita Insurance Counselor in New York from February 2012 to March 2016,[6] described how, in July 2015, she attended a regional meeting in North Carolina for DaVita's "Avanti" region, which covered "the Eastern seaboard."   The meeting featured a presentation called "Medicaid Opportunity," which was given by a Senior Vice President ("SVP") in DaVita's Corporate Analytics Department.   CW 1 recalled that the focus of the presentation was to train DaVita employees on how to "sell" patients on ditching Medicaid as their primary insurer in favor of commercial insurance.   CW 1 stated that during the presentation, the SVP also showed the Medicaid reimbursement rates versus the higher commercial insurance rates, as well as the number of patients in each region who were currently insured by Medicaid.   The SVP specifically instructed attendees to "get American Kidney Fund to pay for exchange plans, on top of Medicaid"—i.e., get Medicaid patients to enroll in a commercial plan as their primary insurer using AKF assistance (with Medicaid then becoming secondary).   CW 1 explained that signing patients up for the AKF assistance program was "a way to force exchange plans on people."   According to CW 1, the directive to get Medicaid

_____

[5] Former DaVita employees and patients are referred to herein as Confidential Witness "CW __" and are referenced in the feminine form to maintain their confidentiality.

[6] CW 1 worked as an Insurance Counselor at DaVita from February 2012 until March 2016. CW 1 worked at several facilities in the New York City area. CW 1's responsibilities included counseling kidney patients on insurance, focusing on commercial insurance patient retention and maximizing commercial insurance revenue opportunities.

ESRD patients to use AKF assistance to enroll in commercial plans was "very, very explicit, nothing was implied at all." CW 1 continued: "It was very explicit that it was all about money, it wasn't about helping patients. That is when I felt they were asking me to be a salesman, not a counselor."

83. Other former DaVita employees also confirmed the existence and purpose of the Company's "Medicaid Opportunity" initiative. For example, former DaVita Facilities Administrator CW 2—responsible for DaVita dialysis clinics located on the opposite coast, in California, from 2012 to 2016—recalled the same initiative being rolled out in her region during the same time period, on an August 2015 conference call with the Regional Operations Director.[7] CW 2 stated that the Company had issued the "Medicaid Opportunity" directive on a "national level," and that during the instructional conference call, the message was clear: Facilities Administrators were responsible for converting any and all Medi-Cal (California's Medicaid program) or Medicare patients at their DaVita facilities to commercial insurance as their primary insurer by using AKF assistance. "They [management] hounded us and hounded us," she said, "asking, 'are you doing this?'" She explained that employees were "[p]ressured to get these people (Medicare/Medicaid eligible ESRD patients) signed up to the AKF programs," and "[a]nybody who was on Medicare or Medicaid was asked to sign up for the AKF programs."

84. CW 2 also described how, in the weeks that followed the "Medicaid Opportunity" conference call, management held weekly follow up calls. "Each week you didn't have a person signed up who was eligible, you had to explain why." She stated that, in the dialysis facilities she was responsible for, she was required to complete a detailed spreadsheet on a weekly basis to

---

[7] CW 2 was a Facility Administrator for DaVita dialysis clinics in California from March 2012 through February 2016. CW 2 was responsible for setting up clinics, contracts, budgets, etc. CW 2 directed approximately 13-15 employees and was responsible for the staffing of programs in all of those facilities.

track progress with regard to getting each of those patients to submit an AKF application so they could switch from Medicaid to commercial insurance. CW 2 also described how the environment at DaVita did not permit employees to question the Company's methods, stating: "My social worker was uncomfortable with it – it didn't seem right to me," but "I was afraid to say anything like 'I don't agree with this.'"

85. Similarly, CW 3,[8] a former Insurance Counselor for multiple DaVita clinics in the Austin, Texas area, from August 2015 to November 2015, recalled participating in an 80-hour two-week training program at the Company's headquarters in Denver in August 2015 about steering patients off of Medicaid and into commercial plans. CW 3 stated that, during that training, at least four DaVita Insurance Counselors from across the country gave detailed instructions regarding "steering" techniques to CW 3 and eight colleagues. CW 3 recalled that the classes included PowerPoint presentations and role-playing scenarios, and that the trainers made clear that it was "important for us to get [the patients] onto private insurance. Even if they qualified for Medicare or Medicaid, you were encouraged to get them on private insurance." In fact, CW 3 recalled that steering Medicaid or Medicare patients into commercial or exchange plans took two or three full days of the training, with the trainers making comparisons between what Aetna would pay for dialysis treatments versus Medicaid or Medicare.

86. Internal Company documents confirm that the "Medicaid Opportunity" was a Company-wide directive to steer patients off Medicaid and into commercial plans. Indeed, in November 2015, DaVita disseminated a Company-wide presentation entitled "Medicaid

_____

[8] CW 3 worked at DaVita from August 2015 through November 2015 as an insurance counselor for multiple clinics in the Austin, Texas area. CW 3 worked in the Silver Spurs region. CW 3 attended a two-week training course in Denver. Her responsibilities included coordinating with social workers and nurse case managers to complete financial assistance assessments and complete applications for the AKF.

Opportunity Update," which instructed DaVita employees on how to use AKF assistance to steer Medicaid patients into commercial plans.  The presentation was circulated by DaVita's upper management to DaVita's Facilities Administrators across the county, including those responsible for the Company's dialysis facilities in the Pacific Gold Division, Divisional Vice Presidents, and Regional Operations Directors.

87.     The Medicaid Opportunity Update minced no words, and left no doubt that every DaVita employee, at every dialysis facility, was responsible for making sure that "all" of DaVita's Medicaid patients applied for AKF assistance to enroll in commercial plans.  The presentation unequivocally instructed employees to "[s]upport AKF application[s] for all enrolled patients"—meaning the Company was not attempting to identify appropriate subsets of its patients who actually needed commercial insurance or AKF assistance for medical or financial reasons.  Rather, it was expressly directing its employees to steer all ESRD patients enrolled in Medicaid into AKF-backed commercial plans for its own profit.

88.     The Medicaid Opportunity Update also made clear that the Company was closely tracking and monitoring this process, to make sure that its directives were being carried out.  To that end, the presentation included a chart tallying the number of AKF applications submitted by DaVita employees across the five different regions in the Pacific Gold Division.  The "Grand Total" was listed as 551 AKF applications submitted by DaVita employees as of that time.  The presentation made no secret that the patients themselves were not filling out these applications.  Instead, the "AKF point person"—i.e., a DaVita employee who was specifically assigned the role—was "to complete initial application as well as ongoing premium requests."  The presentation went as far as to break down how much time each of these efforts would take,

stating the "AKF HIPP Application" would take one hour, while the "Premium Status Request" would take 30 minutes.

89.     The Medicaid Opportunity Update also provided a Company-wide "standard operating procedure" for steering.  This procedure included a detailed a "Plan of Action" for the steering initiative, which broke down the different roles for each DaVita employee in the Company's dialysis facilities across the country.  In other words, in each DaVita facility nationwide, the entire facility was to be mobilized to support the Company's steering efforts. For example, the "Plan of Action" stated that Insurance Counselors were to "[p]erform enrollment conversations with patients" and "track conversations" with patients.  The "Medicaid Opp. AKF Point" was to "[s]ubmit initial HIPP [Health Insurance Premium Program] Application [to the AKF]" and "[s]ubmit ongoing premium requests"—meaning, again, that DaVita employees were actively filling out and submitting ESRD patients' AKF applications for them.  Social Workers were to "[p]rovide support in areas with limited capacity for AKF process" and "[b]e a resource" for patients with questions.  Finally, the Facility Administrators, who were in charge of dialysis facilities and had the most duties under the "Plan of Action," were to (i) "[b]e aware of the patients impacted in your facility," (ii) "[p]articipate in follow up conversations with patients as needed," (iii) "[e]nsure AKF management in your facility is being done by designated teammate," and (iv) "[h]ave a solid process for AKF Application submission."  In short, and as this "Plan of Action" shows, the Company sought to have all of its facilities across the country operate in a coordinated, meticulous fashion to enroll (or "steer") all ESRD patients into AKF-backed commercial plans.

3. **Former Employees Confirm that, During the Class Period, Patient Steering at DaVita—For the Express Purpose of Obtaining Higher Insurance Reimbursements—Was "Second Nature" at the Company**

90.    Numerous former employees at DaVita dialysis clinics across the country described being pressured by the Company to steer ESRD patients eligible for, or insured by, government programs to enroll in commercial plans as their primary insurer using AKF assistance during the Class Period—or, if they were already insured by commercial plans, to use AKF assistance to forego the government programs they were automatically eligible for and maintain that insurance at all costs.

91.    For example, CW 3, who served as an Insurance Counselor for DaVita dialysis facilities in the Austin, Texas, area (for DaVita's "Silver Spurs" region, which included New Mexico as well) from August 2015 to November 2015, described how DaVita "always wanted to get the best coverage to pay more for treatments," and Medicaid or Medicare "are horrible payers – they don't pay well."  CW 3 stated that, as a result, "absolutely, [DaVita] would steer [patients] away to get private insurance" for the purpose of "ensur[ing] higher rates of reimbursements for DaVita."  CW 3 explained:  "It was awkward for me, especially coming from the hospital world where you used your best judgment and you are supposed to give the patient what they need first, not what the provider wants.  At DaVita it was the other way around."

92.    CW 3 further recalled that her supervisor, a regional manager, instructed her to talk to patients about signing up for AKF assistance even if they clearly did not want it:  "I do recall that my supervisor [] wanted me to talk about the foundations to the patients and they clearly weren't interested.  She told me they really don't have a choice – that it needed to be done."  CW 3 admitted, however, that "I didn't feel comfortable doing it."  CW 3 stated:  "They [DaVita management] were very hungry for us to make sure we spoke to every single patient to make sure to either get them on Obamacare or on something or maybe onto a COBRA plan or to

find something." CW 3 said that, in general, patient steering was "part of the training and also something that my direct manager encouraged us to do. It was just a practice everyone did across the board, the clinical workers and the social workers and everyone involved in the treatment. It became second nature."

93.     CW 1, who served as an Insurance Counselor for several DaVita facilities in New York from February 2012 to March 2016, shared a similar experience. CW 1 described being under constant pressure to keep up the number of patients enrolled in commercial insurance, stating: "We weren't educators. We were revenue generators." She explained that "the business model that was explained to us was that they do not make any profit off the Medicare primary patients or the Medicaid primary patients, and their main source of revenue was the commercially insured patients." CW 1 stated that DaVita employees were encouraged to focus on their "win ratio," which was a tally of how many patients an employee had convinced to switch to commercial insurance. If a patient was enrolled in commercial insurance, it was "great," but if CW 1 reported she had failed to "save" a patient (*i.e.*, enroll them in commercial insurance), her supervisors would "drill and drill," and even humiliate CW 1, asking why she had failed to enroll the patient in a private exchange plan. CW 1 also described how, while AKF assistance was supposed to be reserved only for those who were financially needy and could not obtain any insurance, DaVita employees indiscriminately used AKF assistance to help patients already covered by Medicare or Medicaid to get on private exchange plans. According to CW 1: "What DaVita was doing is using the AKF to pay for Obamacare plans without noticing a hardship."

94.     Similarly, CW 4, a former Insurance Counselor and Clinical Supervisor at DaVita dialysis facilities in Oregon (in the "North Star" region, which included parts of Oregon and

Washington state) from July 2001 through July 2015, recalled that ESRD patients on Medicaid were singled out by the Company, as she said it was always deemed preferable to have Medicaid patients put on commercial plans because the pay-outs to DaVita would be much higher than what Oregon Medicaid would pay.[9]  CW 4 explained:  "It was always about the bottom line [at DaVita].  It always came down to revenue."  CW 4 stated that whenever a patient was identified as needing assistance with private coverage, the facility staff would help the patient prepare the paperwork for the AKF.  CW 4 stated that the instructions on steering patients to the AKF and to private insurers came from her insurance management superiors, and the superiors above them. CW 4 recalled that the steering of patients to private insurance began when Obamacare kicked in, and that both she and her colleagues were trained on how to locate private insurance plans for patients on the Obamacare exchanges. Additionally, with regard to deductibles that would sometimes apply to commercial policies, CW 4 recalled that DaVita would often write them off to make sure patients were not discouraged from signing up:  "They would write it off . . . we will suck it up."

95.    Former DaVita patients also recalled being steered by DaVita employees. Specifically, CW 5, whose husband (now deceased) was a dialysis patient at a DaVita clinic in Aberdeen, Maryland in early 2016, recalled being "steered" away from Medicare by her husband's assigned Social Worker.[10]  CW 5's husband was on her commercial insurance at the time he began dialysis treatments at DaVita.  CW 5 recalled that the DaVita Social Worker told

---

[9] CW 4 was an Insurance/Financial Counselor at DaVita from July 2001 to August 2013 and then a Clinical Supervisor from August 2013 to July 2015 in Oregon.  CW 4 said her facility was in the "North Star" region, as named by DaVita. CW 4 would participate in weekly calls with supervisors regarding AKF referrals. CW 4 left the Company due to "unreasonable requests" and DaVita "trying to protect the bottom line."

[10] CW 5's husband was a patient with DaVita from January 2016 until he passed away in March 2016.  CW 5 has been a nurse for over 2 decades.  Her husband was also a registered nurse.

her and her husband not to enroll in Medicare because it would not cover the medications her husband would need, and that the Social Worker would not even allow her husband to fill out the paperwork to switch to Medicare, which she and her husband wanted as a "safety net." CW 5 stated the Social Worker "made [my husband] feel like my insurance was so great that he was better off keeping my insurance." CW 5 further recalled that when she later took a tour of the DaVita dialysis clinic in Maryland, the Social Worker giving the tour told her DaVita "educates" patients and "tells" them not to enroll in Medicare even though they are qualified because Medicare does not cover necessary medications. When CW 5 asked the Social Worker what happens if a patient loses his or her private insurance, the Social Worker said DaVita had a "system set in place with the American Kidney Fund," and that "they [the AKF] would cover premiums."

96.     CW 5's husband died only two months after beginning dialysis treatments at DaVita, and only hours after being seen at a DaVita dialysis clinic, from sepsis caused by his hemodialysis catheter. When CW 5 reviewed her husband's medical records after his death, she noticed exorbitant charges to her private insurance company for his dialysis treatments, amounting to over $100,000 a month—several of which were listed on days CW 5 knew her husband did not receive any dialysis treatments.

97.     Former DaVita employees also described how obtaining "private pay" patients, and patient steering, were key to their job performance at DaVita. For example, CW 4 described that pay raises and bonuses at DaVita were directly tied to progress each employee made in gaining private coverage for eligible patients. "They based everyone on performance depending on if you had a lot of commercial patients," she recalled. CW 3 also recalled that her regional managers stood to get a bonus, on a monthly or quarterly basis, for having the highest number of

patients with better-paying private insurance. "The regions got kudos for having the most payers," she said.

98.      In contrast, former employees also described how, if they failed to obtain private pay patients, or questioned the Company's methods for doing so, their job performance was negatively affected.

99.      For example, CW 2 described she got the sense from DaVita employees at her facilities that if they did not comply with the steering initiative, it would be a "problem" for their job. CW 1 described similar pressure, stating that "losing" private pay patients would lead to poor performance evaluations, and that a big part of an employee's rating at the Company was "your ability to keep people on the commercial plans at the higher revenue." CW 1 also stated that employees at DaVita "were machines" who had to "do everything [DaVita] said without question," stating: "If I questioned things, I was told to shut up." Other former employees described how the constant pressure the Company put on them to steer patients, or to keep their private pay numbers up, was a significant factor in their decision to no longer work for DaVita.

**4.      Former Employees Confirm DaVita's Upper Management Closely Tracked The Acquisition of "Private Pay" Patients, Including the "Steering" of Patients Into Commercial Plans and Away from Medicaid or Medicare**

100.     Numerous former DaVita employees described—and, as discussed above, internal Company documents also confirm—that the Company relentlessly tracked its "private pay" patients during the Class period, including private pay patients that were converted as a result of the Company's "steering" directive.

