**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:17-cv-00304-WJM-MJW

PEACE OFFICERS' ANNUITY AND BENEFIT FUND OF GEORGIA, and
JACKSONVILLE POLICE AND FIRE PENSION FUND, Individually and on Behalf of All
Others Similarly Situated,

Plaintiffs,

v.

DAVITA INC.,
KENT J. THIRY,
JAMES K. HILGER, and
JAVIER J. RODRIGUEZ,

        Defendants.

---

**DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT UNDER FED. R.
CIV. P. 9(b) AND 12(b)(6) AND THE PRIVATE SECURITIES LITIGATION REFORM
ACT OF 1995 AND MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

---

        DaVita Inc., Kent J. Thiry, James K. Hilger, and Javier J. Rodriquez ("Defendants")

through their undersigned counsel, hereby move to dismiss the Amended Class Action

Complaint ("Complaint") for failure to state a claim pursuant to Federal Rules of Civil Procedure

12(b)(6) and 9(b) and the Private Securities Litigation Reform Act of 1995.  In accordance with

Local Rule 7.1(a), prior to filing this motion, counsel for Defendants conferred telephonically

with counsel for Plaintiffs regarding deficiencies of the Complaint.  Counsel for Defendants

stated that the Complaint fails to adequately plead facts and law establishing a securities law

violation including falsity, scienter and causation. Counsel for Plaintiffs stated that it disagreed

that the Complaint was deficient and further stated that it did not wish to amend the Complaint to

attempt to remedy the deficiencies identified by counsel for the Defendants.

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ........................................................................................... 1

II.     BACKGROUND ............................................................................................. 4

      A.     ESRD Patients Have the Right To Choose The Insurance That Best Fits Their Needs And Financially Needy Patients Have Long Had Access To CPA ........................................................................................................... 4

      B.     Dialysis Providers Are Required To Educate Patients About CPA ...................... 6

      C.     DaVita Has Long Disclosed That Its Profits Are Driven By Commercial Insurance Reimbursement And That It Contributes To AKF In An Arrangement The Government Has Long Supported ........................................... 7

      D.     The *Burwell* Decision Supports Patient Access To CPA ....................................... 8

      E.     Institutional Investors Decide That The Controversy Over Insurance Coverage For ESRD Patients Constitutes Securities Fraud ................................... 9

      F.     No Factual Allegations Support That DaVita's Conduct Is Illegal ..................... 11

      G.     Plaintiffs' Theory Of Liability Depends On The Existence Of Illegality ........... 12

III.     ARGUMENT ................................................................................................ 12

      A.     Plaintiffs Must Satisfy Strict Legal Standards .................................................... 13

      B.     Plaintiffs' Underlying Contention Is One of Corporate Mismanagement, Not Securities Fraud ........................................................................................... 13

      C.     The Complaint Cannot Plead Falsity Because It Lacks Support For The Premise That DaVita's Alleged Conduct Is "Illegal." ........................................ 14

           1.     The Complaint Does Not Plead Any Indicia Of Illegality ....................... 16

           2.     The Complaint Lacks Legal Support For The Claim That "Illegal" Conduct Occurred ................................................................................... 16

           3.     Plaintiffs Lack Factual Support For The Claim That "Illegal" Steering Occurred ................................................................................. 18

      D.     The Complaint Should Be Dismissed Because It Lacks Facts Supporting That The Challenged Affirmative Statements Were False ................................... 21

      E.     The Complaint Should Be Dismissed Because It Fails To Plead That Defendants Acted With Scienter ......................................................................... 23

           1.     The Standard For Pleading Scienter Is Exceedingly High ....................... 24

           2.     The Complaint Relies Upon Unwarranted Assumptions To Attempt To Infer Scienter ...................................................................... 25

i

## TABLE OF CONTENTS

**Page**

3.      The Competing Inference That Defendants Believed DaVita's
        Conduct Was Legal Outweighs Any Weak Inference Of Scienter.......... 27

F.      The Complaint Does Not Plead Loss Causation.................................................. 28

G.      Section 20(a) Claim Must Be Dismissed ............................................................ 30

IV.    CONCLUSION............................................................................................................. 30

## TABLE OF AUTHORITIES

Page(s)

CASES

*Adams v. Kinder–Morgan, Inc.*,
  340 F.3d 1083 (10th Cir. 2003) ............................................................................24

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
  827 F.3d 1229 (10th Cir. 2016) ......................................................................25, 26

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,
  505 F. Supp. 2d 662 (D. Colo. 2007)....................................................................14

*Anixter v. Home-Stake Prod. Co.*,
  77 F.3d 1215 (10th Cir. 1996) ..............................................................................14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..........................................................................................4, 13

*Blue Chip Stamps v. Manor Drug Stores*,
  421 U.S. 723 (1975).............................................................................................23

*Castro v. United States*,
  540 U.S. 375 (2003).............................................................................................21

*Christensen v. Cty.*,
  529 U.S. 576 (2000).............................................................................................18

*City of Phila. v. Fleming Cos., Inc.*,
  264 F.3d 1245 (10th Cir. 2001) ...............................................................13, 24, 30

*Curry v. Yelp Inc.*,
  875 F.3d 1219 (9th Cir. 2017) ..............................................................................30

*Dialysis Patient Citizens v. Burwell*,
  No. 4:17-CV-16, 2017 WL 365271 (E.D. Tex. Jan. 25, 2017) ...................... *passim*

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005).......................................................................................12, 28

*Farlow v. Peat, Marwick, Mitchell & Co.*,
  956 F.2d 982 (10th Cir. 1992) ..............................................................................23

*Grossman v. Novell, Inc.*,
  120 F.3d 1112 (10th Cir. 1997) .....................................................................13, 23

*Hershfang v. Citicorp*,
    767 F. Supp. 1251 (S.D.N.Y. 1991).............................................................................16

*In re Almost Family, Inc. Sec. Litig.*,
    No. 3:10-CV-00520-H, 2012 WL 443461 (W.D. Ky. Feb. 10, 2012)....................................29

*In re AXIS Capital Holdings Ltd., Sec. Litig.*,
    456 F. Supp. 2d 576 (S.D.N.Y. 2006)............................................................... *passim*

*In re Banco Bradesco S.A. Sec. Litig.*,
    277 F. Supp. 3d 600 (S.D.N.Y. 2017)........................................................................19

*In re Dell Inc., Sec. Litig.*,
    591 F. Supp. 2d 877 (W.D. Tex. 2008)......................................................................30

*In re Duke Energy Corp. Sec. Litig.*,
    282 F. Supp. 2d 158 (S.D.N.Y. 2003), *aff'd*, 113 F. App'x 427 (2d Cir. 2004)....................19

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    305 F. Supp. 2d 249 (S.D.N.Y. 2004)........................................................................16

*In re Herbalife, Ltd Sec. Litig.*,
    No. CV 14-2850 DSF, 2015 WL 1245191 (C.D. Cal. Mar. 16, 2015)...................................30

*In re Hutchinson Tech., Inc. Sec. Litig.*,
    536 F.3d 952 (8th Cir. 2008) .............................................................................18, 26

*In re Infineon Techs. AG Sec. Litig.*,
    No. C 04-04156 JW, 2006 WL 1329887 (N.D. Cal. May 16, 2006), *on
    reconsideration sub nom.* 2006 WL 2925680 (N.D. Cal. Sept. 11, 2006) ............................15

*In re JP Morgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005)........................................................................19

*In re Key Energy Servs., Inc. Sec. Litig.*,
    166 F. Supp. 3d 822, 872 (S.D. Tex. 2016) ..........................................................15, 18, 19

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
    667 F.3d 1331 (10th Cir. 2012) ......................................................................13, 24, 27

*In re Marsh & Mclennan Cos., Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006)......................................................................15, 26

*In re Maxwell Techs., Inc. Sec. Litig.*,
    18 F. Supp. 3d 1023 (S.D. Cal. 2014)........................................................................26

*In re Merrill Lynch & Co.*,
    273 F. Supp. 2d 351 (S.D.N.Y. 2003), *aff'd sub nom. Lentell v. Merrill Lynch*
    *& Co.*, 396 F.3d 161 (2d Cir. 2005) ............................................................18

*In re Syncor Int'l Corp. Sec. Litig.*,
    327 F. Supp. 2d 1149 (C.D. Cal. 2004), *aff'd in part, reversed and remanded*
    *in part*, 239 F. App'x 318 (9th Cir. 2007) ...............................................15

*In re Williams Sec. Litig.–WCG Subclass*,
    558 F.3d 1130 (10th Cir. 2009) ......................................................................28, 29

*In re Yukos Oil Co. Sec. Litig.*,
    No. 04 Civ. 5243 (WHP), 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006)....................15, 17, 27

*In re Zagg, Inc. Sec. Litig.*,
    797 F.3d 1194 (10th Cir. 2015) ......................................................................26

*Janbay v. Canadian Solar, Inc.*,
    No. 10 Civ. 4430, 2013 WL 1287326 (S.D.N.Y. Mar. 28, 2013) ............................................30

*Khalik v. United Air Lines*,
    671 F.3d 1188 (10th Cir. 2012) ......................................................................13

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) ......................................................................29

*McConnell v. FEC*,
    540 U.S. 93 (2003) ......................................................................21

*McNamara v. Pre-Paid Legal Servs., Inc.*,
    189 F. App'x 702 (10th Cir. 2006) ......................................................................28

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2012) ......................................................................18, 29

*Nakkhumpun v. Taylor*,
    782 F.3d 1142 (10th Cir. 2015) ......................................................................22

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015) ......................................................................22

*Prissert v. EMCORE Corp.*,
    894 F. Supp. 2d 1361 (D.N.M. 2012) ......................................................................29

