**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 1:17-cv-00304-WJM-CBS

PEACE OFFICERS' ANNUITY AND BENEFIT FUND OF GEORGIA, Individually and on
Behalf of All Others Similarly Situated, and
JACKSONVILLE POLICE AND FIRE PENSION FUND, Individually and on Behalf of All
Others Similarly Situated,

      Plaintiffs,

v.

DAVITA INC.,
KENT J. THIRY,
JAMES K. HILGER, and
JAVIER J. RODRIGUEZ,

      Defendants.

---

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**

---

**TABLE OF CONTENTS**

TABLE OF CONTENTS ......................................................................................................... ii

TABLE OF AUTHORITIES ................................................................................................... iii

I.     INTRODUCTION ............................................................................................... 1

II.    THE ALLEGATIONS IN THE COMPLAINT ................................................... 6

     A.    DaVita's Declining "Commercial Mix" Prompts The Illicit Steering Scheme ....................................................................................................... 6

     B.    Internal Company Documents and Statements From Former Employees Confirm DaVita's Illicit Steering Scheme ............................................... 7

     C.    DaVita's Company-Wide Steering Program: The "Medicaid Opportunity" ......... 9

     D.    CMS Issues a Request For Information On "Inappropriate Patient Steering"—To Which DaVita Repeatedly Claims: "We Do Not Steer" ............. 11

     E.    DaVita's Steering Scheme Is Slowly Revealed Through Media and Analyst Investigations Based on Internal Company Documents ......................... 12

III.    ARGUMENT ...................................................................................................... 14

     A.    Defendants Made False and Misleading Statements ........................................... 14

          1.    Defendants Falsely Asserted: "We Do Not Steer," and that the Relationship With the AKF Was Legitimate and Arm's Length ............. 15

          2.    Defendants Falsely Attributed DaVita's Financial Success To Improvements In Its "Commercial Mix" .................................................. 20

          3.    Defendants Actively Concealed the Company's Highly Material Exposure to Its Illicit Relationship with the AKF ................................... 21

     B.    The Complaint Adequately Alleges A Strong Inference Of Scienter ................. 22

     C.    The Complaint Adequately Pleads Loss Causation ........................................... 28

IV.    CONCLUSION .................................................................................................. 30

# <u>TABLE OF AUTHORITIES</u>

*Cases*

*Adams v. Kinder-Morgan, Inc.*,
  340 F.3d 1083 (10th Cir. 2003) ....................................................................... 14, 25

*Agnes v. Smallworldwide PLC*,
  94 F.Supp.2d 1167 (D. Colo. 2000) ........................................................................ 24

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
  827 F.3d 1229 (10th Cir. 2016)................................................................................ 26

*Carpenters Pension Tr. Fund of St. Louis, St. Clair Shores Police & Fire Ret. Sys.*
  *v. Barclays PLC*,
  56 F. Supp. 3d 549 (S.D.N.Y. 2014)........................................................................23

*City of Sunrise General Employees' Ret. Plan v. FleetCor Tech., Inc.,*,
  CA No. 1:17-cv-2207-LMM (N.D. Ga. May 15, 2018)........................................... 19

*Cohen v. Kitov Pharm. Holdings, Ltd.*,
  2018 WL 1406619 (S.D.N.Y. Mar. 20, 2018) ........................................................ 28

*Croker v. Carrier Access Corp.*,
  2006 WL 2038011 (D. Colo. July 18, 2006)............................................................ 26

*Crowell v. Ionics, Inc.*,
  343 F. Supp. 2d 1 (D. Mass. 2004) .......................................................................... 15

*Curry v. Yelp*,
  875 F.3d 1219 (9th Cir. 2017)................................................................................... 29

*Dialysis Patient Citizens et al. v. Burwell*,
  2017 WL 365271 (E.D. Tex. Jan. 25, 2017) ........................................................... 18

*Dura Pharms. v. Broudo*,
  544 U.S. 336 (2005) ................................................................................................. 28

*Eastwood Enterprises, LLC v. Farha*,
  2009 WL 3157668 (M.D. Fla. Sept. 28, 2009) ....................................................... 26

*Garden City Employees' Ret. Sys v. Psychiatric Solutions, Inc.*,
  2011 WL 1335803 (M.D. Tenn. Mar. 31, 2011)...................................................... 26

*Gilbreath v. Cleveland Cnty. Bd. of Cnty. Comm'rs*,
  2012 U.S. Dist. LEXIS 93544, at *31 (W.D. Okla. July 6, 2012) ........................... 30

*Gordon v. Sonar Capital Management LLC*,
   2014 WL 3900560 (S.D.N.Y. Aug. 1, 2014) ...................................................... 15

*In re Almost Family, Inc. Sec. Litig.*,
   2012 WL 443461 (W.D. Ky. Feb. 10, 2012) ...................................................... 29

*In re AXIS Capital Holdings Ltd. Sec. Litig.*,
   456 F. Supp. 2d 576 (S.D.N.Y. 2006) ........................................................ 19, 20, 25

*In re Countrywide Fin. Corp. Deriv. Litig.*,
   554 F. Supp. 2d 1044 (C.D. Cal. 2008) ............................................................ 28

*In re Duke Energy Corp. Sec. Litig.*,
   282 F.Supp.2d 158 (S.D.N.Y. 2003) ................................................................ 20

*In re FBR Inc. Sec. Litig.*,
   544 F.Supp.2d 346 (S.D.N.Y. 2008) ................................................................ 20

*In re Flower Foods, Inc. Sec. Litig.*,
   2018 WL 1558558 (M.D. Ga. Mar. 23, 2018) ............................................ 4, 19, 23

*In re Hi-Crush Partners L.P. Sec. Litig.*,
   2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ...................................................... 25

*In re Merck & Co., Inc. Sec. Litig.*,,
   432 F.3d 261 (3d Cir. 2005) ............................................................................ 16

*In re Molycorp, Inc. Sec. Litig.*,,
   157 F.Supp.3d 987 (D. Colo. 2016) ............................................................ 28, 30

*In re Molycorp, Inc. Sec. Litig.*,
   2016 WL 233402 (D. Colo. Jan. 20, 2016) .................................................... 24, 25

*In re Mylan N.V. Sec. Litig.*,,
   2018 WL 1595985 (S.D.N.Y. Mar. 28, 2016) ...................................... 24, 25, 28, 30

*In re NPS Pharm., Inc. Sec. Litig.*,
   2007 WL 1976589 (D. Utah July 3, 2007) ........................................................ 24

*In re Qwest Commc'ns Int'l, Inc.*,
   396 F. Supp. 2d 1178 (D. Colo. 2004) .............................................................. 26

*In re Rhythms Sec. Litig.*,
   252 F.3d 63 (2d Cir.2001) ................................................................................ 30

*In re Scholastic Corp. Sec. Litig.*,,
    300 F. Supp. 2d 1081 (D. Colo. 2004) ........................................................... 30

*In re Scientific-Atlanta, Inc. Sec. Litig.*,
    571 F. Supp. 2d 1315 (N.D. Ga. 2007) ........................................................... 15

*In re SemGroup Energy Partners*, L.P.,
    729 F. Supp. 2d 1276 (N.D. Okla. 2010) ................................................... 27, 28

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
    195 F.Supp.3d 528 (S.D.N.Y. 2016) ............................................................... 19

*In re Williams Sec. litigation-WCG Subclass*,
    558 F.3d 1130 (10th Cir. 2009) ...................................................................... 28

*In re Wilmington Tr. Sec. Litig.*,
    29 F. Supp. 3d 432 (D. Del. 2014) .................................................................. 23

*In re Zagg Inc. Sec. Litig.*,
    797 F.3d 1194 (10th Cir. 2014) ...................................................................... 25

*JP Morgan Chase Sec. Litig.*,
    262 F.Supp. 2d 595 (S.D.N.Y. 2005) .............................................................. 19

*In re Key Energy Servs., Inc. Sec. Litig.*,
    166 F.Supp.3d 822 (S.D. Tex. 2016) .............................................................. 20

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) ........................................................................ 29

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) .......................................................................... 29

*Medina v. Clovis Oncology, Inc.*,
    215 F. Supp. 3d 1094 (D. Colo. 2017) ....................................................... 25, 30

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) ...................................................................... 29

*Mishkin v. Zynex, Inc.*,
    2011 WL 1158715 (D. Colo. Mar. 30, 2011) ............................................. 23, 26

*Mrs. Fields Franchising, LLC v. MFGPC*,
    2018 WL 314848 ............................................................................................. 6

*Mulligan v. Impax Labs., Inc.*,
  36 F. Supp. 3d 942 (N.D. Cal. 2014) ................................................................. 28

*Nakkhumpun v. Taylor*,
  782 F.3d 1142 (10th Cir. 2015) ........................................................................ 22

*New Jersey v. Sprint Corp.*,
  531 F. Supp. 2d 1273 (D. Kan. 2008) ............................................................... 22

*Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*,
  135 S.Ct. 1318 (2015) ....................................................................................... 21

