**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 17-cv-0304-WJM-NRN

PEACE OFFICERS' ANNUITY AND BENEFIT FUND OF GEORGIA, Individually and
on Behalf of All Others Similarly Situated, and
JACKSONVILLE POLICE AND FIRE PENSION FUND, Individually and on Behalf of All
Others Similarly Situated,

      Plaintiffs,

v.

DAVITA INC.,
KENT J. THIRY,
JAMES K. HILGER, and
JAVIER J. RODRIGUEZ,

      Defendants.

_____

## ORDER DENYING MOTION TO DISMISS

_____

This case arises out of Defendant DaVita Inc.'s ("DaVita") relationship to the

American Kidney Fund ("AKF") and statements made by DaVita executives Kent Thiry,

James Hilger, and Javier Rodriguez (together with DaVita, "Defendants") about DaVita's

financial performance and its relationship to AKF.  Plaintiffs Peace Officers' Annuity and

Benefit Fund of Georgia ("POA") and Jacksonville Police and Fire Pension Fund

("Jacksonville Fund") (together, "Plaintiffs") bring this action pursuant to Sections 10(b)

and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of

themselves and others who purchased or otherwise acquired common stock of DaVita

between February 26, 2015, and October 6, 2017 (the "Class Period").  They allege that

Defendants made a variety of fraudulent statements or omissions in connection with the

sale of DaVita stock, which caused Plaintiffs to purchase DaVita stock at artificially inflated prices.

Now before the Court is Defendants' Motion to Dismiss (the "Motion") in which Defendants argue that Plaintiffs lack standing to assert claims for statements made after October 14, 2016, and that Plaintiffs have failed to sufficiently plead fraudulent statements, scienter, and loss causation. (ECF No. 43.) For the reasons discussed below, the Court denies Defendants' Motion.

## I. BACKGROUND

The following factual summary is drawn from Plaintiffs' Amended Complaint.

### A. Healthcare for End-Stage Renal Disease Patients

At the center of this action is DaVita's business of providing dialysis to end-stage renal disease ("ESRD") patients. Because of the expensive and time-consuming nature of dialysis, ESRD patients often have difficulty finding or maintaining employment. (ECF No. 36 ¶ 38.) In 1972, Congress recognized the challenge faced by ESRD patients and made all ESRD patients eligible for Medicare at any age and regardless of financial circumstance. (*Id.*) Medicare covers 80% of ESRD patients' dialysis treatments as well as kidney transplant and aftercare. (*Id.* ¶ 39.) Patients are liable for the remainder of dialysis costs, and may be eligible for state-run Medicaid programs for those remaining costs not covered by Medicare. (*Id.* ¶ 39.)

Some ESRD patients are insured by private group plans through an employer or other private insurance. When the Affordable Care Act ("ACA") went into effect in January 2014, ESRD patients' insurance options expanded because commercial

2

insurers could no longer exclude coverage for preexisting conditions.  (*Id.* ¶ 41.)  Private insurance plans typically reimburse dialysis providers at much greater rates than Medicare or Medicaid, "*i.e.*, up to $4,000 per treatment, as opposed to only $300 per treatment."  (*Id.* ¶ 42.)

Pursuant to a rule issued by the Centers for Medicare & Medicaid Services ("CMS"), private plans serve as the patients' primary insurer for a 30-month "coordination period," during which Medicare is a secondary insurer.  (*Id.* ¶ 40.)  After that period, Medicare becomes the primary insurer, and private insurance becomes secondary.  (*Id.*)

**B.    AKF Commercial Premium Assistance**

AKF provides charitable premium assistance ("CPA") to ESRD patients who would otherwise have difficulty affording insurance premiums and cost of care.  (*Id.* ¶ 50.)  AKF is the largest provider of third-party CPA for ESRD patients in the country, and is funded almost entirely by dialysis providers.  (*Id.*)  In 2015, AKF reported over $260 million in donations, 80% of which, according to press reports, was provided by DaVita and its competitor Fresenius.  (*Id.* ¶ 51.)  Plaintiffs allege that DaVita donated in excess of $100 million to AKF in 2015, and imply that DaVita increased its annual donation in 2016.  (*Id.*)

The federal government has been aware of the AKF's CPA program for at least twenty years.  In 1997, AKF sought an advisory opinion from the Department of Health and Human Services' Office of Inspector General ("OIG") regarding funding of CPA for ESRD patients for Medicare Part B or Medigap premiums.  OIG Ad. Op. 97-1, 1997 WL

34684549.  Under the arrangement proposed by AKF, it would assess applicants'

eligibility and financial need, and award CPA solely based on those factors; AKF would

not take into account the identify of the referring facility or amount of any donor's

contribution.  *Id.*  Donor companies certified that they would not track the amount that

AKF pays on behalf of patients at their facilities, but could consider what they would

have otherwise paid on behalf of financially needed patients.  *Id.*  In addition, donor

companies agreed not to disclose the amount of their donations or method of

calculating contributions, nor place restrictions or conditions on donations.  *Id.*  Based

on the information provided, the OIG stated that the proposed arrangement would not

constitute grounds for the imposition of civil monetary penalties under Section 231(h) of

the Health Insurance Portability and Accountability Act of 1996.  *Id.*

## C.    DaVita's Business Practices

DaVita's profits are primarily driven by private insurance, due to the much greater

reimbursement rates of private insurers.  While commercially insured patients comprise

approximately 10% of DaVita's patient population, those patients drive nearly 100% of

its profits and 33–36% of its revenues.  (*Id.* ¶¶ 4, 43–44.)