101.     For example, CW 1, a former Insurance Counselor for DaVita facilities in New York from February 2012 to March 2016, stated that she would participate in weekly conference calls with her department heads and Divisional Operational Managers regarding the status of

private pay patients.  She recalled that the documentation prepared for the calls would be very detailed, showing which patient had which insurance plan and how much money the Company would receive in reimbursements for each.   CW 1 explained that, for example, a patient with Aetna had $700 next to his name, while another patient on Medicare had just $250 next to his name.  CW 1 described that comments would be made during the calls such as:  "Oh, look, Aetna has given us more money, so we must keep that guy," or "That guy only has Medicare, <u>so we don't care about him</u>."  CW 1 stated that her sense on these calls was:  "When a Medicare patient transfers out, who cares?  But when a commercial guy transfers out, it was like this big disaster.  Don't go!  They would break their backs to keep them."

102.    CW 1 stated that during the conference calls, participants would go down the list of patients on commercial insurance so they could tally "losses," "saves" and "wins."  If there was a "loss"—meaning a commercial patient had been transferred, or lost his or her private insurance— CW 1 and her colleagues "were browbeaten for not doing our jobs."  "Losing" commercial patients also led to a downgrading of employees' job performance evaluations:  "You let six commercial patients go, so now you are a 'C' instead of a 'B.'"  "<u>Win ratios" were also discussed on these calls, or the tally of how many patients an employee had convinced to switch from a government program to commercial insurance</u>.

103.    CW 4, a former DaVita Insurance Counselor and Clinical Supervisor for DaVita dialysis clinics in Oregon from July 2001 to July 2015, also recalled weekly calls during which she was asked to discuss progress on getting private coverage for patients.  She and her colleagues were expected to keep track of how many Medicaid or uninsured patients they had successfully referred to the AKF for private insurance.  "They [management] would want to know what steps you have taken and what you are doing to rectify matters."  CW 4 stated:

"<u>They were on top of our numbers all the time</u>."  CW 4 explained that there were many calls about how many people had been switched to private policies and "we were put on the hottest seat" if anyone had too many people who were still uninsured or had not been put on a commercial plan.  CW 4 also similarly recalled "huge" spreadsheets, where employees were expected to record each and every patient who was put on a private plan.

### F.   DaVita's Scheme Slowly Unravels

   **1.   By August 2016, Public Scrutiny of DaVita's Practices Intensified, and Was Met By Defendants' Emphatic Denials**

   104.   On July 1, 2016, UnitedHealth sued kidney-care chain American Renal Association ("ARA") for fraud.  The complaint alleged that ARA systematically targeted Medicaid and Medicare-eligible patients and, through deception and unlawful means, convinced them to drop or reject their affordable government insurance options and enroll in UnitedHealth's commercial plans instead by funneling funds through the AKF in the form of "donations."  In other words, UnitedHealth alleged that ARA was engaged in an illicit scheme that was almost identical to the scheme DaVita had been secretly perpetrating for over a year.

   105.   The news of UnitedHealth's lawsuit was not lost on DaVita's investors.  On an August 8, 2016 earnings conference call, analysts asked DaVita about its own relationship with the AKF, and whether there was anything investors should be concerned about.  Defendants responded by emphatically denying any impropriety, claiming DaVita's relationship with the AKF adhered to the letter of the law.  For example, Defendant Rodriguez stated that Defendants "<u>stay and abide by the rules that were outlined by the OIG</u>."  Defendant Thiry similarly assured investors that the Company's actions were above-board, stating: "If you're on Medicare, you're not eligible" for commercial plans.  In response, DaVita's stock price dropped approximately 7% over the next two trading days.

44

106.    On August 18, 2016, CMS issued a Request for Information ("RFI") regarding illegal "steering" by dialysis companies of Medicare/Medicaid-eligible ESRD patients into ACA plans using AKF programs in order to collect higher reimbursement rates.  Specifically, CMS stated:  "We are concerned about reports that some organizations may be engaging in enrollment activities that put their profit margins ahead of their patients' needs."  CMS expressed several key concerns about these allegations, stating:  "These actions can limit benefits for those who need them, potentially result in greater costs to patients, and ultimately increase the cost of Marketplace coverage for everyone."  Significantly, in the RFI, CMS made it abundantly clear that:  "It is improper to influence people away from Medicare or Medicaid coverage for the purpose of financial gain."  CMS' public letter to dialysis providers, issued the same day, elaborated on this point, stating that "[e]nrollment decisions should be made, without influence, by the consumer," and that the Social Security Act "prohibits selling such a person insurance coverage knowing it duplicates such Medicare and/or Medicaid benefits."  In reaction to the disclosure about the CMS inquiry, DaVita's stock price dropped approximately 4.7%.

107.    Numerous responses to the RFI—including from former DaVita social workers and commercial insurers DaVita contracted with—asserted that patient "steering" was a rampant, widespread and systemic occurrence at DaVita facilities across the country.  For example, Teri Browne, PhD, MSW, NSW-C, LSW, a former nephrology social worker at both Fresenius and DaVita, provided a response to the RFI sating that patient steering was how DaVita did business: "I know that there is indeed 'Inappropriate Steering of Individuals Eligible for or Receiving Medicare and Medicaid Benefits to Individual Market Plans.'"

108.    Dr. Browne worked in the nephrology community for over two decades and is an international nephrology social work expert, having presented across the country and world on

45

kidney disease and nephrology social work issues.  Dr. Browne explained that patient steering

negatively impacted ESRD patients in a myriad of ways, including by making it difficult for

them to obtain a life-saving kidney transplant.  Dr. Browne explained the significant

consequences of DaVita's steering as follows:

> <u>What has happened is that patients are steered into these commercial insurance</u>
> <u>plans (or persuaded to keep their commercial insurance despite their eligibility for</u>
> <u>Medicare or Medicaid) with impossibly high premiums, which are paid by the</u>
> <u>American Kidney Fund</u>.  This allows the dialysis unit to charge commercial rates
> for services.  However, as soon as the patient receives a transplant, the patient
> cannot keep their insurance, because this 'charity' premium funding from [the
> AKF] disappears (as [the AKF] only helps those who receive dialysis because
> their funds for this program come from dialysis companies).  Patients are then
> stuck with this market plan, which is most definitely not in their best interest as a
> transplant patient as they cannot afford the premiums that [AKF] once paid.  In
> worse case scenarios, they also are stuck with penalties because they did not
> enroll in Medicare when they were eligible.  This results in dialysis patients not
> being eligible to get listed for a kidney transplant, or have serious consequences
> related to having no/inadequate insurance once they are transplanted . . . <u>[P]atients</u>
> <u>are steered into insurance decisions . . . that are only best for dialysis companies'</u>
> <u>profits, not patients' transplant pursuit</u>.

109.    Dr. Browne also stated she had "personally heard" DaVita representatives "talk

about helping patients get commercial insurance as a priority (with [the AKF] paying the

premiums), and [] questioned them about the negative consequences for patients related to

getting kidney transplants (to no avail)."  Dr. Browne concluded that patient steering "is a

serious barrier to getting patients transplants…absolutely unacceptable and unconscionable."

110.    Other public comments in response to the RFI further evidenced systemic

"steering" at DaVita.  For example, one response from a former insurance counselor at DaVita

referenced a meeting in North Carolina where the corporate "Analytics" department "came up

with this plan to convince our Medicaid only enrolled patients to enroll into exchange and

individual plans"—*i.e.*, the anonymous contributor corroborated the same meetings and

presentations that other former DaVita employees had recounted:

> Despite our objections, we were told [convincing Medicaid patients to switch to commercial plans] was mandatory. We had calls and meetings surrounding 'our numbers' and were reprimanded for not enrolling enough people by the Regional Operations Director. If a patient refused, we were forced to keep approaching them until they gave in and it was implied we shouldn't take no for an answer. In most cases, we were required, if the patient is not enrolled in Medicare but still eligible, that they should enroll into an exchange plan because of its better coverage. We felt extreme pressure to deliver these enrollments and were chastised for not getting the numbers up.

111.    Another former DaVita social worker for two DaVita clinics in Sacramento, California between March 2015 and March 2016 described the Company's "unethical practice(s)," including the launch of "an individual market plan initiative" that "tasked the social workers with identifying our patients who were insured with 'Medi-Cal Only.'" She stated:

> They asked us to 'educate' the patients with marketing material DaVita designed specifically to entice the patient into enrolling in a secondary private payer plan with the promise of being able to travel outside of the state and improved chances of passing financial clearance for kidney transplant. DaVita also assured our most vulnerable population of patients that they would not have to worry about paying their health insurance premium because our Insurance Counselors would preapprove them for AKF HIPP [Health Insurance Premium Program] grant.

112.    Still another former DaVita insurance counselor, in Missouri, submitted a statement confirming rampant and systemic patient steering at DaVita—and that DaVita closely tracked "their AKF enrollees and how much money goes for each person that receives assistance." In fact, this former employee verified that "DaVita insurance counselors . . . have the specific goal to make sure patients can obtain higher paying plans than Medicare," and that "there is pressure to put everybody on the [AKF] program."

113.    Commercial insurers also responded to the RFI, confirming patient steering and asking CMS to put a stop to it. For example, in Aetna's response, Aetna referred to a North American Equity Research analysis of DaVita's practices, which highlighted the Company's sudden, dramatic and disproportionate increase of "100 basis points" in commercial patients after

the ACA went into effect, and that "inappropriate steering could have been a significant driver of the growth in [DaVita's] commercial customer base."

114.   Blue Cross of Idaho also singled out DaVita in its response, noting that the Company, along with Fresenius, provides "nearly 80% of [the AKF's] annual donations – which exceeded $260 million in 2015."  The response further highlighted that these two companies' control of the market "has enabled them to extract robust commercial payment rates" that were "substantially in excess of Medicare and Medicaid payment rates."  Because of this disparity, the response noted that the "financial incentives for DaVita and Fresenius" to steer are "substantial," and that "their funding of AKF furnishes the vehicle" to pay for commercial premiums.

115.   Blue Shield of California submitted a response stating it had conducted an internal investigation of patients receiving AKF assistance.  The investigation revealed that Blue Cross had paid out tens of millions of dollars more for ESRD patients receiving AKF assistance, dramatically impacting the entire insurance pool, and that the AKF programs were "designed for the purpose of steering patients into commercial individual market plans, and to defer and deter those patients from enrolling in Medicaid and Medicare."

116.   Blue Shield of California stated its internal investigation also revealed the mechanics of the steering scheme, which it claimed was occurring at DaVita.  The response stated that counselors and social workers would "approach patients about 'financial assistance' with insurance premiums, but offered "no information about Medicare eligibility to members." The response noted that DaVita's misinformation campaign led to several patients being unaware that "they were Medicare eligible until told by our interviewer," or that "they believed Medicare/MediCal plans do not cover dialysis."

2.      **Defendants Emphatically Denied the Steering Allegations in the CMS RFI and Subsequent Investigative Reports Further Exposing The Company's Unlawful Practices**

117.    Despite the multitude of specific reports detailing DaVita's steering practices, including from former DaVita social workers, insurance counselors, and commercial insurers, the Company's September 22, 2016 response to the RFI was one of denial. In short, DaVita insisted: "We do not steer," and instead that its practice was to merely "educate" patients about all of their insurance options, of which ACA exchange plans were only one. DaVita's denials echoed Thiry's earlier public statements that ESRD patients independently enrolled in ACA exchange plans by "personal choice." Specifically, DaVita stated:

> DaVita does not steer patients toward any particular insurance option or plan. DaVita educates its patients so that they are able to make informed decisions that are in their best interest. Moreover, DaVita does not pay patients' health insurance premiums. Charitable assistance provided to [ESRD] patients by the [AKF HIPP] is sufficiently separate from provider contributions to the AKF and provides invaluable support to patients most in need.

118.    On the heels of DaVita's flat denials of its steering practices, on October 23, 2016, the *St. Louis Post-Dispatch* published an investigative report based on internal Company emails and interviews with former DaVita employees. While the report referenced DaVita's claim that it merely "educates" patients and does not steer, the report stated that internal Company documents demonstrated otherwise, including a "systematic approach" to steering patients towards AKF-backed plans, and that "DaVita employees were instrumental in helping patients enroll by helping complete applications for the plans and for the American Kidney Funds." Notably, the report also confirmed that the "initiative was referred to as the 'Medicaid Opportunity' in internal emails."

119.    The report went on to detail how the Company targeted Medicaid patients in particular, with Company brochures making false claims to patients about how private insurance

coverage would offer access to better care and faster kidney transplants.  The brochures also attempted to "sell" patients on switching to a commercial plan by telling them it would allow them to travel out of state, and that the coverage was "low to no cost and encouraged patients to reach out to social workers and insurance counselors to learn more."

120.    The report also revealed how the Company closely tracked employees' "steering" efforts, by monitoring "how many patients were interested in commercial coverage and the percentage of those that had been talked to by employees about their options."  For example, the report quoted one internal email that stated:  "Hooray!  The Village [DaVita] has completed over 75% of interest conversations, and over 7,200 patients will receive enrollment education on the specific plans available in their market."  The report stated that "[t]he goal outlined in the emails was to hit 100 percent of 'interest conversations' by late October."

121.    The report also described how "disinterested" patients were also closely tracked "and their cases were reviewed by division vice presidents and regional operational directors." The report stated:  "The emails instructed that division leadership teams should conduct weekly or biweekly calls to discuss 'validation' for patients who are not interested in this opportunity."

122.    In reaction to the *Post-Dispatch* article, DaVita's stock price dropped $2.86 per share, or nearly 5%, wiping out $565 million in Company market capitalization.

**3.    DaVita Announces The Suspension of AKF Assistance for its Medicaid Patients and Downplays the Potential Financial Impact to the Company**

123.    Under increasing regulatory pressure, and in the wake of the *St. Louis Post-Dispatch* report revealing internal Company documents that confirmed DaVita's steering scheme, on October 31, 2016, DaVita issued a press release effectively admitting that it had been steering certain patients away from Medicaid and into commercial plans.  Specifically, the Company announced that, "effective immediately," it would "suspend support for applications to

the [AKF] for charitable premium assistance by patients enrolled in minimum essential Medicaid coverage who are seeking additional coverage on a 2017 ACA Plan."

124.    The financial impact of this policy change was estimated at up to $140 million, with up to $90 million in additional costs.  While DaVita downplayed its suspension of AKF assistance for this subset of patients by saying it impacted only 1% of its total patient population, the potential $140 million comprised 16% of its $880 million in 2016 profits—and if DaVita were to incur the full $230 million loss, it would comprise nearly 18% of the Company's operating income, or 26% of its 2016 profits.

125.    Nevertheless, DaVita continued to mislead the public regarding its steering practices, intentionally minimizing both the fact that it had been steering patients and the significant contribution of the steering scheme to the Company's profits.  Specifically, DaVita again claimed that it merely provided "education" to its patients regarding insurance options, and that its patients chose those plans out of their own accord.  The Company also insisted that the number of patients affected by its policy change was "only a small number."

126.    Analysts began to highlight the inconsistencies and deficiencies in DaVita's disclosures.  An October 31, 2016 J.P. Morgan report, entitled "DVA Sizes a Portion of AKF Exposure," commented that without the Medicaid patients who switched to AKF-backed ACA plans, DaVita's "<u>dialysis operating income growth was negative in 2014 and 2015 excluding the benefit of shifting these patients into ACA plans</u>."

127.    The Company's disclosures regarding its AKF exposure were also materially incomplete.  Specifically, DaVita's October 31, 2016 press release listed only the financial impact for the total number of ESRD patients with <u>ACA plans</u> who were receiving AKF assistance—not the total number of ESRD patients with <u>commercial plans</u> who were receiving

AKF assistance (*i.e.*, including those with COBRA and group plans).  This omission was highly material and deliberate, seeking to conceal that, as DaVita would ultimately be forced to admit by the end of the Class Period, over 75% of its profits were directly attributable to its illicit relationship with the AKF.

128.    On DaVita's November 2, 2016 third quarter earnings call, DaVita reaffirmed its prior statements that it had done nothing improper with regard to patient steering, and continued to minimize the impact.  Specifically, Defendant Rodriguez claimed the Company's change in policy with regard to the AKF was not permanent, stating:  "[W]e have only temporarily suspended support for applications to the American Kidney Fund for patients enrolled in minimum essential Medicaid coverage," and that the Company was awaiting formal guidance from CMS.  Rodriguez also emphatically insisted "[o]ur historical practices were legal and compliant."  Rodriguez otherwise continued to downplay the issue, stating, among other things: "Just a small portion of our Medicaid patients made the choice to purchase an ACA plan.  And they did so for their own personal reasons, such as to have access to specialists who do not accept Medicaid, or increased chance of qualifying for transplantation or other reasons."