*Robbins v. Oklahoma*,
    519 F.3d 1242 (10th Cir. 2008) ......................................................................13

*Santa Fe Indus., Inc. v. Green*,
   430 U.S. 462 (1977) ..........................................................................................14

*Sapssov v. Health Mgmt. Assocs., Inc.*,
   22 F. Supp. 3d 1210, 1231-32 (M.D. Fla. 2014), *aff'd*, 608 F. App'x 855 (11th
   Cir. 2015) ..........................................................................................................30

*Shoemaker v. Cardiovascular Sys., Inc.*,
   No. 16-568, 2017 WL 1180444 (D. Minn. Mar. 29, 2017) ..............................14, 15

*Shoemaker v. Cardiovascular Sys., Inc.*,
   No. 16-568, 2018 WL 527386 (D. Minn. Jan. 10, 2018)........................................14

*Slater v. A.G. Edwards & Sons, Inc.*,
   719 F.3d 1190 (10th Cir. 2013) .........................................................................4, 13

*Sorkin, LLC v. Fischer Imaging Corp.*,
   No. Civ.A. 03-CV-00631-R, 2005 WL 1459735 (D. Colo. June 21, 2005)...........26

*Stumpf v. Garvey*,
   Nos. 03-CV-1352-PB, 02-MDL-1335-PB, 2005 WL 2127674 (D.N.H. Sept. 2,
   2005) ...................................................................................................................19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) .................................................................................. *passim*

*United States ex rel. Williams v. Renal Care Grp., Inc.*,
   696 F.3d 518 (6th Cir. 2012) ..............................................................................27

*Vining v. Oppenheimer Holdings Inc.*,
   No. 08 CIV. 4435 LAP, 2010 WL 3825722 (S.D.N.Y. Sept. 29, 2010) ...............18

*Washtenaw Cty. Emps.' Ret. Sys. v. Avid Tech., Inc.*,
   28 F. Supp. 3d 93 (D. Mass. 2014) ......................................................................26

**STATUTES, RULES AND REGULATIONS**

15 U.S.C. § 78t(a) ..................................................................................................30

15 U.S.C. § 78j(b) ..................................................................................................12

15 U.S.C. § 78u–4(b)(2)(A) ....................................................................................24

15 U.S.C. § 78u-4(b)(1)(B) .....................................................................................13

42 C.F.R. § 494.80(a)(7) .........................................................................................6

42 U.S.C. § 1320a-7b(b)(2) ....................................................................................17

42 U.S.C. § 1882(d)(3)(A)(i) ........................................................................................17

Office of Inspector General, *Special Advisory Bulletin on Offering Gifts and Other Inducements to Beneficiaries*, 67 Fed. Reg. 55,855 (Aug. 30, 2002)............................7

Medicare and State Health Care Programs: Fraud and Abuse; Civil Money Penalty Exception to Protect Payment of Medicare Supplemental Insurance and Medigap Premiums for ESRD Beneficiaries, 67 Fed. Reg. 72,896 (Dec. 9, 2002) ...............................................................................................................7

Request for Information: Inappropriate Steering of Individuals Eligible for or Receiving Medicare and Medicaid Benefits to Individual Market Plans, 81 Fed. Reg. 57,554 (Aug. 23, 2016)...........................................................................8

Interim Final Rule, Medicare Program; Conditions for Coverage for End-State Renal Disease Facilities – Third Party Payment, 81 Fed. Reg. 90,211 (Dec. 14, 2016) ...................................................................................................... *passim*

## OTHER AUTHORITIES

OIG Advisory Op. No. 09-07, 2009 WL 2371265 ..........................................................8

OIG Advisory Op. No. 13-16, 2013 WL 7155024 ..........................................................8

OIG Advisory Op. No. 13-19, 2013 WL 7155029 ..........................................................7

OIG Advisory Op. No. 15-17, 2016 HHS OIG Adv. Op. LEXIS 7 .................................8

OIG Advisory Op. No. 97-1, 1997 WL 34684549 ..........................................................8

OIG Advisory Op. No. 97-2, 1997 WL 34684550 ..........................................................8

OIG Advisory Op. No. 98-17, 1998 WL 35287772 ........................................................8

"Acceptance of New Patients with Public and Private Insurance by Office-Based Physicians," https://www.cdc.gov/nchs/data/databriefs/db195.pdf.............................5

*ESRD Surveyor Training Interpretive* Guidance, Final Version 1.1 (Oct. 3, 2008), https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/GuidanceforLawsAndRegulations/downloads/esrdpgmguidance.pdf ............................................................................................................6

https://www.medicare.gov/dialysisfacilitycompare/#resources/patients-rights .............7

NIH, *Financial Help for Treatment of Kidney Failure*, https://www.niddk.nih.gov/health-information/kidney-disease/kidney-failure/financial-help-treatment .....................................................................8

NKF, https://www.kidney.org/news/monthly/How_AffordableCareAct_affects
_Dialysis_Patients .................................................................................................................5

NKF, https://www.kidney.org/atoz/content/dial_billofrights .........................................................7

NKF, https://www.kidney.org/atoz/content/traveltip ....................................................................5

NKF, https://www.kidney.org/news/national-kidney-foundation-statement-cms-
announcement-examine-inappropriate-steering-patients .........................................................20

NKF, https://www.kidney.org/patients/financial-and-insurance-changes ..................................5, 6

## I.      INTRODUCTION[1]

This case rests on the false premise that Plaintiffs can state a claim for securities fraud simply by labeling lawful conduct as "illegal," but without pleading facts and law that establish it actually is.  Plaintiffs assert – without the requisite legal or factual support required to allege securities fraud – that DaVita and certain of its executives[2] misled the market by failing to disclose that DaVita engaged in a purported "scheme" to illegally steer its dialysis patients away from Medicare or Medicaid and into commercial health insurance made available to them by the passage of the Affordable Care Act ("ACA").  This supposed "scheme" was allegedly effected by DaVita educating patients about the availability of charitable premium assistance ("CPA") from the American Kidney Fund ("AKF"), a nonprofit organization that has been in existence for more than 45 years.  DaVita, like many other dialysis providers, has openly donated to AKF for decades, and eligible patients of all providers, whether those providers donate to AKF or not, may use AKF's assistance to pay monthly insurance premiums that a patient may not be able to afford otherwise. ¶¶ 45, 49.  Rather than being some covert fraudulent scheme, this charitable system, which was supported by the government, gives financially disadvantaged patients the ability to choose the most appropriate insurance for them and their family.

Plaintiffs' Complaint fails to meet the high bar of the Private Securities Litigation Reform Act of 1995 ("PSLRA") to plead securities fraud, because: (1) it does not plead facts and law sufficient to establish the illegality of this alleged scheme and (2) it conveniently ignores facts and law that establish it is not.  Plaintiffs rely on the fog of media controversy surrounding

---

[1] Citations to "¶___" refer to paragraphs of the Amended Class Action Complaint for Violations of the Federal Securities Laws and Jury Trial Demand (Doc. 36) ("Complaint").  Unless otherwise noted, all emphasis is added, and all citations are omitted.

[2] "Defendants" refer collectively to DaVita and the Individual Defendants:  Kent J. Thiry, DaVita's Chief Executive Officer, James K. Hilger, DaVita's Chief Financial Officer and Javier Rodriguez, Chief Executive Officer of DaVita's Kidney Care Division.  ¶¶ 23, 24, 26, 28.

CPA to baldly claim that illegal conduct occurred, instead of pleading particularized facts as required by the PSLRA.  In doing so, Plaintiffs fail to plead three of the required elements to state a claim for securities fraud: (1) a materially false and misleading statement or omission; (2) fraudulent intent or scienter; and (3) loss causation.

First, Plaintiffs do not and cannot allege that the steering scheme is illegal because no statute, regulation or other authority prohibits these activities.  To the contrary, through a government-supported system, dialysis patients have had access to CPA for decades, and dialysis providers have long contributed to charities that provide CPA and have informed patients about these resources.  As stated recently by another U.S. District Court, "[f]or decades, ESRD [end-stage renal disease] patients have had the choice of selecting private insurance options over Medicare if those options better served their treatment needs," "charitable organizations provide [CPA] to eligible ESRD patients," and "[d]ialysis providers have long donated to these charities, which [the Department of Health and Human Services ("HHS")] has approved of and regulated." *Dialysis Patient Citizens v. Burwell*, No. 4:17-CV-16, 2017 WL 365271, at *1 (E.D. Tex. Jan. 25, 2017) (cited ¶ 137).  Plaintiffs have not and cannot plead any indicia of illegality such as guilty pleas or admissions of liability against DaVita in connection with this purportedly illegal scheme.  DaVita candidly disclosed the financial benefits it realizes from patients on commercial insurance, its donations to AKF, and that AKF provides CPA to many of its patients.

Moreover, Plaintiffs' theory that DaVita engaged in "steering" mischaracterizes DaVita's communications with its ESRD patients about their insurance options as improper "steering," when DaVita was actually required by law to educate patients regarding insurance options and the availability of CPA.  Plaintiffs paternalistically assume that all ESRD patients should be on Medicare or Medicaid, and therefore, any discussion of commercial insurance options must be

"steering" because there is no legitimate reason for an ESRD patient to enroll in commercial insurance instead of Medicare or Medicaid.  But, contrary to Plaintiffs' rhetoric, there are many reasons an ESRD patient might choose to remain on or obtain commercial insurance. Accordingly, if ESRD patients choose commercial insurance, this does not mean that they were "steered" because they are "vulnerable," ¶ 193; rather, it demonstrates that the patient, consistent with the fundamental premise underlying CPA, exercised their right to choose what insurance they – not Plaintiffs—thought was best for them and their family.  Thus, Plaintiffs lack law or facts supporting their premise that some type of hidden, illegal conduct occurred that could possibly have rendered the challenged statements false.