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Intern. N.V.*,
  89 F. Supp. 3d 602 (S.D.N.Y.) .......................................................................... 29

*SEC v. Kovan*,
  807 F.Supp.2d 1024 (D. Kansas 2011) .............................................................. 25

*Shoemaker v. Cardiovascular Sys., Inc.*,
  2018 WL 527386 (D. Minn. Jan 10, 2018) ........................................................ 19

*Singer v. Reali*,
  883 F.3d 425 (4th Cir. 2018) ............................................................... 4, 19, 20, 29

*Sorkin, LLC v. Fischer Imaging Corp.*,
  2005 WL 1459735 (D. Colo. June 21, 2005) ..................................................... 25

*Stumpf v. Garvey*,
  2005 WL 2127674 (D.N.H. Sept. 2, 2005) ........................................................ 20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) .......................................................................................... 22

*Touchtone Grp., LLC v. Rink*,
  913 F. Supp. 2d 1063 (D. Colo. 2012) .............................................................. 26

*U.S. ex rel. Lacy v. New Horizons, Inc.*,
  348 Fed.Appx. 421 (10th Cir. 2009) ................................................................. 17

*U.S. v. Bilzerian*,
  926 F.Supp.2d 1285 (2d Cir. 1991) ................................................................... 25

*Washtenaw Cnty. Emples. Ret. Sys. v. Avid Tech., Inc.*,
  28 F. Supp. 3d 93 (D. Mass. 2014) ................................................................... 26

***Statutes***

42 U.S.C. § 1320a-7b(b)(1)(A), (2)(A) ............................................................................... 16

***Other Authorities***

OIG Advisory Opinion No. 13-19, 2013 WL 7155029 (2015) .................................................... 17

Lead Plaintiffs respectfully submit this memorandum of law in opposition to Defendants' Motion to Dismiss Amended Complaint (ECF No. 43) ("Motion" or "Br.").[1]

## I.   **INTRODUCTION**

DaVita is one of the largest dialysis providers in the country.  As the Complaint pleads in extraordinary detail—buttressed by statements from numerous high-ranking former DaVita employees and a plethora of internal Company documents—throughout the Class Period, DaVita unlawfully "steered" its Medicare and Medicaid patients into commercial insurance plans in order to obtain much higher reimbursement rates for the <u>exact same dialysis treatments</u>.  Further, because most of its patients could not afford commercial premiums, and federal anti-kickback laws precluded the Company from paying patients' premiums directly, DaVita sought to evade those laws through an illicit *quid pro quo* relationship with the American Kidney Fund ("AKF").

Pursuant to that relationship, DaVita "donated" over a hundred million dollars annually to the AKF, who in turn used those "donations" to pay DaVita's dialysis patients' commercial premiums.  As a result, and unbeknownst to investors, the majority of the Company's annual profits were utterly dependent on the AKF.  Indeed, while the Company's SEC filings claimed that only "some patients who do not qualify for Medicaid" received AKF assistance for commercial premiums, in reality, the exact opposite was true—DaVita steered thousands of patients who <u>did</u> qualify for Medicare and Medicaid into AKF-backed plans that, as revealed at the end of the Class Period, accounted for an astonishing 75% of the Company's profits.

---

[1] All "¶__" references are to the Amended Class Action Complaint (ECF No. 36) (the "Complaint"); all defined terms have the meanings assigned in the Complaint; and all emphasis in quoted material is added.  Defendants are DaVita Inc. ("DaVita" or the "Company"); its CEO and Chairman, Kent J. Thiry ("Thiry"); former Interim CFO and current Chief Accounting Officer, James K. Hilger; and its CEO of DaVita's Kidney Care Division, Javier J. Rodriguez ("Rodriguez").  The Class Period spans February 26, 2015 through October 6, 2017, inclusive.

Internal company documents and testimonials from high-level former employees make clear that DaVita's steering scheme was Company-wide and directed by its most senior officers. Indeed, in the summer of 2015—the middle of the Class Period—DaVita launched a Company-wide initiative aptly named "The Medicaid Opportunity."  While Defendants claim they merely "educated" patients on AKF assistance based on patients' individualized needs, their own documents belie that assertion.  The "Medicaid Opportunity" expressly ordered employees nationwide to steer "all" Medicaid and Medicare-eligible patients into AKF-backed commercial plans, regardless of necessity.  In furtherance of this initiative, DaVita conducted nationwide training seminars on steering techniques; disseminated a detailed "Plan of Action" with specific roles for all employees to steer patients into AKF plans; offered cash bonuses of up to $10,000 for steering; and meticulously tracked employees' steering efforts through weekly conference calls and a variety of spreadsheets and data, including "win" rates for the number of patients "converted" to commercial insurance.  ¶¶62-67, 77-89, 93, 100-03.  In other words, DaVita's entire operation was mobilized to support the steering initiative by any means necessary.

In 2016, the scheme began to unravel.  In August 2016, the Centers for Medicare and Medicaid Services ("CMS") investigated "inappropriate patient steering" in the dialysis industry, making it crystal clear that "steering," or "improper[ly] influenc[ing] people away from Medicare or Medicaid coverage for the purpose of financial gain," violated federal law.  ¶¶5, 106.  Although Defendants' principal argument in their motion is that steering is not unlawful, that is not what DaVita told CMS during the Class Period.  To the contrary, in response to CMS's Request for Information ("RFI"), DaVita repeatedly and emphatically asserted that "[w]e do not steer," that the Company "does not steer patients toward any particular insurance option or plan," and that it "does not pay patients' health insurance premiums."  ¶117.

2

Notwithstanding the Company's denials, the truth began to emerge.  On October 23, 2016, the *St. Louis Post Dispatch* published an exposé based on internal Company documents, which revealed that steering was a Company-wide business strategy.  ¶¶118-21.  In response, DaVita's stock price plummeted 5%, wiping out $565 million in market capitalization in a single day.  ¶122.  Just one week later, on October 31, 2016, DaVita essentially admitted that it had improperly steered thousands of patients from Medicaid into private insurance backed by the AKF, disclosing that, "effective immediately," it would "suspend support for applications to the [AKF] for charitable premium assistance" for 2,000 Medicaid patients who were applying for commercial ACA plans.  ¶123.  This "suspension," which ultimately became permanent, cost the Company $230 million in lost profits, or 26% of its 2016 profits.  ¶124.  Shortly thereafter, in January 2017, the DOJ opened a probe on the Company, and DaVita announced that it had received a subpoena from the United States Attorney for the District of Massachusetts seeking documents related to DaVita's relationship with the AKF.  ¶136.  Sensing that DaVita had not disclosed the full extent of its relationship with the AKF, analysts pressed Defendant Thiry on multiple occasions to disclose the total number of patients with commercial plans backed by the AKF.  ¶¶209, 222.  Tellingly, Thiry repeatedly refused to answer, claiming it was not in investors' "best interests" to know.  *Id.*

The full truth did not emerge until October 9, 2017, when JP Morgan issued a report downgrading DaVita's stock and stating that, based on the AKF's recent disclosures, a staggering 60-80% of DaVita's profits were dependent on its relationship with the AKF.  ¶224.  As a result, the Company's stock price plummeted by 10%.  The next day, DaVita confirmed the JP Morgan report's analysis, revealing that $680 million of its 2016 profits, or 75%, were

directly attributable to patients with AKF-backed commercial plans—nearly three times the amount DaVita originally disclosed was at risk.  ¶225.

In the face of these highly particularized allegations, Defendants now file a motion to dismiss this action.  Tellingly, Defendants' principal argument is not that they did not steer, but that steering is not improper or unlawful, and no court or regulatory agency has yet found that they engaged in illegal conduct.  Br. at 2, 14-21.  These arguments are meritless.  First, CMS specifically stated that it is "improper to influence people away from Medicare or Medicaid coverage for the purpose of financial gain."  Second, if steering were not improper, Defendants obviously would not have publicly and repeatedly denied doing it.  Third, if Defendants truly believed that steering was perfectly appropriate and legal, they would not have permanently "suspended" the practice only one week after media reports focused a spotlight on it, sacrificing hundreds of millions of dollars in annual profits.  Fourth, when directly asked by analysts to disclose the total number of commercially insured patients receiving AKF assistance, Thiry would not have repeatedly refused to answer, telling them it was not in DaVita's "best interests" to reveal that information.  The most plausible explanation for these cold, hard facts—if not the only explanation—is that DaVita understood full well that it was steering, and that such practices were blatantly improper.

Finally, the fact that there has been no formal adjudication that DaVita's conduct is illegal is of no moment.  As numerous courts have held, violations of the securities laws do not hinge on whether underlying conduct has been found to be illegal, but on whether Defendants' statements were *false*.  *See*, *e.g.*, *Singer v. Reali*, 883 F.3d 425, 441 (4th Cir. 2018) ("[u]nfortunately for the Company, the duty to disclose may extend to uncharged and unadjudicated illegal conduct."); *In re Flower Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at *8

(M.D. Ga. Mar. 23, 2018) ("Even though Defendants argue that no court or government agency has ever said that Flowers was misclassifying distributors, Plaintiff sufficiently alleges facts that would allow one to reasonably infer that Flowers was intentionally misclassifying distributors."). Here, Plaintiffs allege numerous facts establishing that, in contrast to Defendants' public statements, DaVita steered thousands of patients from government programs to private insurance for the Company's financial gain.