Plaintiffs allege that DaVita "intentionally and illegally 'steered' as many ESRD

patients as it could," including Medicare- and Medicaid-eligible patients, "into

commercial plans by paying their premiums for them through AKF."  (*Id.* ¶ 53.)  Plaintiffs

set forth in great detail, with reference to internal DaVita documents and confidential

witness statements, how DaVita tracked the acquisition of "private pay" patients at its

facilities, incentivized patient steering by offering bonuses to employees, prepared

training and instructional materials for employees that disparaged Medicare and Medicaid, and designed materials to convince patients that Medicare and Medicaid were worse options than private insurance.  (*Id.* ¶¶ 54–103.)

Specifically, Plaintiffs allege that DaVita tracked the acquisition of "private pay" patients, including patients who switched from Medicaid to Medicare to commercial plans (described in one instance as "private insurance wins" and a "leading indicator" of performance for one of DaVita's divisions).  (*Id.* ¶¶ 55–59.)  They also claim that DaVita insurance counselors were required to regularly circulate internal DaVita spreadsheets that listed patients with commercial insurance as their primary insurer, reimbursement rates for dialysis treatments under each plan, and how much money was collected by DaVita for each patient.  (*Id.* ¶¶ 61, 100.)  According to Plaintiffs, DaVita implemented formal incentive programs for employees, regions, and divisions that acquired the most privately insured patients (*id.* ¶¶ 62–67, 97–99), and, by 2015, had developed a "Medicaid Opportunity" initiative, which formalized a company-wide plan to direct all current patients to private insurance with AKF CPA helping patients afford otherwise unaffordable private insurance premiums (*id.* ¶¶ 81–82, 89).  Confidential Witness 3 ("CW 3"), a former insurance counselor for DaVita clinics in and around Austin, Texas, explains that DaVita conducted training for insurance counselors that emphasized the benefits to DaVita of having patients with private insurance, rather than Medicaid or Medicare.  (*Id.* ¶¶ 85, 91, 92.)

Plaintiffs also allege that DaVita's educational materials pushed all ESRD patients toward private insurance, regardless of individualized medical or financial

need, by "telling patients that Medicaid and Medicare would not meet their medical needs, and was much worse than private insurance." (ECF No. 36 ¶¶ 68, 72, 76; *see also id*. ¶¶ 69–80, 92.)  Plaintiffs cite an example of DaVita counseling a patient, who had obtained private insurance prior to becoming a DaVita patient but struggled to pay premiums, on the "benefits of having private insurance as primary as opposed to Medicare." (*Id.* ¶ 78.)  They also cite an example of Confidential Witness 5's ("CW 5") husband being told by DaVita staff not to enroll in Medicare, and a DaVita social worker not allowing CW 5's husband to fill out paperwork to enroll in Medicare, which CW 5 and her husband wanted as a safety net. (*Id.* ¶ 95.)

According to Plaintiffs, DaVita also instructed employees to assure ESRD patients concerned about monthly premiums for private insurance that they may qualify for CPA through AKF, and employees assisted patients in applying for CPA through AKF. (*Id.* ¶¶ 70, 79.)  Confidential Witness 1 ("CW 1"), a former DaVita insurance counselor who worked at several facilities in the New York City area, explained that signing up patients for the AKF CPA program was "a way to force exchange plans on people." (*Id.* ¶ 82.)

Plaintiffs also reference public comments filed in response to CMS's August 18, 2016 Request for Information ("RFI") regarding dialysis companies' steering patients to commercial insurance plans with AKF would paying patient premiums. (*Id.* ¶¶ 106–112.)  They cite the comments of a former DaVita social worker who stated that DaVita insurance counselors would assure ESRD patients that they would "preapprove them for AKF" CPA. (*Id.* ¶ 111.)  Another former insurance counselor stated that

DaVita closely tracked "their AKF enrolles and how much money goes for each person that receives assistance." (*Id.* ¶ 112.)

In response, DaVita contends that it has a statutory obligation to "educate ESRD patients about any financial resources—such as CPA—that may be available to help pay for their care." (ECF No. 43 at 15.)

**D.    Public Scrutiny of and Reaction to the AKF CPA Program**

In July 2016, UnitedHealth sued the American Renal Association for fraud, alleging that the organization targeted Medicaid- and Medicare-eligible patients, and convinced them to enroll in UnitedHealth commercial plans using financial assistance from the AKF. (ECF No. 36 ¶ 104.)

On August 18, 2016, CMS issued the RFI seeking information about dialysis companies steering Medicare- and Medicaid-eligible ESRD patients on to commercial health plans through the ACA and use of the AKF CPA program. (*Id.* ¶ 106.) CMS expressed concern that "some organizations may be engaging in enrollment activities that put their profit margins ahead of their patients' needs." (*Id.*) DaVita responded to the RFI on September 22, 2016, stating that it "does not steer patients toward any particular insurance option or plan. DaVita educates its patients so that they are able to make informed decisions that are in their best interest." (*Id.* ¶ 117.)