129.    During the call, Thiry echoed Rodriguez' statements, claiming: "we fulfilled our regulatory responsibility to provide comprehensive education to our patients," and that "a very small percentage of our Medicaid patients determined that an ACA plan was better for them." Thiry also claimed that because DaVita knew it would receive much higher rates for any patients who switched to a private plan, it had created a "very intense oversight process" and "did everything possible to live up to the CMS standards."

130.    When, later on the call, an analyst asked the Company to address "comments from either current or former DaVita employees who talked about being pressured to sign people

up on commercial plans," Rodriguez responded by "highlight[ing] that the numbers are small," while claiming that a minority of the Company's employees must have somehow negatively experienced its "intense oversight" to prevent patient steering (*i.e.*, as steering).

131.    Of course, rather than creating a "very intense oversight process" to make sure that the Company did "everything possible" to present information about all insurance options to its patients objectively, DaVita did the exact opposite.   It created a "very intense oversight process" to pressure its employees, nationwide, to steer patients into commercial plans for the Company's profit and at the patients' expense.   Moreover, the Company's practices were not "legal and compliant"—far from it. DaVita was, instead, illicitly steering ESRD patients into commercial plans and paying its patients' commercial premiums for them by funneling funds through the AKF, in direct contravention of CMS regulations, the Social Security Act, the 1997 OIG opinion and the federal anti-kickback laws.

132.    Also during the call, an analyst from J.P. Morgan asked Thiry to quantify the Company's full exposure to the AKF, stating:   "Any chance you could tell us what percentage of your commercial patients, if you know it, receive premium assistance from the AKF?" Tellingly, Thiry refused to answer the question, remarkably stating that it was not in the market's "best interests":   "I think at this point, we've decided that disclosing that is not in your best interests, although we'll continue to stare at that each quarter."

### 4.    CMS Issues An Interim Rule, Leading To Ramped Up Scrutiny of DaVita's Relationship With The AKF

133.    On December 14, 2016, CMS issued an interim rule requiring dialysis providers to disclose to commercial insurers which patients were receiving AKF assistance, thereby empowering commercial insurers to refuse to insure those patients (which they were already legally permitted to do, and encouraged to do by CMS).   In its rationale for the interim rule,

CMS noted that steering was "widespread"; that dialysis providers were "paying for or arranging payments" for patients' premiums, among "a range of concerning practices"; and that these practices lead to various harms to patients, including "negatively impacting their determination of readiness for a kidney transplant":

> Comments [in response to the August 18, 2016 RFI] indicated that dialysis facilities are involving themselves in ESRD patients' coverage decision and that <u>this practice is widespread</u>.  In addition, all commenters on the topic – including insurance companies, dialysis facilities, patients, and non-profit organizations – stated that they believe many dialysis facilities <u>are paying for or arranging payments</u> for individual market health care premiums for patients they serve . . . [C]omments [] documented <u>a range of concerning practices</u>, with providers and suppliers influencing enrollment decisions in ways that put the financial interest of the supplier above the needs of patients . . . Comments also described that, even though it is financially beneficial to suppliers, enrollment in individual market coverage paid for by dialysis facilities or organizations affiliated with dialysis facilities can lead to three types of harm to patients:  <u>negatively impacting their determination of readiness for a kidney transplant, potentially exposing [them] to additional costs for health care services, and putting them at significant risk of mid-year disruption in health care coverage</u>.

134.   On December 25, 2016, *The New York Times* published an exposé on the American Kidney Fund that further confirmed DaVita's illicit steering scheme, entitled: "Kidney Fund Seen Insisting On Donations, Contrary to Government Deal."   The article described how, for years, the AKF intentionally favored its biggest donors, including DaVita, by giving premium assistance to their ESRD patients—and denying such assistance for patients of dialysis companies who did not donate to the fund.

135.   Specifically, the article detailed "multiple cases" in which the AKF "pushed back on workers at clinics that had not donated money, discouraging them from signing up their patients for assistance."   The article was based on "interviews with more than a dozen social workers, employees of dialysis clinics, insurance officials and regulators, and a former executive at the charity" from "about a half-dozen states around the country" who were "called randomly." The article also revealed that, until recently, the AKF's own guidelines on its website included

an "Honor System" instructing dialysis providers <u>to track the amount of money their patients</u> <u>received from the AKF and donate an equivalent amount back to the program in order for</u> <u>patients to receive premium assistance</u>.

136.    On January 6, 2017, the Department of Justice opened a probe on the Company, and DaVita announced that the United States Attorney's Office for the District of Massachusetts served a subpoena on the Company seeking "documents relevant to charitable patient assistance organizations, particularly the American Kidney Fund, including documents related to efforts to provide patients with information concerning the availability of charitable assistance."   On this news, DaVita's stock fell $2.41, or 3.7%, from $65.79 per share on Friday, January 6, 2017 to $63.38 per share on Monday, January 9, 2017.

137.    On January 9, 2017, DaVita and other dialysis providers, in addition to a patient advocacy group controlled by DaVita, sued CMS in federal court in Texas to stop the interim rule from going into effect.  The court enjoined implementation of the rule on technical grounds, holding that it violated the Administrative Procedures Act by failing to provide appropriate notice of the rule or enough time to comment.  Tellingly, despite DaVita's claim that its suspension of AKF assistance for Medicaid patients to switch to commercial plans was temporary pending CMS' interim rule, DaVita did not resume using AKF assistance to switch Medicaid patients onto commercial plans.

138.    On January 12, 2017, Change to Win Investment Group ("CtW"), a shareholder activist group that aims to hold public companies accountable, wrote a letter to DaVita's board questioning the Company's suspicious uptick in commercial patients after the ACA went into effect and its improper relationship with the AKF.  Specifically, the letter expressed concerns "that DaVita may have failed to comply with CMS rules surrounding the signing-up of

Medicaid-eligible patients for commercial insurance through the [ACA] exchanges over the past three years." The letter further asked DaVita to "[d]isclose corporate contributions to the [AKF], and the percentage of DaVita's commercially insured patients receiving premium assistance from the AKF, since January 1, 2014."

139. The letter also highlighted that "following a steady decline in the share of patients with commercial insurance – from 36% in 2007 to 33% in 2014 – this trend reversed in 2015 in a 100 basis point jump." The letter further underscored DaVita's prior refusal to disclose the Company's percentage of commercially insured patients receiving AKF assistance:

> Independent financial analysts have estimated that changes to the rules governing third-party insurance support for dialysis patients could cost DaVita an additional $270 million to $670 million in annual pretax income. Unfortunately, DaVita has refused to answer analyst questions concerning the percentage of its commercial patients receiving premium assistance or comparable financial support from the AKF, with Chairman and CEO Kent Thiry remarkably stating that "I think at this point, we've decided that disclosing that is not in your best interests."

### 5. The Company's Full Exposure to its AKF Relationship Emerges

140. In 2017, the truth regarding the full impact of DaVita's steering scheme with the AKF, and the Company's staggering exposure to that scheme, began to emerge.

141. On February 24, 2017, the Company filed its Form 10-K with the SEC, reporting that, in 2017, commercial payers—who by now had gotten wind of DaVita's scheme to steer its patients into commercial plans with AKF assistance so it could profit off high commercial reimbursement rates—were amending their policies to refuse to accept charitable premium assistance from foundations like the AKF:

> In 2017, a number of commercial payers have incorporated policies into their provider manuals refusing to accept charitable premium assistance from bona fide non-profit organizations, such as the American Kidney Fund, which may impact the number of patients who are able to afford commercial exchange plans.

142.    On May 2, 2017, DaVita held its first quarter earnings call, during which it confirmed "lower enrollment of patients on the ACA plans." The Company also disclosed that it had in fact lost <u>all</u> of the 2,000 Medicaid patients who were enrolled in ACA plans with AKF assistance, causing its commercial mix to drop to 11%. This meant the Company would absorb in 2017 the full $140 million impact disclosed in the October 31, 2016 press release. In reaction to this news, DaVita's stock dropped over 5%.

143.    On May 25, 2017, the Company held its "Analyst/Investor Day." During that conference, an analyst again asked if Thiry could provide disclosure regarding "AKF funding of the commercial plans outside of the ACA?" Remarkably, Thiry again responded by refusing to answer the question because "<u>it would not be in your best interest for us to start providing all sorts of detail on that other chunk</u>."

144.    Then, on April 14, 2017, Aetna sued DaVita in Pennsylvania state court, seeking disclosure of DaVita's patients receiving charitable premium assistance from the AKF pursuant to the parties' contract (which DaVita had refused to provide). Aetna's lawsuit directly referenced the litany of steering allegations lodged against DaVita since CMS' August 2016 RFI.

145.    On August 1, 2017, DaVita reported disappointing second quarter earnings, which dropped 15% compared to the same period in 2016 (from $210 million to $179 million). DaVita attributed these poor results to the decrease in its commercial mix, which was causing the Company to earn less revenue per treatment: "We continue to expect full-year revenue per treatment in 2017 to be down 1% to 2% from full-year average in 2016." The fact that DaVita was continuing to lose commercial patients even after the initial $140 million loss from its suspension of switching Medicaid patients to AKF-backed commercial plans revealed that (i) the Company was far more reliant on AKF assistance than what it had disclosed; and (ii) commercial

payers were continuing to successfully refuse to insure ESRD patients who were paying their premiums with AKF assistance.  In reaction to this news, DaVita's stock dropped nearly 10% on heavy trading volume.

### 6.     The Full Magnitude of Defendants' Steering Fraud is Revealed

146.     In the fall of 2017, due to a storm of analysts' questions and estimates, the Company could no longer conceal the full exposure it had to its illicit relationship to the AKF.

147.     On September 22, 2017, the Southern Investigative Reporting Foundation ("SIRF") published an exposé on DaVita, revealing that as much as 50% of the Company's operating income was attributable to its illicit relationship with the AKF.  Specifically, the report revealed that: "The Company's finances, according to [SIRF's] accounting analysis, appear to be massively levered to an opaque non-profit, the American Kidney Fund, that <u>may provide up to half its operating profits</u>."  The report stated in pertinent part:

> Using DaVita's [SEC] filings, the AKF's Internal Revenue Service annual Form 990 filings and a little extrapolation, [SIRF] estimates that at a minimum, <u>AKF's support helps generate between 40 and 45 percent of the Kidney Care unit's estimated earnings before interest and taxes</u>."

148.     The report went on to state that "[w]hat makes AKF's role so astounding is that [DaVita's] handsome profits came from a base of about 9,000 dialysis patients, barely more than four percent of DaVita's 194,600 patients."  The report also opined on Thiry's refusal to disclose the Company's full exposure to the AKF, stating:  "Thiry's reticence is a function of the fact that the AKF relationship is – in the parlance of value investors – DaVita's sole moat, or a sustainable economic advantage separating it from competitors."  In reaction to this report, DaVita's stock dropped again, over 6%, from $61.26 to $57.49.

149.     Then, on October 9, 2017, J.P. Morgan published a report downgrading DaVita's stock, based on its estimate that "<u>as much as 60-80%+ of DVA's earning power is derived from</u>

its AKF relationship." The report reached this conclusion as a result of the AKF's "updated disclosures"—specifically, the AKF had recently disclosed that it was assisting a total of 21,000 non-ACA commercial patients with their premiums (*i.e.*, COBRA and group plan patients). Applying DaVita's 38% market share to this figure, the report extrapolated that DaVita's non-ACA commercial patients being assisted by the AKF amounted to approximately 8,000 patients, comprising a staggering "60-80%+ of DVA's earning power." The report stated that this exposure was "in addition to [the Company's] previous HIX-subsidized enrollment disclosure ($230m or 18% of total earnings)."

150. This figure was, of course, substantially higher than the SIRF's report's conclusion. The J.P. Morgan report also noted that "DVA has refused to publicly disclose its total number of AKF-subsidized commercial patients," and emphasized that "[u]ntil we can receive greater clarity to the contrary, we advise investors to underweight DVA shares." The report concluded that "[t]his earnings power is at risk if the legal legitimacy of the AKF is compromised by a possible DOJ investigation AND as health plans ferret out subsidized patients that they are under no legal obligation to underwrite."

151. In reaction to this report, DaVita's stock dropped nearly 10% from $59.82 to $53.89, the lowest it had been since late October 2016.

152. On October 10, 2017, under mounting pressure from investors and analysts, DaVita was forced to confirm analysts' estimates that the Company's full exposure to its relationship with the AKF impacted more than 75% of its $880 million in 2016 profits. Specifically, the Company revealed that, altogether, $680 million of its earnings were reliant upon its illicit relationship with the AKF, or more than three times greater than the $230 million the Company had initially asserted was at risk in its October 30, 2016 press release. The

Company disclosed that this was because a staggering 4,300 patients—in addition to the 2,500 already disclosed—were receiving AKF assistance for commercial plans, including 4,000 receiving AKF assistance for "employer group plans and COBRA plans."  DaVita estimated that its loss in operating income if these patients could no longer receive AKF assistance—or if insurers refused to cover them—would amount to $450 million in financial exposure (in addition to the $230 million potential impact already disclosed), resulting in a total of $680 million at risk because of the Company's illicit steering scheme.

## VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

153.    Defendants made false and misleading statements and material omissions during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder.  Throughout the Class Period, DaVita's press releases, investor presentations, and public filings made with the SEC included material misstatements and/or omissions concerning the Company's financial results, which included revenue derived from insurance plans in which DaVita, through the AKF, was improperly paying for patients' health care premiums.

154.    Defendants repeatedly emphasized that for those patients that do not otherwise qualify for dialysis reimbursement through government-sponsored programs such as Medicare or Medicaid, DaVita supported commercial insurance programs paid for by the AKF, a purported third-party 501(c)(3) charity.  Defendants failed to disclose, however, that DaVita improperly steered renal care patients with government-sponsored health insurance into private health insurance plans to maximize corporate profits.  Patients were steered under the guise that they would gain coverage that was superior and typically out of reach financially.  In reality, steering

patients into commercial plans could result in the disruption of care associated with a change in network providers, and actually limited patients' ability to receive kidney transplants altogether.

155.    Defendants' representations regarding charitable premium assistance and its relationship with the AKF were false.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of DaVita's business, operational status, and future growth prospects as the Company was relying on improper and unlawful business practices to boost profitability.

### A.    Statements Regarding 2014 Annual Results

156.    On February 26, 2015, the Company filed its Form 10-K with the SEC for the year ended December 31, 2014 ("2014 Form 10-K").  The 2014 Form 10-K was signed by Defendants Thiry and Hilger.  The 2014 Form 10-K was certified by Defendant Thiry and DaVita's then-CFO Garry E. Menzel, who resigned in March 2015 after "a slate of high-profile civil and criminal investigations" and less than two years at the Company.[11]

157.    The 2014 Form 10-K falsely stated that <u>only</u> "some patients who do not qualify for Medicaid" and "cannot afford secondary insurance" were receiving AKF assistance, and that DaVita's "voluntary contributions" were charitable in nature:

> <u>Some patients who do not qualify for Medicaid, but otherwise cannot afford secondary insurance, can apply for premium payment assistance from charitable organizations through a program offered by the American Kidney Fund. We and other dialysis providers support the American Kidney Fund and similar programs through voluntary contributions</u>.

158.    The statements in paragraph 157 above were materially false and misleading, and omitted material facts when made.  Specifically, the statement set forth above limiting the AKF's

---

[11] Susan Morse, "DaVita HealthCare CFO resigns after settlements sting dialysis provider," (Healthcare Finance Mar. 31, 2015), *available at* http://www.healthcarefinancenews.com/news/davita-healthcare-cfo-resigns-after-settlements-sting-dialysis-provider.

assistance to "some patients who do not qualify for Medicaid" was materially false and misleading as the truth was exactly the opposite.  In reality, DaVita was intentionally "steering" all of its ESRD patients to AKF-backed insurance programs, including those who qualified for, or were currently enrolled in, Medicaid.  Additionally, DaVita's support to the AKF was not mere "voluntary contributions." Rather, DaVita engaged in a "coordinated effort," an established "quid pro quo," enabling DaVita to fund commercial insurance premiums for its own dialysis patients, thereby violating CMS regulations and anti-kickback laws.