Second, Plaintiffs do not and cannot plead particularized facts giving rise to a strong inference that Defendants acted with the requisite state of mind (scienter).  Plaintiffs assert they have adequately pled Defendants' scienter based on allegations that Defendants were aware of the supposed "steering," but they do not and cannot plead that Defendants would have been aware the conduct was illegal.  Moreover, Plaintiffs cannot base scienter on motive allegations as motive alone is legally insufficient to plead scienter, and in any event, the motive to make a profit does not support scienter since it would apply to any publically traded company.

Third, Plaintiffs do not – and cannot – plead loss causation. The announcements on which they rely to establish that DaVita's stock price dropped after the purported "truth" was disclosed to the market did not actually reveal any fraudulent or illegal activity (because there was none). Those announcements are thus legally insufficient to constitute loss causation.

In essence, the Complaint simply assumes that the conduct it describes was illegal and ignores facts and law weighing against illegality.  In doing so, Plaintiffs fail to plead securities fraud, and the Court should accordingly dismiss all of the claims against Defendants pursuant to

Federal Rules of Civil Procedure 9(b) and Rule 12(b)(6), as well as the PSLRA. The dismissal should be with prejudice because amendment cannot cure the Complaint's flaws.

## II.   BACKGROUND[3]

Determining whether a complaint states a plausible claim for relief is a "context-specific task." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Here, Plaintiffs contend that DaVita misled ESRD patients about commercial compared to government insurance. Consequently, the applicable context requires examining the insurance options for ESRD patients to determine whether the "scheme" alleged by Plaintiffs is plausible – or even possible in light of these facts. This context demonstrates the flaws in Plaintiffs' allegations because numerous assumptions underlying the "scheme" they have constructed are incorrect.

### A.   ESRD Patients Have the Right To Choose The Insurance That Best Fits Their Needs And Financially Needy Patients Have Long Had Access To CPA.

In 1972, Congress made most ESRD patients eligible for Medicare if they choose, ¶ 38, but did not *require* ESRD patients to enroll. IFR, at 90,213.[4] ESRD patients can elect coverage that best serves their needs, whether it be commercial insurance or Medicare, or if they meet the income requirements, Medicaid. *Id.* The ACA expanded ESRD patients' choices when it went into effect in January 2014, by prohibiting commercial insurance plans from excluding coverage

---

[3] This Background Section is drawn from the Complaint's well-pled factual allegations, documents referenced in the Complaint, and matters of public record of which the Court may properly take judicial notice without converting this motion to dismiss to a motion for summary judgment. *See generally Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23, (2007) (discussing sources courts examine on Rule 12(b)(6) motions). Defendants accept as true the Complaint's well-pled facts for purposes of this motion, to the extent they do not conflict with the sources referenced herein, but reserve the right to challenge them later if necessary. *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1196 (10th Cir. 2013) (courts may consider "documents incorporated by reference into the complaint, public documents filed with the SEC, and documents the plaintiffs relied upon in bringing suit . . . . ***And if those documents conflict with allegations in the complaint, [courts] need not accept those allegations as true.***").

[4] Interim Final Rule, Medicare Program; Conditions for Coverage for End-Stage Renal Disease Facilities – Third Party Payment, 81 Fed. Reg. 90,211 (Dec. 14, 2016) ("IFR") (cited ¶ 133).

for patients with preexisting conditions like ESRD.  ¶¶ 40-41.  Not unsurprisingly, some patients elect to have a commercial insurance plan that fits their particular needs, rather than rely on government insurance.  There are a number of factors that can inform that decision:

- Some ESRD patients are not eligible for Medicare.  IFR at 90,213.

- Medicare Part B has a monthly premium of $134, which could be more than a patient's premium on his or her existing commercial plan.  IFR at 90,225.

- Medicare only pays for 80% of ESRD patients' covered medical expenses. Medicare patients must pay the other 20% out of pocket, with no limit on their maximum out-of-pocket exposure. By contrast, commercial insurance often has a lower patient responsibility and an out of pocket maximum.  *See* ¶ 39.

- To cover the 20% gap, some patients[5] purchase supplemental insurance—if such insurance is available and the patient can afford it.[6]

- Medicare does not cover spouses and dependents.[7]

- Many health care providers do not accept Medicare or Medicaid, so switching to Medicare or Medicaid could mean that ESRD patients lose access to their health care providers.[8]

- Medicaid coverage varies by state and can involve significant drawbacks including delayed patient access to primary care. [9]

- Medicaid patients in many states will not be able to receive dialysis outside of their home state, and thus their travel options may be severely limited.[10]

---

[5] Plaintiffs allege that "ESRD patients are largely eligible for state-run Medicaid programs for the remaining 20% of dialysis costs that Medicare does not cover."  ¶ 39.  However, many patients do not qualify for both Medicare and Medicaid—of patients enrolled in Medicare because of ESRD, only 41 percent were also enrolled in Medicaid.  IFR at 90,213.

[6] While patients over 65 may purchase Medigap policies, "individuals under age 65 who are entitled to Medicare through the ESRD program cannot sign up for a Medigap policy in many states," leaving them without guaranteed coverage for this 20% gap.  IFR at 90,212.

[7] National Kidney Foundation website ("NKF website") (cited ¶ 41), https://www.kidney.org/news/monthly/How_AffordableCareAct_affects_Dialysis_Patients

[8] NKF website, https://www.kidney.org/patients/financial-and-insurance-changes, ("Some providers do not accept Medicaid.").

[9] "Acceptance of New Patients with Public and Private Insurance by Office-Based Physicians," at 1, https://www.cdc.gov/nchs/data/databriefs/db195.pdf (summarizing CDC data showing that physician acceptance of new Medicaid patients varies by states and is significantly "lower than acceptance of new Medicare patients or new privately insured patients").

[10] NKF website, https://www.kidney.org/atoz/content/traveltip, ("Most state Medicaid programs will not pay for treatment outside of your home state.").

Plainly, there are potential benefits to ESRD patients from commercial insurance as opposed to government sponsored insurance.  Regardless of whether an ESRD patient is on Medicare or commercial health insurance, they must pay premiums for their health insurance. While many ESRD patients face financial constraints due to the severity of their condition, IFR at 90,212, charities, including AKF, have helped these patients pay their premiums for decades, regardless of the patient's insurance or dialysis provider.  *Id.*[11]

### B.    Dialysis Providers Are Required To Educate Patients About CPA.

Dialysis providers, like DaVita, are required to educate ESRD patients about any financial resources – such as CPA – that may be available to help pay for their care.  Dialysis facilities are legally required to have an interdisciplinary team that provides each patient with an "[e]valuation of psychosocial needs."  42 C.F.R. § 494.80(a)(7).  Centers for Medicare and Medicaid Services ("CMS") guidance states that this evaluation must address the patient's "[f]inancial capabilities and resources," "[a]ccess to available community resources" and "[e]ligibility for Federal, State or local resources."  ESRD Surveyor Training Interpretive Guidance, Final Version 1.1 (Oct. 3, 2008)[12] at 193; *see id.* at 271 (explaining facility may "provid[e] information and help[] patients apply for Medicare, Medicaid and other insurance benefits to assure payment for care").  Additionally, CMS mandates that dialysis providers

---

[11] Plaintiffs criticize AKF because it allegedly only provides funds to pay premiums while a patient is on dialysis.  ¶¶ 50, 75, 154.  According to Plaintiffs, patients using AKF's CPA for a commercial policy cannot obtain a kidney transplant because they cannot demonstrate that they could afford insurance coverage after the transplant occurred.  ¶ 75.  This criticism, however, applies to all patients who receive AKF funds, not just those on commercial insurance.  *See, e.g.*, NKF Website, https://www.kidney.org/patients/financial-and-insurance-changes, (informing patients that because CPA ceases after transplant and CPA often pays the premium for Medigap insurance, Medicare patients must plan how to pay for the 20% co-pay after transplant). Accordingly, the fact that AKF does not offer CPA post-transplant, does not support preferring Medicare to commercial insurance.

[12] https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/Guidance forLawsAndRegulations/downloads/esrdpgmguidance.pdf.

inform patients of their "Patients' [R]ights," including "the right to be told about any financial help available to me."[13]  Thus, DaVita has for years educated patients about the access CPA provides to otherwise unaffordable insurance options.  ¶ 189.

       **C.**     **DaVita Has Long Disclosed That Its Profits Are Driven By Commercial Insurance Reimbursement And That It Contributes To AKF In An Arrangement The Government Has Long Supported.**

It is no secret that commercially insured patients comprise 10% of DaVita's patient population and drive 100% of its profits.  ¶ 4.  For years DaVita has disclosed this and the fact that commercial insurance reimbursement rates for dialysis services are "significantly higher than Medicare rates."  ¶ 171.  Another well-known fact is that DaVita, like many other dialysis providers, donates money to AKF.  ¶¶ 4, 42, 157.  The government has publicly acknowledged this practice for at least twenty years – including in an advisory opinion issued by the OIG in 1997.  ¶ 181.  This support has continued through the years,[14] including support for charitable

---

[13] CMS website, https://www.medicare.gov/dialysisfacilitycompare/#resources/patients-rights. The NKF provides a similar patient bill of rights which lists a dialysis patient's right to "[o]btain assistance about how you can pay your bill and about programs available to help you." NKF website, https://www.kidney.org/atoz/content/dial_billofrights.