The Complaint also easily pleads scienter, which Defendants barely dispute. Plaintiffs' allegations establish that Defendants were fully aware of rampant, Company-wide steering, while at the same time denying to investors that DaVita steered, and representing that DaVita merely provided "education" to patients based on their individualized needs. Documents cited in the Complaint, as well as CW testimonials, make clear that the Individual Defendants were directly responsible for implementing the Company's campaign to steer all of its patients into AKF-backed commercial plans. Although Defendants argue that Plaintiffs must show that Defendants knew this conduct was illegal to establish scienter, that is incorrect: Plaintiffs need only establish a strong inference that Defendants knew, or were reckless in not knowing, that their public statements were false and misleading. *See In re SemGroup Energy Partners L.P.*, 729 F.Supp.2d 1276, 1297 (N.D. Okla. 2010). In sum, the Complaint establishes a strong inference of scienter that is cogent and more compelling than any opposing inference.

Lastly, there is no question that the Complaint adequately alleges loss causation. The Complaint clearly alleges that the truth of Defendants' steering scheme was slowly revealed through a series of partial disclosures that directly caused DaVita's stock price to drop. Plaintiffs more than meet the requirements for pleading loss causation.

For all of these reasons, Defendants' motion should be denied in its entirety.

## II.   THE ALLEGATIONS IN THE COMPLAINT[2]

### A.   DaVita's Declining "Commercial Mix" Prompts The Illicit Steering Scheme

Dialysis is extremely expensive and time consuming, making it difficult for end-stage renal disease ("ESRD") patients to find or maintain employment.  ¶¶37-38.  To alleviate this problem, in 1972, Congress made ESRD patients universally eligible for Medicare.  *Id*.  Because of the breadth of this coverage, the National Kidney Foundation has emphasized in recent years that "[t]here is [] no reason for [ESRD patients] to obtain a health insurance plan in the [ACA] as it is unlikely to offer [them] additional benefits above what Medicare covers."  ¶95.

Although 90% of DaVita's ESRD patients were insured by a government program, virtually all of its profits were attributable to the 10% of its patient base that were commercially insured.  ¶¶31, 38, 42.  In the years leading up to the Class Period, DaVita's "commercial mix"—meaning the number of patients on private insurance as opposed to Medicare or Medicaid—was steadily decreasing.  However, upon the ACA going into effect in 2014—which made individual market plans available to ESRD patients who could not work (¶41)—DaVita capitalized by illicitly steering all of its government-insured patients into commercial plans.

However, ESRD patients could not afford costly commercial insurance premiums.  ¶48. DaVita's workaround was to pay patients' commercial premiums for them by illicitly funneling funds through the AKF, with which DaVita had long-standing ties, and whose chairwoman was a former DaVita executive.  ¶¶51, 181-85.  After the passage of the ACA, DaVita "donated" upwards of $100 million to the AKF annually, which, unbeknownst to investors, the AKF then

---

[2] Defendants ask the Court to consider numerous materials outside the four corners of the Complaint, which is improper on a motion to dismiss, and is not remedied by a request for judicial notice.  *See Mrs. Fields Franchising, LLC v. MFGPC*, 2018 WL 314848, at*3 (10th Cir. Jan 8, 2018) ("documents may only be used to show their contents, not to prove the truth of the maters asserted therein").   Defendants cite these materials to establish that commercial insurance may benefit certain ESRD patients—an irrelevant point since Plaintiffs allege that DaVita steered all patients into commercial plans, regardless of their individualized needs.

used to pay the insurance premiums for DaVita's dialysis patients.  This scheme allowed DaVita to rake in $680 million in profits from ESRD patients insured by AKF-backed commercial plans in 2016—or a staggering 75% of the Company's $880 million in profits that year.  ¶¶51, 152.[3]

Significantly, because the AKF was funded almost entirely by dialysis companies, it would pay patients' premiums only so long as they were on dialysis.  This meant that if a patient obtained a life-saving kidney transplant, the AKF's assistance would immediately cease—a fact which often disqualified patients from receiving a transplant in the first place.  ¶75.

**B.   Internal Company Documents and Statements From Former Employees Confirm DaVita's Illicit Steering Scheme**

The Complaint includes a remarkable level of detail derived from internal Company documents and the accounts of former DaVita employees, all of which confirm a Company-wide scheme to steer Medicaid and Medicare ESRD patients into commercial plans using the AKF.

***DaVita meticulously tracked the number of patients it steered into private insurance, and systematically used the AKF to pay patients' commercial premiums.***  Internal presentations entitled "Private Pay Growth" show that the Company specifically tracked "Private Insurance Wins," or patients steered from Medicare or Medicaid into commercial plans, and even set specific "private pay" quotas that each facility had to meet by year-end.  ¶¶ 58, 59.  These documents left no doubt that these quotas were mandatory, as they warned employees that private pay admissions would be "tracked and reported out from the top down."  ¶57.  Moreover, each week, senior management sent detailed emails and spreadsheets—called "Active Starts"—

---

[3] In its public filings, DaVita falsely claimed that its donations to the AKF were "not given in order to induce or receive patient referrals or gain an unfair business advantages" and that only "some patients who do not qualify for Medicaid" and "cannot afford secondary insurance" were receiving AKF assistance.  ¶¶ 159, 170.  The Company also stated that "nearly all of our profits" were from ESRD patients who were commercially insured "before" they became eligible for Medicare—*i.e.*, from ESRD patients who could not have been steered.  ¶171.

that highlighted the acquisition of private pay patients, and made clear that the exclusive focus of DaVita employees was to acquire more and more private pay patients.  ¶56.

Plaintiffs' CWs, who worked at DaVita facilities across the country, unequivocally confirmed that they were ordered to steer patients off government plans.  For example, CW 1, a former Insurance Counselor ("IC") for DaVita clinics in New York, explained that DaVita employees indiscriminately steered patients already covered by government programs into commercial plans backed by the AKF.  ¶93.  CW 1 described weekly conference calls with management where participants would explicitly discuss "win ratios," or the tally of how many patients an employee had switched from government to commercial insurance.  ¶102.

Similarly, CW 3, an IC for DaVita clinics in Texas, stated that steering was "second nature" at the Company in order to "ensure higher rates of reimbursements for DaVita."  ¶91.  CW 3 stated that she was required to talk to "every single patient" about signing up for AKF assistance even if they did not want or need it.  ¶92.  CW 4, a DaVita Facility Administrator ("FA") in California, described weekly calls during which management would ask her and her colleagues to track how many Medicaid patients they had successfully referred to the AKF for private insurance.  ¶103.  CW 4 stated that management was "on top of our numbers all the time" and put employees "on the hottest seat" if they failed to steer enough patients.  CW 5, the spouse of a former DaVita patient (now deceased), stated that a Social Worker told her DaVita had a "system set in place with the [AKF] to cover the premiums" for private insurance.  ¶95.

**_DaVita incentivized its employees to steer._**  Internal Company documents also show that, beginning in 2014 (soon after the ACA went into effect), DaVita rolled out formal incentive programs encouraging employees to steer by offering lucrative cash awards, including a "Private Pay Incentive Program" offering bonuses from $1,000 to $10,000 if private pay goals were met.

¶65. Similarly, the "Kidney Smart Incentive Program" offered a $2,500 prize to management of the division with the most patients converted to private pay, and $1,500 to the individual with the most "private pay wins." *Id.* Employees who did not steer "were browbeaten for not doing our jobs," and their performance was downgraded, imperiling their job security. ¶¶99, 102.

***DaVita instructed employees to disparage Medicare and Medicaid while touting the benefits of private insurance.*** Notwithstanding the National Kidney Foundation's own guidance that "[t]here is [] no reason for [ESRD patients] to obtain [an ACA plan] as it is unlikely to offer [them] additional benefits above what Medicare covers," DaVita told dialysis patients the exact opposite. ¶41. Training materials circulated to regional management in June 2014 included "slide notes" guiding "educators" on how to steer patients into commercial plans by highlighting that such plans provided "better access"; "more comprehensive" coverage; and "lower total cost," including that "many patients qualify for AKF assistance." ¶74. Tellingly, these materials focused exclusively on why—for all patients—government plans were inferior to private plans, failing to mention the likely disqualification from receiving a kidney transplant.