On October 23, 2016, the *St. Louis Post-Dispatch* published an investigative report, based on internal DaVita e-mails and interviews with former DaVita employees, which suggested that DaVita systematically steered patients toward commercial plans and AKF CPA. (*Id.* ¶¶ 118–21.) After publication of the article, DaVita's stock price

dropped by $2.86 per share.  (*Id.* ¶ 122.)

On October 31, 2016, DaVita issued a press release stating that it would "suspend support for applications to the . . . charitable premium assistance by patients enrolled in minimum essential Medicaid coverage who are seeking additional coverage on a 2017 ACA Plan." (*Id.* ¶ 123.)  DaVita stated that this change would impact only 1% of its patient population.  (*Id.* ¶ 124.)  The press release included only the financial impact for the ESRD patients with ACA plans receiving CPA from AKF, not the total number of its ESRD patients with commercial plans receiving assistance.  (*Id.* ¶ 127.)

On December 14, 2016, CMS published an interim final rule requiring dialysis providers to disclose to commercial insurers which patients received AKF CPA assistance.  (*Id.* ¶ 133.)[1]  In the summary of comments received in response to the RFI, CMS observed that "all commenters on the topic—including insurance companies, dialysis facilities, patients, and non-profit organizations—stated that they believe many dialysis facilities are paying for or arranging payment for individual market health care premiums for the patients they serve." (*Id.*)  In addition, "[c]omments also described that, even though it is financially beneficial to suppliers, enrollment in individual market coverage paid for by dialysis facilities or organizations affiliated with dialysis facilities can lead to . . . harm to patients." (*Id.*)

---

[1] On January 25, 2017, Judge Amos L. Mazzant of the Eastern District of Texas issued an order preliminarily enjoining the interim final rule for failure to comply with the notice and comment procedures of the Administrative Procedures Act.  *Dialysis Patients Citizens v. Burwell*, 2017 WL 365271, at *6 (E.D. Tex. Jan. 25, 2017).  The case is currently stayed, and CMS has not sought further notice and comment.  Although the interim final rule does not have the force and effect of law, it helpfully summarizes the comments received in response to the RFI and CMS's impressions based on those comments.

On December 25, 2016, the *New York Times* published an article that described the relationship between AKF and its largest donors, including DaVita, and suggested that AKF denied CPA to patients of dialysis companies who did not donate to AKF. (*Id.* ¶¶ 134–35.) It also discussed AKF's guidelines, which allegedly "instruct[ed] dialysis providers to track the amount of money their patients received from the AKF and donate an equivalent amount back to the program in order for patients to receive premium assistance." (*Id.* ¶ 135.)

On Friday, January 6, 2017, the federal government opened an investigation and served a subpoena on DaVita related to AKF and CPA. (*Id.* ¶ 136.) DaVita stock fell from $65.79 on that day to $63.38 per share on Monday, January 9, 2017. (*Id.*)

On January 12, 2017, a shareholder activist group wrote a letter to DaVita's board questioning DaVita's increase in commercial patients after the ACA went into effect and its relationship with AKF. (*Id.* ¶ 138.) In DaVita's Form 10-K filed with the SEC on February 24, 2017, DaVita noted that insurance companies had started to include provisions to refuse to accept CPA, which could impact the number of patients able to afford commercial plans. (*Id.* ¶ 141.) On May 2, 2017, DaVita noted "lower enrollment of patients on the ACA plans" and that its commercial mix dropped significantly. (*Id.* ¶ 142.)

DaVita subsequently confirmed that over 4,000 patients also received AKF CPA for employer group and COBRA plans, and estimated that its loss in operating income if patients no longer received AKF assistance for commercial non-ACA plans would amount to $450 million in financial exposure. (*Id.* ¶ 152.) These numbers were in

addition to the "2,000 Medicaid patients who were enrolled in ACA plans with AKF assistance," with a potential financial impact of $140 million.  (*Id.* ¶ 142.)

In September and October 2017, third-party reports estimated that "as much as 60–80% of [DaVita's] earning power is derived from its AKF relationship" and described the AKF relationship as "DaVita's sole moat, or a sustainable economic advantage separating it from competitors."  (*Id.* ¶¶ 148–49.)  Plaintiffs contend that DaVita's stock dropped over 6%, from $61.26 to $57.49 in reaction to the September 22, 2017 report, and nearly 10%, from $59.82 to $53.89 in reaction to the October 9, 2017 report.  (*Id.* ¶¶ 148, 151.)