### B.   DaVita's Code of Conduct

159.   DaVita's Code of Conduct was described in DaVita's annual filings on Form 10-K and posted and published on the Company's website.  During the Class Period, the Code of Conduct falsely stated that the Company "[does] not participate in charitable activities or make charitable contributions to improperly induce referrals, to illegally gain an unfair business advantage, or in violation of the law."  The Code of Conduct further stated that "DaVita may make a charitable contribution, if it is not given in order to induce or receive patient referrals or gain an unfair business advantage, and you obtain appropriate approvals in accordance with local policies."[12]

160.   Defendants' statements in paragraph 159 above that DaVita did not make charitable contributions to "illegally gain an unfair business advantage, or in violation of the law," was materially false and misleading.  Indeed, that is exactly what Defendants sought to accomplish through their steering scheme: an unfair, illegal and unethical business advantage.  Moreover, DaVita's purported "voluntary" contributions to the AKF were provided for a

---

[12]   *See*   https://www.davita.com/UploadedFiles/About_v4/Corporate_Governance/Code_of_Conduct/CodeOfConduct_English_Interactive.pdf

singular purpose: so that the AKF would, in turn, pay the Company's ESRD patients' commercial premiums for them, thereby enabling DaVita to obtain exponentially higher reimbursements for its dialysis services.

### C.    Statements Regarding 2015 Second Quarter Earnings

161.    On August 4, 2015, DaVita filed with the SEC its Form 10-Q for second quarter of 2015 ("Q2 2015 Form 10-Q"), which was signed and certified by Defendants Hilger and Thiry. The Q2 2015 Form 10-Q stated that the Company's strong financial performance was "mostly due to an increase of $129 million associated with the U.S. dialysis and related lab services' net revenues," which was "driven by improvements in our commercial payor mix."

162.    Also on August 4, 2015, DaVita held a conference call with analysts and investors to discuss the Company's Q2 2015 financial results.  During the call, Defendant Thiry stated that "the biggest good news is that our commercial mix and our rates, both went up a bit." Elaborating on the importance of the Company's commercial mix number, Thiry stated: "The commercial mix number is particularly significant in that it shows that up to this point at least, exchanges are not hurting us as we continue to hold our commercial prices constant for this commercial segment in our mind."  Defendant Hilger also highlighted the growth in "improved revenue per treatment due to improved commercial mix."

163.    The statements in paragraphs 161-162 above were false and misleading, and omitted material facts when made.  Specifically, DaVita's statements regarding its improved commercial mix metric were materially false and misleading because this improvement was not driven by the availability of exchange plans to ESRD patients as a result of the ACA.  Instead, DaVita's commercial mix was materially bolstered by Defendants' illegal steering scheme aimed at convincing all patients enrolled in Medicare and Medicaid to enroll in commercial insurance

plans, with the Company paying the premiums for those plans by illicitly funneling funds through the AKF. Moreover, Defendant Thiry's statement that exchanges were not "hurting" DaVita's commercial mix number was materially false and misleading, and omitted material facts when made, because Defendants were in fact exploiting the ACA individual market exchanges, steering patients to commercial insurance as it now became available to ESRD patients who had previously been disqualified.

        **D.**      **Statements Regarding Third Quarter 2015 Earnings**

164. On November 4, 2015, the Company filed with the SEC its Form 10-Q for third quarter of 2015 ("Q3 2015 Form 10-Q"), which was signed and certified by Defendants Hilger and Thiry. In disclosing the Company's financial results, DaVita attributed its net revenues increase of approximately $274 million or 8.4%, and increase in adjusted consolidated operating income of approximately $54 million or 11.9%, to "an increase in dialysis revenue per treatment of approximately $7" with the increase in average dialysis revenue per treatment primarily due to "improvements in [DaVita's] commercial payor mix."

165. DaVita's statements in paragraph 164 above regarding the supposed "improvements" in its key commercial mix metric were materially false and misleading. Indeed, these results and metrics were artificially bolstered as a direct result of DaVita's fraudulent scheme to illegally steer all of its ESRD patients—including those eligible for, and already insured by, Medicare and Medicaid—to enroll in commercial insurance plans, with the Company paying the premiums by illicitly funneling funds through the AKF. The improvements in commercial mix cited purportedly supporting the Company's increased revenues was therefore artificially manufactured by Defendants' widespread unlawful conduct.

### E.      Statements Regarding Fourth Quarter 2015 and Full Year 2015 Earnings

166.    On February 11, 2016, DaVita issued a press release announcing its financial results for the fourth quarter 2015 and full year 2015.  The Company reported strong results in its key metrics for the full year 2015, with adjusted net income of $828 million, or $3.83 per share, and consolidated net revenue of $13.78 billion.  Moreover, DaVita reported U.S. dialysis segment net revenue of $8.642 billion, an increase of approximately 5.3% and an increase in revenue per treatment of 1.6% to $347.64 on a year-over-year basis.  Also on February 11, 2016, DaVita held a conference call with analysts and investors whereby Defendant Thiry praised Kidney Care's "once again, strong quarter, strong year," adding that Defendants "anticipate[d] in 2016 another solid year, $1.625 billion to $1.725 billion."

167.    On February 26, 2016, the Company filed its Form 10-K with the SEC for the year ended December 31, 2015 ("2015 Form 10-K"), which was signed and certified by Defendants Thiry and Hilger.  In addition to reiterating DaVita's previously reported financial results, the 2015 Form 10-K stated that the Company's "financial performance was once again strong for 2015," with growth coming from "payor mix improvements in our dialysis business." The 2015 Form 10-K also stated that the Company's increase in consolidated net revenues was attributable to "an increase of $6 in the average dialysis revenue per treatment," primarily from "improvement in [DaVita's] commercial payor mix."

168.    Significantly, the 2015 Form 10-K noted that, for the first time in several years, the Company's growth of commercial patients outpaced the growth of government-based patients, demonstrating that Defendants' steering campaign was succeeding:

> Prior to 2015, we had experienced growth in our government-based patients that had been outpacing the growth in our commercial patients which had negatively impacted our average dialysis and related lab services revenue per treatment since we receive higher reimbursement rates from our commercial payors. However, in

> 2015, for the first time in several years, the growth of our commercial patients slightly outpaced the growth of our government-based patients as more of our patients are covered by commercial contracted plans.

169.    DaVita's statements in paragraph 166-168 above regarding the supposed "improvements" in its key commercial mix metric were materially false and misleading. In reality, these improvements were the product of Defendants' illegal steering campaign, which resulted in DaVita's sudden turnaround in its commercial mix metric and growth in government patients "for the first time in several years." The improvements in commercial mix cited, which purportedly supported the Company's increased financial results, were therefore artificially manufactured by Defendants' widespread unlawful conduct.

170.    With regards to the AKF, the 2015 Form 10-K once again affirmatively misstated the scope of DaVita's reliance on and relationship with the AKF, asserting only that patients who did not qualify for Medicaid or Medicare were eligible for AKF assistance. Indeed, the 2015 Form 10-K again falsely stated that only "some patients who do not qualify for Medicaid" and "cannot afford secondary insurance" were receiving AKF assistance, and that DaVita's "voluntary contributions" were charitable in nature:

> Some patients who do not qualify for Medicaid, but otherwise cannot afford secondary insurance, can apply for premium payment assistance from charitable organizations through a program offered by the American Kidney Fund. We and other dialysis providers support the American Kidney Fund and similar programs through voluntary contributions."

171.    The 2015 Form 10-K also specifically represented, for the first time, that the AKF also provided commercial premium assistance only for patients who were not eligible for Medicare – *i.e.*, those who were commercially insured "before" Medicare became their primary payor for dialysis. Moreover the Company falsely represented to investors that it was only this small subset of commercial patients who accounted for "nearly all of our profits."

<u>Before a patient becomes eligible to have Medicare as their primary payor for dialysis services</u>, a patient's commercial insurance plan, if any, is responsible for payment of such dialysis services for the first 33 months, as discussed above. Although commercial payment rates vary, average commercial payment rates established under commercial contracts are generally significantly higher than Medicare rates. <u>The payments we receive from commercial payors generate nearly all of our profits</u> . . . <u>Patients with commercial insurance who cannot otherwise maintain coverage frequently rely on financial assistance from charitable organizations, such as the American Kidney Fund</u>. If these patients are unable to obtain or continue to receive such financial assistance, our revenues, earnings, and cash flow could be substantially reduced.

172. The statements in paragraphs 170-171 above were materially false and misleading, and omitted material facts when made. Specifically, the statements set forth above limiting the AKF's assistance to "some patients who do not qualify for Medicaid," or to those patients who had not yet become eligible for Medicare, were materially false and misleading as the truth was exactly the opposite. In reality, DaVita was intentionally "steering" <u>all</u> of its ESRD patients to AKF-backed insurance programs, <u>including those who qualified for, or were currently enrolled in, Medicaid and Medicare</u>. In addition, the Company's statement that "nearly all of our profits" were attributable to commercial patients <u>before</u> they were eligible for Medicare was materially false. Indeed, as would be revealed by the end of the Class Period, more than 75% of the Company's profits was directly attributable to ESRD patients who <u>were</u> eligible for Medicare and Medicaid, but had been steered by the Company to commercial plans using AKF assistance. Additionally, DaVita's support to the AKF was not mere "voluntary contributions." Rather, DaVita engaged in a "coordinated effort," an established "quid pro quo," enabling DaVita to fund commercial insurance premiums for its own dialysis patients, thereby violating CMS regulations and anti-kickback laws.

## F.   Statements Regarding First Quarter 2016 Earnings

173. On May 4, 2016, the Company filed with the SEC its Form 10-Q for first quarter of 2016 ("Q1 2016 Form 10-Q"), which was signed and certified by Defendants Hilger and

Thiry.  Among other things, the Q1 2016 Form 10-Q touted that the Company's increase in consolidated net revenues of approximately $293 million, or 8.9% compared to the same period in 2015, was attributable to "an increase in [DaVita's] average dialysis revenue per treatment of approximately $5," due to "improvements in [DaVita's] commercial payor mix."

174.    DaVita's statements in paragraph 173 above regarding the supposed "improvements" in its key commercial mix metric were materially false and misleading.  Indeed, these results and metrics were artificially bolstered as a direct result of DaVita's fraudulent scheme to illegally steer all of its ESRD patients—including those eligible for, and already insured by, Medicare and Medicaid—to enroll in commercial insurance plans, with the Company paying the premiums by illicitly funneling funds through the AKF.  The improvements in commercial mix cited purportedly supporting the Company's increased revenues were therefore artificially manufactured by Defendants' unlawful conduct.

175.    Also on May 4, 2016, DaVita held a conference call with analysts and investors to discuss the Company's Q1 2016 financial results.  During the earnings call, analysts specifically inquired as to the cause of DaVita's increase in its commercial mix:

> <Q - Gary P. Taylor>: …Did you make a comment about commercial mix of patients, which I think was – actually grew year-over-year in 2015 for, I think, the first time in some time, so 1Q of 2016, did that change?
>
> <A - James K. Hilger>: It did grow in 2015 for the first time in a long time, and so we're pretty pleased with where we are at. I think we disclosed in the 10-K a 12% mix. We're rounding up to 12%.
>
> <p align="center">* * *</p>
>
> <Q - Gary P. Taylor>: Okay. So the commercial mix continued to improve year-over-year in 1Q of 2016 or has that leveled out?
>
> <A - Vijay Kotte>: We continued to improve in the quarter.
>
> <Q - Gary P. Taylor>: And is most of that – is that improvement being driven by exchanges or...?

<A - Vijay Kotte>: <u>That is a portion of the improvement. The improvement we've seen over a multiple-quarter period is in part due to exchanges and in part due to improving economy and in some cases it's difficult to discern which is where.</u> We know where the exchanges are but there also is some cannibalization.

176.   Defendants' statements in paragraph 175 above regarding DaVita's key commercial mix metric were materially false and misleading, as this growth was not driven "due to exchanges" now available to ESRD patients as a result of the ACA, or an "improving economy." DaVita's sudden turnaround in its commercial mix metric and growth in government patients "in 2015 for the first time in a long time," was, instead, a direct result of DaVita's fraudulent scheme to illegally steer <u>all</u> of its ESRD patients—including those eligible for, and already insured by, Medicare and Medicaid—to enroll in commercial insurance plans, with the Company paying the premiums by illicitly funneling funds through the AKF.

177.   The importance of Defendants' fabricated positive core dialysis segment financials, including the increase in the number of commercial patients, was underscored by analysts' reaction. For example, SunTrust stated in its May 5, 2016 report that "continued strength in Kidney Care (volumes, mix, international expansion) is encouraging…We were encouraged by Kidney Care momentum, improving payor mix, strength in cash flow and see an upward bias to the guidance." Additionally, KeyBanc noted in its May 4, 2016 report that it was "raising our estimates at DVA following better than expected 1Q results driven by (as usual) strong Kidney Care Performance."

### G.   Statements Regarding 2016 Second Quarter Earnings

178.   On August 8, 2016, the Company filed with the SEC its Form 10-Q for the second quarter of 2016 ("Q2 2016 Form 10-Q"), which was signed and certified by Defendants Hilger and Thiry. Among other things, the Q2 2016 Form 10-Q stated that the Company's increase in consolidated net revenues of approximately $283 million, or 8.2% as compared to the second

quarter of 2015, was a result of "an increase in our average dialysis revenue per treatment of approximately $3" due to "improvements in [DaVita's] commercial payor mix."

179.    DaVita's statements in paragraph 178 above regarding the supposed "improvements" in its key commercial mix metric were materially false and misleading.  Indeed, these results and metrics were artificially bolstered as a direct result of DaVita's fraudulent scheme to illegally steer all of its ESRD patients—including those eligible for, and already insured by, Medicare and Medicaid—to enroll in commercial insurance plans, with the Company paying the premiums by illicitly funneling funds through the AKF.  The improvements in commercial mix cited purportedly supporting the Company's increased revenues were therefore artificially manufactured by Defendants' widespread unlawful conduct.

180.    Further, on August 8, 2016, DaVita held its Q2 2016 earnings call where the Company reported "solid adjusted operating income and strong cash flows" for the quarter, driven by Kidney Care.  In addition to Defendants touting the Company's artificially strong Kidney Care results, this call was the first time during the Class Period that Defendants were directly confronted about DaVita's relationship with the AKF.  These inquiries were prompted by a lawsuit filed by UnitedHealth on July 1, 2016 against American Renal Associates, another large dialysis company, alleging that it was engaged in the exact scheme DaVita had been perpetrating for over a year: using the AKF to pay its ESRD patients' commercial premiums for them so it could obtain much higher reimbursements.  Accordingly, on the Company's Q2 2016 earnings call, analysts focused on DaVita's own relationship with the AKF.

181.    During the call, in response to analyst questioning, Defendant Rodriguez falsely claimed that the Company strictly adhered to an advisory opinion issued by the OIG twenty years ago in 1997, which allowed contributions from DaVita to the AKF for charitable premium

assistance under certain circumstances.   Rodriguez also claimed that DaVita was merely "donating" altruistically to the AKF:

> In Kidney Care, we have been donating and so have all other providers to help patients with end-stage renal disease for decades in order to be assisted with their premium. The OIG has reviewed that framework more than once and actually just did it over a year ago or so. And so, that framework has been vetted and, of course, we have to make sure that we all stay and abide by the rules that were outlined by the OIG. Did I get to what you're going to?"

182.   The statements in paragraphs 180-181 above were materially false and misleading, and omitted material facts when made.  First, while DaVita had been donating to the AKF for decades, it had materially increased those contributions in recent years to fund the Company's illicit steering scheme, so the Company could collect hundreds of millions of dollars in additional profits in commercial insurance reimbursements per year.

183.   Second, while the OIG had recently reviewed other requests for advisory opinions regarding charitable assistance for patients in recent years for entirely different programs—and specifically, charitable assistance for Medicare Part D costs (*i.e.*, a government funded prescription drug program)—the OIG had not reviewed the 1997 opinion DaVita was relying on to legitimize its donations to the AKF, nor had the OIG determined that DaVita and the AKF's arrangement remained in compliance with the 1997 OIG opinion.  Indeed, the 1997 OIG opinion was issued long before the ACA went into effect in 2014, and expressly applied only to the AKF's charitable assistance for Medicare and Medigap premiums – *i.e.*, government programs, not charitable premium assistance for commercial plans.  Additionally, at the time the opinion was issued, the AKF was receiving only $5 million in donations annually, less than 10% of which were attributable to dialysis companies.  In 2015, the AKF reported over $260 million in donations, 80% of which came directly from DaVita and Fresenius.