[14] *See* Office of Inspector General, Special Advisory Bulletin on Offering Gifts and Other Inducements to Beneficiaries, 67 Fed. Reg. 55,855-56 (Aug. 30, 2002) ("[V]aluable services or other remuneration can be furnished to financially needy beneficiaries by an independent entity, such as a patient advocacy group, even if the benefits are funded by providers, so long as the independent entity makes an independent determination of need and the beneficiary's receipt of the remuneration does not depend, directly or indirectly, on the beneficiary's use of any particular provider.  An example of such an arrangement is the American Kidney Fund's program to assist needy patients with [ESRD] with funds donated by dialysis providers, including paying for their supplemental medical insurance premiums"); Medicare and State Health Care Programs: Fraud and Abuse; Civil Money Penalty Exception to Protect Payment of Medicare Supplemental Insurance and Medigap Premiums for ESRD Beneficiaries, 67 Fed. Reg. 72,896, at 72,897 (Dec. 9, 2002) ("Financially needy dialysis patients are already receiving, and will continue to receive, supplemental health insurance support through funding arrangements with AKF or comparable independent nonprofit organizations.  These arrangements are lawful, are apparently efficient, and minimize the potential for abuse."); OIG Advisory Op. No. 13-19, 2013 WL 7155029, at *5 ("Long-standing OIG guidance makes clear that industry stakeholders can contribute to the health care safety net for financially needy patients, including beneficiaries

assistance programs designed for ESRD patients.[15]  Government websites even direct patients to

AKF to learn about help to pay premiums.[16]  The CPA regulatory scheme – including DaVita's

support to patients through its donations to AKF – is a long-standing practice widely

acknowledged by the government as important to a vulnerable patient population.

>        D.        **The *Burwell* Decision Supports Patient Access To CPA**.

In January 2017, the federal court in *Burwell* enjoined a proposed rule that would have

diminished the ability of ESRD patients to use CPA.  2017 WL 365271, at *2, *6.  After CMS

sought public comment through an RFI on whether ESRD patients were being "steered" into

ACA plans and whether ACA plans were appropriate for them,[17] CMS issued an Interim Final

Rule ("IFR") that "[i]n effect . . . would allow insurers to refuse to insure ESRD patients who

receive [CPA]."  *Burwell*, 2017 WL 365271, at *2, *6.  The court found that the government had

violated its own procedures and failed to properly consider the entirety of the circumstances:

"HHS failed to consider the benefits of private qualified health plans and ignored the

disadvantages of the Rule," which "would leave thousands of Medicare-ineligible ESRD patients

---

of Federal health care programs, by contributing to independent, *bona fide* charitable assistance programs"); OIG Advisory Op. No. 15-17, 2016 HHS OIG Adv. Op. LEXIS 7, at *12 (repeating OIG's guidance about industry support to charities to help patients with insurance premiums and other costs).

[15] *See, e.g.*, OIG Advisory Op. No. 13-16, 2013 WL 7155024 (insurer's payment of Medicare premiums for ESRD patients); OIG Advisory Op. No. 09-07, 2009 WL 2371265 (free nutritional supplements for ESRD patients); OIG Advisory Op. No. 98-17, 1998 WL 35287772 (provider contributions to charity for support of patient Medicare and Medicare supplemental insurance premiums); OIG Advisory Op. No. 97-1, 1997 WL 34684549 (same); and OIG Advisory Op. No. 97-2, 1997 WL 34684550 (state-funded support for insurance premiums for ESRD patients).

[16] *See* NIH, *Financial Help for Treatment of Kidney Failure*, https://www.niddk.nih.gov/health-information/kidney-disease/kidney-failure/financial-help-treatment, (identifying AKF as a private organization that can help ESRD patients pay health plan premiums).

[17] Request for Information: Inappropriate Steering of Individuals Eligible for or Receiving Medicare and Medicaid Benefits to Individual Market Plans, 81 Fed. Reg. 57,554 at 57,555 (Aug. 23, 2016) (cited ¶¶ 11, 106) ("RFI").

without health insurance."  In fact, "more than 600 individuals currently receiving [CPA] . . . stated [in response to the RFI] that charitable premium assistance supports patient choice and is valuable to avoid relying on 'taxpayer dollars.'"  IFR at 90,214.  *Burwell* noted "[p]reserving the status quo ensures that ESRD patients have the choice to select private or public insurance options based on their health care needs and financial means."  *Burwell*, 2017 WL 365271, at *6.

> ### E.     Institutional Investors Decide That The Controversy Over Insurance Coverage For ESRD Patients Constitutes Securities Fraud.

Plaintiff Peace Officers' Annuity and Benefit Fund of Georgia ("Georgia Fund"), a large institutional investor, commenced this lawsuit on February 1, 2017.  On November 6, 2017, this Court appointed as Lead Plaintiffs Georgia Fund and Jacksonville Police and Fire Pension Fund ("Jacksonville Fund"), another large institutional investor who is a serial plaintiff in securities fraud class actions.  Both institutional investors made money off of the alleged "fraud." According to their certifications, Complaint at 118-21, Georgia Fund sold just as many DaVita shares at allegedly inflated prices as it purchased at allegedly inflated prices, and Jacksonville Fund bought its last shares of DaVita on October 14, 2016 (before several supposedly misleading statements were made (¶¶ 197-98, 205, 207-09, 216-17, 219-20, 222)), and sold 22,000 more shares of DaVita than it purchased during the putative class period.  ¶¶ 266-70.

Plaintiffs filed this Complaint on January 12, 2018 asserting that "Defendants implemented a Company-wide scheme whose entire purpose was to 'steer' every single one of DaVita's Medicare and Medicaid patients to commercial insurance," which pays far more for dialysis treatments than the government.  ¶¶ 4-5 (emphasis in original).  The "scheme" purportedly had two parts: (1) DaVita employees supposedly violated regulations and laws by "steering" ESRD patients to commercial insurance, ¶ 5; then, (2) DaVita had a "'quid pro quo' relationship" with AKF, in which DaVita "donated" money to AKF, and AKF, in turn, "used

those proceeds to pay the commercial insurance premiums for DaVita's patients." ¶ 6.

The Complaint attempts to support its theory with background allegations that after the ACA was passed, DaVita supposedly implemented programs to increase the number of its patients on commercial insurance, including providing training materials and incentive programs for its employees, and made efforts to track patients on commercial insurance. In 2014, according to the Complaint, the program was called "Private Pay Growth," ¶¶ 57-61, 64-66, 73-75, 77-80. In 2015, DaVita allegedly promoted the "Medicaid Opportunity" initiative that was supposedly designed "to pressure all Medicaid-eligible ESRD patients to enroll in commercial insurance plans, backed by AKF." ¶ 81; *see generally* ¶¶ 82-89. Significantly, the Complaint refers to no initiatives, documents, training sessions or any communications from 2016 or 2017. Thus, even though the putative class period extends until October 2017, the Complaint includes no allegations about DaVita's conduct in 2016-17. Former employees' general discussions of the supposed pressure to add commercial patients do not identify when these discussions happened. ¶¶ 90-94, 97-103. They necessarily occurred before March 2016, the last date when one of the four former DaVita employees who are referenced in the Complaint left DaVita. ¶ 82.

The Complaint refers to a series of public revelations that supposedly brought to light the truth about DaVita's allegedly illegal steering scheme:

- In July 2016, an insurer, UnitedHealth, sued dialysis provider, American Renal Association, seeking to avoid paying for dialysis services for ESRD patients using CPA to pay their premiums. ¶ 104. This lawsuit does not mention DaVita.

- On August 8, 2016, in an investor phone call, Mr. Rodriguez acknowledged that the United lawsuit had prompted a whirlwind of speculative media coverage about patient steering and CPA, when responding to the following question from an analyst: "There has been some recent articles about insurers focusing on third-party payments from charities like [AKF] . . . I think it's been the longstanding practice for dialysis companies to donate to these charities, but for those of us less familiar, can you provide some color on how AKF fits into your overall strategy and any dynamics at play regarding increased focus?" Ex. 1, Aug. 8, 2016 Tr. at 6-7 (cited ¶ 259). Mr. Rodriguez confirmed what the analyst already

knew, namely that the Company had been donating to AKF for decades. ¶ 259.

- On August 18, 2016, CMS announced the RFI on steering. ¶ 261.

- On October 23, 2016, the *St. Louis Post-Dispatch* published an article speculating about alleged steering of Medicaid patients and a purported quid pro quo relationship between DaVita and AKF.  ¶ 118.

- On October 31, 2016, DaVita announced that in light of ongoing uncertainty as CMS examined the issue of using CPA to pay premiums for ACA plans, DaVita would suspend its support for applications to AKF's program only for patients who were eligible for Medicaid.  ¶ 123.  DaVita estimated that the financial impact of this change would be up to $140 million.  ¶ 140.

- On December 16, 2016, CMS issued its IFR, which was later enjoined. ¶ 133.

- On January 6, 2017, "DaVita announced that the Department of Justice ("DOJ") opened a probe and the United States Attorney's Office for the District of Massachusetts served a subpoena on the Company seeking 'documents relevant to charitable patient assistance organizations, particularly the American Kidney Fund, including documents related to efforts to provide patients with information concerning the availability of charitable assistance.'" ¶ 136.

- On May 2, 2017, DaVita confirmed the $140 million impact announced on October 31, 2016.  ¶ 266.

- On August 1, 2017, DaVita reported that insurers were increasingly refusing to accept CPA which was contributing to a downturn in its commercial mix.  ¶ 267.

- On September 22, 2017 and October 9, 2017 media outlets reported their speculation of how many DaVita patients received CPA from AKF, a number that DaVita clarified on October 10, 2017.  ¶¶ 268-271.