### C.    DaVita's Company-Wide Steering Program: The "Medicaid Opportunity"

In the summer of 2015, DaVita launched a Company-wide initiative—internally known as "The Medicaid Opportunity"—which DaVita's own documents make clear was intended to steer all government insured ESRD patients into commercial plans backed by the AKF. Indeed, a November 2015 presentation entitled "Medicaid Opportunity Update" unequivocally instructed DaVita employees across the country to "[s]upport AKF application[s] for all enrolled patients," regardless of need, and assigned an "AKF point person" to "complete initial [AKF] application]" for patients "as well as ongoing premium requests." ¶¶86, 87. The Medicaid Opportunity Update specifically provided a Company-wide blueprint for steering, including a detailed "Plan of Action" assigning employees specific roles with a singular purpose: getting as many patients

as possible signed on to AKF-backed programs across the country.  ¶89.  For example, ICs were to "[p]erform enrollment conversations with patients" and "track conversations."  The "Medicaid Opp. AKF Point" was to "[s]ubmit initial [AKF] application" and "ongoing premium requests" for patients directly.  Social Workers were to "[p]rovide support in areas with limited capacity for AKF process" and "[b]e a resource" for patients' questions.  Finally, FAs were to, among other things, "[e]nsure AKF management in your facility is being done by designated teammate," and to "[h]ave a solid process for AKF Application submission."  *See id.*

Former DaVita employees confirmed that the "Medicaid Opportunity" was a Company-wide steering program.  For example, CW 1 recalled that during a July 2015 regional meeting in North Carolina, a Senior Vice President in DaVita's Corporate Analytics Department gave a presentation entitled "Medicaid Opportunity," in which the directive to steer patients into AKF-backed commercial plans was "very, very explicit, nothing was implied at all."  ¶82.  CW 2 stated that the same initiative was discussed during an August 2015 conference call with the Regional Operations Director, where the overriding objective was that "anybody who was on Medicare or Medicaid was asked to sign up for the AKF programs."  ¶83.  CW 2 recalled that management "hounded us and hounded us" with follow-up calls and spreadsheets tracking AKF applications in their facilities.  ¶84. Similarly, CW 3 participated in a two-week training program in August 2015 at Company headquarters, where for three full days ICs from across the country gave presentations on "steering" techniques, stressing that it was "important to get [the patients] onto private insurance" because of the higher commercial dialysis reimbursement rates.  ¶85.

In sum, the documents and testimonials cited in the Complaint confirm that steering was standard operating procedure for DaVita.

**D.     CMS Issues a Request For Information On "Inappropriate Patient Steering"—To Which DaVita Repeatedly Claims: "We Do Not Steer"**

On August 18, 2016, CMS issued an RFI regarding improper "enrollment activities" at dialysis companies.  ¶106.  CMS stated in no uncertain terms: "It is improper to influence people away from Medicare or Medicaid coverage for the purpose of financial gain," citing, among other things, disruption to patients' care and the profound impact of expensive ESRD patients on the insurance risk pool.  *Id.*  CMS also emphasized that the Social Security Act "prohibits selling [Medicaid or Medicare beneficiaries] insurance coverage knowing it duplicates [government] benefits."  In reaction to the RFI, DaVita's stock dropped 4.7%.  *Id.*

Numerous responses to the RFI from DaVita employees confirmed that the Company had been steering.  For example, a former IC in North Carolina stated that, "[d]espite our objections, we were told [steering patients into commercial plans] was mandatory"; that employees "felt extreme pressure to deliver these enrollments and were chastised for not getting the numbers up"; and that employees were told "we shouldn't take no for an answer." ¶110.  A former social worker for two DaVita clinics in Sacramento stated that "[DaVita] asked us to 'educate' the patients with marketing material DaVita designed specifically to entice the patient into enrolling in a secondary private payer plan," and "assured our most vulnerable population of patients" that they did not have to worry about paying premiums because "our [ICs] would pre-approve them for AKF HIPP grant."  ¶111.  An IC in Missouri submitted a similar statement, stating DaVita closely tracked "[its] AKF enrollees and how much money goes for each person that receives assistance"; that ICs "have the specific goal to make sure patients can obtain higher paying plans than Medicare"; and that "there is pressure to put everybody on the AKF program."  *Id.*

Commercial insurers also responded to the RFI by confirming DaVita's steering.  For example, Aetna highlighted the Company's sudden and disproportionate increase of "100 basis

points" in commercial patients after the ACA went into effect.  ¶113.  Blue Cross of Idaho

flagged DaVita's excessive donations to the AKF, commenting that DaVita's incentive to steer

was "substantial," and its "funding of the AKF furnishes the vehicle" to illicitly pay its patients'

commercial premiums.  ¶114.  Blue Shield of California conducted an internal investigation of

its patients receiving AKF assistance, confirming that ICs and Social Workers offered "no

information about Medicare eligibility to members," and as a result, patients were unaware they

were eligible or erroneously thought those programs did not cover dialysis.  ¶116.

Despite these specific reports, DaVita unequivocally—and falsely—publicly insisted in

its September 22, 2016 response to the RFI: "We do not steer"; DaVita "does not steer patients

toward any particular insurance option or plan"; DaVita "does not pay patients' health insurance

premiums"; and AKF assistance "is sufficiently separate from provider contributions to the

AKF."  ¶117.  Moreover, despite the fact that documents cited in the Complaint show DaVita

paid substantial bonuses to employees who got patients to switch from Medicare and Medicaid to

private insurance (¶¶62-67), DaVita falsely claimed that, to "ensure an unbiased presentation of

information to the patients," its employees had "no outcome incentives" and no "knowledge of

specific terms or rate agreements between DaVita and the commercial payors."  ¶192.

### E.  DaVita's Steering Scheme Is Slowly Revealed Through Media and Analyst Investigations Based on Internal Company Documents

On October 23, 2016, the *St. Louis Post-Dispatch* published an investigative report based

on internal Company documents and interviews with former DaVita employees, which revealed

a "systematic approach" to steering patients into AKF-backed commercial plans, and confirmed

that the "initiative was referred to as the 'Medicaid Opportunity' in internal emails."  ¶118.  The

report detailed how the Company targeted Medicaid patients by falsely claiming that private

coverage would offer better care and faster kidney transplants.  ¶119.  In reaction to the article, DaVita's stock price dropped nearly 5%, wiping out $565 million in market capitalization.  ¶122.

Only one week later, on October 31, 2016, DaVita issued a press release effectively admitting it steered Medicaid patients into commercial plans.  The Company announced that, "effective immediately," it would "suspend support" for AKF applications "by patients enrolled in minimum essential Medicaid coverage who are seeking additional coverage on a 2017 ACA Plan."  ¶¶123-24.  In other words, DaVita would no longer steer Medicaid patients to ACA plans using the AKF.  The Company estimated this change would decrease profits by up to $140 million, with up to $90 million more in additional impact.  ¶124.  Significantly, however, DaVita continued to minimize the scope and magnitude of the scheme, claiming that this change affected only 1% of its total patient population, when in reality more than 75% of the Company's profits were derived from patients with an AKF-backed plan.  ¶124.

On December 25, 2016, *The New York Times* published an exposé on the AKF, which was based on "interviews with more than a dozen social workers, employees of dialysis clinics, insurance officials and regulators, and a former executive at the charity" from "about a half-dozen states around the country."  ¶¶134-35.  The article revealed that, for several years, the AKF favored DaVita by giving premium assistance to their patients while denying such assistance for other companies' patients, in direct contravention of the 1997 Office of the Inspector General Advisory Opinion ("1997 OIG Opinion") that prohibited donations to the AKF unless several anti-kickback conditions were met.  *Id.*[4]

---

[4] The 1997 OIG Opinion mandated that: (1) DaVita did not publicly advertise AKF assistance; (2) its contributions would not be "earmarked" for use by its patients; (3) DaVita would not track the amount the AKF paid to calculate future donations; (4) the AKF would have "absolute discretion" over donated funds; (5) DaVita's contributions would be gifts without any promise by the AKF to provide premium assistance to DaVita's patients; and (6) the AKF would not "take the identity of the referring facility into account" in providing assistance.  ¶184.

Then, in the Company's 2017 Form 10-K, DaVita revealed that commercial payers—who had now gotten wind of DaVita's illicit steering scheme—were amending their policies to refuse to accept charitable premium assistance from the AKF.  ¶141.  On May 25, 2017, during the Company's "Analyst Day," analysts pressed Defendant Thiry for the second time (the first being back in November 2016) for the number of commercial patients funded by the AKF outside of ACA plans.  As he had before, Thiry steadfastly refused to answer, stating "it would not be in your best interest for us to start providing all sorts of detail on that other chunk."  ¶143.

Finally, on October 9, 2017, J.P. Morgan issued a report downgrading DaVita's stock, based on its estimate that, in light of recent AKF disclosures, "as much as 60-80%+ of DVA's earning power is derived from its AKF relationship."  ¶149.  As the JP Morgan report noted: "This earnings power is at risk if the legal legitimacy of the AKF is compromised by a possible DOJ investigation AND as health plans ferret out subsidized patients that they are under no legal obligation to underwrite."  On this news, DaVita's stock plummeted 10%.  ¶150.  A day later, under mounting pressure from investors and analysts, DaVita was forced to confirm that the full exposure to its illicit relationship with the AKF impacted in excess of 75%, or $680 million of its $880 million in 2016 profits—nearly three times greater than the $230 million the Company had initially stated was the maximum at risk in its October 31, 2016 press release.  ¶152.