## E.    DaVita's Public Statements

Plaintiffs allege that DaVita made false and misleading statements and material omissions during the Class Period in its annual 10-K filings, quarterly 10-Q filings, statements made in conjunction with those filings and during earnings calls, press releases, a response to the CMS RFI, and during the 2017 Capital Markets Day. (*Id.* ¶¶ 153–225.)  In detailed allegations, Plaintiffs contend that DaVita made false and misleading statements, or material omissions, in four ways:

- •    DaVita obscured, with omissions and false statements, the extent to which it pushed patients toward private insurance and the impact on its performance (*id.* ¶¶ 175, 189, 192, 198, 208, 222);

- •    DaVita misled investors as to the drivers of its performance and omitted material facts regarding the reason for improvement (*id.* ¶¶ 161–62, 164, 167, 168, 173, 175, 178, 198, 205, 217);

- DaVita misrepresented its relationship with AKF as legitimate and arms length when, in fact, it had an illicit *quid pro quo* relationship under which DaVita made payments (not donations) in exchange for AKF providing premium assistance to DaVita's patients (*id.* ¶¶ 157, 159, 170, 181, 184, 189, 207, 209); and

- DaVita's SEC submissions implied that AKF provided premium assistance only to patients who were not eligible for Medicare when in fact DaVita pushed Medicare-eligible or -enrolled patients to private insurance plans, who then received AKF premium assistance (*id.* ¶¶ 157, 170, 171, 219–20).

For each allegation, Plaintiffs recite the allegedly false or misleading statement, the source of the statement, and the reasons why they believe each statement to be misleading. (*Id.* ¶¶ 156–225.)

In addition, Plaintiffs cite specific facts supporting Defendants' knowledge of DaVita's steering practices by reference to the testimony of former employees (*id.* ¶¶ 227–232) and to internal Davita documents (*id.* ¶¶ 233–238). Plaintiffs also allege with reference to facts in the Amended Complaint that DaVita was aware of federal investigations regarding AKF and downplayed its relationship with AKF, Defendants closely monitored DaVita's commercial mix and reported increasing average dialysis revenue per treatment, and Defendants knew the AKF CPA was critical to DaVita's financial success. (*Id.* ¶¶ 226–255.)

**F.      Procedural History**

Plaintiffs filed this action against Defendants on February 1, 2017, alleging violations of Sections 10(b) and 20(a) of the Exchange Act (ECF No. 1).  On November 6, 2017, the Court appointed Plaintiffs as lead plaintiffs and approved their selection of lead counsel.  (ECF No. 30 at 3.)  On January 12, 2018, Plaintiffs filed the Amended Complaint, and Defendants' instant Motion followed.  (ECF Nos. 36 & 43.)

## II.  LEGAL STANDARDS

**A.      Article III Standing**

Article III of the U.S. Constitution restricts federal courts to deciding "cases" and "controversies."  *See* U.S. Const. art. III, § 2, cl. 1.  These words have been interpreted to restrict federal courts from giving "advisory opinions," *Flast v. Cohen*, 392 U.S. 83, 96 (1968), meaning that a federal court may not resolve questions in the abstract, but instead may only resolve "disputes arising out of specific facts when the resolution of the dispute will have practical consequences to the conduct of the parties," *Columbian Fin. Corp. v. BancInsure, Inc.*, 650 F.3d 1372, 1376 (10th Cir. 2011).

To safeguard this restriction, the Supreme Court has articulated a three-element test for "Article III standing":

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"  Second, there must be a causal connection between the injury and the conduct complained of . . . .  Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted; certain alterations incorporated).

## B.     Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted." In reviewing a motion to dismiss under Rule 12(b)(6), the Court will "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff." *Ridge at Red Hawk, LLC v. Schneider,* 493 F.3d 1174, 1177 (10th Cir. 2007). "[T]o withstand a motion to dismiss, a complaint must contain enough allegations of fact 'to state a claim to relief that is plausible on its face.'" *Robbins v. Okla.*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007) ("*Twombly*")). This means that "[t]he burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief. 'Factual allegations must be enough to raise a right to relief above the speculative level.'" *Id.* (quoting *Twombly,* 550 U.S. at 545 & 556). The plaintiff "does not need detailed factual allegations" but must plead more than merely "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Ridge at Red Hawk*, 493 F.3d at 1177 (quoting *Twombly,* 550 U.S. at 556).

# III.  ANALYSIS

## A.    Section 10(b) and Pleading Requirements under the Private Securities Litigation Reform Act

"Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b-5 prohibit making any material misstatement or omission in connection with the purchase or sale of any security."  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014).  While not explicit in the statute, the courts have "long recognized" an implied cause of action to enforce Section 10(b) and its implementing regulations.  *Id.*

While complaints in civil actions usually require a "short and plain statement of the grounds for the court's jurisdiction," Fed. R. Civ. P. 8(a), a plaintiff alleging a Section 10(b) claim bears a "heavy burden at the pleading stage," *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012).  A Section 10(b) complaint must allege that

> (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance.

*Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") raised the pleading standard on the first and third elements of a federal securities fraud claim,

namely, falsity and scienter, beyond what was required by Rule 8(a) or Rule 9(b).[2]
*Hogan v. Pilgrim's Pride Corp.*, 2018 WL 1316979, at *4 (D. Colo. Mar. 14, 2018). The
PSLRA requires that a plaintiff plead falsity by specifying each allegedly misleading
statement, the reason why the statement is misleading, and, if made on information and
belief, all facts on which that belief is formed. *Adams*, 340 F.3d at 1095. For scienter,
the complaint must state with particularity, for each act or omission, facts giving rise to a
strong inference that the defendant acted with an intent to defraud or recklessness. *Id.*
at 1095–96.