184.    Finally, while Defendant Rodriguez claimed DaVita would "make sure that we all stay and abide by the rules that were outlined by the OIG," DaVita was not doing so.  The 1997 OIG opinion specifically provided multiple safeguards to ensure that the arrangement between DaVita and the AKF did not violate federal anti-kickback laws, requiring that (i) DaVita did not "advertise the availability of possible financial assistance to the public"; (ii) DaVita's contributions "w[ould] not be earmarked for the use of particular beneficiaries or groups of beneficiaries"; (iii) DaVita would not "track the amount that AKF pays on behalf of patients dialyzing at [its] facilities in order to calculate future contributions";  (iv) the AKF would have "absolute discretion" regarding the use of any donated funds; (v) DaVita's contributions would be "gifts without any guarantee or promise on the part of the AKF that patients referred to the AKF for possible financial assistance with their insurance premiums will receive such assistance"; and (vi) that the AKF would not "take the identity of the referring facility into account in providing assistance to ESRD patients."

185.    DaVita's scheme violated the 1997 OIG opinion in all respects.  First, DaVita advertised the availability of AKF assistance directly to all prospective ESRD patients in its "Kidney Smart" classes.   *See, e.g.*, ¶¶65, 73-75.  Second, DaVita's contributions to the AKF were "earmarked" for payments of its patients' premiums, as part of its *quid pro quo* relationship with the AKF.   *See, e.g.*, ¶¶6, 14, 134-135.  Third, DaVita meticulously tracked the AKF's payments of its patients' commercial premiums, and directly based its contributions on those amounts.  *See, e.g.,* ¶¶88-89, 112, 135.  Fourth, the AKF did not have "absolute discretion" regarding the use of DaVita's "donations," but was completely beholden to the Company due its heavy reliance on the Company for its funding.  *See, e.g.,* ¶¶51, 114.  Fifth, DaVita's donations to the AKF were not "gifts," but an express *quid pro quo* in exchange for which the AKF paid its

ESRD patients' commercial premiums. *See, e.g.,* ¶¶14, 114-115, 134-135. Sixth, the AKF absolutely took "the identity of the referring facility into account" in providing premium assistance, as it provided that assistance to DaVita's patients in direct recognition of, and in proportion to, the Company's "donations." *See, e.g.,* ¶¶6, 14, 93, 95, 134-135.

186. Indeed, DaVita's use of its own funds to pay its patients' premiums by illicitly funneling them through the AKF—and its use of AKF assistance for "superior" commercial plans to entice vulnerable ESRD patients to utilize its clinics—was in direct contravention of the 1997 OIG opinion.

**H.     DaVita's Response to the CMS RFI**

187. On August 18, 2016, CMS announced a formal Request For Information regarding allegations that dialysis companies, including DaVita, had been steering ESRD patients into commercial plans for the sole purpose of collecting higher insurance reimbursements—*i.e.*, DaVita's exact scheme. The RFI reiterated: "It is improper to influence people away from Medicare or Medicaid coverage for the purpose of financial gain," as it would violate both the Social Security Act and federal anti-kickback laws.

188. In response to the RFI, J.P. Morgan issued a report discussing its "heightened" concerns regarding the impact that AKF assistance payments would have on DaVita, noting that "exchange health plans may reject the majority of American Kidney Fund (AKF) dialysis third party premium assistance payments during 2017 open enrollment," which "threatens at least 1% of DVA's patient mix (10-15% of EPS)." The report emphasized that "the issue is whether providers and financially interested third parties can pay the premiums for ESRD patients in order to benefit from higher commercial reimbursement rates." The report went on to highlight the CMS concern over DaVita's abuse of the healthcare system:

73

CMS has previously cautioned that such assistance could drive adverse selection and negatively impact the exchange risk pool . . . Following DVA's 2Q16 call we wrote "management did not do a great job of explaining the primary recent investor concern regarding the sustainability of the AKF patient subsidy program". Follow up conversations with DVA heightened our concerns . . . . Today, we are lowering our forward earnings estimates for DVA and reducing our 2017YE PT from $75 to $65.

189.  On September 22, 2016, DaVita submitted its response to the RFI, egregiously denying the truth of its relationship with the AKF and the effect that that had on its patients.  In its response, Defendants made numerous false claims, including that DaVita "does not steer patients towards any particular insurance option or plan":

> DaVita does not steer patients towards any particular insurance option or plan. DaVita educates its patients so that they are able to make informed decisions that are in their best interest.  Moreover, DaVita does not pay patients' health insurance premiums. Charitable assistance provided to end stage renal disease (ESRD) patients by the American Kidney Fund's (AKF) Health Insurance Premium Program (HIPP) is sufficiently separate from provider contributions to the AKF . . .

190.  The statements in paragraph 189 above were materially false and misleading, and omitted material facts when made.  First, DaVita's statement that it "does not steer patients towards any particular insurance option or plan," was patently false and misleading as DaVita employees nationwide confirmed that the reality was the exact opposite.  *See e.g.* ¶¶8-9, 53-103, 107-16, 118-21.  In truth, DaVita's steering of ESRD patients was its key business strategy, which has been confirmed by a plethora of confidential witness accounts, internal Company documents, testimonials in response to the CMS RFI, and other independent analyses.  *See e.g.* ¶93 (CW 1:  "We weren't educators.  We were revenue generators," explaining that "it was more about profit than patients" at DaVita); ¶¶56-89 (emails and presentations discussing DaVita's steering initiatives); ¶¶77-80, 84, 103 (spreadsheets that included detailed information tracking patients' commercial insurance and reimbursement rates); ¶¶107-16 (RFI public comments focused on DaVita's systemic steering).

191.     Second, DaVita did pay its ESRD "patients' health insurance premiums," by illicitly funneling funds through the AKF as there was no meaningful "separation" at all between DaVita and the AKF.  In reality, DaVita's "contributions" to the AKF were effectively a "quid pro quo" arrangement meant to skirt regulations prohibiting the Company from directly paying for its patients' commercial insurance premiums.

192.     Further, in DaVita's September 22, 2016 RFI response, the Company claimed that it "educated" patients by providing "balanced" information, and that its "interdisciplinary team" had "no outcome incentives" and "no knowledge of specific contract terms or rate agreements between DaVita and the commercial payors":

> If a patient has multiple insurance options, DaVita seeks to ensure the patient receives balanced, comprehensive information presented in a straightforward way to enhance the patient's understanding, including the short and long-term implications of each option . . . To help ensure an unbiased presentation of information to the patients, the DaVita interdisciplinary team has no outcome incentives.  In addition, the team does not have knowledge of specific terms or rate agreements between DaVita and the commercial payors.

193.     The statements in paragraph 192 above were materially false and misleading, and omitted material facts when made.  First, DaVita did not present "balanced" information to patients, nor meaningfully inform them of the "short and long-term implications" of the patient choosing private insurance funded by the AKF.  DaVita instead pushed private plans with AKF assistance on its vulnerable ESRD patients, neglecting to mention the serious implications of that choice—and most critically, the significant obstacles patients would face in obtaining a life-saving kidney transplant.  *See e.g.,* ¶¶37-41, 73-75, 108-09, 111.

194.     Second, as Plaintiffs' confidential witness accounts and review of internal Company documents show, DaVita specifically trained its employees to have knowledge of commercial reimbursement rates versus Medicare or Medicaid reimbursement rates.  *See e.g.* ¶¶77-80, 81-89, 103, 118 ("Medicaid Opportunity" training sessions specifically detailing the

higher reimbursement rates from commercial insurance; spreadsheets that included detailed information tracking patients' commercial insurance and reimbursement rates). DaVita's employees therefore had <u>full</u> knowledge of rate agreements between DaVita and the commercial payors.

195. Third, DaVita also provided significant "outcome incentives" for patient steering, as internal Company documents demonstrate that DaVita rolled out <u>formal incentive programs</u> that offered lucrative monetary bonuses to employees who contributed to the most "private pay" growth—*i.e.*, steered the most patients into commercial plans—and for employees who used Kidney Smart meetings to "educate" (*i.e.*, steer) the most patients to "choose" private insurance. *See e.g.* ¶¶62-67.

196. On October 26, 2016, J.P. Morgan released a follow-up note to its August 19, 2016 note lowering estimates and its price target. The J.P. Morgan report stressed potential legal consequences to DaVita, that it was engaged in behavior that was "unlawful," and in justifying its misconduct, <u>DaVita was remarkably taking the complete opposite view of its regulator</u>:

> The August 18, 2016 RFI from CMS explicitly states "<u>it is unlawful</u> to enroll an individual in individual market coverage if they are known to be entitled to benefits under Medicare Part A, enrolled in Medicare Part B, or receiving Medicaid benefits".  In its RFI response, <u>DVA takes the complete opposite view of its regulator</u>, stating "Contrary to the letter written to dialysis facilities in connection with the RFI, Medicaid patients have the right under the current regulations to enroll in an individual market plan." This may be <u>an implicit acknowledgement that DVA has played a role in enrolling such patients into HIX plans. Further, numerous RFI comments and a recent news article suggest DVA "educated" not just MDCD-eligibles, but current MDCD enrollees.</u>

**I.      October 31, 2016 DaVita Press Release**

197. On October 31, 2016, DaVita issued a press release announcing that it was suspending support for applications to the AKF for charitable premium assistance by patients enrolled in minimum essential Medicaid coverage, effective immediately.  This policy change

constituted a tacit acknowledgment that the Company's practices ran afoul of CMS regulations and constituted unlawful steering.

198.     Furthermore, in the October 31, 2016 press release, DaVita continued to mislead the public regarding its steering practices, attempting to significantly downplay the impact of this dramatic change in its key business strategy.  First, DaVita claimed that this suspension applied to ESRD Medicaid patients seeking "additional" coverage from an ACA plan (implying Medicaid was primary and the ACA plan was secondary).  Second, as it had before, DaVita stated it was merely providing "education to its patients," not steering them.  Third, DaVita claimed that these patients "were seeking – and often obtained – access to services beyond dialysis."  Fourth, DaVita asserted the affected patients were a "small number"—2,000, "or about one percent of DaVita's total patient population, who have pre-existing minimum essential Medicaid coverage and obtained additional coverage through ACA plans."  With regard to the "financial impact" of this development, DaVita estimated it would be "up to approximately $140 million before any offsets"—and an additional $90 million if all of the Company's ESRD patients receiving AKF assistance for ACA plans were affected.

199.     The statements in paragraphs 197-198 above were materially false and misleading, and omitted material facts when made.  First, these patients were not patients who had existing Medicaid insurance and obtained "additional coverage through ACA plans."  They were, instead, patients who had Medicaid as their primary insurer, who then were steered by DaVita to switch to an ACA plan as their primary insurer (with Medicaid becoming secondary).

200.     Second, the notion that DaVita was "educating" its patients is a farce: the Company's primary business strategy was to steer all of its patients, as a multitude of internal documents and former employee accounts had confirmed.

201.   Third, these patients were not "seeking" private insurance for the benefits DaVita listed.  DaVita instead foisted private insurance upon them, and used claims of benefits—most of them false—to pressure patients to forego government benefits.

202.   Fourth, the Company's estimation that the financial impact was "up to approximately $140 million before offsets," further misleadingly downplayed the issue, suggesting the financial impact could be less, and "offset" by other unnamed factors.

203.   Finally, DaVita's claim that this change in policy affected only 1% of its total patient population distorted the Company's true financial picture.  In fact, those 2,000 patients comprised <u>nearly ten percent</u> of DaVita's commercial patient population.  Indeed, when measured against the Company's profits, the potential $140 million impact was highly material, comprising 16% of the Company's $880 million in profits that year.  The percentage was even higher when including the additional $90 million impact for the 1,500 non-Medicaid patients receiving AKF assistance for ACA plans, amounting to a total impact of $230 million, or nearly 30% of the Company's 2016 profits.

204.   Notably, J.P. Morgan's October 31, 2016 report, "DVA Sizes a Portion of AKF Exposure," noted that DaVita was minimizing the effect on its financial results, and significantly highlighted that absent the fraudulently-inflated financial results, <u>the Company's operating income growth would have been negative in the prior two years</u>:

> DVA raises questions by sizing a smaller potential financial impact from these patients ($230m, 12% of trailing operating income, 15% of trailing earnings) than we have estimated (note we had previously reduced our 2017 EPS by 20%) . . . However, <u>the disclosure does suggest that dialysis operating income growth was negative in 2014 and 2015 excluding the benefit of shifting these patients into ACA plans.</u>

J.      **Statements Regarding 2016 Third Quarter Earnings**

205.    On November 2, 2016, the Company filed with the SEC its Form 10-Q for third quarter of 2016 ("Q3 2016 Form 10-Q"), which was signed and certified by Defendants Hilger and Thiry.   Among other things, the Q3 2016 Form 10-Q highlighted that the Company's increase in consolidated net revenues increase of approximately $205 million, or 5.8%, was a result of "an increase in our average dialysis revenue per treatment of approximately $5," due to "improvements in [DaVita's] commercial payor mix."

206.    DaVita's statements in paragraph 205 above regarding its supposed "improvements" in its key commercial mix metric were materially false and misleading.   In reality, this improvement was a direct result of DaVita's fraudulent scheme to illegally steer its ESRD patients—including those eligible for, and already insured by, Medicare and Medicaid— to enroll in commercial insurance plans, with the Company paying the premiums by illicitly funneling funds through the AKF.   The improvements in commercial mix cited purportedly supporting the Company's increased revenues were therefore artificially manufactured by Defendants' widespread unlawful conduct.

207.    Also on November 2, 2016, DaVita held a conference call with analysts and investors to discuss the Company's Q2 2015 financial results, the first call since DaVita's October 31, 2016 press release.   During the call, Defendant Rodriguez discussed the RFI and DaVita's historical practices regarding the charitable premium assistance, falsely stating that DaVita's "historical practices were legal and compliant."

208.    During the call, Defendant Thiry made several additional comments elaborating on Defendant Rodriguez's comments, stating that Defendants "fulfilled our regulatory responsibility to provide comprehensive education to our patients" and that "a very small

percentage of our Medicaid patients determined that an ACA plan was better for them." Thiry also claimed that because DaVita knew it would receive much higher rates for any patients that switched to a private plan, it had created a "very intense oversight process":

> [W]e were very sensitive to the fact that some of these patients choosing an ACA plan meant that we would be paid higher rates – commercial rates versus Medicaid rates. And, therefore, we created a very intense oversight process to make sure that we did everything possible to live up to the CMS standards around objective presentation of information and absolutely letting the patient choose.

209. Also during the Q and A session, analysts directly confronted Defendant Thiry regarding the percentage of the Company's commercial patients that receive premium assistance from the AKF. In response, Defendant Thiry stated that "disclosing that is not in your best interests." In addition, analysts directly questioned the legality of the Company's arrangement with the AKF, and noted that "there are some investors that believe that in fact it's illegal for the Medicaid patients to have been given premium support." In response, Defendant Thiry stated that "it's very clearly legal, and have never run into a single objection from anyone."

210. The statements in paragraphs 207-209 above were materially false and misleading, and omitted material facts when made. First, DaVita's actions were not "clearly legal" and "compliant" —far from it. Indeed, by illicitly funneling funds through the AKF for the purpose of obtaining higher dialysis reimbursement rates, DaVita rampantly violated CMS regulations, the federal anti-kickback laws, as well as the OIG's 1997 advisory opinion. *See* ¶¶184-186. The Company also "steered" beneficiaries of Medicare and Medicaid into commercial insurance plans, which violated the "anti-duplication" provision of the federal Social Security Act (prohibiting the sale of commercial plans to recipients of government health benefits).

211. Second, Thiry's statement that the Company did "everything possible" to present information about insurance options to its patients objectively was false and misleading as

DaVita did the exact opposite. It created a "very intensive oversight process" to pressure its employees, nationwide, to steer patients into commercial plans for the Company's profit and at the patients' expense.