DaVita's stock price dropped following the information revealed on August 8, 2016, August 18, 2016, October 23, 2016, January 6, 2017, May 2, 2017, August 1, 2017, September 22, 2017 and October 9, 2017.  ¶¶ 259-270.  Tellingly, the putative class period ends not with an admission of misconduct but with DaVita correcting misinformation about its business.  ¶ 271.

### F.     No Factual Allegations Support That DaVita's Conduct Is Illegal.

Plaintiffs base their assumption that DaVita's conduct was "illegal" on statements by former employees, a lawsuit by a commercial insurer against a *different* dialysis provider, the existence of a DOJ investigation, select responses to CMS' RFI, and reports in the press. *See generally* ¶¶ 14, 53-122, 136.  DaVita emphatically denies that it steered patients.  However,

11

assuming, *arguendo*, that it did, Plaintiffs do not plead that steering" is unlawful:

- They do not – and cannot – allege the existence of any statute that prohibits "steering" or any opinion finding that "steering" is illegal.

- They do not – and cannot – allege that any regulation prohibits "steering."

- They do not – and cannot – allege that CMS' language describing steering as "improper" is found in any regulation or even proposed regulation.

- They do not – and cannot – allege that DaVita or any of its employees have pled to or been found guilty of any criminal conduct relating to the alleged scheme or admitted that the supposed scheme was illegal.

- They do not – and cannot – allege that the DOJ investigation is complete, only that an investigation began.

- They do not – and – cannot allege that the private complaint filed by UnitedHealth against American Renal Association mentions DaVita.

- They do not – and cannot – allege that the "concerns" about "steering" raised in the RFI and IFR were confirmed by ESRD patients.

### G. Plaintiffs' Theory Of Liability Depends On The Existence Of Illegality.

Plaintiffs plead that from February 26, 2015 through October 6, 2017, Defendants made statements that allegedly violated the federal securities laws because the statements failed to disclose that DaVita engaged in illegal steering and allegedly paid its patients' commercial insurance premiums through AKF, ¶¶ 153-54, or because the statements contained false and misleading "representations regarding [CPA] and [DaVita's] relationship with the AKF." ¶ 155.

## III. ARGUMENT

The Court should dismiss with prejudice the Section 10(b), 15 U.S.C. § 78j(b), claims because Plaintiffs do not and cannot adequately plead any of three required elements: 1) falsity, i.e., a material misrepresentation or omission; (2) scienter, i.e., a wrongful state of mind; and (3) loss causation, i.e., a causal connection between the misrepresentation and the loss. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). Plaintiffs fail to plead falsity because no law or facts show that the scheme was illegal. Plaintiffs fail to plead scienter because they lack facts giving rise to a strong inference that Defendants knew or were reckless in not knowing that

the scheme was illegal.  Finally, Plaintiffs fail to plead loss causation because no fraud was ever revealed to the market.  Thus, the Complaint should be dismissed with prejudice.

### A.      Plaintiffs Must Satisfy Strict Legal Standards.

On a motion pursuant to Rule 12(b)(6), the court examines only the complaint's well-pled facts because conclusory statements or "naked assertions devoid of further factual enhancement" do not suffice to state a claim.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012).  Neither do allegations requiring implausible inferences, *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008), nor allegations contradicted by facts properly considered on a motion to dismiss.  *Slater*, 719 F.3d at 1196.

Securities fraud claims are subject to the heightened pleading requirements of Rule 9(b) and the PSLRA.  *Tellabs*, 551 U.S. at 322; *accord In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012).  The PSLRA imposes a standard even higher than Rule 9(b), requiring that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state ***with particularity*** all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B); *City of Phila. v. Fleming Cos., Inc.*, 264 F.3d 1245, 1258 (10th Cir. 2001).  Even higher standards apply to pleading scienter as set forth *infra*. Courts strictly enforce these pleading standards.  *See, e.g.*, *City of Phila.*, 264 F.3d at 1258; *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1118 (10th Cir. 1997) (affirming dismissals).

### B.      Plaintiffs' Underlying Contention Is One of Corporate Mismanagement, Not Securities Fraud.

Plaintiffs contend that DaVita's conduct was "illicit" or "improper."  *See, e.g.*, ¶¶ 5, 12, 16, 45, 104, Headings V.C and V.E.  But Plaintiffs cannot base a securities fraud claim upon their own private views of CPA.  Unable to plead that DaVita's conduct was illegal, Plaintiffs'

allegations reduce to a criticism of how Defendants ran DaVita's business.  But a Section 10(b) claim is not cognizable if the misconduct arises from acts of alleged corporate mismanagement; rather, the complaint must plead deception or misrepresentation to investors.  *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1225 (10th Cir. 1996); *see generally Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977).  "Plaintiff[s] may not bootstrap [their] internal mismanagement claim into a federal securities action by alleging the disclosure philosophy of the statute obligates Defendants to reveal their managerial deficiencies."  *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 683-84 (D. Colo. 2007).  This is exactly what Plaintiffs try to do, and thus, the Complaint should be dismissed for this reason alone.

### C.   The Complaint Cannot Plead Falsity Because It Lacks Support For The Premise That DaVita's Alleged Conduct Is "Illegal."

Plaintiffs lack support for their characterization of DaVita's purported steering scheme as "illegal," which is fatal to their contention that the challenged statements are materially false because Defendants did not disclose the purported illegal scheme.  It is well-established that if a Section 10(b) claim is predicated on illegal conduct, Plaintiffs must adequately plead that the company actually engaged in illegal conduct.  *See*, *e.g.*, *Shoemaker v. Cardiovascular Sys., Inc.*, No. 16-568 (DWF/KMM), 2017 WL 1180444, at *5 (D. Minn. Mar. 29, 2017) ("*Shoemaker I*") ("Plaintiffs must plead particular facts that, if true, would constitute illegal conduct" to survive a motion to dismiss under the PSLRA); *Shoemaker v. Cardiovascular Sys., Inc.*, No. 16-568 (DWF/KMM), 2018 WL 527386 (D. Minn. Jan. 10, 2018) ("*Shoemaker II*") ("If a § 10(b) claim is predicated on illegal conduct, then the complaint must allege conduct that if true would be illegal."); *In re AXIS Capital Holdings Ltd., Sec. Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006) ("If the complaint fails to allege facts which would establish such an illegal scheme, then the securities law claims premised on the nondisclosure of the alleged scheme are fatally

14

flawed."). Congress passed the PSLRA to protect against meritless strike suits. *Tellabs*, 551 U.S. at 313. "Allowing shareholders to sue based on conclusory allegations that a company has engaged in widespread illegal conduct without adequately pleading facts that demonstrate illegal conduct would just allow strike suits by another name." *Shoemaker I,* 2017 WL 1180444, at *5.

Securities fraud claims based on allegedly "illegal" conduct have survived a motion to dismiss when they were supported with facts that affirmatively pled illegal conduct, such as:

- "Guilty pleas" that the company entered into with the DOJ, *In re Infineon Techs. AG Sec. Litig.*, No. C 04-04156 JW, 2006 WL 1329887, at *5 (N.D. Cal. May 16, 2006), as amended (May 22, 2006), *on reconsideration sub nom.* 2006 WL 2925680 (N.D. Cal. Sept. 11, 2006); or

- An SEC Cease and Desist Order finding that the company violated the FCPA in multiple respects, *In re Syncor Int'l Corp. Sec. Litig.*, 327 F. Supp. 2d 1149, 1155 (C.D. Cal. 2004), *aff'd in part, reversed and remanded in part*, 239 F. App'x 318 (9th Cir. 2007); or

- A complaint against the company filed by the New York State Attorney General, the resignations of the CEO and other employees and guilty pleas by employees in another company that had purportedly schemed with the defendant company. *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469, 476 (S.D.N.Y. 2006).

In the absence of indicia of unlawful conduct such as those found in the cases above, a securities fraud complaint must include specific allegations of misconduct that support illegality including the legal and factual predicates for such a claim. *See*, *e.g.*, *In re Yukos Oil Co. Sec. Litig.*, No. 04 Civ. 5243 (WHP), 2006 WL 3026024, at *14-16 (S.D.N.Y. Oct. 25, 2006) (dismissing securities fraud claims based upon a purported scheme that allegedly violated "90/70/70/70 Rule" because no legal precedent supported plaintiffs' theory of liability and dismissing claims that scheme violated "Article 40" where complaint lacked  sufficient particularized facts to support illegality); *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 872 (S.D. Tex. 2016) (dismissing securities fraud claim where complaint failed to "identify[] the nature of the violation," and the "when, where and who was involved"); *AXIS*,

456 F. Supp. 2d at 585 (dismissing securities fraud complaint where "Plaintiffs do allege that AXIS engaged in the "steering" of business (Compl. ¶ 90) but there is no explication of how the steering occurred or in what manner this activity violated competition laws").  Here, the Complaint does not plead any indicia of illegality, nor does it plead the existence of a law that would be broken even assuming the steering scheme is true, nor does it plead the actual factual predicates of the purportedly illegal scheme.

## 1. The Complaint Does Not Plead Any Indicia Of Illegality.

The Complaint does not even attempt to allege any actual finding by any court or governmental body that DaVita has engaged in any unlawful conduct with respect to the alleged steering scheme.  It does not allege any admission of illegality, such as a guilty plea or a finding by the DOJ or SEC that anything illegal occurred.  Instead, it bases its premise that there was illegal conduct on the Plaintiffs' flawed interpretation of the law and speculative media reports. But the Complaint's reliance on press reports to bolster its premise that illegal conduct occurred amounts to "what is essentially a 'guilt by association' argument" improperly trying to find DaVita liable because of attacks on industry-wide conduct or actions of a competitor.  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 305 F. Supp. 2d 249, 262 (S.D.N.Y. 2004).[18]  This is insufficient under the PSLRA.