## III.   ARGUMENT

### A.   Defendants Made False and Misleading Statements

To plead a false statement under Section 10(b), Plaintiffs must allege that "the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading."  *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003).  Defendants made numerous false and misleading statements throughout the Class Period, in which they (i) flatly and falsely asserted "we do not steer," and

misrepresented the Company's relationship with the AKF; (ii) falsely attributed DaVita's financial success to improvements in its "commercial mix"; and (iii) deliberately misled investors about the highly material exposure DaVita had to its illicit relationship with the AKF.[5]

### 1. Defendants Falsely Asserted: "We Do Not Steer," and that the Relationship With the AKF Was Legitimate and Arm's Length

In response to CMS' August 8, 2016 RFI about "inappropriate patient steering," DaVita sent a letter that repeatedly and unequivocally asserted: "We do not steer," and that DaVita "does not steer patients toward any particular insurance option or plan" and "does not pay patients' health insurance premiums." ¶117. DaVita further asserted that, "[t]o help ensure an unbiased presentation of information to the patients," employees had "no outcome incentives" and no "knowledge of specific terms or rate agreements between DaVita and the commercial payors." ¶192. Defendants also stated that DaVita's relationship with the AKF was legitimate, claiming it adhered to the 1997 OIG Opinion and did not violate federal anti-kickback laws. ¶¶157, 159.

These statements were affirmatively false. DaVita's own internal documents, Plaintiffs' confidential witnesses, media reports, and numerous responses to CMS' RFI from former DaVita employees and commercial payers all confirmed that DaVita systematically steered government-insured ESRD patients into commercial plans backed by the AKF as part of an illicit *quid pro quo* arrangement, <u>regardless of patients' medical or financial need</u>. Indeed, the Company's own documents show that, in 2015, the Company launched an explicit, Company-wide program

---

[5] In passing, Defendants argue that Plaintiffs do not have standing to challenge certain false statements made after Plaintiffs' last stock purchases. Br. at 23. This argument is nonsense, as "[n]umerous courts have stated that class representatives do have standing to assert claims under § 10(b) which arise from statements made after the class representative purchased shares as long as the statements allegedly were made in furtherance of a common scheme to defraud." *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 13 (D. Mass. 2004); *see also In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1326-32 (N.D. Ga. 2007). Moreover, Defendants' assertion that Lead Plaintiffs "made money" is both false and premature—Lead Plaintiffs suffered substantial losses under both the widely-accepted LIFO and FIFO methodologies. *Gordon v. Sonar Capital Management LLC*, 2014 WL 3900560, at *3 (S.D.N.Y. Aug. 1, 2014) (rejecting arguments that plaintiff purchased more shares than he sold as premature on a motion to dismiss).

tellingly named the "Medicaid Opportunity" whose sole purpose was to steer "<u>all</u>" patients off of

Medicaid and on to private insurance.  *See* ¶¶81-89.

In addition, DaVita did not merely "educate" its patients about insurance options in an

"unbiased" manner.  To the contrary, and as internal documents show, the Company trained its

employees to tout the benefits of private insurance <u>exclusively</u>, disparaging Medicaid and

Medicare to <u>all</u> ESRD patients, while relentlessly pressuring <u>all</u> patients to apply for AKF

assistance.  Also, contrary to the Company's public statements denying employees had

knowledge of commercial rates or that there were any outcome incentives for steering patients,

documents and employee testimonials show that DaVita specifically trained employees on the

differences between commercial and government rates, and offered employees lucrative cash

awards for obtaining the most "private pay" patients.  *See* ¶¶62-67, 77-80, 81-89, 103, 118.[6]

In response to these detailed allegations, Defendants' principal argument—if not their

sole argument—is that Plaintiffs have failed to plead any false statement because, according to

Defendants, steering is not unlawful or improper.  Br. at 14-18.  This argument fails.

*First*, while Defendants assert that the mere act of donating to the AKF and informing

certain patients based on their individualized needs about AKF assistance is not unlawful (Br. at

16-17), that is <u>not</u> what Defendants did.  Defendants systematically steered <u>all</u> patients,

regardless of need, into commercial plans by illicitly funneling funds through the AKF to pay

their premiums for them, for the sole purpose of the Company's own financial gain.  This

---

[6] Defendants assert Plaintiffs cannot rely on allegations "about programs and initiatives from 2014-2015" to plead that their statements denying the existence of outcome incentives in 2016 were false, Br. at 23, but this is not so.  It is well-settled that events both pre- and post-dating alleged misstatements can be used to establish their falsity. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (pre-Class Period information "sheds light on whether class period statements were false or materially misleading"); *see also In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 271 (3d Cir. 2005) (same).

conduct is unquestionably illegal.  CMS explicitly stated that "influenc[ing] people away from Medicare or Medicaid coverage for the purpose of financial gain" was "improper" and violated the Social Security Act's ("SSA") anti-duplication statute prohibiting the sale of commercial plans to Medicare beneficiaries.[7]  ¶107.  The Anti-Kickback Statute ("AKS") also expressly forbids any payment "to any person to induce such person to purchase" medical services from a certain provider "for which payment may be made *in whole or in part* under a federal healthcare program."  42 U.S.C. § 1320a-7b(b)(1)(A), (2)(A) (emphasis added).

While Defendants claim they did not violate anti-kickback laws because the point of the scheme was to steer patients "off" government insurance and into commercial plans "so the government would not be paying for their care," Br. at 17, this mischaracterizes the facts.  DaVita did not steer patients "off" government insurance; it steered patients to enroll in commercial plans as their *primary* insurance, while Medicare or Medicaid remained secondary, paying for up to 20% of dialysis costs.  Moreover, at the end of 30 months, Medicare became the patient's primary insurer again.  This conduct falls within the broad purview of the federal anti-kickback laws.  *See U.S. ex rel. Lacy v. New Horizons, Inc.*, 348 Fed.Appx. 421 (10th Cir. 2009) (noting the AKS prohibits inducing patients to use services that may involve "payment or potential payment," in whole or in part, from federal healthcare programs).[8]

Moreover, contrary to Defendants' public statements stating the Company adhered to the 1997 OIG Opinion governing its donations to the AKF, the Company in fact violated <u>every</u>

---

[7] Defendants claim the SSA does not apply to them because they do not "sell" private insurance – however, the SSA is not restricted to insurers.  It applies to any "person" who sells commercial plans to Medicare beneficiaries.  This is effectively what Defendants did as part of the steering scheme, as shown by internal Company materials instructing employees on how to directly market those plans to patients while disparaging Medicare.

[8] Defendants' conduct also violated the anti-kickback provision of the SSA which applies to any person who "offers or transfers to a Medicare or Medicaid beneficiary any remuneration that the person knows or should know is likely to influence the beneficiary's selection of a particular provider . . . of Medicare or Medicaid payable items."  §1128A(a)(5).

single condition of that opinion—to which Defendants were required to adhere in order to <u>not</u> violate federal anti-kickback laws.  ¶185.  Specifically, DaVita (1) advertised AKF assistance to the public in order to steer patients into commercial plans (¶¶65, 73-75); (2) "earmarked" its donations to the AKF for payment of its patients' premiums (¶¶6, 14, 134-35); (3) meticulously tracked the amount of premiums the AKF paid for its patients (¶¶88-89, 112, 135); (4) had full control over the funds it donated to the AKF (¶¶51, 114); (5) conditioned its donations on the AKF paying its patients' premiums (¶¶14, 114-115, 134-35): and (6) the AKF in turn conditioned premium support on DaVita making donations (¶¶6, 14, 93, 95, 134-35).  Indeed, a singular theme runs through the series of OIG opinions Defendants cite in support of their assertion their relationship with the AKF was legitimate:  that "<u>the charitable assistance program must not function as a conduit for payments . . . from donors to patients</u>."  *See* Br. at 8; OIG Advisory Opinion No. 13-19, 2013 WL 7155029 (2015).  Yet that was precisely the purpose of DaVita's relationship with the AKF here.[9]

*Second*, Defendants' own words and actions fatally undermine their assertion that steering is legal.  Defendants publicly and repeatedly represented that "we do not steer," and only one week after the *St. Louis Post Dispatch*'s revelations, they suspended AKF application support for patients enrolling in ACA plans.  Clearly, if Defendants believed that steering was appropriate, and that DaVita was not engaged in steering, they would not have repeatedly denied steering, and would not have forfeited hundreds of millions of dollars in annual profits by suspending the practice immediately after media reports focused on it.

---

[9] Defendants' reliance on *Dialysis Patient Citizens et al. v. Burwell*, 2017 WL 365271 (E.D. Tex. Jan. 25, 2017) is unavailing.  *See* Br. at 8-9, 17-18.  In *Burwell,* the court merely enjoined CMS' proposed rule requiring dialysis providers to disclose to commercial insurers which ESRD patients' premiums were being paid for by the AKF—not because the Company's steering practices were legal, as Defendants appear to suggest, but because CMS <u>did not adhere to the standard review and comment process for proposed rules</u>.  *Id.* at **5, 6.  The *Burwell* decision simply has no relevance here, and it in no way legitimized Defendants' illicit steering scheme.