### B.     Standing to Challenge Statements After October 14, 2016

Defendants contend that Plaintiffs lack standing to bring claims based on
statements made after their last purchase on October 14, 2016. (ECF No. 43 at 32.)
Defendants note that "the Tenth Circuit has not addressed the specific question of a
plaintiff's standing to challenge post-purchase statements," and the only district court
opinion in the Tenth Circuit to address the question (as of the date of Defendants' reply
brief) found that "the plaintiff had adequately pled it purchased through the entire class
period." (ECF No. 48 at 15 n.9.) *See Andropolis v. Red Robin Gourmet Burgers, Inc.*,
505 F. Supp. 2d 662, 676 (D. Colo. 2007).

Plaintiffs respond that the argument is "nonsense" because "numerous courts
have stated that class representatives do have standing to assert claims under § 10(b)
which arise from statements made after the class representative purchased shares as

---

[2] Prior to the PSLRA, Rule 9(b) governed securities fraud claims, and required that
"circumstances constituting fraud . . . be stated with particularity. Malice, intent, knowledge and
other condition of mind may be averred generally." *Adams*, 340 F.3d at 1095 (quoting Fed. R.
Civ. P. 9(b)).

long as the statements allegedly were made in furtherance of a common scheme to defraud." (ECF No. 47 at 22 n.5 (quoting *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 13 (D. Mass. 2004)) (alterations incorporated).)

The Seventh and Third Circuits have examined this issue and found that a plaintiff does not have standing in such circumstances because post-purchase statements could not have affected the price at which the plaintiff actually purchased. *Roots P'ship v. Lands' End, Inc.*, 965 F.3d 1411, 1420 (7th Cir. 1992); *Winer Family Tr. v. Queen*, 503 F.3d 319, 325 (3d Cir. 2007). However, other courts "have not strictly applied the 'post-purchase' rule identified in *Roots Partnership* . . . when multiple material representations form part of a common course of fraudulent conduct." *Mariconda v. Farmland Partners Inc.*, 2018 WL 6307868, at *7 (D. Colo. Dec. 3, 2018) (citing *Crowell*, 343 F. Supp. 2d at 13–14, and *In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*, 413 F. Supp. 2d 378, 393 (E.D. Pa. 2005)).

The Court is "persuaded that cases . . . which apply a 'common course of conduct analysis' to standing questions are better reasoned than cases that require the lead plaintiff to have purchased on the last day of the class period." *Crowell*, 343 F. Supp. 2d at 14. In this case, Plaintiffs allege that Defendants perpetrated a course or scheme of fraud that ended on October 6, 2017, when "the full magnitude of Defendants' steering fraud [was] revealed." (ECF No. 36 at 62 & ¶¶ 146–152.) Plaintiffs have pled individual standing to bring a Section 10(b) claim based on the fact that they actually purchased securities and allegedly sustained a loss as the result of alleged misrepresentations by Defendants during the Class Period. *See Crowell*, 343

F. Supp. 2d at 13 (distinguishing a case in which the plaintiff lacked standing because he purchased stock before any false or misleading statement was made); *Lujan*, 504 U.S. at 560–61. Plaintiffs also allege that others who purchased DaVita stock before and after them (up to October 6, 2017) suffered the same kind of injury arising from the same course of fraudulent conduct. (ECF No. 36 ¶¶ 279–84.)

At this pleading stage of the litigation, more is not required. Plaintiffs have adequately pled individual standing for their own claims occurring within the putative class period. This suffices, at this juncture in the proceedings, for Plaintiffs to have standing to assert claims on behalf of the entire class, predicated as such claims are on the Defendants' alleged common course of fraudulent conduct undertaken throughout the Class Period.

To the extent that Defendants attempt to convert questions of Plaintiffs' typicality or adequacy under Rule 23 into a standing question under Rule 12, the Court rejects Defendants' end-run around a full Rule 23 briefing. Questions of class certification are not presently before the Court, and the Court therefore expresses no opinion on whether Plaintiffs are typical and adequate representatives under Rule 23.

**C.    Falsity of statements**

1.    <u>Relevance of the Illegality of the Underlying Conduct</u>

Defendants claim that Plaintiffs' entire theory of liability depends on the illegality or impropriety of steering patients to private insurance with AKF paying patients' commercial insurance premiums, and statements made by DaVita about its relationship with AKF. (ECF No. 43 at 12.) Thus Defendants' arguments on failure to plead falsity are premised on Plaintiffs' supposed failure to present law or facts to show that the

17

scheme was illegal. (ECF No. 43 at 12 ("Plaintiffs fail to plead falsity because no law or facts show that the scheme was illegal.").) In particular, Defendants argue that Plaintiffs cannot plead their claims with the particularly required by the PSLRA because Plaintiffs failed to allege the existence of an underlying illegal steering scheme. (ECF No. 48 at 8.) *See Hogan*, 2018 WL 1316979, at *5; *Shoemaker v. Cardiovascular Sys., Inc.*, 2017 WL 1180444, at *8 (D. Minn. Mar. 29, 2017).