212. Third, the "very small percentage" of commercial patients DaVita had lost was, in fact, highly significant. Indeed, analysts noted that without this "1%" of Medicaid patients who switched to commercial plans, the Company's critical commercial mix metric had in fact been flat over the prior years. As one analyst noted: "I guess if we look at commercial mix and take out maybe this 1% that's related to the ACA, it looks like mix has basically been flat over the last five years, maybe down a little bit, during a time when the economy is improving."

213. Significantly, despite persistent questions from regulators, commercial insurers and investors concerning the Company's relationship with the AKF, Defendant Thiry's refusal to disclose or quantify the Company's full exposure to that relationship speaks volumes.

214. RBC's November 2, 2016 report was critical of the responses Defendants made during the call, stating that "[w]hile armed with various datapoints, DVA seemed less constructive toward repetitive questioning on the [AKF] issue."

215. However, Defendants still were successful in concealing the full scope of the AKF steering fraud, as demonstrated in J.P. Morgan's January 10, 2017 report:

> CEO Thiry spent a very sizable portion of the presentation discussing the recent controversy over "charitable patient assistance" (CPA) – what we refer to as the AKF issue. DVA and other industry participants have filed a lawsuit against CMS for the final rule prohibiting CPA for dialysis in the ACA marketplace, but did not mention the recently disclosed Massachusetts US Attorney subpoena of DVA and others. . . DVA downplayed the risk of CPA "contagion" to other parts of its business, while simultaneously describing their worst year of commercial rate pressure since 2007.

**K.       Statements Regarding 2016 Fourth Quarter and Full Year Earnings**

216.    On February 16, 2017, DaVita announced its fourth quarter 2016 ("Q4 2016") and full year 2016 ("FY 2016") financial results. For FY 2016, DaVita reported adjusted net income of $789 million, or $3.85 per share, and consolidated net revenue of $14.74 billion.   The Company reported U.S. dialysis segment net revenue of $9.138 billion and an increase in revenue per treatment of 1.2% to $351.64 on a year-over-year basis. Kidney Care's operating income increased by approximately from 1.260 billion in FY 2015 to $1.777 billion for FY 2016.

217.    On February 24, 2017, the Company filed its Form 10-K with the SEC for the year ended December 31, 2016 ("2016 Form 10-K"), which was signed and certified by Defendants Thiry and Hilger.  The 2016 Form 10-K stated that consolidated net revenues for 2016 increased by approximately $963 million, or 7.0%, from 2015 "<u>due to an increase of $4 in the average dialysis revenue per treatment</u>" caused by "<u>improvements in [DaVita's] commercial payor mix</u>."

218.    DaVita's statements in paragraph 217 above regarding supposed "improvements" in its key commercial mix metric were materially false and misleading.   Indeed, these improvements were a direct result of DaVita's fraudulent scheme to illegally steer its ESRD patients—including those eligible for, and already insured by, Medicare and Medicaid—to enroll in commercial insurance plans, with the Company paying the premiums by illicitly funneling funds through the AKF.  The improvements in commercial mix cited purportedly supporting the Company's increased revenues was therefore artificially manufactured by Defendants' widespread unlawful conduct.

219.    Further, and despite the Company's October 31, 2016 press release stating otherwise, the 2016 Form 10-K again misrepresented the scope of the Company's relationship

with the AKF, asserting that only patients who did <u>not</u> qualify for Medicaid or Medicare were eligible for AKF assistance.  Indeed, the 2016 Form-10K again stated that  only "some patients" who did "not qualify for Medicaid" used AKF assistance for secondary insurance:

> <u>Some patients who do not qualify for Medicaid, but otherwise cannot afford secondary insurance, can apply for premium payment assistance from charitable organizations through a program offered by the American Kidney Fund. We and other dialysis providers support the American Kidney Fund and similar programs through voluntary contributions</u>."

220.    The 2016 Form 10-K also again stated that the AKF provided commercial premium assistance <u>only for patients who were not eligible for Medicare</u> – *i.e.*, those who were commercially insured "<u>before</u>" Medicare became their primary payor for dialysis.  The Company also again falsely represented to investors that it was only this small subset of commercial patients who accounted for "nearly all of our profits."

> <u>Before a patient becomes eligible to have Medicare as their primary payor for dialysis services</u>, a patient's commercial insurance plan, if any, is responsible for payment of such dialysis services for the first 33 months, as discussed above. Although commercial payment rates vary, average commercial payment rates established under commercial contracts are generally significantly higher than Medicare rates. <u>The payments we receive from commercial payors generate nearly all of our profits</u> . . . <u>Patients with commercial insurance who cannot otherwise maintain coverage frequently rely on financial assistance from charitable organizations, such as the American Kidney Fund</u>. If these patients are unable to obtain or continue to receive such financial assistance, our revenues, earnings, and cash flow could be substantially reduced.

221.    The statements in paragraphs 219-220 above were materially false and misleading, and omitted material facts when made.  Specifically, the statements set forth above limiting the AKF's assistance to "some patients who do not qualify for Medicaid," or to those patients who had not yet become eligible for Medicare, were materially false and misleading as the truth was exactly the opposite.  In reality, DaVita was intentionally "steering" <u>all</u> of its ESRD patients to AKF-backed insurance programs, <u>including those who qualified for, or were currently enrolled in, Medicaid and Medicare</u>.  In addition, the Company's statement that "nearly all of our

profits" were attributable to commercial patients <u>before</u> they were eligible for Medicare was materially false. Indeed, as would be revealed by the end of the Class Period, more than 75% of the Company's profits was directly attributable to ESRD patients who <u>were</u> eligible for Medicare and Medicaid, but had been steered by the Company to commercial plans using AKF assistance. Additionally, DaVita's support to the AKF was not mere "voluntary contributions." Rather, DaVita engaged in a "coordinated effort," an established "quid pro quo," enabling DaVita to fund commercial insurance premiums for its own dialysis patients, thereby violating CMS regulations and anti-kickback laws.

### L.      2017 Capital Markets Day

222.    DaVita held its 2017 Capital Markets Day in New York on May 25, 2017. During that conference, Defendants again refused to provide any information regarding the total percentage of its commercially insured patients receiving AKF assistance. Specifically, an analyst asked if Thiry could provide disclosure regarding "AKF funding of the commercial plans outside of the ACA?" Thiry again responded that "<u>it would not be in your best interest for us to start providing all sorts of detail on that other chunk</u>." The analyst persisted, stating: "I was hoping maybe you could just confirm this. And the AKF has public disclosures. It seems that they are paying for 20,000 commercial members outside of the ACA. So if you just look at the market shares, it would seem that, that would be 40% to 50% of your commercial exposure. Are those numbers roughly right?" Thiry misleadingly demurred:

> Yes, I don't know anything about the AKF numbers, and so I can't comment on whatever they're publishing. Sorry, I just don't have any idea what numbers they put out or how they calculate them.

223.    The statements in paragraph 222 above were false and misleading, and omitted material facts when made. Specifically, Thiry knew full well the answer to the analyst's question—*i.e.*, the percentage of DaVita's commercially insured patients receiving AKF

assistance.  Indeed, in his prior public statements on the issue, he had admitted to "star[ing] at that [percentage] each quarter."  ¶132.

224.    When Defendants' fraud was finally revealed, the impact on DaVita's financials was staggering.  Specifically, on September 22, 2017, SIRF published a report on DaVita revealing that:  "The Company's finances, according to [SIRF's] accounting analysis, appear to be massively levered to an opaque non-profit, the American Kidney Fund, that may provide up to half its operating profits."  On October 9, 2017, J.P. Morgan published a report downgrading DaVita's stock because of the AKF's "updated disclosures," which concluded that "as much as 60-80%+ of DVA's earning power is derived from its AKF relationship."

225.    Finally, the next day, DaVita confirmed the analyses included in the SIRF and J.P. Morgan reports: an additional 5,800 patients relied on AKF payments for their commercial insurance premiums, and a total of $680 million of the Company's earnings were reliant upon its illicit relationship with the AKF, or over 75% of DaVita's $880 million in reported net income for 2016.

## VII.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

226.    As alleged above, numerous facts raise a strong inference that Defendants knew, or were severely reckless in disregarding, the true facts regarding DaVita's widespread illicit practices.  Specifically, Defendants were well aware that DaVita was illegally "steering" as many of its Medicaid and Medicare-eligible Kidney Care patients as it could into more lucrative commercial insurance plans, illicitly paying their premiums for them under the guise of "donations" to the AKF, in order to inflate the Company's revenues.  These facts include, in addition to the allegations set forth above, the following.

227.    *Former employees confirm that the Company's illicit practices were being directed by DaVita corporate management.*  Former employees corroborated the *St. Louis Post-Dispatch* article and numerous other media reports, stating that DaVita executive management was directly involved in the illicit admissions scheme.  For example, a former DaVita Insurance Counselor in New York described how, in July 2015, he attended a regional meeting that featured a presentation on the "Medicaid Opportunity," which was given by a Senior Vice President in DaVita's Corporate Analytics Department.  The focus of the presentation was to train DaVita employees on techniques to "sell" patients on ditching Medicaid as their primary insurer in favor of commercial insurance.  CW 1 stated that during the presentation, the SVP showed the reimbursement rates for Medicaid ESRD patients versus the higher rates for commercially insured ESRD patients, as well as the number of patients in each region who were currently insured by Medicaid.  The SVP instructed attendees to "get American Kidney Fund to pay for exchange plans, on top of Medicaid"—i.e., get Medicaid patients to enroll in a commercial plan as their primary insurer using AKF assistance (with Medicaid then becoming secondary).

228.    A former DaVita Facilities Administrator CW 2—responsible for DaVita dialysis clinics located on the opposite coast, in California—recalled the same initiative being rolled out in her region during the same time period, on an August 2015 conference call with the Regional Operations Director.  CW 2 stated that it was her impression that the Company had issued the "Medicaid Opportunity" directive on a "national level."  Similarly, CW 3, a former Insurance Counselor for multiple DaVita clinics in the Austin, Texas area, recalled participating in an 80-hour two-week training program at the Company's headquarters in Denver about steering patients off of Medicaid and into commercial plans.

229.    Former employees also described that DaVita focused on "the bottom line" over the welfare of its patients, and that superiors were "motivated by money, not care."  A former Insurance Counselor at a different DaVita facilities in Oregon, CW 4, similarly stated:  "[I]t was always about the bottom line [at DaVita].  It always came down to revenue."  Another former Insurance Counselor for DaVita facilities in New York CW 1 described his role as follows:  "We weren't educators.  We were revenue generators."  CW 1 explained that "it was more about profit than patients" at DaVita.

230.    Former employees were pressured to steer ESRD patients eligible for, or insured by, government programs to enroll in commercial plans as their primary insurer using AKF assistance—or, if they were already insured by commercial plans, to use AKF assistance to maintain that insurance at all costs.  For example, CW 2 described that after the "Medicaid Opportunity" was rolled out in her region, if employees did not comply with the steering initiative, it would be a "problem" for their job.  CW 1 described similar pressure, stating that "losing" private pay patients would lead to poor performance evaluations, and that a big part of an employee's rating at the Company was "your ability to keep people on the commercial plans at the higher revenue."  CW 1 also stated that employees at DaVita "were machines" who had to "do everything [DaVita] said without question," stating:  "If I questioned things, I was told to shut up."  Other former employees described how the constant pressure the Company put on them to steer patients, or to keep their private pay numbers up, was a significant factor in their decision to no longer work for DaVita.

231.    Former DaVita employees also described how obtaining "private pay" patients, and patient steering, was key to their job performance at DaVita.  Aside from being punished or reprimanded for "losing" commercial patients or failing to successfully get government-insured

patients to enroll in a commercial plan, DaVita also offered numerous lucrative incentives to employees for increasing the Company's "private pay" count.  For example, CW 4 described how pay raises and bonuses at DaVita were directly tied to progress each employee made in gaining private coverage for eligible patients.  "They based everyone on performance depending on if you had a lot of commercial patients," she recalled.  CW 3 also recalled that her regional managers stood to get a bonus, on a monthly or quarterly basis, for having the highest number of patients with better-paying private insurance.   "The regions got kudos for having the most payers," she said.

232.    As these former employee accounts show, DaVita management was directly and intensely involved in tracking "private pay" patients, which were critical to the Company's profits, including "private pay" patients that were steered away from Medicaid or Medicare and into far more lucrative commercial plans with AKF assistance (*i.e.*, the Company's own funds) and placing pressure on DaVita employees to facilitate Defendants' steering scheme.

233.    *Internal DaVita documents also confirm that the Company's illicit practices were being directed by DaVita corporate management.*  Plaintiffs' investigation included the review of thousands of remarkable internal Company documents.  These documents confirm that DaVita intentionally and illegally "steered" as many ESRD patients as it could, including those eligible for and already receiving Medicare or Medicaid benefits, into commercial plans by offering to pay their premiums for them through the AKF.  The documents further confirm that the Individual Defendants meticulously tracked several financial and operational metrics that directly demonstrated the Company's progress in steering patients towards AKF-backed insurance plans.

234.    For example, an internal DaVita presentation entitled "Medicaid Opportunity Update," dated November 2015, which was widely circulated by DaVita's upper management to DaVita's Facilities Administrators, included guidance on "Patient Outreach" for the "Medicaid Opportunity" directive, instructing, among other things, that employees were to "[s]upport AKF application[s] for all enrolled patients" and "[p]rovide ongoing support to new PP [Private Pay] Patients."  The presentation also included a list tallying AKF applications submitted for DaVita patients, as well as a "Plan of Action" that meticulously broke down the different roles for DaVita employees in each dialysis facility.

235.    Moreover, a presentation entitled "Kidney Smart CKD [Chronic Kidney Disease] Patient Education Program Overview," included a slide about how to talk about insurance options to patients.  The presentations provided several key talking points specifically designed to sway patients away from Medicare or Medicaid, and towards AKF-backed plan options, including false or faulty claims about superior access to kidney transplants, as well as "better access" to specialists, "more comprehensive" coverage options, and "lower total cost" of care.

236.    Plaintiffs' review of internal documents confirms that DaVita closely tracked its "Private Pay" patients, in addition to patients who were not commercially insured and could be "educated."  *See* ¶¶55-61. Plaintiffs' investigation also located large internal Company spreadsheets regularly tracking patients' commercial insurance and reimbursement rates, as described by the former DaVita employees.  *See* ¶¶77-80..

237.    Moreover, internal Company documents confirm that DaVita had a formal bonus program for facilities and employees who successfully acquired the most "private pay" patients, including quarterly and annual incentive and bonus programs focused directly focused on private pay growth.  These programs even went so far as to include bonuses of up to $10,000 for

employees who "educated" the most patients about commercial insurance options, with various Company propaganda enticing employees to be a "champion" and "go for it!"  *See* ¶¶62-67,

238.    These and numerous other internal company documents confirm all aspects of the DaVita steering scheme and how it was a top-down driven scheme, indicative of a strong finding of scienter.

239.    *The federal investigation of the AKF and charitable premium assistance—and of DaVita itself—concerns Defendants' illicit steering practices.*   On January 6, 2017, DaVita announced that it received a subpoena from the United States Attorney in Massachusetts relating to its business practices and its relationship with the AKF.  *See* ¶¶14, 136.  Despite the fact that these investigations remain ongoing, Defendants downplayed them, failing to disclose any facts about their substance, aside from that they involve federal health care offenses and the subpoena covers the period from January 1, 2007 through the present.  The subpoena seeks documents relevant to charitable patient assistance organizations, particularly the AKF and related to efforts to provide patients with information concerning the availability of charitable assistance.  This serious investigation is indicative of a strong inference of scienter.

240.    *During the Class Period, Defendants repeatedly emphasized DaVita's increasing commercial mix:* The Individual Defendants repeatedly emphasized that the Company's "commercial lives"—or DaVita's ESRD patients who are commercially insured—were the Company's "economic lifeline."  ¶¶4, 10, 42.  Indeed, Defendants touted DaVita's net revenue and operating income growth attributable to "improved revenue per treatment due to improved commercial mix" (*see, e.g.,* ¶¶10, 162), and emphasized to investors how for the first time in several years, the Company's growth of commercial patients outpaced the growth of government-based patients.  *See, e.g.*, ¶162 ("the biggest good news is that our commercial mix

and our rates, both went up a bit"); ¶175 ("It did grow in 2015 for the first time in a long time, and so we're pretty pleased with where we are at"); ¶168 ("for the first time in several years, the growth of our commercial patients slightly outpaced the growth of our government-based patients as more of our patients are covered by commercial contracted plans").