## 2. The Complaint Lacks Legal Support For The Claim That "Illegal" Conduct Occurred.

Plaintiffs cannot adequately plead that conduct was illegal based on their personal interpretation of the law; they must have an established legal basis for their position.  For

---

[18] *Accord AXIS*, 456 F. Supp. 2d at 589 ("Plaintiffs cannot parrot allegations made in the AG Complaint against Marsh . . . and other insurance companies . . . to establish a factual predicate for AXIS's misuse of contingent commission agreements."); *see also Hershfang v. Citicorp*, 767 F. Supp. 1251, 1255 (S.D.N.Y. 1991) (a "complaint must rise or fall on allegations about defendants' conduct and not on wide-eyed citation to the gratuitous commentary of outsiders").

example, the court in *Yukos Oil*, 2006 WL 3026024, at *15-16, dismissed securities fraud claims based upon a purported illegal transfer pricing scheme that allegedly violated Russian law.  The court determined dismissal was mandatory because Plaintiffs lacked any examples of the Russian Tax Ministry or courts challenging the type of transactions at issue or "the existence of any precedent to support [plaintiffs'] contention."  *Id.*  The Complaint here suffers from the same defect: no support for Plaintiffs' view that a law was violated.  Plaintiffs plead that Defendants violated the Anti-Kickback Statute ("AKS"), the Social Security Act ("SSA") and CMS regulations (¶¶ 11, 46, 49, 106), but Plaintiffs do not and cannot allege how the scheme, even taken as true, would result in a violation of these laws or regulations.

The allegation (¶ 49) that Defendants violated the AKS fails because the statute prohibits certain payments that induce the use of services paid for by government programs, but the "scheme" here has the opposite effect.  42 U.S.C. § 1320a-7b(b)(2).  Here, he "scheme" was not about inducing referrals of patients on government insurance; the point was to move ESRD patients off government programs so the government would not be paying for their care, *see, e.g.*, ¶¶ 5-11.  Thus, Plaintiffs could not possibly plead facts showing a violation of the AKS.

The allegation (¶ 46) that Defendants violated the SSA fails because the SSA makes it "unlawful for a person to sell or issue" a private health insurance contract under certain circumstances, 42 U.S.C. § 1882(d)(3)(A)(i).  Defendants do not sell or issue private insurance.

The allegations (¶¶ 11, 106) that Defendants violated CMS regulations fail because no CMS regulation prohibits the conduct alleged.  Indeed, CMS issued the RFI and proposed the IFR because no existing regulation addressed "steering."  Obviously, Plaintiffs cannot claim that DaVita's conduct was illegal because it violated the IFR since *Burwell* enjoined implementation of the IFR.  *Burwell*, 2017 WL 365271, at *6.  In any event, the IFR attempted to regulate

whether insurers had to accept premiums paid for with CPA, not the conduct of dialysis providers. Thus, the IFR does not support a claim that DaVita violated any rule of law.[19]

Finally, Plaintiffs cannot rely on the DOJ investigation to satisfy their pleading burden because the existence of a government investigation is insufficient to allege illegal conduct as the basis of a claim for securities fraud. *Key Energy*, 166 F. Supp. 3d at 872; *see also Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2012) ("The announcement of an [SEC] investigation reveals just that—an investigation—and nothing more."); *In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 962 (8th Cir. 2008) ("[T]he mere existence of an SEC investigation does not suggest that any of the allegedly false statements were actually false"). Accordingly, Plaintiffs' averments about a DOJ investigation do not show that DaVita violated some law.

Thus, Plaintiffs do not – and cannot – plead that the laws cited in the Complaint were violated, and the Motion to Dismiss can be granted on that basis alone.

### 3.   Plaintiffs Lack Factual Support For The Claim That "Illegal" Steering Occurred.

Where the gravamen of a complaint is a scheme that supposedly rendered the challenged statements false or misleading, the Court must determine whether the Complaint contains particularized well-pled facts that, if true, allege the existence of that purported scheme. *In re*

---

[19] Nor does the RFI support the claim that conduct was illegal because the RFI is merely an agency request for information, not a rule that sets a legal standard of conduct. *Vining v. Oppenheimer Holdings Inc.*, No. 08 CIV. 4435 LAP, 2010 WL 3825722, at *11 (S.D.N.Y. Sept. 29, 2010) (granting motion to dismiss § 10(b) claims and citing *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000), which held that interpretations not arrived at after formal rulemaking are not accorded the force of law, in concluding that agency document failed to indicate alleged conduct was illegal). Plaintiffs' allegation that "CMS made it abundantly clear that: 'It is improper to influence people away from Medicare or Medicaid coverage for the purpose of financial gain'" (¶¶ 11, 106) is also not based on a rule; it refers to language in a press release, not a regulation. *See* Ex. 2. A statement by a CMS Deputy Administrator in a press release does not have the force of law. *In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 374 (S.D.N.Y. 2003), *aff'd sub nom. Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) (conclusions of the New York Attorney General do not sufficiently plead illegality of conduct at issue).

*Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 631-32 (S.D.N.Y. 2017) ("the Court must determine at the outset whether Plaintiff has adequately alleged any or all of those schemes"). Conclusory, generalized averments of illegal conduct are insufficient.  To adequately plead a kickback scheme, a plaintiff must include "specific allegations that defendants acted corruptly." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005) (dismissing as too general allegations that defendants provided billions in financing in return for investment opportunity).  Courts dismiss complaints that fail to meet this requirement.[20]  The Complaint's conclusory factual allegations do not identify the "when, where and who was involved" in the purportedly illegal scheme and should be dismissed for this reason as well.  *Key Energy*, 166 F. Supp. 3d at 872 (dismissing securities fraud claims based on illegal conduct where plaintiff relied "on vague assertions" and "not a single specific violation of the [Foreign Corrupt Practices Act] (identifying the nature of the violation, when, where and who was involved) is alleged").

An initial – and fatal – omission from the Complaint is any fact about any DaVita patient who claims that he or she was steered onto unnecessary or detrimental insurance.  Like CMS in the *Burwell* case, Plaintiffs profess to be concerned about patients who cannot obtain kidney transplants because of this supposedly illegal conduct, but they "have not provided a single example of a patient denied a kidney transplant because of charitable assistance."  *Burwell*, 2017 WL 365271, at *4.  Just as "[s]peculation that some patients will not have foresight to arrange

---

[20] *See, e.g.*, *Stumpf v. Garvey*, Nos. 03-CV-1352-PB, 02-MDL-1335-PB, 2005 WL 2127674, at *16 (D.N.H. Sept. 2, 2005) (dismissal where allegations of an "undisclosed quid pro quo" were "bald assertion[s]," and remaining allegations were based on ongoing investigations against other similar companies); *In re JP Morgan Chase*, 363 F. Supp. 2d at 601, 632 (claims of failure to disclose purported "kickbacks" lacked "particular factual allegations that support the conclusory assertion that these investment opportunities were provided as 'kickbacks'"); *In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158, 160 (S.D.N.Y. 2003), *aff'd*, 113 F. App'x 427 (2d Cir. 2004) (dismissal where plaintiff relied on vague references to "wash sales" and "round-trip trading" and conclusory allegations these are illegal).

for alternative coverage does not provide good cause to bypass notice and comment," *id.*, speculation does not satisfy the PSLRA's heightened pleading requirements.

Moreover, the Complaint's premise that ESRD patients were "steered" onto commercial plans that were "unnecessary" and possibly "detrimental" to ESRD patients is utterly implausible.  ¶ 251, s*ee also* ¶ 41 ("There is [] no reason for [an ESRD patient] to obtain a health insurance plan in the Marketplace as it is unlikely to offer you additional benefits above what Medicare covers.") (first alteration in original).  Medicare and Medicaid have significant downsides.  *See supra* II(A).  Even CMS, which based the promulgation of the IFR on the assumption that some patients would likely prefer Medicare and Medicaid to commercial plans after being fully informed, IFR at 90,225, only assumed that half the patients on commercial plans would choose Medicare.  IFR at 90,226.  Other than concerns expressed by CMS, the only other source Plaintiffs cite for their assertion that commercial plans are not necessary is the NKF website. ¶ 41.  But that website actually provides that "patients should retain the option to choose private health insurance coverage" and ***"[a]ccess to this assistance [CPA] is critical for many dialysis patients and should be continued."***[21]  The implausibility of Plaintiffs' assumption is confirmed by ESRD patients who support CPA and the choice it offers them.  IFR at 90,214.

In effect, Plaintiffs' theory of liability amounts to an effort by institutional investors to bring a securities fraud lawsuit based on a premise that deprives ESRD patients (many of whom are low income, IFR at 90,215) of the ability to choose what insurance is best for them.  Plaintiffs – like the insurance companies whose views they adopt to support their claim, *see, e.g.*, ¶¶ 113-16 – have conveniently ignored the views of the ESRD patients and the obvious benefits

---

[21] NKF website, https://www.kidney.org/news/national-kidney-foundation-statement-cms-announcement-examine-inappropriate-steering-patients.

these patients realize from CPA and commercial insurance.[22]  ESRD patients are "fully capable of considering both the substance of the [information] presented to them and its proximate and ultimate source" and then making an informed decision about which insurance coverage best suits their needs.  *McConnell*, 540 U.S. at 258-59.  Indeed, CMS requires patients to be educated about financial resources so they can make precisely this decision.  *See supra*, II(B).  In short, there is no reason why the views of institutional investor plaintiffs should be considered a more plausible source to determine what is in ESRD patients' best interest than the ESRD patients themselves.  And, as shown by the overwhelming number of comments to the RFI that were submitted by ESRD patients, they support CPA and patient choice.  *See* IFR at 90,214.