*Third*, Defendants' argument that there needs to be a determination by a court or regulator that DaVita's conduct was unlawful is flat wrong. Br. at 15-16. Defendants do not need to have "separately violate[d] some statutory or regulatory scheme to be actionable." *City of Sunrise General Employees' Ret. Plan. v. FleetCor Tech., Inc.*, CA No. 1:17-cv-2207-LMM (Dkt. No. 40) (N.D. Ga. May 15, 2018). Indeed, numerous courts have held that there is a duty to disclose uncharged or unadjudicated illegal conduct where, as here, Defendants make affirmative false statements about that conduct. *See Singer*, 883 F.3d at 441 ("the duty to disclose may extend to uncharged and unadjudicated illegal conduct."); *Flower Foods*, 2018 WL 1558558, at *8 ("Even though Defendants argue that no court or government agency has ever said that Flowers was misclassifying distributors, Plaintiff sufficiently alleges facts that would allow one to reasonably infer that Flowers was intentionally misclassifying distributors."); *Inr e Mylan N.V. Sec. Litig.*, 2018 WL 1595985, *12 (S.D.N.Y. Mar. 28, 2018) (holding that Mylan's statements falsely representing EpiPen rebate, which generated scrutiny from CMS and the DOJ, "need not be illegal to be materially misleading"); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F.Supp.3d 528, 536 (S.D.N.Y. 2016) (finding a duty to disclose "uncharged wrongdoing" where "a defendant makes a statement that can be understood, by a reasonable investor, to deny the illegal conduct is occurring").[10]

Finally, while Defendants argue, in conclusory fashion, that Plaintiffs do not plead facts sufficient to establish Defendants' illicit steering scheme and *quid pro quo* relationship with the AKF, Br. at 18-19, as set forth at length above, the Complaint is replete with such allegations,

---

[10] This distinguishes the authority Defendants cite, which applies to pure omissions cases, not cases involving affirmative misstatements concerning the precise misconduct alleged. *See* Br. at 14; *In re AXIS Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006) (securities law claims "premised on the *nondisclosure* of the alleged scheme" require pleading underlying conduct was illegal) (emphasis in original); *Shoemaker v. Cardiovascular Sys., Inc.*, 2018 WL 527386 (D. Minn. Jan 10, 2018) (same). For the same reason, Defendants' argument that Plaintiffs have alleged only "corporate mismanagement" makes no sense. Br. at 13-14.

which are substantiated by the Company's own documents, Defendants' own actions, and the

statements from numerous former DaVita employees.[11]

### 2.   Defendants Falsely Attributed DaVita's Financial Success To Improvements In Its "Commercial Mix"

Throughout the Class Period, Defendants repeatedly attributed DaVita's financial success

to "improvements in commercial mix," and emphasized how the trend in DaVita's commercial

mix, after years of steadily declining, was finally improving, and even "outpacing" the growth of

government-insured patients. *See, e.g.*, ¶¶162, 164, 167, 173, 178, 217.

These statements were false because Defendants failed to disclose that the

"improvements" in its commercial mix were directly attributable to their illicit steering scheme.

Courts have uniformly held that, when a company makes public statements touting the reasons

for its financial success, it has a duty to ensure those statements are accurate and complete. *See,*

*e.g.*, *In re FBR Inc. Sec. Litig.*, 544 F.Supp.2d 346, 357 (S.D.N.Y. 2008) ("[W]here a company

puts at issue the cause of its financial success, it may mislead investors if the company fails to

disclose that a material source of its success is the use of improper or illegal business

practices."); *Singer*, 883 F.3d at 442 ("[B]y choosing to speak about its reimbursement practices,

the Company possessed a duty to disclose its alleged illegal conduct."). In their motion,

Defendants fail to specifically address any of these statements. To the extent Defendants intend

---

[11] In Defendants' cited authorities, the court found the plaintiffs' allegations of illegal conduct were conclusory—a far cry from the detailed allegations here. *See AXIS*, 456 F.Supp.2d at 585 (no "explication of how the steering occurred" or how laws were violated); *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F.Supp.3d 822, 872 (S.D. Tex. 2016) ("vague assertions" of FCPA violations); *In re JP Morgan Chase Sec. Litig.*, 262 F.Supp. 2d 595, 632 (S.D.N.Y. 2005) (no specific facts regarding "kickback" scheme); *In re Duke Energy Corp. Sec. Litig.*, 282 F.Supp.2d 158, 160 (S.D.N.Y. 2003) (no misstatements or allegations why accounting practices were improper); *Stumpf v. Garvey*, 2005 WL 2127674, at *16 (D.N.H. Sept. 2, 2005) (not a "single fact" in support of alleged scheme). Defendants also argue that, even if they did steer, it did not harm all patients, but this is irrelevant. Br. at 19, 20. Plaintiffs allege that, contrary to Defendants' public statements, DaVita steered all government-insured patients, regardless of need, into AKF-backed commercial plans.

to lump these statements into their argument that Plaintiffs failed to plead any false statements because steering is not illegal, this argument fails for all of the reasons set forth above.

### 3.      Defendants Actively Concealed the Company's Highly Material Exposure to Its Illicit Relationship with the AKF

In the Company's public filings, it stated that <u>only</u> "some" patients who did <u>not</u> qualify for Medicaid utilized AKF assistance to obtain secondary insurance from commercial payers.[12] In reality—and as Defendants would admit in the October 31, 2016 press release—Defendants steered <u>all</u> patients who <u>did</u> qualify for Medicaid into AKF-backed commercial plans as their <u>primary</u> insurer.  In other words, the truth was <u>exactly the opposite</u> of what Defendants stated.

Moreover, even when Defendants disclosed that the Company had steered its Medicaid patients into AKF-backed ACA plans—comprising up to $230 million, or 26%, of its annual profits—they still misled investors, concealing the highly material fact that 4,300 additional patients had enrolled in commercial plans with AKF assistance.[13]  This meant that, in reality, the Company's exposure to its illicit relationship with the AKF was $680 million, <u>or nearly three times more than the amount at risk that Defendants had disclosed</u>.  Defendants appear to dismiss these false statements as not being actionable based on their argument that their scheme was legal, however, for the reasons set forth above, this is not so—and moreover, even absent illegality, the Company's incredibly heavy reliance on the AKF for 75% of its profits was highly material to investors.  As the J.P. Morgan report commented, this earnings power was at risk "if

---

[12] While Defendants argue they did not mislead investors because this statement was technically true (Br. at 21), it is well established that "literal accuracy is not enough; an issuer must as well desist from misleading investors by saying one thing and holding back another."  *Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*, 135 S.Ct. 1318, 1330 (2015).

[13] Defendants argue that Thiry's statement that he did not "know anything" about the percentage of AKF-backed patients when asked by analysts was inactionable "opinion." Br. at 22. This makes no sense.  Thiry knew that percentage full well—he previously stated that he "stared at that [number] each quarter" (¶223), and opined that it was not in investors' "best interests" to know it.  *See id.*

the legal legitimacy of the AKF is compromised by a possible DOJ investigation <u>AND as health plans ferret out subsidized patients that they are under no legal obligation to underwrite</u>."[14]

### B.      The Complaint Adequately Alleges A Strong Inference Of Scienter

To establish scienter, "a plaintiff must allege facts that create a strong inference that the defendants acted with the intent to deceive shareholders or in reckless disregard of a risk that shareholders would be misled." *See Nakkhumpun v. Taylor*, 782 F.3d 1142, 1147 (10th Cir. 2015). An inference of scienter "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 324 (2007). Instead, an inference of scienter is "strong" when it is as likely as any other inference—in effect awarding a draw to the plaintiff. *See id*. at 314; *see also New Jersey v. Sprint Corp*., 531 F. Supp. 2d 1273, 1281 (D. Kan. 2008) ("the Tenth Circuit accurately predicted the holding in *Tellabs* by awarding the draw to the plaintiff when there are equally strong inferences for and against scienter"). Moreover, a court must evaluate "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23

Here, the Complaint sets forth a myriad of detailed factual allegations that establish a strong inference of Defendants' knowing or reckless misconduct.

---

[14] The Company's public filings also state that "nearly all" of their profits were attributable to patients covered by commercial plans <u>before</u> Medicare eligibility—*i.e.*, to patients who could not have been steered. However, DaVita obtained most of its profits from steering patients who were already eligible for, or receiving, government insurance. ¶ 152. Defendants' argument that their disclosure that patients "frequently rely" on AKF assistance to maintain their commercial insurance renders these statements true is unavailing. Br. 22. That disclosure in no way informed investors that the Company was steering patients who were already eligible for, or receiving, government insurance. While Defendants claim that they simply recite the Medicare Secondary Payor rule in this disclosure, that rule merely caps the amount of a time a private insurer can cover a patient at 30 months. It is not the case that, during that 30-month period, the patient is not eligible for Medicare. Patients become eligible for Medicare three months after diagnosis.