However, as a factual matter, not all of Plaintiffs' claims rest on the purported illegality of the underlying scheme. (*See* ECF No. 51 at 3–4.) Certain of the alleged false statements, particularly those related to educating or steering patients, can be construed as potentially false or misleading independent of the illegality of the underlying scheme. The Court will separately address these two categories of statements: (1) fraudulent statements or omissions not necessarily tied to the alleged illegal steering scheme; and (2) fraudulent statements or omissions premised on the impropriety or illegality of DaVita's underlying conduct.

2.  Statements Not Premised on the Illegality of the Underlying Scheme

Certain statements alleged by Plaintiffs to be false or misleading are not solely predicated on the illegality of DaVita's relationship to AKF. (ECF No. 36 ¶¶ 175, 189, 192, 198, 208; ECF No. 51 at 4.) These statements relate to DaVita's disclaimer of patient steering, while maintaining programs strongly suggesting a business plan to direct ESRD patients to private insurance, and to DaVita's attribution of the change in commercial mix to specific factors, such as the ACA exchanges and an improving economy, but not DaVita's company-wide push to persuade all patients to obtain private insurance. (*Id.*)

18

Plaintiffs sufficiently plead that the following statements were false or misleading:

• On September 22, 2016 in response to the RFI: "DaVita does not steer patients toward any particular insurance option or plan." (*Id.* ¶ 189.)

• Also on September 22, 2016, in response to the RFI: "To help ensure an unbiased presentation of information to the patients, the DaVita interdisciplinary team has no outcome incentives. In addition, the team does not have knowledge of specific terms or rate agreements between DaVita and the commercial payers." (*Id.* ¶ 192.)

• In an October 31, 2016 press release, DaVita again stated that it provided "education to its patients." (*Id.* ¶ 198.)

• During a November 2, 2016 conference call with analysts, Thiry stated that Defendants "fulfilled our regulatory responsibility to provide comprehensive education to our patients"; that "a very small percentage of our Medicaid patients determined that an ACA plan was better for them"; and DaVita "created a very intense oversight process to make sure that we did everything possible to live up to the CMS standards around objective presentation of information and absolutely letting the patient choose." (*Id.* ¶ 208.)

• In response to a question regarding DaVita's improvement in its commercial mix, a DaVita employee stated on May 14, 2016, that the exchanges were a "portion of the improvement. The improvement we've seen over a multiple-quarter period is in part due to exchanges and in part

due to improving economy and in some cases it's difficult to discern which is where."  (*Id.* ¶ 175.)

Plaintiffs contend that the first four statements were false and misleading because "DaVita's steering of ESRD patients was its key business strategy" and "DaVita did not present 'balanced' information to patients . . . neglecting to mention the serious implications" of choosing a private plan with AKF assistance.  (*Id.* ¶¶ 190, 193, 200, 210–11.)  In addition, Plaintiffs contend that "DaVita specifically trained its employees to have knowledge of commercial reimbursement rates," citing to internal DaVita documents and statements by several former DaVita employees.  (*Id.* ¶ 194.)

For the last statement, Plaintiffs contend that it was materially false or misleading because "this growth was not driven 'due to exchanges' now available to ESRD patients as a result of the ACA, or an 'improving economy'" but rather DaVita's (allegedly illegitimate) plans to steer all ESRD patients, including those with or eligible for government insurance, to commercial insurance plans regardless of individualized need.  (*Id.* ¶ 176.)  *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d. Cir. 2016) ("[A]t the moment the company chooses to speak, it takes upon itself the obligation to *speak truthfully*, and it is the breach of *that* obligation which forms the basis for the § 10(b) claim." (emphasis in original)).

Defendants raise a variety of arguments that Plaintiffs have failed to adequately plead any false or misleading statement.  Defendants first argue that Plaintiffs have not alleged facts sufficient to support a claim of illegal steering because they fail to identify with particularity the "when, where and who was involved" in the purportedly illegal scheme.  (ECF No. 43 at 28.)  This criticism is unavailing because it is premised on

identifying conduct related to an illegal scheme and, as just discussed, Plaintiffs' allegations related to certain steering statements are in fact not all predicated on an underlying illegal scheme.

Defendants also criticize Plaintiffs' failure to identify any DaVita patient who was steered onto "unnecessary or detrimental insurance." (*Id.*) However, as an example of such steering, Plaintiffs cite CW 5's experience of DaVita staff refusing to allow CW 5's husband to enroll in Medicare. (ECF No. 36 ¶ 95.) Moreover, Plaintiffs do not necessarily have to demonstrate that any patient was in fact steered; at this stage, it is sufficient to plead that DaVita expressly disclaimed steering and publicly attributed success to other factors, while fully cognizant that it had a policy of directing ESRD patients to private insurance and internal metrics to demonstrate its success in directing patients.

Finally, Defendants claim that Plaintiffs cannot rely on evidence of DaVita's 2014–15 initiatives to support the falsity of statements made in 2016. (ECF No. 43 at 32.) As a factual matter, Plaintiffs' support for allegations of steering go through at least early 2016. (ECF No. 36 ¶¶ 95, 101.) According to the 2014–2015 documents referenced by Plaintiffs, DaVita characterized its business plan as patient education, even though the program allegedly pushed people to enroll in private insurance plans. DaVita's 2016 statements challenged by Plaintiffs emphasize the allegedly educational nature of DaVita's actions. It is thus a reasonable inference that DaVita's educational (potential steering) activities continued into 2016 and through the date of the allegedly fraudulent statements. Whether DaVita's program changed by the time it made the 2016 statements is a question best left for summary judgment or trial.