241.    These statements demonstrate that Defendants closely monitored commercial mix rates, believed them to be critical to the Company's financial success, and were motivated to keep such rates as high as possible.  Defendants' strong, emphatic and repeated statements about Kidney Care's increasing commercial mix, while at the same time DaVita facilities across the country were manufacturing that "growth" by engaging in the illicit steering scheme, are indicative of a strong inference of scienter.

242.    *Defendants also prominently reported during the Class Period that Kidney Care had increasing average dialysis revenue per treatment.*  Defendants reported to investors that Kidney Care's critical revenue per treatment metric—which, along with the other key metrics, Defendants prominently reported every quarter—had increased at the outset of the Class Period, clearing the way for Kidney Care's strong revenue growth.  *See e.g.,* ¶162 (Defendant Hilger highlighted the growth in "improved revenue per treatment due to improved commercial mix"); ¶¶164, 167, 173, 178, 205, 217 (net revenue growth being attributable to "an increase in our average dialysis revenue per treatment").  Defendants were well-aware of the fact that the market was relying on these statements, as analysts published numerous reports that underscored Kidney Care's strong metrics, improved commercial mix and revenue per treatment, and critical importance to the Company's overall business.

243.    For example, a May 5, 2015 *SunTrust* report noted that DaVita's "core dialysis segment remains robust, with stable demand and steady cash flow generation…In addition, a

91

modest 1Q <u>improvement in mix is encouraging</u>, the <u>guidance raise was driven by this segment</u>." A May 6, 2015 *Jefferies* report noted DaVita's "better run-rates for commercial contracts," stating that "<u>we see the trend of DVA winning market share in commercial patients continuing</u>." Moreover, in its August 5, 2015 report, *SunTrust* stated that "Revenue per treatment of $348.32 came in comfortably ahead of our $341.52 estimate, on both improved payor mix and rates and <u>drove upside in the dialysis business</u>." Additionally, in its August 4, 2015 report, *William Blair* rated the stock Outperform "given the company's <u>strong core dialysis business model</u>," and stated that "[r]evenue per treatment was above our estimate and up sequentially at $348, up 2.5% over the prior-year quarter. <u>A higher mix of commercial patients drove the beat and is likely to be sustainable through the end of the year</u>." Lastly, in its May 5, 2016 report, *SunTrust* stated that "continued strength in Kidney Care (volumes, mix, international expansion) is encouraging…We were encouraged by Kidney Care momentum, improving payor mix, strength in cash flow and see an upward bias to the guidance." The Individual Defendants knew, or were severely reckless in not knowing, that DaVita's consistently increasing key metrics were inflated by the Company's illicit steering scheme.

244.    *The October 2016* St. Louis Post-Dispatch *article made clear that DaVita's senior executives were directly involved in the fraud.* The October 2016 *St. Louis Post-Dispatch* report revealed several facts that made clear that DaVita's senior executives were aware of, and in fact orchestrators of, the fraud.  ¶¶118-121.  Specifically, the report described a "coordinated effort" and systematic approach to "steer" hundreds of St. Louis patients—and thousands across the country—to lucrative commercial health plans.  DaVita corporate was also unquestionably aware of, and in fact responsible for, the "Medicaid Opportunity", meaning employees were to pressure all Medicaid and Medicaid eligible ESRD patients in their facilities to enroll in commercial

insurance plans.  Indeed, this directive came from high-ranking DaVita executives, and filtered to employees at DaVita facilities across the country.   The *St. Louis Post-Dispatch* reported that internal emails from fall 2015 open enrollment tallied each region's performance and showed how regions were tracked by how many patients were interested in commercial coverage and the percentage of those that had been talked to by employees about their options.

245.    The fact that high-ranking DaVita executives nationwide were engaging in the Company's illicit practices show that DaVita executive management was not only involved in these practices, but in fact *orchestrated the scheme*, raising a strong inference of scienter.

246.    *The Individual Defendants participated directly in the setting and reporting of the Kidney Care division's financial metrics.*  Defendant Hilger, the Company's CFO during the majority of the Class Period, and Defendant Thiry, the Company's CEO since 1999, were personally involved in the Company's reporting of its dialysis revenues, revenue per treatment and other key metrics, and personally signed Sarbanes Oxley certifications as to their accuracy, every quarter.   Moreover, in light of how critical Kidney Care was to DaVita's overall business and how crucial that business' commercial mix levels were to its revenue growth, the Individual Defendants closely tracked the metrics they repeatedly touted and prominently reported for that business every quarter.  Additionally, the fact that 75% of the Company's profits were directly attributable to the AKF also raises a strong inference of scienter, as the idea that the Company's executives would be unaware of such a critical contributor to the Company's profitability is absurd.

247.    *The magnitude and duration of DaVita's widespread illicit admissions scheme is indicative of scienter.*  Defendants perpetrated their illicit admissions scheme throughout the two and a half year Class Period.   Moreover—as shown by the *St. Louis Post-Dispatch* article,

internal corporate documents, statements from former employees, and pre-Class Period investigations and *qui tam* lawsuits—insurance manipulation schemes pervaded DaVita facilities and business practices nationwide.   Thus, contrary to Defendants' representations, the Company's illicit practices were not "education," the patient's "decision" alone or "in their best interest."   Indeed, Defendants directed employees at DaVita dialysis centers to prioritize profits over patients through the illicit steering scheme, the Company-wide directive to pressure all Medicaid and Medicaid eligible ESRD patients in their facilities to enroll in commercial insurance plans, in order to increase the Company's critical commercial mix and which in turn resulted in higher net revenues and operating income.   The magnitude of Defendants' scheme, which permeated DaVita facilities nationwide—and its long duration (at least two and a half years and counting)—support a strong inference of scienter.

248.   *The fact that the AKF was absolutely critical to the Company's financial success is further evidence of scienter*.   As set forth above, the Company's profits during the Class Period depended on the AKF premium assistance; indeed, the Company's goal was to enroll "all" Medicare and Medicaid patients in AKF-backed commercial plans.   As the Company was forced to disclose at the end of the Class Period, approximately 75% of its profits were derived from commercial plans paid for by the AKF with money DaVita gave the AKF to pay those premiums.   Accordingly, there is no question that DaVita's most senior officers were well aware of all aspects of the Company's relationship with the AKF, and the fact that the Company was "steering" patients to private plans.

249.   *The fact that DaVita "temporarily suspended" AKF applications for certain patients (accounting for 16% of the Company's 2016 profits) is also extremely probative of scienter*.   Significantly, notwithstanding the Company's denials of any wrongdoing, that so-

called "temporary" suspension was in fact a permanent one – to date, nearly 18 months later, DaVita has never resumed AKF applications for these patients.  Moreover, the timing of that suspension was highly suspicious, as it came less than three months after CMS issued its August 18, 2016 RFI, only one month after numerous DaVita employees and insurers responded to the RFI by claiming that DaVita was steering, and only one week after the *St. Louis Post-Dispatch* article.  The fact that DaVita forfeited hundreds of millions of dollars in annual profits almost immediately after evidence of its steering emerged is compelling evidence that DaVita itself understood that its practices were improper and unlawful.  Indeed, if DaVita truly believed that its practices were entirely lawful and appropriate, it would never have relinquished those profits.

250.     *The manner in which Defendants' illicit admissions scheme came to light supports scienter.*  DaVita did not voluntarily disclose Defendants' illicit scheme.  It instead has been revealed through public scrutiny of the Company's unlawful steering practices.  *See e.g.* ¶¶106-116, 118-121, 133-136.  Even after the publication of the CMS RFI, the *St. Louis Post-Dispatch* report, and the subpoena from the U.S. Attorney's Office for the District of Massachusetts "seeking the production of information related to charitable premium assistance," Defendants did not admit to the scheme.  They instead flatly denied the *St. Louis Post-Dispatch* report's startling revelations and the CMS' concern, dismissing them by stating that "DaVita does not steer patients," but instead "educates its patients."

251.     In addition to effectively denying that the Company and its employees manipulate patients into signing up for unnecessary, even detrimental commercial insurance coverage, Defendants refused to come clean on numerous occasions as to the magnitude of the Company's reliance on AKF contributions.  Thiry dodged the question of how many commercial patients are receiving AKF premium assistance on November 2, 2016, stating in response that "<u>disclosing</u>

that is not in your best interests, although we'll continue to stare at that each quarter, but that's

our current thinking."   Again, on May 25, 2017, Thiry stated that DaVita would "not and it

would not be in your best interest for us to start providing all sorts of detail" as to AKF funding

of DaVita patients.   It was SIRF who revealed that, "at a minimum, AKF's support helps

generate between 40 and 45 percent of the Kidney Care unit's estimated [EBITDA], or at least

$339.4 million through June 30"—and it was J.P. Morgan who revealed on October 9, 2017, that

60-80% of DaVita's earnings power is derived from its AKF relationship.   Even when DaVita

finally disclosed on October 10, 2017 that 13% of its current dialysis patients—or 25,000

patients—received AKF support, Defendants still did not fully come clean.   In fact, to date,

Defendants maintain that they did nothing wrong, even as the federal investigation of their

conduct continues to escalate, and remains ongoing.

252.    The manner in which the scheme came to light, and the federal investigation of

DaVita's "possible federal health care offenses…relevant to charitable patient assistance

organizations, particularly the American Kidney Fund," suggests that DaVita's widespread illicit

steering scheme was not the result of negligence, isolated occurrences, or rogue employees.   It

was instead the result of an intentional, or at minimum, severely reckless, coordinated effort to

falsely portray the Company's financial and operational results.

253.    *The Company's misrepresentations were material*.  As set forth above, the Kidney

Care Division is critical to the Company's success, accounting for 97% of DaVita's earnings in

2015, and 100% in 2016.  DaVita makes no secret that its Kidney Care profits depend on its

commercially insured ESRD patients.  DaVita stressed that the approximately 10% of patients on

commercial insurance subsidize the remaining 90% of patients that use government plans.  *See

e.g.*  ¶¶4, 10, 42.  Defendants have claimed that the Kidney Care division, through its

"wonderful" commercial mix and rates caused the Company's increasingly steady and reliable growth. *See e.g.* ¶¶162, 164, 167, 173, 178, 205, 217 . Defendants' coordinated and widespread scheme to inflate this business' key metrics and sizeable revenues was unquestionably material.

254.     *Prior to the Class Period, DaVita was the subject of investigations and numerous* qui tam *lawsuits alleging that DaVita "knowingly" engaged in "sophisticated scheme[s]" involving unlawful practices.*  The lawsuits involve a variety of illegal practices, all of which concern various methods to illicitly increase DaVita's financial results:

a.     **$389 Million Kickback Scheme Settlement**: In 2009, a former employee brought a *qui tam* lawsuit against DaVita, alleging that it was engaged in a massive kickback scheme in which the Company would pay physician groups to refer patients to DaVita's dialysis clinics.  After investigating the claim, federal authorities determined that DaVita's illegal kickback scheme had been ongoing for nearly a decade, from March 2005 to February 2014.  DaVita settled the suit for $389 million.

b.     **$495 Million False Claims Settlement**: In 2012, two former DaVita employees—a doctor and a nurse—brought another *qui tam* lawsuit against the Company, accusing it of intentionally wasting certain medicines to fraudulently overbill Medicare and Medicaid in order to receive significantly higher reimbursements.  The complaint alleged that the scheme spanned several years, from 2003 to 2010.  DaVita settled the suit for $495 million.

c.     **$55 Million False Claims Settlement**: Also in 2012, DaVita settled a similar *qui tam* suit brought by a whistleblower in Texas, who alleged that DaVita fraudulently billed the government for Epogen, an anemia drug made by Amgen.  According to the complaint, Amgen overfilled Epogen vials given to DaVita to meet federal regulations that health care providers include an extra quantity to ensure full doses are given to patients.  The whistleblower, a former Amgen employee, alleged that DaVita fraudulently billed the federal government for the overfills, amounting to millions of dollars in false claims to Medicare and other government programs.  DaVita settled the suit for $55 million.

d.     **$63.7 Million DaVita Rx Settlement**: Most recently, on December 14, 2017, DaVita agreed to pay a total of $63.7 million to resolve allegations that DaVita Rx fraudulently billed federal programs for prescription medications that were never shipped, that were shipped but then returned, or that did not comply with requirements for documentation of proof of delivery, refill requests, or patient consent.  The settlement also resolved

allegations that DaVita paid kickbacks to federal healthcare program beneficiaries in exchange for their enrollment in DaVita Rx, as DaVita Rx allegedly wrote off co-pays and gave significant discounts to beneficiaries who paid for their medications by credit card.

255.    These lawsuits, which spanned several years and implicated numerous DaVita facilities in different states across the country, show that Defendants were unquestionably on notice of DaVita's illicit and coordinated practices to unlawfully increase profits, regardless of the ultimate impact on patients' lives.

## VIII.  LOSS CAUSATION

256.    During the Class Period, shares of DaVita's publicly traded common stock traded on the NYSE.  The market for shares of DaVita's common stock was open, well-developed and efficient at all relevant times.

257.    Throughout the Class Period, the price of DaVita's common stock was artificially inflated as a result of Defendants' materially false and misleading statements and omissions identified above.  Defendants engaged in a scheme to deceive the market, and a course of conduct that operated as a fraud or deceit on Class Period purchasers of DaVita common stock, by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of DaVita common stock fell precipitously as the prior artificial inflation dissipated.  As a result of their purchases of DaVita common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

258.    By issuing materially false and misleading financial statements, among other adverse facts detailed herein, Defendants presented a misleading picture of DaVita's business. Defendants' false and misleading statements had the intended effect, and caused DaVita

common stock to trade at artificially inflated levels throughout the Class Period, with DaVita common stock reaching as high as $84.23 per share on May 28, 2015.  On the last trading day before Defendants' fraud was revealed, DaVita common stock traded at $59.82 per share on October 6, 2017, the last day of the Class Period.  From its Class Period high of $84.23 per share to its closing price of $53.89 per share on Monday, October 9, 2017, DaVita's stock price dropped $30.34 per share, or 36%, wiping out roughly $6 billion in market capitalization.

259.    On August 8, 2016, DaVita announced its second quarter results for 2016 and held a conference call with analysts and investors to discuss the Company's Q2 2016 results.  For the first time during the Class Period, Defendants were confronted about their relationship with the AKF.  During the conference call, Defendant Rodriguez indicated that the Company had been donating money to the AKF "to help patients with end-stage renal disease for decades in order to be assisted with their premium."

260.    On this news, DaVita's stock price dropped $3.05 per share, or 4.05%, from $75.36 per share on August 8, 2016 to $72.31 per share on August 9, 2016 on unusually heavy volume.  On August 10, 2016, DaVita's stock price dropped an additional $2.20 per share, or 3.04%, as the market continued to digest the news.  In total, this news caused a 7% decline in DaVita's stock price over two trading days wiping out approximately $1.086 billion in Company market capitalization

261.    On August 18, 2016, CMS announced its formal Request For Information regarding allegations that dialysis companies, including DaVita, had been steering ESRD patients into commercial plans for the sole purpose of collecting higher insurance reimbursements—DaVita's exact scheme.

262.    In reaction to the disclosure about the CMS inquiry, DaVita's stock price dropped $3.17 per share, or 4.7%, on unusually heavy trading volume from $67.65 per share on August 18, 2016 to $64.48 per share on August 19, 2016, wiping out approximately $656 million of the Company's market capitalization in one day.

263.    On October 23, 2016, the *St. Louis Post-Dispatch* published its expose on the Company, stating that, based on its review of internal Company emails and interviews with former employees, DaVita had been deliberately steering patients into commercial plans by funneling "donations" through the AKF.  Specifically, the article revealed to investors that (i) DaVita was engaged in a "coordinated effort" and systematic approach to "steer" hundreds of St. Louis patients—and thousands across the country—to lucrative commercial health plans; (ii) DaVita corporate was responsible for the "Medicaid Opportunity", meaning employees were to pressure all Medicaid and Medicaid eligible ESRD patients in their facilities to enroll in commercial insurance plans; and (iii) the Company closely tracked employees' "steering" efforts, including by documenting "how many patients were interested in commercial coverage and the percentage of those that had been talked to by employees about their options."