### D.     The Complaint Should Be Dismissed Because It Lacks Facts Supporting That The Challenged Affirmative Statements Were False.

Plaintiffs also attack a handful of statements that they contend are affirmatively false, *see* ¶¶ 170-71, 181, 189, 192, 198, 207-09, 222, but either misread the language or lack factual support for their claims.

Paragraphs 170-171 misinterpret statements from DaVita's annual report filed with the SEC.  Viewed in context, the challenged statements consist of (1) the non-controversial proposition that AKF assistance is available to "some patients who do not qualify for Medicaid," ¶ 170 and (2) an accurate description of the Medicare Secondary Payor Act, namely that "[b]efore a patient becomes eligible to have Medicare as their primary payor for dialysis services, a patient's commercial plan, if any, is responsible for payment of such dialysis

---

[22] This approach is contrary to "the premise that the parties know what is best for them."  *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring).  Or, as Justice Scalia put it in another context: "The premise of the First Amendment is that the American people are neither sheep nor fools, and hence fully capable of considering both the substance of the speech presented to them and its proximate and ultimate source."  *McConnell v. FEC*, 540 U.S. 93, 258-59 (2003) (Scalia, J., dissenting).

services." ¶ 171.[23]  Plaintiffs aver that these statements limit AKF assistance to patients who "do not qualify for Medicaid" and have the effect of "attribut[ing] [DaVita's profits] to commercial patients <u>before</u> they were eligible for Medicare." ¶ 172.  Not so.  This claim not only distorts the words in the document it is easily refuted by language on the very same page of the document. DaVita informed the market that: patients with commercial insurance receive CPA from AKF ("[p]atients with commercial insurance who cannot otherwise maintain coverage frequently rely on financial assistance from charitable organizations, such as the American Kidney Fund"); and not all its patients leave their commercial plans for Medicare.  Ex. 3 (2015 10-K at 6).

The statement in Paragraph 222 is pure opinion – Mr. Thiry did not believe it was in the best interest of investors for DaVita to provide the details being requested about AKF funding. No facts show that he did not honestly hold this opinion or that he actually knew all the numbers being requested and was being disingenuous in his responses.  To plead an opinion is false, a complaint must allege the speaker "did not hold the belief she professed" or that "the supporting fact she supplied were untrue."  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1326-27 (2015); *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1159 (10th Cir. 2015) (upholding dismissal and district court's conclusion, applying *Omnicare* to a § 10(b) claim, that plaintiff "has not alleged any facts that would cast doubt on the sincerity or reasonableness of [defendant's] statement of his opinion").  These claims are nothing more than speculation, which falls far short of pleading securities fraud.  *Nakkhumpun*, 782 F.3d at 1159.

---

[23] The Medicare Secondary Payor Act requires that group health plans pay for dialysis for 30 or 33 months, *even if the insured is enrolled in Medicare.*  This statement does not say that patients with commercial insurance always switch to Medicare.  Further, the report disclosed that "Medicare **generally** becomes the primary payor after 33 months," Ex. 3 (2015 10-K at 6) (cited ¶ 171), which necessarily implies that for some patients, commercial insurance remains the primary payor.  For example, as discussed *supra* II(A), some ESRD patients are not eligible for Medicare, thus Medicare never becomes their primary payor.

All the remaining claims (¶¶ 181, 189, 192, 198, 207-09) plead that various statements about aspects of DaVita's communications with patients or about its profits were false because of either the alleged illegal "steering" or the relationship between DaVita and AKF.  These statements include comments about DaVita's donations to AKF, DaVita's adherence to the OIG opinion, DaVita's patient education efforts and financial incentives surrounding these efforts, and DaVita's fulfillment of its legal responsibilities.  Any contention that DaVita's conduct was illegal has been thoroughly debunked for the reasons set forth previously.  Nor do Plaintiffs plead facts showing that any of the alleged reasons these statements were false (e.g., DaVita employees supposedly received financial incentives) existed at the time of the statement in 2016 or 2017.  Plaintiffs cannot rely upon allegations about programs and initiatives from 2014-2015 to plead the state of affairs at the time the challenged statements were made in 2016 or 2017.  *Grossman*, 120 F.3d at 1124 (plaintiff must give "explanation as to why the disputed statement was untrue or misleading *when made*") (emphasis in original).

In addition, Plaintiffs lack standing to challenge the statements in Paragraphs 198, 207-09, 222 because those statements were made after Plaintiffs' last stock purchase on October 14, 2016.  *See* Lead Plaintiff Certifications.  Statements and omissions made after a plaintiff's stock purchase cannot form the basis of that party's Section 10(b) action because the plaintiff could not have relied on those statements in making its purchase.  *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 733 (1975); *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 987 (10th Cir. 1992) (affirming dismissal, noting statement "was issued after all of the partnerships had been closed and could not have been the basis for reliance in the purchase of securities").

### E.       The Complaint Should Be Dismissed Because It Fails To Plead That Defendants Acted With Scienter.

This Court should also dismiss the Complaint on the independent ground that Plaintiffs

have failed to adequately plead scienter because none of their scienter theories is legally sufficient.  They cannot infer fraudulent intent from mere knowledge of the alleged "steering" since knowledge of the challenged conduct does not entail knowledge that the conduct is illegal. To the extent Plaintiffs try to infer scienter based on a purported motive, motive alone is legally insufficient to plead scienter. In any event, the motive to make a profit is not a valid basis from which to infer scienter as it applies to all publically traded companies.  Plaintiffs' other grounds for pleading scienter fail as well, and the competing inference that Defendants believed DaVita's conduct was permissible is stronger than any weak inference of scienter.

### 1.    The Standard For Pleading Scienter Is Exceedingly High.

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a ***strong inference*** that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A).  The required state of mind, or scienter, is "a mental state embracing intent to deceive, manipulate, or defraud, or recklessness."  *Adams v. Kinder–Morgan, Inc.*, 340 F.3d 1083, 1105 (10th Cir. 2003).  Recklessness is "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *City of Phila.*, 264 F.3d at 1258.  A "strong inference" is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.  The court compares the plaintiff's inferences with competing inferences rationally drawn from the facts alleged.  *Level 3 Commc'ns*, 667 F.3d at 1345.  In doing so, it must consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs*, 551 U.S. at 323.

The Tenth Circuit demands compliance with this exacting standard,[24] which the Complaint here fails to meet.

### 2. The Complaint Relies Upon Unwarranted Assumptions To Attempt To Infer Scienter.

The Complaint contains more than a dozen pages of allegations seeking to provide a basis from which this Court should infer that Defendants acted with scienter.  Plaintiffs, however, confuse quantity with quality and almost all their scienter allegations amount to variations on the same theme:  Defendants purportedly knew about the alleged "steering."  For example, Plaintiffs aver that former employees, documents and media reports supposedly confirm that corporate management was directing the initiatives, as does the manner in which the alleged illicit scheme came to light.  ¶¶ 227-38, 244-45, 250-52.  Similarly, Plaintiffs base an inference of scienter on the facts that Defendants were supposedly involved in setting and reporting the Kidney Care divisions' financial metrics and "commercial mix," which were purportedly material to the Company and that the AKF relationship was "critical."  ¶¶ 240-43, 46, 48, 53.  Plaintiffs also contend that the alleged scheme was "widespread."  ¶ 247.  All these averments lead to the same conclusion:  Plaintiffs believe that Defendants must have known about the supposed "steering."

This conclusion, however, does nothing to plead a strong inference of scienter because knowledge of "steering" does not equate to knowledge of illegal conduct.[25]  Even assuming the Complaint pled knowledge of DaVita's patient education efforts, it lacks particularized facts alleging when or how Defendants should have been aware that this conduct was illegal.

Moreover, Plaintiffs cannot plead that Defendants were aware of the "scheme" through

---

[24] *See, e.g.*, *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1237, 1245 (10th Cir. 2016), as amended (July 6, 2016) (affirming dismissal because "[w]e cannot infer scienter based only on a defendant's position in a company or involvement with a particular project").

[25] *AXIS*, 456 F. Supp. 2d at 592 ("plaintiffs appear to conflate the long-standing use of [certain] agreements with the *misuse* of such agreements").

vague, generalized averments about awareness of "all aspects of [DaVita's] relationship with the AKF," ¶ 248, or that "AKF was absolutely critical to the Company's financial success." *Id.*[26]

The remaining scattered scienter allegations fare no better. For example, the "mere existence of a [government] investigation" does not support an inference of scienter,[27] so scienter cannot be based on the government investigation. ¶ 239. In addition, the decision to stop using well-known arrangements "in the wake of controversy is insufficient to raise the requisite strong inference of scienter,"[28] meaning the decision to suspend support for applications to AKF does not support an inference of scienter. ¶ 249. Lastly, allegations relating to conduct prior to the putative class period that resulted in *qui tam* lawsuits, investigations and/or settlements with the government do not support scienter because these settlements have no factual overlap with the allegations relating to the conduct at issue in this Complaint.[29] ¶¶ 33-35; 254.

Although Plaintiffs do not give "motive to make a profit" its own heading in the scienter section, this theme is plainly woven throughout the Complaint. Allegations of motives that do not plead "a concrete benefit that would accrue to [defendants] as a result of the alleged fraud"

---

[26] *Anderson*, 827 F.3d at 1246 (affirming dismissal and noting insufficiency of scienter allegations that defendants "were intimately involved in[,]" "intensely focused on[,]" "proactive[,]" "made on-site visits[,]" and "reviewed detailed cost analyses").

[27] *Hutchinson Tech.*, 536 F.3d at 962; *accord Washtenaw Cty. Emps.' Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 114 (D. Mass. 2014); *Marsh & Mcllenan Cos.*, 501 F. Supp. 2d at 484.