*First*, Plaintiffs' allegations are directly supported by numerous internal Company documents, all of which provide truly overwhelming evidence of Defendants' fraud.  *See e.g. Carpenters Pension Tr. Fund of St. Louis, St. Clair Shores Police & Fire Ret. Sys. v. Barclays PLC*, 56 F. Supp. 3d 549, 554 (S.D.N.Y. 2014) (scienter supported by "examples—based on internal company documents"); *In re Flowers Foods, Inc. Sec. Litig.*, No. 7:16-CV-222 (WLS), 2018 WL 1558558, at *14 (M.D. Ga. Mar. 23, 2018) ("Here, allegations that Defendants had access to meaningful and internal reports" add to an inference of scienter.").

These documents include internal emails between high-level DaVita employees discussing the implementation and oversight of the steering scheme; internal employee training materials and PowerPoint presentations that explicitly detailed and incentivized the scheme; Company-wide promotions awarding cash bonuses for employees who met steering goals; and widely circulated internal spreadsheets documenting the progress of Defendants' scheme.  ¶¶54-81, 86-89.  Indeed, the November 2015 "Medicaid Opportunity Update," distributed to senior employees across the country, outlined the Company's systemic efforts to mobilize employees across the country to steer "all" ESRD patients, regardless of need, into AKF-backed commercial plans. *See id.*  This level of detail is remarkable at the pleading stage of a securities class action, and is more than sufficient on its own to establish scienter.  *See In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 448 (D. Del. 2014) (scienter supported by "internal emails along with the contents of those, evidence that some of the officer defendants knew of and discussed [the fraud]").  Significantly, at no point do Defendants challenge the veracity or reliability of any of these documents, and the failure to do so is fatal to their motion in light of Plaintiffs' allegations.

*Second*, Plaintiffs' allegations are further substantiated by detailed firsthand accounts from high-level former employees directly responsible for the oversight and management of

DaVita clinics across the country.   ¶¶82-85, 90-103, 110-12.  *Mishkin v. Zynex, Inc.*, 2011 WL 1158715, at *7 (D. Colo. Mar. 30, 2011) (CW allegations "are entitled to significant weight" in establishing scienter "because the complaint describes the bases of the CWs' knowledge, the positions they held, their exposure to the relevant conduct, and the relevant time frame"); *In re Molycorp, Inc. Sec. Litig.*, 2016 WL 233402, at *12-13 (D. Colo. Jan. 20, 2016) (same).  Again, as with the documents cited in the Complaint, Defendants do not challenge these accounts, nor can they: the CWs are reliable, consistent and well-founded.

*Third*, the Company's own reaction to news reports about its steering—and the timing of that reaction—support a strong inference of scienter.  DaVita's denials show that the Company and its most senior officers knew both what steering was, and that it was unlawful and improper.  Moreover, only one week after the *St. Louis Post Dispatch* published its exposé, the Company announced that, effective immediately, it was suspending steering patients into AKF-backed private insurance.  The most plausible inference—if not the only inference—that can be drawn is that Defendants understood full well what steering was, that it was unlawful, and that DaVita was doing it.  Moreover, the timing of the "suspension"—only one week after the revelations— strongly supports scienter.[15]  *Agnes v. Smallworldwide PLC*, 94 F.Supp.2d 1167, 1175 (D. Colo. 2000) (scienter pled where plaintiffs "alleged knowledge on the part of Defendants that the products were not ready for shipment, contrary to Defendants' representations").

*Fourth*, Defendants' efforts to conceal the true extent of DaVita's relationship with the AKF is compelling evidence of scienter.  In reaction to the investigations and reports about the Company, and even when repeatedly pressed by analysts, Defendants actively refused to disclose

---

[15] Tellingly, DaVita never resumed the practice even though the CMS rule was not implemented. Unlike Defendants' cited authorities, here, Defendants repeatedly stated "we do not steer," suspending it only after media reports revealed Defendants misconduct. *See* Br. at 26; *AXIS*, 456 F.Supp.2d at 592; *In re Zagg Inc. Sec. Litig.*, 797 F.3d 1194, 1205 (10th Cir. 2014); *Sorkin, LLC v. Fischer Imaging Corp.*, 2005 WL 1459735, at *8 (D. Colo. June 21, 2005).

the full extent of DaVita's relationship with the AKF, with Defendant Thiry going so far as to repeatedly tell investors that it would not be in their "best interests" to know (an assessment that could only have been made with full appreciation of DaVita's AKF relationship).  ¶¶209, 222. Again, if there was nothing improper about the Company's relationship with the AKF, there would have been no reason for Thiry not to disclose this information.  In fact, the Company only came clean after financial analysts revealed the full extent at the end of the Class Period.[16]

*Fifth*, Defendants' misstatements concerned DaVita's Kidney Care Division, which is indisputably the most critical aspect of the Company's operations, representing 97% of DaVita's earnings in 2015 and 100% in 2016.  ¶¶31, 253.  As numerous courts have repeatedly held, and as common sense dictates, "the core-operations inference are among the allegations that may be considered in the complete PSLRA analysis." *Molycorp*, 2016 WL 233402, at *15; *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013) (senior officers "can be presumed to have knowledge of the company's core operations.").

Indeed, throughout the Class Period Defendants themselves repeatedly spoke publicly— and were directly questioned by analysts—about the importance of DaVita's "commercial mix" and its relationship with the AKF.[17]  Contrary to Defendants' arguments (Br. at 26), where, as here, defendants regularly discuss topics that are critical to a company's success, courts routinely hold that the defendants were knowledgeable about such topics.  *See Medina v. Clovis Oncology, Inc.,* 215 F. Supp. 3d 1094, 1127 (D. Colo. 2017) (scienter found where "[defendants] 'gave

---

[16] Defendants assert they "openly" disclosed "all elements" of the scheme, Br.at 28, but this is nonsense.  Defendants did not disclose that DaVita was <u>steering</u>, or that <u>it was using the AKF as a conduit to pay patients' commercial premiums for them</u>, in direct violation of federal law, and contrary to their own public statements.  Moreover, the fact that DaVita's stock price dropped upon the revelation of the scheme belies this assertion. *SEC v. Kovan*, 807 F.Supp.2d 1024, 1041 (D. Kansas 2011) (citing *U.S. v. Bilzerian*, 926 F.Supp.2d 1285, 1298 (2d Cir. 1991)).

[17] *See, e.g.*, ¶¶10, 162 ("improved revenue per treatment due to improved commercial mix"); ¶162 ("the biggest good news is that our commercial mix and our rates, both went up a bit"); ¶175 ("[commercial mix] did grow in 2015 for the first time in a long time").

detailed, data-laden responses to analyst questions on multiple occasions'); *Adams v. Kinder-Morgan*, *Inc*., 340 F.3d 1083, 1106 (10th Cir. 2003) (a "substantial contribution" to earnings would have been known by the president and CEO); *Croker v. Carrier Access Corp*., 2006 WL 2038011, at *7 (D. Colo. July 18, 2006) ("the only fair and reasonable inference is that [the CEO] knew the status of the development of the one product on which Carrier's future profitability depended").[18]

*Sixth*, the DOJ investigation of the Company and the AKF concern the misconduct that lies at the heart of Plaintiffs' claims—Defendants' illicit steering practices.  This investigation, which expressly implicates efforts to provide patients with information "concerning the availability of charitable assistance," (¶136), supports a strong inference of scienter.  *Garden City Employees' Ret. Sys v. Psychiatric Solutions, Inc*., 2011 WL 1335803 at **55-56 (M.D. Tenn. Mar. 31, 2011) (investigations "create the 'red flags' that support a strong inference of scienter"); Defendants' own authority agrees.  *See Washtenaw Cnty. Emples. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 115 (D. Mass. 2014) (a "government investigation can be seen as one more piece of the puzzle, a series of circumstances that add up to a strong inference of scienter.").[19]

---

[18] *Anderson v. Spirit Aerosystems Holdings, Inc*., 827 F.3d 1229 (10th Cir. 2016) is easily distinguishable on this basis, involving only a handful of projects.  Br. at 25-26. Here, by contrast, the illicit steering scheme involved DaVita's entire business model.

[19] The magnitude and duration of Defendants' fraud—which permeated DaVita's countrywide facilities and has lasted several years— support a strong inference of scienter.  *Touchtone Grp., LLC v. Rink*, 913 F. Supp. 2d 1063, 1080 (D. Colo. 2012) ("The Tenth Circuit has found 'the magnitude of the alleged falsity' to be a significant factor in assessing whether a plaintiff has sufficiently alleged scienter."); *Mishkin v. Zynex, Inc*., 2011 WL 1158715, at *7 (D. Colo. Mar. 30, 2011) (magnitude of the fraud supported a strong inference of scienter).  Additionally, contrary to Defendants' contentions (Br. at 27), the fact that, prior to the Class Period, DaVita was the subject of multiple regulatory investigations and numerous *qui tam* lawsuits is probative of scienter.  ¶¶32-36, 254-255.  *See In re Qwest Commc'ns Int'l, Inc*., 396 F. Supp. 2d 1178, 1194 (D. Colo. 2004) ("pattern of repeated manipulations and misrepresentations" support a strong inference of scienter); *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 970 (N.D. Cal. 2014) ("scienter is strengthened by the allegation of pervasive and long standing problems.").