Defendants do not make any arguments as to the materiality of these statements, nor do they contend that the statements were not made in connection with the sale of securities. The Court will not address arguments not actually raised and briefed by the parties. Therefore, the Court finds that Plaintiffs have adequately pled that Defendants made false or misleading statements regarding steering and attributing DaVita's success to other factors.

3.    Statements Premised on the Illegality of the Underlying Scheme

The remainder of the allegedly false or misleading statements are premised on the impropriety or illegality of DaVita's relationship with AKF. These statements concern which types of patients were eligible and targeted for AKF CPA, DaVita's relationship to AKF, and whether DaVita failed to disclose that its performance was based on illegal conduct. (ECF No. 36 ¶¶ 157, 159, 161, 164, 170, 171, 173, 178, 181, 184.)

Because Plaintiffs adequately plead a claim for relief based on certain of Defendants' false statements, the Court need not at this juncture determine whether Plaintiffs have also adequately pled the falsity of these statements premised on the illegality of the underlying scheme. This is not to say that claims based on the remaining statements would necessarily survive summary judgment or a Rule 50 motion at trial. Nonetheless, at this time, Plaintiffs have sufficiently pled particular facts regarding Defendants' false or misleading statements that, taken as true, would form the basis for a securities fraud action against Defendants.

**D.    Scienter**

To establish scienter, Plaintiffs must "state with particularity facts giving rise to a

strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Scienter in this context requires "a mental state embracing intent to deceive, manipulate, or defraud, or recklessness." *Adams*, 340 F. 3d at 1105 (internal quotation marks omitted). Recklessness is "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1258 (10th Cir. 2001) (internal quotation marks omitted). A court inquires "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). The court "must take into account plausible opposing inferences." *Id.*

With regard to the statements discussed in Part C.2 above, Plaintiffs have adequately pled facts giving rise to a strong inference that Defendants made the statements in question with an intent to deceive. Plaintiffs allege that DaVita knew that its statements publicly denying steering patients to ACA plans, made feasible by the AKF CPA, were false when made, and knew that its improving financials were attributable to that companywide effort, and not necessarily as a result of other economic factors. Specifically, Plaintiffs allege, with reference to internal documents and confidential witness statements, that Defendants were aware, or should have been aware, of DaVita's alleged steering program, as well as DaVita's efforts to move patients to private insurance plans with AKF CPA. Through these averments, Plaintiffs

clearly allege that Defendants made these statements with the intent to deceive investors about the true source of the DaVita's success, as well as about the extent to which it relied on AKF and CPA.

Defendants argue that Plaintiffs fail to adequately allege scienter as to steering because "knowledge of 'steering' does not equate to knowledge of illegal conduct." (ECF No. 43 at 34.)  Defendants state that "the internal company documents and former employees' accounts pled here, Opp. at 23–24, aver, at most, that the Defendants knew about the Medicaid Opportunity program's existence, not its alleged illegality."  (ECF No. 48 at 16.)  However, as discussed above, the falsity of Defendants' disclaimer of steering does not necessarily depend on the alleged illegality of DaVita's relationship to AKF.  Defendants also add that they "openly disclosed all the elements of the scheme."  (ECF No. 43 at 37.)  However, this statement is contrary to the facts plausibly pled by Plaintiffs, which allege that DaVita in fact concealed the nature of its so-called "education" programs.

Defendants also argue that Plaintiffs do little more than make generalized allegations about Defendants' awareness of DaVita's relationship to AKF, and that they cannot rely on executive knowledge of "core operations" to plead scienter.  (*See* ECF No. 43 at 35.)  This argument relies on the Tenth Circuit's decision to decline to accept a "core operations" inference in order to plead scienter, absent particularized facts showing what executives actually knew.  *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1245 (10th Cir. 2016).

Plaintiffs do much more, however, than make generalized allegations related to scienter.  Plaintiffs allege that DaVita executives were personally involved in DaVita's

reporting of dialysis revenues, revenue per treatment, and other key metrics, and that they closely tracked the dialysis businesses financial metrics. (ECF No. 36 ¶¶ 242, 246.) *See Anderson*, 827 F. 3d at 1246. And, unlike in *Anderson*, Defendants' statements cannot be characterized as "overly optimistic" projections about DaVita's abilities to achieve some outcome, because Defendants statements flatly denied the existence of the program that Plaintiffs have plausibly alleged existed. *See id.*

Defendants also attempt to clarify DaVita's statement that it "does not steer" claiming that "DaVita was asserting that it did not engage in illegal conduct and that its communications with patients about insurance were proper—a position that DaVita maintains and that the Complaint's allegations have not contradicted." (ECF No. 48 at 13.) In proffering this clarification, however, Defendants ignore Plaintiffs substantial allegations that DaVita's communications with patients were not solely for the purpose of education, but rather for persuasion. Defendants' own definition of "steering"—as legal communications with ESRD patients—is not necessarily supported by the context of the statement, or what a reasonable person would understand that statement to mean. Defendants thus present only a weak plausible alternative explanation as to the meaning of the statement that it "does not steer."