264.    In reaction to the *St. Louis Post-Dispatch* report, DaVita's stock price dropped $2.86 per share, or 4.7%, from $60.96 per share on Friday, October 21, 2016 to $58.10 per share on Monday, October 24, 2016, wiping out an additional $565 million in Company market capitalization.

265.    On January 6, 2017, *The Wall Street Journal* reported that investigators from the U.S. Department of Justice "are probing a controversial arrangement under which kidney-care companies support charitable efforts to help patients pay health-insurance premiums."  As part of the investigation, the U.S. Attorney's Office for the District of Massachusetts had subpoenaed

DaVita and the AKF seeking information relating to the Company's donations to the AKF. On this news, DaVita's stock fell $2.41, or 3.7%, from $65.79 per share on Friday, January 6, 2017 to $63.38 per share on Monday, January 9, 2017, wiping out $476 million in Company market capitalization.

266.     On May 2, 2017, after the markets closed, DaVita held its first quarter earnings call, during which it confirmed "lower enrollment of patients on the ACA plans."  The Company also disclosed that it had lost all of the 2,000 Medicaid patients who were enrolled in ACA plans with AKF assistance—meaning it would absorb in 2017 the full $140 million impact that it had previously reported as being possibly reduced by offsets.  On this news, DaVita's stock dropped 5.2%, from a close of $70.09 on May 2, 2017 to $66.45 the following day, wiping out $708 million in Company market capitalization..

267.     On August 1, 2017, DaVita reported that its second quarter earnings dropped 15% compared to the same period the prior year.  DaVita reported that that it was continuing to experience a downturn in its commercial mix improvements in the payer climate, particularly since payers were increasingly amending their policies to refuse to accept third party charitable premium assistance. On this news, DaVita stock price plummeted 8.84% on unusually high trading volume, from $64.13 on August 1, 2017 to $58.46 on August 2, 2017, wiping out $1.084 billion in Company market capitalization.

268.     On September 22, 2017, the Southern Investigative Reporting Foundation "SIRF" published an expose on DaVita and its illicit relationship with the AKF that revealed, for the first time, that the AKF provided DaVita with "up to half of its operating profits."  Specifically, "at a minimum, AKF's support helps generate between 40 and 45 percent of the Kidney Care unit's estimated earnings before interest and taxes."   The report also described the scheme as

"astounding" because "those handsome profits come from a base of about 9000 dialysis patients, barely more than four percent" of DaVita's patients. On this news, DaVita's stock declined 6.2%, from $61.26 on September 21, 2017 to $57.49 at the close of trading the following day, wiping out $721 million in Company market capitalization.

269.    On October 9, 2017, J.P. Morgan downgraded DaVita's stock from "Neutral" to "Underweight," citing AKF's "updated disclosures," which "heighten our existing concern regarding the level of earnings power that DVA derives from AKF operations."   The report stated that the AKF had recently disclosed that it assists 21,000 non-ACA commercial patients (*i.e.*, COBRA patients) through its premium assistance program, and applying DaVita's 38% market share to that figure, "as much as 60-80% plus of DVA's earning power is derived from its AKF relationship."

270.    On this news, DaVita stock plummeted approximately 10% on unusually high trading volume, closing at $53.89 on Monday, October 9, 2017 from a prior close of $59.82 on Friday, October 6, 2017, wiping out $1.134 billion in Company market capitalization.

271.    The following day, DaVita issued a press release largely confirming the SIRF and J.P. Morgan analyses.   Specifically, on October 10, 2017, the Company disclosed that, in addition to the previously-acknowledged 2,000 Medicaid patients that used AKF assistance to switch to ACA plans, a full 5,800 other commercially-insured patients also received AKF assistance, which could result in a loss in operating income of approximately $450 million.   All told, DaVita confirmed that a staggering $680 million of its earnings were reliant upon its illicit relationship with the AKF, <u>or more than 75% of the $880 million in net income that the Company reported in 2016</u>.

272.     The drastic and continuing decline in DaVita's stock price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the decline in the Company's share price negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## IX.     PRESUMPTION OF RELIANCE

273.     At all relevant times, the market for DaVita's common stock was efficient for the following reasons, among others:

    a.     DaVita's stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

    b.     As a regulated issuer, DaVita filed periodic reports with the SEC and the New York Stock Exchange;

    c.     DaVita regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    d.     DaVita was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers.  Each of these reports was publicly available and entered the public market place.

274.     As a result of the foregoing, the market for DaVita's common stock reasonably and promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of DaVita's common stock.  All purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of DaVita stock at artificially inflated prices, and a presumption of reliance applies.

275.    A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding DaVita's business and operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

276.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.  None of the statements complained of herein was a forward-looking statement.  Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about DaVita's present business and operations, its present financial condition, and its internal controls, among others.

277.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted Defendants' statements regarding DaVita's steering of patients to AKF programs, among others.  Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made

by DaVita were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

278.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of DaVita who knew that the statement was false when made.

## XI.    CLASS ACTION ALLEGATIONS

279.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased, or otherwise acquired, the common stock of DaVita between February 26, 2015 and October 6, 2017, inclusive (the "Class"), and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of DaVita at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

280.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, DaVita shares were actively traded on the New York Stock Exchange.  As of August 5, 2016, there were over 206.9 million shares of DaVita common stock outstanding.  While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds-of-thousands of members of the proposed Class.  Class

members who purchased DaVita securities may be identified from records maintained by the Company, or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

281. Lead Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws, as complained of herein.

282. Lead Plaintiffs will fairly and adequately protect Class members' interests, and have retained competent counsel experienced in class actions and securities litigation.

283. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

    a.     whether the federal securities laws were violated by Defendants' acts, as alleged herein;

    b.     whether the Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

    c.     whether Defendants acted with scienter; and

    d.     the proper way to measure damages.

284. A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**For Violations of Section 10(b) of the Exchange Act,
and SEC Rule 10b-5 Promulgated Thereunder
(Against All Defendants)**

285.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

286.    This Count is asserted on behalf of all members of the Class against Defendants DaVita, Thiry, Hilger and Rodriguez for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

287.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

288.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and other investors similarly situated in connection with their purchases of DaVita common stock during the Class Period.

289.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the

other members of the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of DaVita common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and the other members of the Class, regarding, among other things, DaVita's business and operations; (b) artificially inflate and maintain the market price of DaVita common stock; and (c) cause Lead Plaintiffs and the other members of the Class to purchase the Company's common stock at artificially inflated prices, and to suffer losses when the true facts became known.

290.   Defendants DaVita, Thiry, Hilger and Rodriguez are liable for all materially false and misleading statements made during the Class Period, as alleged above.

291.   As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of DaVita common stock, were either known to the Defendants, or were so obvious that the Defendants should have been aware of them.

292.   Lead Plaintiffs and the other members of the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for DaVita common stock, which inflation was removed from its price when the true facts became known. Lead Plaintiffs and the other members of the Class would not have purchased DaVita common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

293.     As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of DaVita common stock during the Class Period.

## COUNT II

### For Violations Of Section 20(a) Of The Exchange Act
### (Against Defendants Thiry, Hilger and Rodriguez)

294.     Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

295.     This Count is asserted on behalf of all members of the Class against Defendants Thiry, Hilger and Rodriguez for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

296.     During their tenures as officers and/or directors of DaVita, each of these Defendants was a controlling person of the Company, within the meaning of Section 20(a) of the Exchange Act.  *See* ¶¶24-29.  By reason of their positions of control and authority as officers and/or directors of DaVita, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the public statements made by DaVita during the Class Period, including its materially misleading statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

297.     In their capacities as senior corporate officers of the Company, and as more fully described above in ¶¶24-29, Defendants Thiry, Hilger and Rodriguez had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal

compliance, and in its accounting and reporting functions.  Defendants Thiry and Hilger signed the Company's SEC filings during the Class Period, and were directly involved in providing false information, and in certifying and approving the false statements disseminated by DaVita during the Class Period.  Defendants Thiry, Hilger, and Rodriguez were also directly involved in providing false information, and Defendants Thiry and Hilger certified and approved the false statements disseminated by DaVita during the Class Period.  As a result of the foregoing, Defendants Thiry, Hilger and Rodriguez, as a group and individually, were controlling persons of DaVita within the meaning of Section 20(a) of the Exchange Act.

298.    As set forth above, DaVita violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

299.    By virtue of their positions as controlling persons of DaVita, and as a result of their own aforementioned conduct, Defendants Thiry, Hilger and Rodriguez are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs, and the other members of the Class, who purchased or otherwise acquired DaVita securities.  As detailed above in ¶¶24-29, during the respective times these Defendants served as officers and/or directors of DaVita, each of these Defendants was culpable for the material misstatements and omissions made by the Company.

300.    As a direct and proximate result of these Defendants' conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or other acquisition of DaVita common stock.

## XIII.   PRAYER FOR RELIEF

301.    WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

a. Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b. Awarding all damages and other remedies available under the Securities Exchange Act in favor of Lead Plaintiffs and all other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c. Awarding Lead Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d. Such other and further relief as the Court may deem just and proper.

## XIV.  **JURY DEMAND**

302. Lead Plaintiffs hereby demand a trial by jury.

Dated: January 12, 2018                    Respectfully Submitted,

                                           */s/ Steven B. Singer*
                                           Steven B. Singer

                                           SAXENA WHITE P.A.
                                           Steven B. Singer
                                           Kyla Grant
                                           10 Bank Street, 8th Floor
                                           White Plains, New York 10606
                                           Telephone: (914) 437-8551
                                           Facsimile: (888) 631-3611
                                           ssinger@saxenawhite.com
                                           kgrant@saxenawhite.com

                                           -and-

                                           SAXENA WHITE P.A.
                                           Maya Saxena
                                           Joseph E. White, III
                                           Lester R. Hooker
                                           Dianne M. Anderson
                                           150 East Palmetto Park Road
                                           Suite 600
                                           Boca Raton, FL 33432
                                           Telephone: (561) 394-3399
                                           Facsimile: (561) 394-3382
                                           msaxena@saxenawhite.com

jwhite@saxenawhite.com
lhooker@saxenawhite.com
danderson@saxenawhite.com

*Lead Counsel for the Class*


Kip B. Shuman (23593)
Rusty E. Glenn (39183)
THE SHUMAN LAW FIRM
600 17th Street, Ste. 2800 South
Denver, CO 80202
Telephone:  303-861-3003
303-536-7849 (fax)
kip@shumanlawfirm.com
rusty@shumanlawfirm.com

*Local Counsel for the Class*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 12th day of January, 2018, I caused to be electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the all registered participants.

*/s/ Steven B. Singer*
Steven B. Singer

## CERTIFICATION AND AUTHORIZATION OF LEAD PLAINTIFF

I, Timothy H. Johnson, on behalf of the Jacksonville Police and Fire Pension Fund ("Jacksonville P&F"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am authorized in my capacity as Executive Director of Jacksonville P&F to initiate litigation and to execute this Certification on behalf of Jacksonville P&F.

2. I have reviewed the Amended Class Action Complaint for Violations of the Federal Securities Laws and Jury Trial Demand ("Complaint") in this action and authorize the filing of the Complaint and this Certification or any substantively similar complaint or amended complaint to be filed in the future.

3. Jacksonville P&F did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

4. Jacksonville P&F is willing to serve as a representative party on behalf of the Class, including by providing testimony at deposition and trial, if necessary.

5. Jacksonville P&F's transactions in DaVita Inc. common stock are set forth in the Schedule A attached hereto.

6. Jacksonville P&F has sought to serve and was appointed as lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification: *None*

7. Jacksonville P&F has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff, was not appointed lead plaintiff or the lead plaintiff decision is still pending:

   *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, No. 15-cv-2404 (S.D. Tex.)

   *Makhlouf v. Tailored Brands, Inc.*, No. 16-cv-838 (S.D. Tex.)

8. Jacksonville P&F will not accept any payment for serving as a representative party on behalf of the Class beyond Jacksonville P&F' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11TH day of January, 2018.

Jacksonville Police and Fire
Pension Fund

Timothy Johnson,
Executive Director

**SCHEDULE A**
**Jacksonville Police and Fire Pension Fund**
**Transactions in DaVita Inc.**

| Common Stock Purchases | | |
|---|---|---|
| **Date** | **Shares** | **Price** |
| 12/10/15 | 3,692 | $70.93 |
| 07/07/16 | 14,160 | $76.82 |
| 07/27/16 | 2,857 | $78.18 |
| 07/28/16 | 287 | $76.76 |
| 08/25/16 | 849 | $64.19 |
| 08/26/16 | 1,662 | $63.82 |
| 08/29/16 | 620 | $64.39 |
| 08/30/16 | 766 | $64.59 |
| 08/31/16 | 404 | $64.30 |
| 10/13/16 | 153 | $62.75 |
| 10/13/16 | 540 | $62.99 |
| 10/14/16 | 375 | $63.09 |

| Common Stock Sales | | |
|---|---|---|
| **Date** | **Shares** | **Price** |
| 05/06/15 | 545 | $81.45 |
| 05/07/15 | 818 | $81.79 |
| 05/08/15 | 405 | $82.42 |
| 05/11/15 | 181 | $81.93 |
| 05/13/15 | 108 | $81.30 |
| 05/14/15 | 1054 | $81.69 |
| 12/17/15 | 1,492 | $64.36 |
| 07/15/16 | 2,770 | $77.73 |
| 08/19/16 | 4,790 | $64.36 |
| 08/24/16 | 6,600 | $64.70 |
| 12/12/16 | 1,187 | $66.90 |
| 01/10/17 | 452 | $64.52 |
| 01/11/17 | 239 | $63.17 |
| 01/12/17 | 575 | $63.27 |
| 01/12/17 | 491 | $63.57 |
| 01/31/17 | 1,002 | $63.80 |
| 02/01/17 | 1,405 | $64.25 |
| 02/01/17 | 703 | $64.35 |
| 02/02/17 | 2,458 | $64.76 |
| 02/03/17 | 4,451 | $65.02 |
| 02/06/17 | 659 | $65.30 |
| 02/08/17 | 522 | $64.68 |
| 02/09/17 | 669 | $64.66 |
| 02/10/17 | 228 | $64.82 |
| 02/14/17 | 421 | $64.75 |
| 02/15/17 | 1,971 | $64.87 |
| 02/16/17 | 985 | $64.68 |
| 02/17/17 | 904 | $66.98 |
| 02/17/17 | 3,370 | $67.25 |
| 02/21/17 | 1,481 | $68.15 |
| 02/21/17 | 5,926 | $68.65 |

## CERTIFICATION AND AUTHORIZATION OF LEAD PLAINTIFF

I, Roger Garrison, on behalf of the Peace Officers' Annuity and Benefit Fund of Georgia ("Georgia Peace Officers"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.  I am authorized in my capacity as Chairman of Georgia Peace Officers to initiate litigation and to execute this Certification on behalf of the Georgia Peace Officers.

2.  I have reviewed the Amended Class Action Complaint for Violations of the Federal Securities Laws and Jury Trial Demand ("Complaint") in this action and authorize the filing of the Complaint and this Certification or any substantively similar complaint or amended complaint to be filed in the future.

3.  Georgia Peace Officers did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

4.  Georgia Peace Officers is willing to serve as a representative party on behalf of the Class, including by providing testimony at deposition and trial, if necessary.

5.  Georgia Peace Officers' transactions in DaVita Inc. common stock are set forth in the Schedule A attached hereto.

6.  Georgia Peace Officers has sought to serve and was appointed as lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification: *None*

7.  Georgia Peace Officers has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff, was not appointed lead plaintiff or the lead plaintiff decision is still pending: *None*

8.  Georgia Peace Officers will not accept any payment for serving as a representative party on behalf of the Class beyond Georgia Peace Officers' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _11_ day of January, 2018.

<div align="right">

Peace Officers' Annuity and
Benefit Fund of Georgia

Roger Garrison, Chairman

</div>

## SCHEDULE A
### Peace Officers' Annuity and Beneift Fund of Georgia
### Transactions in DaVita Inc.

| Common Stock Purchases | | |
|---|---|---|
| Date | Shares | Price |
| 07/07/16 | 16,060 | $76.82 |

| Common Stock Sales | | |
|---|---|---|
| Date | Shares | Price |
| 08/19/16 | 6,780 | $64.36 |
| 08/24/16 | 9,280 | $64.70 |