[28] *AXIS*, 456 F. Supp. 2d at 592; *accord In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1205 (10th Cir. 2015) (affirming dismissal because new policy prohibiting conduct at issue did not show "an earlier intent to defraud"); *Sorkin, LLC v. Fischer Imaging Corp.*, No. Civ.A. 03-CV-00631-R, 2005 WL 1459735, at *8 (D. Colo. June 21, 2005) (finding failure to allege scienter because "adoption of a more conservative approach . . . does not show that management's prior choices were fraudulent or reckless").

[29] *In re Maxwell Techs., Inc. Sec. Litig.*, 18 F. Supp. 3d 1023, 1043 (S.D. Cal. 2014) ("past failings" did not make "it more likely to have internal control problems with revenue recognition, or that it should have put the individual defendants on alert").

are not sufficient to plead scienter.[30]  DaVita's alleged motive to make a profit – which Plaintiffs repeatedly emphasize, *see, e.g.*, ¶¶ 4, 5, 45, 48, 53, 81, 87, 125, 131, 229, 232 –  is  no different from the motive of any other for-profit enterprise and therefore is not a legally sufficient ground to infer scienter. *See supra* n. 30.  DaVita freely admitted that its profits are driven by patients with commercial insurance who effectively subsidize those on Medicare and Medicaid.  Under those circumstances, it is only natural – and, indeed, consistent with the Individual Defendants' obligation to manage DaVita's business in a manner that does not breach any fiduciary duties that they owe – Defendants focused on growth of patients with commercial coverage who drive DaVita's profits.  "Why a business ought to be punished solely for seeking to maximize profits escapes us."  *United States ex rel. Williams v. Renal Care Grp., Inc.*, 696 F.3d 518, 528 (6th Cir. 2012).  This approach in no way supports an inference of scienter for securities fraud.

### 3.   The Competing Inference That Defendants Believed DaVita's Conduct Was Legal Outweighs Any Weak Inference Of Scienter.

As noted above, the Supreme Court in *Tellabs* instructed courts to weigh competing inferences of non-culpable conduct, and here, the stronger inference to be drawn from the facts is that at the time of the challenged statements. Defendants did not know and had no reason to know that DaVita's patient education efforts and contributions to AKF violated any law.

The Court should examine Defendants' state of mind at the time the challenged statement was made.  CPA had been in place for decades.  There was no reason to believe that the enactment of the ACA would have changed the legality of CPA or communications between DaVita and its ESRD patients about their insurance coverage options.  The Complaint points to

---

[30] *AXIS*, 456 F. Supp. 2d at 596; *accord Yukos Oil*, 2006 WL 3026024, at *18 ("generalized desire to maximize stock value" fails to plead scienter); *see generally Level 3 Commc'ns*, 667 F.3d at 1346 ("general motives for management to further the interests of the corporation fail to raise an inference of scienter").

no facts that could be considered "red flags" that the government might now have concerns about this arrangement before the CMS press release on August 18, 2016.  Even after that press release, all the Complaint alleges is that the practice was under governmental scrutiny, media attack and private civil litigation had been filed.  Whether considered collectively or individually, the scienter allegations provide no basis for a strong inference of fraudulent intent.

Further, conduct that is utterly inconsistent with the execution of an illegal scheme. weighs against an inference of scienter.  DaVita openly disclosed all the elements of the scheme: that it received all its profits from patients with commercial coverage; that it made donations to AKF; and that AKF provided CPA for ESRD patients receiving dialysis services at DaVita facilities.[31]  This would make no sense if Defendants knew this was an illegal scheme.  Also, during the putative class, DaVita repurchased shares of its stock with an approximate value of $2 billion, which would have been irrational if Defendants knew the stock price was inflated.[32]

F.      The Complaint Does Not Plead Loss Causation

"The securities laws are not meant to 'provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause."  *In re Williams Sec. Litig.–WCG Subclass*, 558 F.3d 1130, 1137 (10th Cir. 2009) (quoting *Dura*, 544 U.S. at 345).  Accordingly, "loss causation"—that is, "a causal connection between the material misrepresentation and the loss"—is an essential element of a Section 10(b) fraud claim.  *Dura*, 544 U.S. at 341.  "[T]o sufficiently plead loss causation, a plaintiff must

---

[31] *AXIS*, 456 F. Supp. 2d at 592 (disclosure "of incentive agreements [in SEC filings]. . . renders implausible any inference that [defendants] knew that the agreements were illegal").

[32] *See* Ex. 4 (excerpts from DaVita's SEC filings showing repurchase of shares during putative class period for approximate value of $2 billion); *see also McNamara v. Pre-Paid Legal Servs., Inc.*, 189 F. App'x 702, 716 (10th Cir. 2006) (affirming dismissal for failure to plead scienter; noting complaint lacked "allegations demonstrating [] alleged fraud was economically logical in light of [Company's] repurchase of its own stock at allegedly inflated prices.").

allege a disclosure or revelation of truth about a defendant's prior misstatement or omission that is in some way connected with a drop in stock price." *Prissert v. EMCORE Corp.*, 894 F. Supp. 2d 1361, 1375 (D.N.M. 2012).  "To be corrective, the disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company." *Williams*, 558 F.3d at 1140.

Courts routinely find that the announcement of a government investigation—or similarly intermediate proceeding—is not a corrective disclosure because it does not reveal any relevant truth showing the falsity of any previous representation.  *E.g.*, *Loos v. Immersion Corp.*, 762 F.3d 880, 883 (9th Cir. 2014); *Meyer*, 710 F.3d at 1197-1200; *see also In re Almost Family, Inc. Sec. Litig.*, No. 3:10-CV-00520-H, 2012 WL 443461, at *13 (W.D. Ky. Feb. 10, 2012) (collecting cases and stating that "[n]umerous federal district courts have held that a disclosure of an investigation, absent an actual revelation of fraud, is not a corrective disclosure," and finding no loss causation based on announcements of government investigations initiated as a result of allegations of wrongdoing).  As the Ninth Circuit reasoned in *Loos*:

> Indeed, at the moment an investigation is announced, the market cannot possibly know what the investigation will ultimately reveal.  While the disclosure of an investigation is certainly an ominous event, it simply puts investors on notice of a *potential* future disclosure of fraudulent conduct.  Consequently, any decline in a corporation's share price following the announcement of an investigation can only be attributed to market speculation about whether fraud has occurred.

762 F.3d at 890 (affirming dismissal of securities fraud action for failing to plead loss causation).

Accordingly, Plaintiffs' theory that DaVita's stock price fell in reaction to the disclosure of government and media scrutiny into its CPA practices with no finding or admission of illegality is insufficient as a matter of law to plead loss causation.  *Loos*, 762 F.3d at 890; *Meyer*,

710 F.3d at 1201-02.[33] None of the alleged corrective announcements (whether viewed alone or collectively) constitute an admission or a finding that illegal conduct occurred.  *See, e.g.*, ¶¶ 259, 261, 263, 265, 266-69, 271.  Rather, they are a list of disclosures, largely by third parties, that relate to CPA and are conveniently followed by stock price drops.  But Plaintiffs cannot make out the element of loss causation merely by resting on speculation and asserting that "where there is smoke, there must be fire."  *Curry v. Yelp Inc.*, 875 F.3d 1219, 1225 (9th Cir. 2017).  Therefore, the Complaint should be dismissed for failure to plead loss causation.

> **G.    Section 20(a) Claim Must Be Dismissed.**

"[T]o state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person." *City of Phila.*, 264 F.3d at 1270-71.  Because Plaintiffs have not pled a primary violation, the control person claim under Section 20(a), 15 U.S.C. § 78t(a), also fails.

## IV.    CONCLUSION

For the reasons set forth herein, Defendants respectfully request that this Court grant their motion to dismiss and dismiss the Complaint with prejudice.

---

[33] *Accord In re Herbalife, Ltd Sec. Litig.*, No. CV 14-2850 DSF (JCGx), 2015 WL 1245191, at *6 (C.D. Cal. Mar. 16, 2015); *Sapssov v. Health Mgmt. Assocs., Inc.*, 22 F. Supp. 3d 1210, 1231-32 (M.D. Fla. 2014), *aff'd*, 608 F. App'x 855 (11th Cir. 2015); *Janbay v. Canadian Solar, Inc.*, No. 10 Civ. 4430, 2013 WL 1287326, at *14 (S.D.N.Y. Mar. 28, 2013); *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 910 (W.D. Tex. 2008).

Respectfully submitted this 27th day of March, 2018.

/s/ *Jeffrey S. Roberts*
Jeffrey S. Roberts (Colo. Bar # 36901)
FAEGRE BAKER DANIELS LLP
1700 Lincoln Street, Suite 3200
Denver, CO 80203
Telephone: 303-607-3500
Facsimile: 303-607-3600
Email: jeff.roberts@FaegreBD.com

Marc J. Sonnenfeld*
Karen Pieslak Pohlmann*
Laura Hughes McNally*
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
Telephone: 215-963-5000
Facsimile: 215-963-5001
Email:  marc.sonnenfeld@morganlewis.com
            karen.pohlmann@morganlewis.com
            laura.mcnally@morganlewis.com
*Admitted pro hac vice*

**Counsel for Defendants DaVita, Inc.,**
**Kent J. Thiry, and James K. Hilger**


## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2018, I caused to be electronically filed the foregoing **DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT UNDER FED. R. CIV. P. 9(b) AND 12(b)(6) AND THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND MEMORANDUM IN SUPPORT OF MOTION TO DISMISS** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all registered participants.

/s/ *Nanette Quarnberg*
Nanette Quarnberg, Legal Administrative Assistant