In response to these particularized allegations, Defendants barely dispute scienter, devoting roughly four pages of their brief to it.  Br. at 24-28.  Significantly, Defendants do not even assert that they were unaware of the Company's systemic steering.  Instead, Defendants' primary argument is that Plaintiffs failed to allege "when or how Defendants should have been aware that this conduct was illegal."  Br. at 25.  Defendants' argument fails for several reasons.

First, the securities laws do not require Plaintiffs to allege that Defendants specifically knew their conduct was illegal in order to establish scienter.  Rather, Plaintiffs need only establish that Defendants knew, or were reckless in not knowing, that their statements were *false*. *In re SemGroup Energy Partners*, L.P., 729 F. Supp. 2d 1276, 1297 (N.D. Okla. 2010) (scienter found where "defendants published statements when they knew facts or had access to information suggesting their public statements were materially inaccurate.").

Second, as discussed above, Defendants' own words and actions demonstrate that they fully appreciated the impropriety of steering.  Again, if Defendants truly believed that DaVita's practices were lawful and appropriate, there is no plausible reason why they would (i) repeatedly deny steering; (ii) permanently "suspend" the practice of facilitating AKF applications, thereby forfeiting hundreds of millions of dollars in annual revenue; and (iii) continually refuse to disclose the extent of DaVita's relationship with the AKF.

Third, regardless of Defendants' contentions, CMS explicitly stated that "[i]t is improper to influence people away from Medicare or Medicaid coverage for the purpose of financial gain," and that steering violated the SSA.  Furthermore, Plaintiffs' allegations—confirmed by internal Company documents and CW testimonials—demonstrate that Defendants' steering scheme violated each of the tenets of the 1997 OIG Opinion. *See*, *e.g.*, ¶¶184, 185.[20]

---

[20] The fact that DaVita repurchased shares (Br. at 28) does not negate scienter.  The Company, not the Individual Defendants, repurchased shares using shareholder money.  Moreover, "the

## C.  The Complaint Adequately Pleads Loss Causation

To plead loss causation, Lead Plaintiffs need only "allege a disclosure or revelation of truth about a defendant's prior misstatement or omission that is in some way connected with a drop in stock price." *In re Molycorp, Inc. Sec. Litig.*, 157 F. Supp. 3d 987, 1012 (D. Colo. 2016). Rule 8 pleading standards apply as "[l]oss causation requires only a 'short plain statement.'" *In re SemGroup Energy Partners, L.P.*, 729 F. Supp. 2d 1276, 1301 (N.D. Okla. 2010) (quoting *Dura Pharms. v. Broudo*, 544 U.S. 336, 346 (2005)).  A plaintiff can allege "a leakage theory that posits a gradual exposure of the fraud rather than a full and immediate disclosure." *In re Williams Sec. litigation-WCG Subclass*, 558 F.3d 1130, 1138 (10th Cir. 2009).

Here, the Complaint readily meets the requirements for pleading loss causation by alleging a series of corrective disclosures that revealed the truth about Defendants' steering scheme, including, among other disclosures:  (i) CMS' August 18, 2016 RFI regarding inappropriate steering in the dialysis industry; (ii) the October 23, 2016 *St. Louis Post-Dispatch* article revealing, based on internal documents and statements from former DaVita employees, that the Company was engaged in systemic nation-wide steering; and (iii) the October 9, 2017 J.P. Morgan report revealing that, despite the Company's prior minimization of its risk to the steering scheme, in reality 75% of its earning power was dependent on its illicit relationship with the AKF.  In response to each of these and other disclosures, DaVita's stock price plummeted. ¶¶256-72.

Defendants nonetheless argue that the form of certain of these disclosures—"government and media scrutiny"—cannot reveal an undisclosed truth "as a matter of law." *See* Br. at 29.

---

repurchase program could properly be viewed as an attempt to keep the ball rolling. . . before the weight of [the alleged fraudulent] practices" took its toll. *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1068 (C.D. Cal. 2008).

Defendants are wrong, as numerous courts have repeatedly held that corrective disclosures such as these satisfy loss causation pleading requirements.  *See Cohen v. Kitov Pharm. Holdings, Ltd.,* 2018 WL 1406619, at *7 (S.D.N.Y. Mar. 20, 2018) (loss causation adequately pled through "a news article describing an Israeli regulatory investigation"); *Singer*, 883 F.3d at 447 (analyst report and Form 8-K sufficient to show loss causation).

Defendants' reliance on *Loos v. Immersion Corp.*, 762 F.3d 880 (9th Cir. 2014), is unavailing.  Br. at 29.  The Ninth Circuit subsequently distinguished *Loos* and clarified that "the announcement of a [government] investigation related to an alleged misrepresentation, coupled with a subsequent revelation of the inaccuracy of that misrepresentation, can serve as a corrective disclosure for the purpose of loss causation."  *See Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (loss causation properly pleaded where, a month after the defendant company announced an SEC subpoena, a subsequent disclosure, even without a market reaction, "confirm[ed] that investors understood the SEC announcement as at least a partial disclosure" of the fraud); s*ee also Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Intern. N.V.*, 89 F. Supp. 3d 602, 620 (S.D.N.Y.) ("*Loos* is plainly not controlling…this Court and other courts within this District have concluded that the disclosure of an investigation into a particular business practice can be sufficient to allege loss causation.").[21]

---

[21] *Curry v. Yelp,* 875 F.3d 1219, 1225 (9th Cir. 2017) is easily distinguishable.  Br. at 30.  In *Curry*, plaintiffs relied on "customer complaints to the FTC without a subsequent investigation" or any other disclosures.  Here, Plaintiffs allege a series of corrective disclosures that include regulator announcements and detailed media and analyst reports based on internal Company documents, which were corroborated by Defendants' subsequent admissions.  The other cases Defendants rely on are similarly inapposite.  Br. at 29.  In *Meyer v. Greene*, 710 F.3d 1189, 1197-1200 (11th Cir. 2013), the court found that a short seller's mere opinion of a stock based on publicly available information could not form the basis of a corrective disclosure. 710 F.3d at 1199-1200.  Similarly, in *In re Almost Family, Inc. Sec. Litig.*, 2012 WL 443461, at *13 (W.D. Ky. Feb. 10, 2012), the news article at issue "presented no *new* information to the market." (emphasis included).  In contrast, here, new facts based on internal company documents were newly disclosed by media reports to the market.

In any event, as courts have repeatedly held, competing theories of loss causation should not be resolved at this stage.  *Molycorp*, 157 F. Supp. 3d at 1013 ("The Court does not definitively resolve this factual concern at this matter's procedural posture."); *In re Rhythms Sec. Litig.*, 300 F. Supp. 2d 1081, 1092 (D. Colo. 2004) ("It is not Plaintiffs' burden to prove loss causation in the pleadings…Defendants' arguments [are] not appropriate for weighing at this stage of the proceedings.").[22]

## IV.    CONCLUSION

For all of these reasons, the Court should deny Defendants' Motion in its entirety.[23]

Dated:  June 6, 2018

Respectfully Submitted,

*/s/ Steven B. Singer*
Steven B. Singer
SAXENA WHITE P.A.
Steven B. Singer
Kyla Grant
10 Bank Street, 8th Floor
White Plains, New York 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com
kgrant@saxenawhite.com

-and-

SAXENA WHITE P.A.
Maya Saxena
Joseph E. White, III
Lester R. Hooker
Dianne M. Anderson
150 East Palmetto Park Road
Suite 600
Boca Raton, FL 33432
Telephone: (561) 394-3399

---

[22] Because Plaintiffs have adequately alleged primary violations of §10(b), they have adequately alleged their §20(a) claim against Defendants Thiry, Hilger and Rodriguez.  *Medina v. Clovis Oncology, Inc.*, 215 F. Supp. 3d 1094, 1131 (D. Colo. 2017).

[23] Alternatively, if the Court decides in favor of Defendants, then Plaintiffs respectfully request leave to amend the Complaint to remedy any pleading deficiencies.

Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com
danderson@saxenawhite.com

*Lead Counsel for the Class*

Kip B. Shuman (23593)
Rusty E. Glenn (39183)
THE SHUMAN LAW FIRM
600 17th Street, Ste. 2800 South
Denver, CO 80202
Telephone:  303-861-3003
303-536-7849 (fax)
kip@shumanlawfirm.com
rusty@shumanlawfirm.com

*Local Counsel for the Class*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 6th day of June, 2018, I caused to be electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the all registered participants.

*/s/ Steven B. Singer*
Steven B. Singer