Weighing the totality of the facts plausibly alleged by the Plaintiffs and Defendants' plausible alternative explanation, the Court finds that these facts give rise to a strong inference that Defendants made statements about steering and the source of Defendants' financial success with the intent to manipulate, deceive, or defraud, or were reckless because their statements presented a danger of misleading buyers. *See Tellabs*, 551 U.S. at 323.

### E.    Loss Causation

"The securities laws are not meant to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause."  *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1137 (10th Cir. 2009) (internal quotation marks omitted).  A plaintiff must demonstrate that losses are "attributable to the revelation of the fraud and not the myriad other factors that affect a company's stock price."  *Id.*  On this element of a Section 10(b) claim, a plaintiff must only provide a short and plain statement of loss causation that gives the defendant fair notice of the claim and the grounds on which it rests.  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005); Fed. R. Civ. P. 8(a).

"Loss causation is easiest to show when a corrective disclosure reveals the fraud to the public and the price subsequently drops."  *In re Williams*, 558 F.3d at 1137. However, statements which merely reveal the *risk of fraud* are insufficient to show loss causation.  Thus, the Ninth Circuit has held that an "announcement of an investigation, without more, is insufficient to establish loss causation," *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014), but an announcement "coupled with a subsequent revelation of the inaccuracy of that misrepresentation[] can serve as a corrective disclosure for the purpose of loss causation," *Lloyd v. CVB Financial Corp.*, 811 F.3d 1200, 1203 (9th Cir. 2016).  The Ninth Circuit has also held that a company's disclosure of customer complaints referring to allegations of fraud, without more, is also insufficient to allege loss causation.  *Curry v. Yelp, Inc.*, 875 F.3d 1219, 1226 (9th Cir. 2017).

Defendants essentially argue that the announcement of an investigation into DaVita's practices, a press report concerning DaVita's practice of steering patients to private insurance, and an investor report revealing the extent of DaVita's profits attributable to private insurance and the AKF CPA are disclosures of a mere risk of fraud, rather than a finding of actual fraud, and are thus insufficient to plead loss causation. (ECF No. 43 at 37–39; ECF No. 48 at 19–20.) Here again, Defendants focus on whether these public announcements revealed findings of illegality or fraudulent conduct. In other words, Defendants contend that the public statements merely revealed the *risk of fraud*, rather than an actual fraud or illegality.

While DaVita is correct that the announcement of a federal investigation into its relevant conduct is not, without more, sufficient to allege loss causation, the Court finds that Plaintiffs have alleged sufficient facts to support a claim of loss causation because they state facts connecting corrective disclosures revealing the fraudulent nature of the statements discussed in Part C.2 above to a subsequent price drop. *See In re Williams*, 558 F.3d at 1137.

First, Plaintiffs allege that the *St. Louis Post-Dispatch* revealed that DaVita systematically steered all patients to commercial plans, backed by the AKF CPA, with reference to internal DaVita documents to contradict DaVita's explicit statement that it did not steer and merely provided education to ESRD patients. (ECF No. 36 ¶¶ 118–21.) Thereafter, DaVita's stock price dropped $2.86 per share. (*Id.* ¶ 122.) Here, the report did not merely reveal a risk of fraud, but rather that DaVita's business practices were the opposite of what they represented in public statements. Plaintiffs also allege that after DaVita's practices were revealed, the stock price dropped.

In addition, an October 9, 2017 investor report revealed that "as much as 60–80% of [DaVita's] earning power is derived from its AKF relationship," after which the stock dropped by nearly an additional 10%. (*Id.* ¶¶ 148–49, 151.) This revelation contradicted DaVita's express contention that its improvements in commercial mix and financials was due to the ACA exchanges or improvements in the economy, rather than primarily due to its steering and relationship to AKF CPA. In this manner Plaintiffs' allegations have plausibly pled "both that corrective information," and not merely the potential of future corrective information, "was revealed and that this revelation caused the resulting decline in price. *In re Molycorp, Inc. Sec. Litig.*, 157 F. Supp. 3d 987, 1012 (D. Colo. 2016). For these reasons, the Court finds that Plaintiffs have adequately pled loss causation.

**F.      Section 20(a) Claims**

Defendants' argument to dismiss Plaintiffs' Section 20(a) claim is derivative of their Section 10(b) arguments. As discussed above, the Section 10(b) claim is adequately pled. The Court therefore denies Defendants' Motion as to the Section 20(a) claims.

## IV. CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

1.      Defendants' Motion to Dismiss (ECF No. 43) is DENIED;

2.      The stay entered on November 13, 2017 (ECF No. 35) is LIFTED;

3.      Counsel are directed to contact the Chambers of U.S. Magistrate Judge N. Reid Neureiter no later than Monday, April 1, 2019, to schedule a status conference to

begin the process of preparing an amended scheduling order, and/or for such further proceedings as Judge Neureiter deems appropriate to move this case forward.

Dated this 28th day of March, 2019.

BY THE COURT:

William J. Martinez
United States District Judge