**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.: 1:17-cv-00304-WJM-NRN

PEACE OFFICERS' ANNUITY AND BENEFIT FUND OF GEORGIA, Individually and on Behalf of All Others Similarly Situated, and
JACKSONVILLE POLICE AND FIRE PENSION FUND, Individually and on Behalf of All Others Similarly Situated,

      Plaintiffs,

v.

DAVITA INC.,
KENT J. THIRY,
JAMES K. HILGER, and
JAVIER J. RODRIGUEZ

      Defendants.

---

**DECLARATION OF JOSEPH E. WHITE, III IN SUPPORT OF (I) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ..................................................................................... 1

II.   THE PROSECUTION OF THE ACTION ................................................................... 7

    A.   The Commencement of the Action and Appointment of Lead Plaintiffs .............. 7

    B.   Lead Counsel's Investigation and Filing of the Amended Complaint................... 7

    C.   Defendants' Motion to Dismiss the Complaint and the Court's Order ............... 10

    D.   Lead Plaintiffs' and Lead Counsel's Extensive Discovery Efforts ..................... 13

        1.   Discovery Obtained from Defendants ...................................................... 13

        2.   Discovery Obtained from Third Parties.................................................... 15

        3.   Discovery from Lead Plaintiffs................................................................ 16

        4.   Lead Counsel's Document Review and Deposition Preparations ........... 17

        5.   Lead Counsel's Experts ........................................................................... 19

    E.   Plaintiffs' Motion for Class Certification and Expert Depositions...................... 20

    F.   Defendants' Motion for Partial Reconsideration ................................................. 24

III.  THE SETTLEMENT IS FAIR, ADEQUATE AND REASONABLE ........................... 24

    A.   Mediation Sessions with Judge Layn R. Philips (Ret.).......................................... 25

    B.   The Settlement Agreement and Preliminary Approval......................................... 28

    C.   Reasons for the Settlement................................................................................... 28

    D.   Notice to the Settlement Class ............................................................................. 30

    E.   The Plan of Allocation ......................................................................................... 32

IV.   LEAD PLAINTIFFS' APPLICATION FOR PLAINTIFFS' COUNSEL'S
    ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES ....... 32

    A.   The Significant Time and Labor Devoted by Plaintiffs' Counsel ........................ 35

    B.   The Risks and the Difficulty of Questions Raised by the Litigation ................... 35

    C.   The Outstanding Result Achieved Supports the Requested Fee Award............... 37

D.      A 30% Fee Award is Customary and in Accordance with Other Similar
        Cases in this District and the Tenth Circuit ........................................................ 38

E.      The Contingent Nature of the Fee, the Undesirability of the Action, and
        Preclusion of Other Employment.......................................................................... 44

F.      The Skill Required and the Experience, Reputation and Ability of the
        Attorneys............................................................................................................... 46

G.      The Reaction of the Settlement Class to the Fee and Expense Application ......... 48

H.      Lead Counsel's Request for Reimbursement of Litigation Expenses .................. 49

I.      Lead Plaintiffs' Representative Reimbursement Requests ................................... 49

V.   CONCLUSION............................................................................................................... 50

**EXHIBIT LIST**

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| A | Declaration of Former United States District Court Judge Layn R. Phillips in Support of: (I) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (II) Lead Plaintiffs' Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses |
| B | Declaration of Robert W. Carter in Support of: (I) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (II) Lead Plaintiffs' Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses |
| C | Declaration of Timothy H. Johnson in Support of: (I) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (II) Lead Plaintiffs' Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses |
| D | Supplemental Declaration of Matthew Mulvihill Regarding (A) Mailing of the Notice and Claim Form; (B) Call Center Services; (C) Settlement Website Maintenance; and (D) Report on Objections or Requests for Exclusion Received |
| E | Summary of Plaintiffs' Counsel's Lodestar and Expenses |
| F | Declaration of Joseph E. White, III in Support of Lead Plaintiffs' Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses, Filed on behalf of Saxena White P.A. |
| G | Declaration of Rusty Glenn in Support of Lead Plaintiffs' Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses, Filed on behalf of Shuman, Glenn & Stecker |

I, Joseph E. White, III, declare as follows:

1.      I am a co-founder and Shareholder of the law firm Saxena White P.A. ("Saxena White" or "Lead Counsel").  I respectfully submit this declaration in support of Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation (the "Settlement Approval Motion"), and Lead Plaintiffs' Motion for Approval of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Fee and Expense Motion").[1]

2.      Saxena White is Lead Counsel for Lead Plaintiffs Peace Officers' Annuity and Benefit Fund of Georgia and Jacksonville Police and Fire Pension Fund in the above-captioned action (the "Action").  I have personal knowledge of the matters set forth herein based on my active participation in the prosecution and settlement of the Action.

3.      Due to the Court's familiarity with the litigation, this Declaration does not seek to detail each and every event during the Action. Rather, the Declaration provides the Court with a summary of the prosecution of the Action, highlights of the events leading to the Settlement, and the basis upon which Lead Counsel and Lead Plaintiffs recommend the Settlement's approval, as well as the approval of Lead Counsel's request for attorneys' fees and litigation expenses.

## I.      **PRELIMINARY STATEMENT**

4.      After four years of hard-fought litigation, Lead Plaintiffs and Lead Counsel have secured an outstanding recovery of $135,000,000 on behalf of the Settlement Class.  If approved, the proposed Settlement will be the second largest all-cash securities class action recovery ever obtained in the District of Colorado, and will rank among the Tenth Circuit's top five securities fraud class action recoveries in history.  Significantly, the Settlement recovers between 31% and 43% of the Settlement Class's likely maximum damages at trial, which is eight to eleven times

---

[1] Unless otherwise stated, all capitalized terms herein have the meanings as in the Stipulation and Agreement of Settlement, dated September 18, 2020 (ECF No. 103-1), and the Exhibit List.

greater than the median 3.9% recovery in similarly-sized cases.  Thus, by any measure, the proposed Settlement provides an outstanding benefit for the Settlement Class that far outpaces the normal range of recoveries in complex securities class actions.

5.      Before agreeing to settle this Action, Lead Plaintiffs and Lead Counsel undertook extensive efforts to advance the Class' claims and to ensure that Plaintiffs were in a position to maximize their recovery. Indeed, Lead Plaintiffs and Lead Counsel not only initiated this Action by filing the initial complaint, but they also filed the only leadership application at the lead plaintiff stage—a rare occurrence in these types of cases, where the PSLRA specifically requires that notice of the lead plaintiff deadline be disseminated to shareholders, and multiple applications are routinely filed.  Thus, absent the efforts of Lead Plaintiffs and Lead Counsel, it is almost certain that Settlement Class Members would have recovered nothing for their claims.

6.      Moreover, the Settlement is the product of four years of vigorous prosecution conducted by Lead Plaintiffs and Lead Counsel.  The litigation efforts included, among other things, conducting a comprehensive legal and factual investigation into the events underlying the Class's claims, including locating critical internal Company documents and interviewing knowledgeable confidential witnesses that were instrumental in drafting a highly detailed, 111-page amended complaint.  Furthermore, Lead Plaintiffs successfully opposed Defendants' motion to dismiss, which meaningfully challenged every major element of Plaintiffs' claims. Thereafter, Plaintiffs aggressively pursued extensive discovery, including consulting with several experts and consultants to develop a comprehensive approach to establishing liability and damages in the Action; obtaining and reviewing 845,000 pages of documents produced by Defendants and over twenty non-parties; defending Lead Plaintiffs' depositions and the deposition of Plaintiffs' expert on market efficiency, deposing Defendants' rebuttal expert, and

preparing for numerous fact witness depositions; moving for class certification, engaging in extensive class certification discovery, and opposing Defendants' motion for reconsideration.

7.      These diligent and exhaustive efforts were undertaken against a background of significant risks.  Indeed, at the pleading stage, the Court sustained only five out of 27 alleged misstatements in the Complaint, and withheld judgment on the remaining 22 misstatements because they were predicated on a finding that DaVita's steering practices were "illegal." Subsequently, the DOJ declined to intervene in a *qui tam* action against DaVita (which action was subsequently voluntarily dismissed); no regulator found or even accused DaVita of engaging in illegal steering misconduct; and Defendants subsequently filed a motion for reconsideration seeking the dismissal of the "illegality" misstatements because the DOJ's decision purportedly negated the sole basis for Plaintiffs' claim of illegality. The substantial risk of establishing illegality would have persisted through summary judgment and trial if litigation had continued.

8.      In addition, Plaintiffs also faced significant risks in establishing loss causation for their claims.  For instance, Defendants argued that the truth regarding DaVita's alleged fraud was purportedly fully disclosed nearly one year before the end of the Class Period when the *St. Louis Post Dispatch* published a detailed article regarding DaVita's steering practices, and the Company subsequently issued a press release disclosing that it would be suspending the Medicaid Opportunity and the financial ramifications for doing so—a disclosure that caused DaVita's stock price to *increase*. Defendants also argued that the stock price declines following several of Plaintiffs' alleged corrective disclosures were caused by factors other than Defendants' fraud, and therefore the Class could not recover damages for such disclosures.

9.      While Lead Plaintiffs believed that they had strong arguments to respond to these points, there is no question that Defendants' arguments could easily have been accepted by this

Court on Defendants' motion for partial reconsideration, at class certification or on summary judgment, or by a jury at trial.  And if the Court or jury ultimately concluded that Defendants' statements were not materially false or otherwise actionable, or that all (or a substantial portion) of the stock price declines following the alleged corrective disclosures were not attributable to the alleged fraud, the potential recovery would be reduced dramatically, or eliminated altogether. Even a favorable jury verdict would have been subjected to an inevitable and uncertain appeals process. Thus, even if Plaintiffs had prevailed at trial, it is highly questionable as to whether Plaintiffs would have recovered more than (or even as much as) the substantial Settlement.

10.     The Settlement is also eminently fair, adequate, and reasonable given the extensive settlement negotiations between the Parties, including six mediation sessions before former Federal District Court Judge Layn R. Phillips, an experienced and highly respected mediator who sat by designation on the Tenth Circuit.  In preparation for these mediation sessions, the Parties submitted several rounds of extensive briefing regarding key legal and factual disputes in this Action, made numerous presentations on liability and damages, and engaged in vigorous, multiparty debate about the strengths and weaknesses of their positions. After lengthy negotiations, on July 20, 2020, the Parties accepted a mediator's proposal to settle this Action, and proceeded to memorialize their agreement in the Stipulation.  Significantly, Judge Phillips has wholly endorsed the Settlement as fair, adequate and reasonable, and has also endorsed the attorneys' fee request as fair and consistent with fees in similar cases.  *See* Ex. A.

11.     As set forth in the Settlement Approval Motion, Plaintiffs respectfully submit that the Settlement represents an outstanding recovery for the Settlement Class that is supported by each of the factors that the Tenth Circuit advises courts to consider in the settlement approval process, as set forth in Federal Rule of Civil Procedure 23(e)(2) and *Rutter & Wilbanks Corp. v.*

*Shell Oil Co.*, 314 F.3d 1180, 1188 (10th Cir. 2002). This is especially true given that the Settlement provides a certain, immediate, and substantial cash recovery for the Settlement Class, while avoiding highly uncertain, risky and costly protracted litigation.

12.    In addition to seeking the Court's final approval of the Settlement, Lead Plaintiffs also seek approval of the proposed Plan of Allocation as fair and reasonable.   Under the proposed Plan of Allocation, the Net Settlement Fund will be distributed on a pro rata basis to members of the Settlement Class who timely submit valid proofs of claim based on their "Recognized Loss" amount as calculated pursuant to the Plan—a methodology that is standard in securities fraud class action settlements and has been approved by courts nationwide.

13.    Lead Plaintiffs also request an award of attorneys' fees and reimbursement of litigation expenses.  Specifically, Lead Counsel is applying for an attorneys' fee award of 30% of the Settlement Fund (i.e., 30% of the Settlement Amount, plus interest earned thereon), and for reimbursement of litigation expenses in the amount of $547,409.27.  Lead Counsel's requested fee is well within the range of fees routinely approved by courts in this District and the Tenth Circuit in comparable securities and other complex class actions, and is amply supported by each of the relevant factors set forth in *Johnson v. Ga. Highway Express, Inc*., 488 F.2d 714, 717–19 (5th Cir. 1979).  Indeed, "[c]ourts in the Tenth Circuit have noted that the typical fee award in complex cases is around ***one third of the common fund***."  *In re Crocs, Inc. Sec. Litig.*, 2014 WL 4670886, at *3 (D. Colo. Sept. 18, 2014) (Brimmer, J.); *Diaz v. Lost Dog Pizza, LLC*, 2019 WL 2189485, at *5 (D. Colo. May 21, 2019) (Martínez, J.) ("33% fee award falls within the norm").

14.    The reasonableness of Lead Counsel's requested 30% fee is also confirmed by a lodestar cross-check, which yields a multiplier of 2.75—which is on the low end of the range of positive multipliers routinely approved within the Tenth Circuit.   *See, e.g., In re DaVita*

*Healthcare Partners, Inc. Deriv. Litig.*, 2015 WL 3582265, at *5 (D. Colo. June 5, 2015) (Martínez, J.) (multiplier of 3 "in line with the multipliers awarded in similar cases"); *Crocs*, 2014 WL 4670886, at *4 ("collecting District of Colorado cases approving multipliers ranging from 2.5 to 4.6%"); *In re Urethane Antitrust Litig.*, 2016 WL 4060156, at *7 (D. Kan. July 29, 2016) (approving 3.2 multiplier in large megafund case, finding multipliers of 4 or 5 have been "accepted by a number of courts in megafund cases").

15.     Lastly, Plaintiffs fully complied with all aspects of the Notice program set forth in the Preliminary Approval Order. 132,884 Notices have been disseminated to potential Settlement Class Members. In addition, the Summary Notice was published in Investor's Business Daily and over the PR Newswire. The Notice explains the Settlement and that Lead Counsel would seek fees of up to 30% of the Settlement Fund. Significantly, no members of the Class have objected even though the February 16, 2021 deadline for doing so has now passed, and only one individual investor with a minimal number of shares has requested exclusion, which is significant given that approximately 87% of the Settlement Class consists of sophisticated institutional investors with the resources and motivation to object, if warranted.  Moreover, Lead Plaintiffs—two sophisticated institutional investors who have actively overseen the prosecution of this Action and who fully understand their fiduciary duty to act in the best interest of the Settlement Class—wholly endorse the Settlement and Lead Counsel's requested fee award.

16.     For all of the reasons discussed in this Declaration, its attached exhibits and in the accompanying memoranda, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation are fair, reasonable, and adequate and should be approved. In addition, Lead Plaintiffs respectfully submit that Lead Counsel's request for attorneys' fees and reimbursement of litigation expenses is also fair and reasonable and should be approved.

## II.     THE PROSECUTION OF THE ACTION

### A.     The Commencement of the Action and Appointment of Lead Plaintiffs

17.     On February 1, 2017, Georgia Peace Officers filed the original securities class action complaint, thereby commencing this Action.  ECF No. 1.  The preliminary investigation was based upon review and analysis of publicly available information concerning the Company, including (a) DaVita's public filings with the SEC; (b) press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) news articles, shareholder communications, conference call transcripts, and postings on DaVita's website concerning the Company's public statements; and (d) other publicly available information concerning DaVita and the Individual Defendants.

18.     On April 3, 2017, Georgia Peace Officers and Jacksonville P&F moved the Court for entry of an order appointing them as Lead Plaintiffs in the Action and approving their selection of Saxena White P.A. as Lead Counsel and Shuman Glenn & Stecker as Liaison Counsel.  ECF No. 26.  Notably, no other shareholders filed motions for appointment as Lead Plaintiff.  ECF No. 29. On November 6, 2017, the Court granted Plaintiffs' motion.  ECF No. 30.

### B.     Lead Counsel's Investigation and Filing of the Amended Complaint

19.     Prior to filing the amended complaint, Lead Counsel further investigated Plaintiffs' claims. In addition to expanding upon its initial review and analysis of publicly available information concerning Defendants, Lead Counsel's multi-faceted investigation included, among other things: (i) review of internal e-mails between high-level DaVita employees discussing the implementation and oversight of the alleged fraud; widely circulated internal spreadsheets that documented the progress of Defendants' alleged scheme; and internal employee training materials and PowerPoint presentations that explicitly detailed and

incentivized the alleged fraud; (ii) interviews with numerous, high-level former employees of DaVita, including executives directly responsible for the oversight and management of DaVita dialysis clinics across the country, and who were present at large-scale Company meetings, conference calls and training sessions where the alleged scheme was explicitly discussed and implemented; (iii) research reports by securities and financial analysts concerning DaVita; (iv) data reflecting the pricing of DaVita common stock; (v) rules and regulations implemented by the Centers for Medicare and Medicaid Services ("CMS"), including a formal Request for Information ("RFI") issued by CMS during the Class Period and public responses thereto, an advisory opinion issued to DaVita in 1997 by the Office of Inspector General (the "OIG Advisory Opinion"), and federal and state false claims act statutes and anti-kickback laws; and (vi) consultations with relevant economic and industry experts.

20.     Lead Counsel's investigation significantly bolstered the strength of Plaintiffs' claims.  For instance, Lead Counsel's exhaustive investigation located several highly credible former DaVita and AKF employees with relevant information about the facts of the case, thereby bolstering Plaintiffs' particularized allegations. Indeed, this Court noted these internal documents and specific testimony by three confidential witnesses in its later order denying Defendants' motion to dismiss.  In my experience, counsel typically lacks access to such key internal documents in securities class actions until after the complaint survives dismissal and the PSLRA's automatic discovery stay is lifted.  Furthermore, by continuing to investigate Plaintiffs' claims during the period between the filing of the original complaint in February 2017 and filing the amended complaint in January 2018, Lead Counsel expanded the class period by more than one year to capture relevant disclosures and potential damages in the Action.  Thus, Lead Counsel's comprehensive investigation provided highly valuable benefits to the Class.

21.     Lead Counsel also became intensely familiar with the interplay among Medicare, Medicaid, COBRA and EGHP health plans, and how such plans applied to DaVita's end-stage renal disease ("ESRD") patients.  Lead Counsel similarly spent countless hours gaining a deep understanding of the convoluted intricacies of numerous federal and state healthcare laws, rules and regulations pertinent to the amended complaint's allegations that Defendants' steering scheme and DaVita's relationship with the American Kidney Fund ("AKF") were illegal.  These tasks not only were difficult and time consuming, but also necessitated frequent consultation with relevant experts and consultants throughout the litigation.

22.     On January 12, 2018, Lead Plaintiffs filed a 111-page amended complaint (the "Complaint," ECF No. 36).  The Complaint alleged, among other things, that throughout the Class Period, Defendants made materially false and misleading statements and omissions regarding DaVita's alleged scheme to "steer" all patients eligible for and/or enrolled in Medicare and/or Medicaid away from government insurance and into high-cost commercial insurance plans in order for DaVita to obtain dialysis reimbursement rates that were up to ten times higher than the rates that government plans paid for the same dialysis treatments. The Complaint alleged that this scheme was facilitated though DaVita's relationship with the AKF—a 501(c)(3) charitable organization to which DaVita purportedly "donated" over $100 million in annual charitable contributions, which the AKF would in turn use to pay the commercial insurance premiums for the patients Plaintiffs alleged Defendants had steered.

23.     The Complaint alleged that DaVita's stock price was artificially inflated throughout the Class Period due to Defendants' alleged materially false and misleading statements and omissions and that shareholders were harmed when the truth about that fraud was revealed.  Specifically, the Complaint asserted that Defendants made false statements by denying

that that DaVita was steering, by representing that DaVita's and the AKF's relationship was above board and that DaVita's donations were charitable in nature, while failing to disclose the illicit *quid pro quo* nature of their relationship, and by attributing DaVita's strong financial performance to the Company's improving commercial mix rather than to Defendants' fraud.

24.     Plaintiffs alleged that the truth regarding Defendants' fraud was revealed in piecemeal fashion through a series of corrective disclosures:

a)  After DaVita held a conference call on August 8, 2016 with analysts and investors revealing that the DaVita had been donating money to the AKF for decades, the Company's stock price experienced declines on August 9, 2016 and August 10, 2016, totaling 7%.

b)  After CMS' August 18, 2016 RFI revealed that the Company was steering ESRD patients, the price of DaVita stock declined on August 19, 2016, falling 4.7%.

c)  After the *St. Louis Post-Dispatch* revealed on October 23, 2016 that DaVita systematically steered all patients to commercial plans backed by AKF-funded premium payments, the Company's stock price dropped 4.7% on October 24, 2016.

d)  After *The Wall Street Journal* revealed on January 6, 2017 that DaVita had been subpoenaed by regulators concerning the Company's donations to the AKF (the "DOJ Investigation"), the Company's stock price declined 3.7% on January 9, 2017.

e)  On May 3, 2017, after DaVita disclosed that it had lost all of the 2,000 Medicaid patients enrolled in commercial plans with AKF assistance, DaVita's stock price declined 5.2%.

f)  On August 2, 2017, after DaVita reported a downturn in its commercial mix improvements in the payer climate due to payers' refusal to accept third party charitable premium assistance from the AKF, the Company's stock price declined 8.84%.

g)  On September 22, 2017, after SIRF revealed the AKF provided DaVita with "up to half its operating profits," the Company's stock price declined 6.2%.

h)  Finally, on October 9, 2017, when J.P. Morgan revealed that as much as 60-80% of DaVita's earning power was derived from the AKF, DaVita's stock price fell by 10%.

### C.     Defendants' Motion to Dismiss the Complaint and the Court's Order

25.     On March 27, 2018, Defendants filed their motion to dismiss the Complaint, challenging the adequacy of the Complaint's allegations with respect to nearly every element of Plaintiffs' claims.  ECF No. 43.

26.     Defendants argued that DaVita, like many other dialysis providers, had openly donated to AKF for decades, and eligible patients of all providers, whether those providers donated to AKF or not, could use AKF's assistance to pay monthly insurance premiums for ESRD patients. According to Defendants, Plaintiffs could not show that the alleged steering scheme was illegal because no statute, regulation or other authority prohibited these activities. Thus, according to Defendants, Plaintiffs lacked law or facts supporting their premise that some type of hidden, illegal conduct occurred that could possibly have rendered the challenged statements false. Defendants argued that Plaintiffs did not plead particularized facts giving rise to a strong inference that Defendants acted with the requisite state of mind (scienter). Defendants claimed that Plaintiffs did not and could not plead that Defendants would have been aware that their conduct was illegal. Additionally, Defendants argued that the Complaint's allegations were not sufficient to support a showing of loss causation. The announcements on which Plaintiffs relied to establish that DaVita's stock price dropped after the purported "truth" was disclosed to the market did not actually reveal any fraudulent or illegal activity (because there was none). Defendants moved to dismiss Plaintiffs' Section 20(a) claim on the ground that the Complaint failed to establish an underlying primary violation.

27.     Lead Plaintiffs filed their opposition to Defendants' motion to dismiss on June 6, 2018. ECF No. 47. In their opposition, Lead Plaintiffs argued that numerous courts have held that violations of the securities laws do not hinge on whether underlying conduct has been found to be illegal, but on whether Defendants' statements were false. Plaintiffs argued that they had alleged numerous facts establishing that, in contrast to Defendants' public statements, DaVita steered thousands of patients from government programs to private insurance for the Company's financial gain. Plaintiffs further claimed that the Complaint pled scienter with allegations

establishing that Defendants were fully aware of rampant, Company-wide steering while simultaneously denying such practices, and falsely representing that DaVita merely "educated" its patients. Plaintiffs also argued that documents cited in the Complaint, as well as CW testimonials, made clear that the Individual Defendants were responsible for implementing the Company's steering campaign.  Thus, to establish a strong inference of scienter, Plaintiffs only needed to show that Defendants knew, or were reckless in not knowing, that their public statements were false and misleading, not that their conduct was illegal. Regarding loss causation, Plaintiffs argued that the Complaint adequately alleged that the truth of Defendants' steering scheme was slowly revealed through a series of partial disclosures that directly caused DaVita's stock price to drop.

28.      On July 20, 2018, Defendants filed their reply brief, which again focused entirely on illegality. However, this time Defendants supported their argument with a recent decision opining on the topic, *Hogan v. Pilgrim's Pride Corporation*, 2018 WL 1316979 (D. Colo. Mar. 14, 2018).  ECF No. 48.  On August 3, 2018, with Court approval, Plaintiffs filed a surreply distinguishing this Action from *Hogan*.  ECF No. 51.

29.      On March 28, 2019, the Court issued its Order denying Defendants' motion to dismiss in its entirety (the "Order," ECF No. 53).  In the Order, the Court sustained five of the Complaint's false statements concerning steering and DaVita's commercial mix, noting that the falsity of those statements was not "predicated on an underlying illegal scheme." *Id.* at 21.  The Court also held, however, that the "remainder" of the Complaint's 27 alleged false statements were "premised on the impropriety or illegality of DaVita's relationship with the AKF," and reserved judgment on whether the Complaint's allegations of illegality were sufficient to survive dismissal.  *Id.* at 22.  The Court rejected Defendants arguments on scienter, finding that the

Complaint, supported by "reference to internal documents and confidential witness statements" obtained by Lead Counsel during its exhaustive investigation, "d[id] much more . . . than make generalized allegations related to scienter." *Id.* at 23-24. Despite agreeing with Defendants that "'an announcement of an investigation, without more, is insufficient to establish loss causation,'" the Court also declined to dismiss the Complaint on that ground. *Id.* at 26-27.

### D.   Lead Plaintiffs' and Lead Counsel's Extensive Discovery Efforts

30.   Discovery commenced immediately after the Court's denial of Defendants' motion to dismiss. On May 28, 2019, Defendants filed their Answer to the Complaint. ECF No. 60. Given the length of the Class Period, the scope of Lead Plaintiffs' claims, and the complex subject matter at issue in this Action, factual discovery was an enormous undertaking. Among other things, Plaintiffs served separate sets of document requests on Defendants, and subpoenaed documents from 23 non-parties, including DaVita's primary dialysis competitor, Fresenius; the AKF; multiple private insurance companies; and multiple kidney transplant facilities. Plaintiffs ultimately obtained and reviewed approximately 845,000 pages of documents and also produced thousands of pages of documents to Defendants during the course of discovery. The amount of work done by Lead Plaintiffs during this time period is extraordinarily compelling evidence of Lead Plaintiffs' vigorous prosecution of and commitment to this Action, as set forth below.

### 1.   Discovery Obtained from Defendants

31.   Lead Plaintiffs served all Defendants with their First Set of Requests for Production of Documents on June 10, 2019. These 46 requests sought, among other things, documents concerning: (i) DaVita's relationship with the AKF, including communications between those parties relevant to the allegations of the Complaint; (ii) the Medicaid Opportunity and all other steering efforts; (iii) Defendants' communications with analysts and shareholders

13

during the Class Period; (iv) sources of improvements in DaVita's commercial mix; (v) CMS's RFI and RFI responses; and (vi) the DOJ Investigation.  Defendants served their responses and objections to Plaintiffs' first document request on July 17, 2019.  Lead Plaintiffs served all Defendants with their Second Set of Requests for Production of Documents on October 9, 2019, which included additional discovery requests concerning DaVita's tax treatment of its AKF donations and Defendant Thiry's resignation.  Defendants served their responses and objections to Plaintiffs' second request on November 8, 2019.

32.     Beginning in August 2019, the Parties frequently exchanged written correspondence and held numerous meet-and-confer conferences to negotiate the appropriate scope of discovery.  Those interactions involved lengthy disputes about the length of the relevant time period, the number of custodians whose e-mail accounts should be searched and what terms to use, and whether the Individual Defendants personally possessed discoverable information.  Conflicts also arose when Defendants initially asserted they would only produce the discovery DaVita produced during the DOJ Investigation, a proposal which Plaintiffs rejected and Defendants eventually withdrew.  The relevancy of DaVita's tax treatment of its AKF donations was also disputed.

33.     In response to Plaintiffs' requests, Defendants produced e-mails and attachments from the custodial files of more than 50 individual custodians, including each of the Individual Defendants.  Ultimately, Defendants made a total of 22 document productions, beginning on July 18, 2019 and concluding on July 10, 2020, which collectively contained approximately 766,204 pages of information contained in 203,000 documents.

## 2.     Discovery Obtained from Third Parties

34.     On September 27, 2019, Lead Plaintiffs served the AKF with a third-party document subpoena, containing 33 separate requests.  Lead Plaintiffs' AKF subpoena sought discovery concerning, among other items: (i) the AKF's relationship with DaVita, including AKF's internal communications; (ii) the Medicaid Opportunity and all other steering efforts of which the AKF was aware; (iii) AKF's policies and procedures regarding charitable premium assistance, including the tracking of DaVita's donations and compliance with the OIG Advisory Opinion; and (iv) the DOJ Investigation.  On October 22, 2019, the AKF served Lead Plaintiffs with its responses and objections.

35.     During the course of negotiating this discovery, Lead Plaintiffs and the AKF exchanged letters and engaged in multiple meet-and-confer conferences regarding the proper scope, timing, cost and reimbursement of the AKF's production and planned depositions of certain AKF senior executives.  Ultimately, the AKF made a total of two document productions, which collectively contained approximately 74,979 pages in 19,630 documents.

36.     Between roughly November 22, 2019 and January 15, 2020, Lead Plaintiffs served subpoenas on 22 other non-party entities: UnitedHealthcare Inc.; Aetna, Inc.; Assurant, Inc.; Blue Cross of Idaho Health Service, Inc.; Blue Cross and Blue Shield of North Carolina; Blue Cross and Blue Shield of Florida Inc. DBA Florida Blue; Blue Shield of California Life & Health Insurance Company; Humana, Inc.; Health Net, LLC; Premera Blue Cross; Sierra Health and Life Insurance Company, Inc.; Regence BlueShield; Fresenius Medical Care North America; UCLA Department of Transplantation Services, the Ohio State University Wexner Medical Center-Comprehensive Transplant Center; Jackson Health System—Miami Transplant Institute; Ann & Robert H. Lurie Children's Hospital of Chicago; Keck Hospital of USC, Harbor-UCLA

Medical Center; Cleveland Clinic Florida; The Regents University of California on behalf of Ronald Reagan UCLA Medical Center; and the Missouri Kidney Program. Ultimately these parties collectively produced, and Lead Plaintiffs reviewed, 3,745 pages from 1,000 documents.

### 3. Discovery from Lead Plaintiffs

37.     Defendants served Lead Plaintiffs with their First Set of Requests for Production of Documents and their First Set of Interrogatories on January 29, 2020, composed of 46 document requests, and 11 interrogatories issued to each Lead Plaintiff.  Defendants' discovery requests primarily sought information relevant to issues of class certification, including information concerning:  (i) Lead Plaintiffs' purchases and sales of DaVita securities, and their decisions to buy, sell, or hold the same; (ii) any research, due diligence, investigation, analysis, or evaluation of DaVita; (iii) internal investment approval processes, policies, and guidelines, including investment management agreements; (iv) Lead Plaintiffs' investigation of allegations in the Complaint; (v) communications with DaVita and its current and former employees; and (vi) Lead Plaintiffs' decision or authorization to commence the Action.  Lead Plaintiffs served their responses and objections to Defendants' discovery requests on February 28, 2020.

38.     The Parties engaged in multiple meet-and-confer conferences and ultimately came to an agreement as to the scope and manner of Lead Plaintiffs' document production.  Thereafter, over the course of several months, Lead Plaintiffs and Lead Counsel engaged in extensive efforts to identify, collect, review and produce documents responsive to Defendants' document requests. Collectively, Lead Plaintiffs made a total of six productions, between March 6, 2020 and June 19, 2020, which contained approximately 25,267 pages of information in 798 documents.

### 4.     Lead Counsel's Document Review and Deposition Preparations

39.     Collectively, the Defendants and third parties produced approximately 845,000 pages contained in 223,000 documents to Lead Plaintiffs in discovery, with the first production on July 18, 2019 and the last production on July 10, 2020.  Lead Counsel devoted substantial time to reviewing and analyzing these documents, including in preparation for 15 fact witness depositions. Moreover, this process needed to be completed efficiently, as fact discovery initially was set to close on July 17, 2020 before modifications to the case schedule were made in response to the COVID-19 pandemic.  To that end, Lead Counsel generated an effective and efficient discovery plan and took significant steps designed to quickly identify the custodians and documents most important to uncovering the facts at the heart of the Action.  As a result of these efforts, Lead Counsel was able to utilize this discovery in connection with class certification and during the Parties' settlement negotiations.  Accordingly, the discovery work conducted by Lead Counsel was critically important to achieving the Settlement.

40.     Lead Counsel's discovery plan leveraged a sophisticated electronic document hosting system, and a dedicated team of attorneys with substantial experience in electronic document discovery, deposition and trial preparation. Attorneys on the litigation team for the Action prepared and continuously updated a highly detailed document review coding manual and protocol, which included detailed case information as well as instructions on coding documents. Document reviewers were trained to code documents for level of responsiveness or importance to the case (e.g. "Hot," "Warm," "Not Relevant"), for case issues (e.g. "Medicaid Opportunity," "Commercial Mix," "Donations to AKF"), and for deposition of specified deponents.

41.     Throughout document discovery, senior attorneys in the litigation team met regularly with document reviewers to discuss key facts uncovered by the review, and staff

attorneys were instructed to prepare memoranda on subject matters of importance to assist senior attorneys in their understanding of the case.

42.     Many of the documents produced to Plaintiffs were substantively complex and laden with healthcare and insurance jargon and terms of art.  Throughout the course of discovery, Lead Counsel consulted with a healthcare expert and conducted independent reading and research to enhance their understanding of these documents. Lead Counsel also developed and continuously updated a set of reference resources to aid members of the document review team, including chronologies of significant events, lists of key players, and a glossary of technical terms and acronyms utilized in the healthcare industry.

43.     To prepare for fact witness depositions, the review team was divided into small subgroups, and each group was assigned to conduct an in-depth review of the custodial files of a particular deponent, identify a set of key documents for that deponent, and prepare a memorandum explaining why that deponent was important to the case and which issues should be addressed during the deponent's deposition.  The review team engaged in this process for 15 separate deponents.

44.     On May 22, 2020, Plaintiffs served Defendants with an initial set of six Notices of Deposition, seeking to schedule depositions for five fact witnesses currently or formerly employed by DaVita and one fact witness currently employed by the AKF, and the Parties subsequently negotiated definitive dates for five out of the six deponents. Plaintiffs also informally noticed depositions for approximately ten additional current or former employees of DaVita, including the depositions of the Individual Defendants.  The first deposition was scheduled to take place on July 21, 2020, the day after an agreement in principle to settle the Action was reached, and the second deposition was scheduled for later that same week.

### 5.   Lead Counsel's Experts

45.   Lead Counsel consulted extensively throughout the litigation with experts in the fields of economics, tax, and healthcare.

46.   Chad Coffman of Global Economics Group, LLC provided opinions on the complex securities-litigation-specific issues of market efficiency, loss causation, and damages. Mr. Coffman authored a report that was submitted with Lead Plaintiffs' motion for class certification. His report opined that: (i) DaVita common stock traded in an efficient market; and (ii) damages could be calculated through a common methodology. Mr. Coffman's 34-page opening report was based on event studies he conducted, and was supported by 14 exhibits and 2 appendices totaling an additional 40 pages. ECF Nos. 83-1 and 83-2.

47.   In addition, Lead Counsel also consulted with other members of the Global Economics Group, LLC team, including Mr. Jeremy Marmer, who assisted in developing the Plan of Allocation for the Settlement.

48.   Lead Counsel also retained and consulted with the Stanford Consulting Group, Inc., which specializes in securities class action damages, to provide analyses and consultation regarding damages and loss causation issues in the Action.

49.   Lead Counsel retained and consulted with Ms. Kirsten Flanagan, CPA of Friedman LLP, an accounting, tax, and business consulting firm, as well as other members of her team.  Ms. Flanagan advised Lead Counsel regarding certain aspects of DaVita's accounting and SEC filings to be reviewed during discovery, and provided assistance in reviewing and analyzing certain tax and accounting issues. Primarily, Ms. Flanagan provided expertise regarding the appropriate tax treatment and disclosure of the charitable contributions DaVita made to the AKF.

50.     Finally, Lead Counsel retained and consulted with Dr. Barbara Grenell and Ms. Debbie Brandel of Preferred Health Strategies, a prominent healthcare consulting firm.  These experts conducted expansive research into steering practices in the dialysis industry and the application of various healthcare rules and regulations to the facts alleged in the Complaint.  Dr. Grenell and Ms. Brandel also reviewed and interpreted documents obtained in discovery, bolstering Lead Counsel's understanding of the interplay between Medicare, Medicaid, COBRA and EGHP health plans and the unique treatment by those plans of patients with ESRD.

### E.     Plaintiffs' Motion for Class Certification and Expert Depositions

51.     On January 31, 2020, Plaintiffs filed their motion for class certification, together with the expert report of Mr. Coffman who opined on market efficiency.  ECF No. 83.  The documents Mr. Coffman relied upon in his expert report were produced to Defendants on March 6, 2020, and Lead Counsel defended Mr. Coffman's deposition on May 27, 2020.

52.     On May 12, 2020 and May 21, 2020, Lead Counsel defended the depositions of Georgia Peace Officers and Jacksonville P&F, respectively.  Robert W. Carter, Secretary/Treasurer, was deposed on behalf of Georgia Peace Officers, and Timothy H. Johnson, Executive Director, was deposed on behalf of Jacksonville P&F.  *See* Exs. B and C, ¶7(e).  Lead Counsel met in person, telephonically and/or virtually on multiple occasions and reviewed numerous documents with Lead Plaintiffs' representatives to prepare for those depositions.

53.     On June 29, 2020, Defendants filed their opposition to Plaintiffs' motion for class certification and submitted the expert report of their rebuttal expert, Dr. Vinita Juneja, who is an expert on economics and a Managing Director and Chair of the White Collar, Investigations, and Enforcement Practice at NERA Economic Consulting. ECF Nos. 102, 102-1. Defendants' opposition did not challenge Plaintiffs' showing that the Class should be certified pursuant to

Rule 23(a) and (b)(3), or Mr. Coffman's conclusion that DaVita's common stock traded in an efficient market during the Class Period.  Instead, Defendants' sole argument in opposition to class certification was that "the only class that may be certified includes purchasers of DaVita securities from May 4, 2016 through October 31, 2016"- i.e., Defendants proposed truncating the Class Period alleged in the Complaint from 32 months to 17 months.  ECF No. 102 at 6.

54.     In their opposition, Defendants drew a bright line distinction between the five allegedly false statements the Court had sustained at the motion to dismiss stage, which Defendants labeled the "Steering Statements," and the 22 alleged misstatements that the Court had reserved judgment on at that time, which Defendants labeled the "Illegality Statements." Defendants then relied on this distinction to support shortening the Class Period to be certified by attacking Plaintiffs' ability to establish loss causation.

55.     With respect to the Illegality Statements, Defendants' argument was two-fold. First, Defendants argued that the Illegality Statements were not sustained at the motion to dismiss stage and, given that the DOJ had since closed its investigation of DaVita in July 2019, the Illegality Statements could not be sustained.[2]  According to Defendants, no class period based on the Illegality Statements could be certified because "the PSLRA does not permit certification of a class for statements that have not been determined to satisfy the PSLRA."  *Id.* at 7.  As a result, Defendants asserted that the class period to be certified had to begin on May 14, 2016, rather than on February 26, 2015 as alleged in the Complaint, because that was the date on which the first of the five Steering Statements was made.

---

[2] Specifically, Defendants' claim that the DOJ Investigation was "closed" largely rested upon the fact that, on July 23, 2019, the DOJ filed a Notice in the related *qui tam* case then-pending against DaVita announcing that DOJ declined to intervene in that case.  This Notice subsequently resulted in the voluntary dismissal of the *qui tam* action.

56.     Second, Defendants claimed that, even if the Illegality Statements could survive the dictates of the PSLRA, no class period based on them could be certified because Plaintiffs could never prove loss causation for those Statements.  Specifically, Defendants contended that the January 6, 2017 announcement of the DOJ Investigation by *The Wall Street Journal* was not corrective of the Illegality Statements, as the Court previously had held that "'an announcement of an investigation, without more, is insufficient to establish loss causation.'"  Moreover, even if that were not the case, any loss causation related to that disclosure had now been eviscerated by the closing of the DOJ Investigation. According to Defendants, because there was not a corrective disclosure revealing that the alleged steering scheme was illegal, no class period based on the Illegality Statements could be certified.

57.     Regarding the Steering Statements, Defendants reiterated that the class period to be certified for those Statements must begin on May 4, 2016, rather than February 26, 2015, because that marked the date the first of the five Steering Statements was made.  As to when the class period pertaining to the Steering Statements should end, Defendants argued that the period certified must end on October 31, 2016—nearly a year prior to the October 6, 2017 date alleged in the Complaint—for two reasons.

58.     First, Defendants claimed that the only disclosure by DaVita that even arguably could have been corrective of the Steering Statements was made when DaVita disclosed it was suspending the Medicaid Opportunity and the financial ramifications from doing so on October 31, 2016.  Thus, Defendants asserted that the certified class period must end one full year earlier than the end of the Class Period alleged in the Complaint.  Moreover, following the October 31, 2016 disclosure, Defendants noted that "DaVita's stock price ***rose*** $3.46" rather than declining,

thereby "more than recovering from the $2.86 drop following the [publication of the *St. Louis Article*]." *Id.* at 15 (emphasis in original).

59.     Second, Defendants argued that Plaintiffs could not establish loss causation for several other of the alleged corrective disclosures, including the final disclosure by J.P. Morgan on October 9, 2017, because such disclosures did not contain new information, and the resulting stock price declines were attributable only to non-fraudulent, confounding information.   For instance, Defendants asserted there could be no loss causation stemming from the J.P. Morgan report because, among other reasons, the report contained no new information about the truth of the Steering Statements, which had not already been disclosed by DaVita's announcement suspending the Medicaid Opportunity on October 31, 2016.   Accordingly, Defendants claimed the end of the certified class period must be truncated by one full year.

60.     The loss causation arguments asserted in opposition to Plaintiffs' motion for class certification not only were complex, but also would have necessitated further substantial reports and testimony from experts, and would have persisted throughout the litigation. Also, had the Court or a jury sided with Defendants on any one or more of their loss causation challenges, the Class would have recovered a far inferior recovery, or even no recovery whatsoever.

61.     On July 6, 2020, Defendants produced the documents Dr. Juneja relied upon in her expert rebuttal report, and on July 16, 2020, Lead Counsel took Dr. Juneja's deposition.

62.     At the time that the Parties agreed in principle to the Settlement, Lead Plaintiffs and Lead Counsel were in the process of finalizing their class certification reply brief and Mr. Coffman's supplemental expert report, which were due to be filed on August 7, 2020.

F.      **Defendants' Motion for Partial Reconsideration**

63.     On February 24, 2020, Defendants filed a Motion for Partial Reconsideration of the Court's Order Denying the Motion to Dismiss, and amended this motion on February 27, 2020 (the "Motion for Reconsideration," ECF Nos. 90, 91).  Defendants asked the Court to reconsider its reservation of judgment and to dismiss Plaintiffs' claims concerning the Illegality Statements.  Defendants argued that dismissal was appropriate because the DOJ had determined that it would not intervene in a related *qui tam* action that was later voluntarily dismissed.

64.     Defendants argued that the Illegality Statements comprised roughly 80% of Plaintiffs' allegations, and spanned a much longer class period than the five Steering Statements (17 months versus 32 months). Defendants argued that a ruling dismissing those statements would substantially narrow the scope of the case and discovery, reduce potential damages, simplify the issues to be tried, and speed up resolution of the case.

65.     On April 10, 2020, Lead Plaintiffs' filed their opposition to the Motion for Reconsideration.  ECF No. 99.  On May 1, 2020, Defendants filed their reply brief in further support of the Motion for Reconsideration and that Motion was *sub judice* before the Court at the time the Settlement was reached.  Had Defendants prevailed, the Class's recoverable damages could have been virtually eliminated and, even if that Motion was denied, the fact that no government entity has found DaVita's conduct to be illegal would have remained a looming threat for the remainder of the litigation.

III.    <u>**THE SETTLEMENT IS FAIR, ADEQUATE AND REASONABLE**</u>

66.     As set forth in the Final Approval Motion filed contemporaneously herewith, the Settlement is fair, adequate, and reasonable in light of the exceptional and historic recovery; the unique risks and difficulties that the Action presented to Plaintiffs; the extensive litigation efforts

expended by Lead Plaintiffs and Lead Counsel over the course of four years of vigorous litigation; the arm's-length settlement negotiations conducted by the Parties; and the overwhelmingly positive reaction of the Settlement Class.  As set forth below and in the Final Approval Motion, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement readily meets all of the relevant factors that courts in the Tenth Circuit consider under Rule 23(e)(2) and *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1188 (10th Cir. 2002).

### A.  Mediation Sessions with Judge Layn R. Philips (Ret.)

67.     The Settlement is the product of arm's-length negotiations among experienced and well-informed counsel, and were conducted in the utmost good faith.  In a total of six mediation sessions, the Parties and Defendants' directors and officers liability insurers ("Insurers"), engaged in vigorous negotiations regarding a potential resolution of the Action, which are described below.[3]

68.     After the Court issued its order denying Defendants' motion to dismiss, the Parties agreed to begin exploring the possibility of resolving the Action. To that end, the Parties engaged former Federal Judge Layn R. Phillips, who sat by designation on the Tenth Circuit, to facilitate a series of settlement negotiations. *See* Ex. A (Declaration of Former United States District Court Judge Layn R. Phillips).  Judge Phillips has extensive experience overseeing negotiations of complex securities class actions.  For example, Judge Phillips assisted in the successful resolution of securities class actions involving Bank of America ($2.425 billion settlement); Merrill Lynch residential mortgage-backed securities ($315 million settlement); Williams ($311 million settlement); WellCare ($200 million settlement); Bank of New York

---

[3] The Parties' mediation sessions are discussed below for the purpose of describing key events in this Action, and do not constitute a waiver of any privilege (including the mediation privilege), doctrine, law, or rule protecting information from disclosure.

Mellon ($180 million settlement); Wells Fargo residential mortgage-backed securities ($125 million settlement); and many others.

69.     On September 25, 2019, the Parties met in New York, New York, for their first mediation session with Judge Phillips.   In preparation for that mediation, Judge Phillips requested, and the Parties exchanged, detailed mediation briefs detailing the relevant facts and analyses concerning falsity, scienter, loss causation and damages. In addition, after reviewing those submissions, Judge Phillips sought additional information from Lead Plaintiffs and Plaintiffs prepared a response further detailing their claims and positions, which they shared with Judge Phillips at the mediation.

70.     During the September 25, 2019 mediation session, Lead Plaintiffs shared their positions and conveyed to Judge Phillips their understanding of the strengths and weaknesses of the claims and defenses in this Action, as well as potential sources of recovery.  However, at the conclusion of this mediation session, it was clear that the Parties maintained highly divergent views on the strengths and weaknesses of their claims and defenses, as well as the settlement value of the Action.   With no settlement in sight, discovery progressed, and no follow-up mediation sessions were scheduled at that time.

71.     After significant additional litigation and discovery efforts over the course of the following nine months, on June 8 and 9, 2020, the Parties participated in two additional mediation sessions before Judge Phillips. Prior to those mediation sessions, each side again submitted comprehensive mediation statements and materials setting forth their respective positions on various highly disputed legal and factual issues, but this time benefitted by the factual record developed through extensive discovery.   The Parties also provided detailed presentations to each other, the Insurers and Judge Phillips concerning their respective views on

liability, loss causation and damages. At the conclusion of the second and third mediation sessions, the Parties had yet again reached an impasse. Given that the Parties had not reached agreement on a resolution, the Parties agreed to continue litigation and also agreed to continue discussions towards a possible settlement.

72.     The Parties attended an additional mediation session on Saturday, June 13, 2020. At the conclusion of this fourth mediation session, the negotiations once again broke down and the Parties determined to continue to litigate the Action. No other mediation sessions were scheduled at that time.

73.     The Parties re-engaged in settlement discussions with a fifth mediation session presided over by Judge Phillips on July 16, 2020. While the Parties did not reach agreement on a resolution of the Action during this session, the Parties agreed to continue settlement discussions. To that end, the Parties engaged in a sixth mediation session on Sunday, July 19, 2020. The Parties made additional presentations concerning their respective views of the Action. At the conclusion of this sixth mediation session, the Parties again had not reached an agreement on the resolution of the Action, but continued discussions with Judge Phillips.

74.     The following day, on July 20, 2020, Judge Phillips issued a mediator's proposal to resolve the Action for $135 million and the negotiation of customary terms and conditions. The Parties accepted the mediator's proposal on the evening of July 20, 2020.

75.     Significantly, the Settlement Amount is not only comprised of the proceeds from Defendants' insurance tower, but also includes a monetary contribution from Defendant DaVita—a rare occurrence in securities class actions that underscores the exceptional nature of the recovery and the tenacity of Lead Counsel's advocacy.

### B.     The Settlement Agreement and Preliminary Approval

76.     After accepting the mediator's proposal, the Parties engaged in extensive negotiations regarding the material terms of the Stipulation; the Supplemental Agreement under which Defendants may terminate the Settlement if requests for exclusion from the Settlement Class reach a certain threshold—generally called a "blow provision"; and various supporting documents, including proposed Class notices and proposed orders for the Court.

77.     On September 18, 2020, Lead Plaintiffs filed its motion for preliminary approval of the proposed Settlement, along with the Stipulation and its exhibits. ECF No. 103. On October 27, 2020, the Court granted Lead Plaintiffs' motion for preliminary approval of the Settlement, conditionally certified the Settlement Class for settlement purposes, and authorized Notice for the proposed Settlement to be sent to potential members of the Settlement Class (the "Preliminary Approval Order," ECF No. 104).

### C.     Reasons for the Settlement

78.     The Settlement provides the Settlement Class with an immediate and certain cash benefit of $135 million, which not only is the second highest cash recovery in any securities class action in the history of this District, but also represents an exceptionally high percentage of the maximum likely recoverable damages for the Class.

79.     Lead Plaintiffs and Lead Counsel fully endorse the Settlement. *See* Exs. B and C, ¶¶8-10 (Lead Plaintiffs' Declarations). Lead Plaintiffs are sophisticated institutional investors who have actively overseen the prosecution of this Action for four years and both understand and have executed their fiduciary duty to act in the best interest of the Settlement Class.  Lead Counsel, Saxena White, specializes in complex securities class action litigation, and is highly experienced in such litigation. *See* Ex. F (Ex. 3) (Saxena White firm resume). Based on their

experience and knowledge of the facts and applicable law in this Action, Lead Counsel and Lead

Plaintiffs have determined that the Settlement is in the best interest of the Settlement Class.

80.     Although Lead Plaintiffs and Lead Counsel believe that the claims asserted in this

Action are meritorious, continued litigation against Defendants posed significant risks that made

recovery in any amount uncertain. For example, Plaintiffs were aware of the significant

challenges Defendants raised in their Motion for Reconsideration, opposition to Plaintiffs'

motion for class certification, and mediation statements on the key issues of falsity, scienter, loss

causation, and damages. Indeed, although Lead Plaintiffs were initially successful at the motion

to dismiss stage, the Court did not resolve several key issues regarding falsity, scienter and loss

causation, and the attendant risks concerning these issues did and would have continued to

resurface at every subsequent stage of the litigation—on reconsideration, class certification,

summary judgment, at trial, and on appeal. Had any of these arguments been accepted in whole

or in part, any potential recovery would have been dramatically reduced or eliminated altogether.

81.     Moreover, even if Lead Plaintiffs had prevailed at trial, Plaintiffs were further

aware that Defendants' damages expert had calculated maximum possible damages far below the

maximum aggregate damages that Lead Plaintiffs' expert had calculated—including credible

scenarios that the Class's maximum damages were well below $100 million, or even that the

Class had suffered no cognizable damages as a result of Plaintiffs' allegations—which

undoubtedly would have resulted in a "battle of the experts" at trial with no certainty of which

expert the jury would credit. Thus, there were very significant risks to the continued prosecution

of the Action against Defendants.

82.     The Settlement eliminates these substantial risks and guarantees the Settlement Class a favorable cash recovery. Lead Counsel firmly believes that settling the Action with Defendants at this stage of the litigation is in the best interest of the Settlement Class.

**D.     Notice to the Settlement Class**

83.     As required by the Court's Preliminary Approval Order, beginning on November 25, 2020, Lead Plaintiffs, through the Court-approved Claims Administrator Epiq Class Action & Claims Solutions, Inc. ("Epiq"), notified potential members of the Settlement Class of the Settlement by mailing a copy of the Notice to potential members of the Settlement Class and their nominees. *See* ECF Nos. 106 and 106-1; Ex. D (Supplemental Declaration of Matthew Mulvihill, hereafter "Epiq Supplemental Declaration").

84.     Epiq used several resources of data to reasonably identify members of the Settlement Class. For example, under the Preliminary Approval Order, DaVita was required to provide Epiq records reasonably available to DaVita or its transfer agent concerning the identity and last known address of Settlement Class Members. *See* ECF No. 104.  DaVita also sent the Notice to entities identified on a proprietary list maintained by Epiq of the most common banks, brokers, and other nominees. *See* ECF Nos. 106 and 106-1. In total, 132,884 copies of the Notice Packet were mailed as part of the initial mailing. *See* Ex. D at ¶4.

85.     The Court-approved Notice also requires brokers/nominees, within ten business days, to either (i) request additional copies of the Notice to send to the beneficial owners of the securities, or (ii) to provide to Epiq the names and addresses of such persons.

86.     In the aggregate, as of February 23, 2021, Epiq has disseminated 132,884 copies of the Notice to potential members of the Settlement Class and their nominees.  *See* Ex. D at ¶4.

87.     In addition, on December 7, 2020, the Summary Notice was published through *Investor's Business Daily* and over *PR Newswire*. Information regarding the Settlement, including copies of the Notice and Claim Form, was posted on the website established by Epiq specifically for this Settlement, and on Lead Counsel's website. *See* ECF No. 106-1. This method of giving notice, previously approved by the Court, is appropriate because it directs notice in a "reasonable manner to all class members who would be bound by the [proposed] judgment." Fed. R. Civ. P. 23(e)(1).

88.     The Notice advises members of the Settlement Class of the essential terms of the Settlement, sets forth the procedure for objecting to or opting out of the Settlement, and provides specifics on the date, time, and place for the final approval hearing.

89.      The Notice also contains information regarding Lead Counsel's fee and expense application and the proposed Plan of Allocation.  As explained in the Final Approval Motion, the Notice fairly apprises members of the Settlement Class of their rights with respect to the Settlement, and therefore is the best notice practicable under the circumstances, and complies with the Court's Preliminary Approval Order, Rule 23 of the Federal Rules of Civil Procedure, and due process.

90.     As discussed in the Final Approval Motion, the February 16, 2021 deadline for objections to, or exclusions from, the Settlement has now passed, and no Settlement Class Member has objected to any aspect of the Settlement, and only a single exclusion request submitted on behalf of an individual investor with 1,425 shares was received.   This overwhelmingly positive response from the Settlement Class wholly supports final approval.

### E.     The Plan of Allocation

91.     Lead Plaintiffs have proposed a plan to allocate the proceeds of the Settlement Fund among members of the Settlement Class who submit valid proofs of claim. The objective of the proposed Plan of Allocation (the "Plan") is to equitably distribute the Settlement proceeds, on a *pro rata* basis, to those members of the Settlement Class who suffered economic losses as a result of Defendants' alleged misrepresentations and omissions.

92.     Lead Plaintiffs engaged Global Economics Group, LLC as an expert to assist in formulating the Plan. In developing the Plan, Lead Plaintiffs' expert calculated the amount of estimated artificial inflation in the per share closing price of DaVita common stock that was allegedly proximately caused by Defendants' false and misleading statements. In so doing, Lead Plaintiffs' expert considered price changes in DaVita common stock in reaction to the alleged corrective disclosures, adjusting for any price changes attributable to market or industry forces.

93.     The Notice set forth and explained the proposed Plan of Allocation to members of the Settlement Class. It was prepared in consultation with Lead Plaintiffs' expert, tracks a theory of damages asserted by Lead Plaintiffs, is substantially similar to numerous other plans that have been approved in this District and around the country, and is fair, reasonable, and adequate to the Settlement Class as a whole.

94.     In response to over 132,884 Notices, there have been no objections to the proposed Plan of Allocation, further underscoring its propriety.

## IV.     LEAD PLAINTIFFS' APPLICATION FOR PLAINTIFFS' COUNSEL'S ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

95.     In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Plaintiffs also submit the Fee and Expense Motion, which requests approval of their application to the Court, on behalf of Plaintiffs' Counsel, for an award of attorneys' fees and

reimbursement of litigation expenses. Specifically, Lead Plaintiffs are applying for a fee of 30% of the Settlement Fund to be paid from the Settlement Fund. Lead Plaintiffs also request reimbursement of $547,409.27 in litigation expenses, also to be paid from the Settlement Fund. Lead Counsel further requests the reimbursement of their time and costs related to representation of the Class to each Lead Plaintiff, in accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(4).

96.     In support of these applications, Plaintiffs' Counsel has submitted the attached Declaration of Joseph E. White, III in Support of Lead Plaintiffs' Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses, Filed on Behalf of Saxena White P.A ("Saxena White Declaration," Ex. F), and the attached Declaration of Rusty Glenn in Support of Lead Plaintiffs' Motion for Attorneys' Fees and Litigation Expenses, Filed on Behalf of Shuman, Glenn & Stecker ("Shuman Declaration," Ex. G).

97.     Plaintiffs' Counsel's Declarations list the lodestar of Lead and Liaison Counsel, including the amount of time spent by each attorney and professional support staff member on the case.  In accordance with D.C.COLO.LCivR 54.3, the Declarations provide a breakdown of the principal tasks that each attorney performed, as well as brief biographies for each timekeeper, including information about his or her position, education, and relevant experience.   The declarations also describe the expenses for which Plaintiffs' Counsel seek reimbursement.

98.     Lead Plaintiffs support Plaintiffs' Counsel's fee request.  *See* Exs. B and C, ¶¶11-14.  The support and approval of court-appointed lead plaintiffs weighs heavily in favor of approval of a fee request.  *See, e.g., In re Veeco Instruments Inc. Sec. Litig.,* 2007 WL 4115808, at *8 (S.D.N.Y. Nov. 7, 2007) ("[P]ublic policy considerations support the award in this case because the Lead Plaintiff ... —a large public pension fund—conscientiously supervised the work of lead counsel and has approved the fee request[.]"); *In re Genworth Fin. Sec. Litig.,* 2016

WL 7187290, at *2 (E.D. Va. Sept. 26, 2016) ("Lead Plaintiffs are sophisticated institutional investors that have been directly and extensively involved in the prosecution and resolution of the Action and have a substantial interest in ensuring that any fees paid to the Plaintiffs' Counsel are duly earned and not excessive.").

99.    Plaintiffs' Counsel's request for a fee based on a percentage of the Settlement Fund is in line with the most typical method of awarding attorney fees in securities and other complex class actions in the Tenth Circuit and in federal courts nationwide.  This method of calculating Plaintiffs' Counsel's fee is favored because it aligns the attorneys' interest in being paid a fair fee with the interest of the Settlement Class in achieving the maximum recovery efficiently and in the shortest amount of time.

100.    As set forth in the Fee and Expense Motion, courts in the Tenth Circuit are guided by the *Johnson* factors in evaluating fee awards, which include: (1) the time and labor required by counsel; (2) the novelty and difficulty of the legal question presented; (3) the skill required to represent the class appropriately; (4) the preclusion of other employment by the attorneys due to the acceptance of this case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) any time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *See Diaz v. Lost Dog Pizza, LLC*, 2019 WL 2189485, at *5 (D. Colo. May 21, 2019) (Martínez, J.) (citing *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1979)).

101.    Based on consideration of these factors as set forth below, and on the additional legal authorities set forth in the Fee and Expense Motion, Lead Plaintiffs and Lead Counsel respectfully submit that the requested 30% fee is fair and reasonable, and should be granted.

### A.    The Significant Time and Labor Devoted by Plaintiffs' Counsel

102.    As described further *supra*, Lead Counsel engaged in an exhaustive and comprehensive investigation and drafted a 111-page amended Complaint, and successfully opposed Defendants' motion to dismiss.   Lead Counsel engaged in extensive discovery negotiations, including multiple meet-and-confers with Defendants and third parties and exchanged substantial amounts of contentious correspondence.   Lead Counsel reviewed and analyzed approximately 845,000 pages of documents, and consulted with economics, health care and tax experts to better understand the issues in the case.   Lead Counsel also opposed Defendants' Motion for Reconsideration, were in the process of fully briefing their motion for class certification, deposed Defendants' class certification expert, and defended depositions of their own expert as well as representatives of each Lead Plaintiff.  In total, Plaintiffs' Counsel expended over 31,000 hours litigating this matter.

103.    Thus, the prosecution of the Action was significantly labor-intensive, and as is often the case with complex securities class actions, the attorneys involved would routinely have to spend significant stretches of time focusing exclusively or near-exclusively on litigating this Action.  Accordingly, Lead Counsel's extensive litigation efforts fully support the requested fee.

### B.    The Risks and the Difficulty of Questions Raised by the Litigation

104.    The risks undertaken and difficulties presented in a complex securities class action such as this one favor approval of the requested fee award.

105.    Indeed, as discussed herein and in the Fee Memorandum, the Court withheld judgment on 22 of the 27 misstatements at issue in the Action, or over 80% of Plaintiffs' case,

because they were purportedly predicated on a finding that DaVita's conduct was illegal.  After the DOJ declined to intervene in a related *qui tam* action, Defendants argued that the "illegality" misstatements should be dismissed because the only purported basis for a finding of illegality was now gone, and to date, no regulator or government agency has found that DaVita's steering conduct was illegal.

106.    Furthermore, Defendants argued that the Class Period should be cut from 32 months down to only 17 months because, among other reasons, the truth regarding DaVita's steering practices was purportedly fully disclosed approximately one year before the end of the Class Period on October 31, 2016, after which DaVita's stock price increased rather than decreased in value.  *See* ECF No. 102 at 23.  In addition, Defendants argued that Plaintiffs would not be able to establish loss causation for the vast majority of the eight corrective disclosures alleged in the Complaint—an issue that the Court did not fully adjudicate in its order denying Defendants' motion to dismiss.  Defendants argued that several corrective disclosures were not attributable to the alleged fraud, but rather to non-fraudulent, confounding information or the disclosure of information that was already known to the market.  Accordingly, loss causation was a significant risk that could have dramatically reduced the value and ultimate recovery in the Action.

107.    Whether at reconsideration, class certification, summary judgment, or trial, had Defendants succeeded in these arguments, the pool of available damages would be a small fraction of what it was at the time of the Settlement, meaning that Lead Counsel would earn at best a small fraction of the requested fee award for its substantial work and time.  Similarly, at trial, a jury could have dramatically reduced the available damages by finding that only a part of the stock drop after the several disclosures was a result of the fraud.

108.    Accordingly, the risks and difficult questions of fact and law presented in this litigation firmly support the requested fee award.

### C.    The Outstanding Result Achieved Supports the Requested Fee Award

109.    The $135 million Settlement achieved in this Action is an outstanding result for the Class by any measure.  The Settlement is the second largest all-cash settlement ever achieved in a securities class action in this District, the largest all-cash securities class action settlement achieved in this District in the last ten years, and among the top five such settlements in the history of the Tenth Circuit. Indeed, in Colorado, the Settlement ranks behind only the $445 million settlement obtained in *In re Qwest Commc's Int. Inc., Sec. Litig*, No. 01-cv-1451—a case in which the corporate defendant admitted it had overstated $2.3 billion in revenue over a two-year period; the company's CEO, CFO, and five other senior executives were convicted of, or pled guilty to, criminal fraud and insider trading (with the CEO receiving a lengthy prison sentence); and estimated damages were upwards of $90 billion. Here, by contrast, there have been no convictions or admissions of wrongdoing, much less civil or criminal guilty pleas, by DaVita or any of the Individual Defendants, and no regulator has taken any formal action against DaVita over the steering conduct challenged in this Action.

110.    As elaborated further in the Fee Memorandum, the $135 million Settlement represents from 31% to 43% of likely maximum damages—an exceptionally high percentage, and far more than the typical recovery achieved in a securities class action.

111.    Significantly, this remarkable recovery for investors not only includes the proceeds of Defendants' insurance tower, but also includes a substantial monetary contribution by Defendant DaVita—a rare occurrence in securities litigation that further supports the requested fee award.  *See In re Genworth Fin. Sec. Litig.*, 210 F. Supp. 3d 837, 842 (E.D. Va.

2016) (company's contribution "of its own cash to the Settlement" "strongly demonstrated the adequacy of the Settlement amount").

112.     Accordingly, as elaborated more fully in the Fee Memorandum, the outstanding recovery obtained in the Settlement wholly supports the requested fee.

### D.     A 30% Fee Award is Customary and in Accordance with Other Similar Cases in this District and the Tenth Circuit

113.     As set forth more fully in the Fee Memorandum, "[c]ourts in the Tenth Circuit have noted that the typical fee award in complex cases is around ***one third of the common fund***." *Crocs*, 2014 WL 4670886, at *3; *see also Diaz*, 2019 WL 2189485, at *5 ("33% fee award falls within the norm").

114.     Lead Counsel's request for an award of 30% of the Settlement Fund is inherently reasonable given that it is well in line with fees recently awarded in similar securities and other complex class actions in this District, Circuit, and around the country.  *See, e.g., In re Syngenta AG MIR 162 Corn Litig.*, 357 F. Supp. 3d 1094, 1114 (D. Kan. 2018) (awarding 33.3% fee of $1.51 billion settlement); *Cook v. Rockwell International Corp.*, 2017 WL 5076498, at *4 n.6 (D. Colo. Apr. 28, 2017) (awarding 40% fee of $150 million settlement and collecting cases with similar percentage awards in megafund cases); *Tennille v. W. Union Co.*, 2014 WL 5394624, at *4 (D. Colo. Oct. 15, 2014) (30% fee on $135 million settlement); *In re Oppenheimer Rochester Funds Grp. Sec. Litig.*, 2014 WL 12768451, at *2 (D. Colo. July 31, 2014) ("fee award of 30% of [$89.5 million settlement] is consistent with awards made within this District and in similar cases"); *Schuh v. HCA Holdings, Inc.,* 2016 WL 10570957, at *1 (M.D. Tenn. Apr. 14, 2016) (awarding 30% of $215 million settlement considering, among other things, that "the awarded fee is in accord with Sixth Circuit authority and consistent with other fee awards in cases of this size"); *City of Pontiac Gen. Emps.' Ret. Sys. v. Wal-Mart Stores, Inc*., 2019 WL 1529517, at *2

(W.D. Ark. Apr. 8, 2019) (awarding 30% fee of $160 million settlement and finding that "the amount of attorneys' fees is consistent with awards in cases that achieved less-significant class recoveries and supported by public policy"); *In re Apollo Grp. Inc. Sec. Litig.*, 2012 WL 1378677, at *9 (D. Ariz. Apr. 20, 2012) (awarding fee of 33% of $145 million recovery).

115. Indeed, the following chart demonstrates that the requested fee is firmly in line with fees awarded in comparable securities and other complex class actions by courts in the District of Colorado and other District courts within the Tenth Circuit:

| TENTH CIRCUIT<br>Comparable Securities and Other Complex Class Actions | Settlement Amount | Fee Award |
|---|---|---|
| *Cook v. Rockwell International Corporation*, 2017 WL 5076498, at *1 (D. Colo. Apr. 28, 2017) (Kane, J.) | $375,000,000 | 40% |
| *Blanco v. Xtreme Drilling & Coil Servs., Inc.*, 2020 WL 4041456, at *4 (D. Colo. July 17, 2020) (Brimmer, J.) | $850,000 | 38% |
| *Davis v. Crilly*, 292 F. Supp. 3d 1167, 1174 (D. Colo. 2018) (Arguello, J.) | $2,180,000 | 37% |
| *Hill v. Kaiser-Francis Oil Co.*, 2013 WL 12090048, at *3 (W.D. Okla. July 30, 2013) | $35,330,000 | 35% |
| *Prim v. Ensign United States Drilling, Inc.*, 2019 WL 4751788, at *6 (D. Colo. Sept. 30, 2019) (Brimmer, J.) | $815,000 | 35% |
| *In re Urethane Antitrust Litig.*, 2016 WL 4060156, at *8 (D. Kan. July 29, 2016) | $835,000,000 | 33.3% |
| *Hershey v. ExxonMobil Oil Corp.*, 2012 WL 5306260, at *7 (D. Kan. Oct. 26, 2012), aff'd in part, dismissed in part, 550 F. App'x 566 (10th Cir. 2013) | $55,000,000 | 33.3% |
| *In re California Municipal Fund,* Master Docket No. 09-md-02063-JLK-KMT, ECF No. 710 at 4 (D. Colo. Nov. 6, 2017) (Kane, J.) | $50,750,000 | 33.3% |
| *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 2011 WL 1808038, at *2-3 (D. Kan. May 12, 2011) | $16,477,958 | 33.3% |
| *Hitch Enterprises, Inc. v. Cimarex Energy Co.*, 2013 WL 12090055, at *3 (W.D. Okla. July 2, 2013) | $16,400,000 | 33.3% |
| *Angres v. Smallworldwide PLC*, No. 1:99-cv-01254, ECF No. 118 (D. Colo. June 17, 2003) (Kane, J.) | $9,850,000 | 33.3% |
| *Friedman v. Quest Energy Partners LP*, 2010 WL 4925133, at *5 (W.D. Okla. Nov. 29, 2010) | $9,090,000 | 33.3% |
| *Droegmueller v. Petroleum Dev. Corp.*, 2009 WL 961539, at *5 (D. Colo. Apr. 7, 2009) (Kane, J.) | $8,040,493 | 33.3% |
| *In re Anadarko Oil & Gas Lease Antitrust Litig.*, 2019 WL 1867446, at *1 (W.D. Okla. Apr. 25, 2019) | $6,950,000 | 33.3% |
| *Shaw v. Interthinx, Inc.*, 2015 WL 1867861, at *8 (D. Colo. Apr. 22, 2015) (Blackburn, J.) | $6,000,000 | 33.3% |
| *Braver v. Northstar Alarm Servs., LLC*, 2020 WL 6468227, at *4 (W.D. | $1,850,000 | 33.3% |

| TENTH CIRCUIT<br>Comparable Securities and Other Complex Class Actions | Settlement Amount | Fee Award |
|---|---|---|
| Okla. Nov. 3, 2020) | | |
| *McClintock v. Continuum Producer Servs., LLC,* 2020 WL 5524790, at *2 (E.D. Okla. May 19, 2020), | $900,000 | 33.3% |
| *Ramos v. Banner Health*, 2020 WL 6585849, at *5 (D. Colo. Nov. 10, 2020) (Martínez, J.) | $500,000 | 33.3% |
| *Shaulis v. Falcon Subsidiary LLC*, 2018 WL 4620388, at *2 (D. Colo. Sept. 26, 2018) (Arguello, J.) | $595,000 | 33.3% |
| *In re Syngenta AG MIR 162 Corn Litig.*, 357 F. Supp. 3d 1094, 1100 (D. Kan. 2018) | $1.51 billion | 33.3% |
| *Campbell v. C.R. England, Inc*., 2015 WL 5773709, at *6 (D. Utah Sept. 30, 2015) | $5,000,000 | 33.3% |
| *Koehler v. Freightquote.com, Inc*., 2016 WL 3743098, at *4 (D. Kan. July 13, 2016) | $5,000,000 | 33% |
| *United Food and Comm'l Workers Union and Participating ... v. Advanced Emissions Solutions, Inc*., 2017 WL 11368197, at *1 (D. Colo. Feb. 10, 2017) (Arguello, J.) | $3,950,000 | 33% |
| *Nakkumpun v. Taylor*, 2016 WL 11724397, at *5 (D. Colo. June 13, 2016) (Arguello, J.) | $3,200,000 | 33% |
| *Whittington v. Taco Bell of Am., Inc*., 2013 WL 6022972, at *6 (D. Colo. Nov. 13, 2013) (Tafoya, Mag.) | $2,490,000 | 33% |
| *Freebird, Inc. v. Merit Energy Co*., 2013 WL 1151264, at *5 (D. Kan. Mar. 19, 2013) | $8,153,908 | 31% |
| *Farley v. Family Dollar Stores, Inc*., 2014 WL 5488897, at *4 (D. Colo. Oct. 30, 2014) (Moore, J.) | $2,300,000 | 30.3% |
| *Chieftain Royalty Co. v. QEP Energy Co*., 2013 WL 12090676, at *3 (W.D. Okla. May 31, 2013) | $155,000,000 | 30% |
| *Tennille v. Western Union Co*., 2014 WL 5394624, at *4 (D. Colo. Oct. 15, 2014) aff'd 809 F.3d 555 (10th Cir. 2015) | $135,000,000 | 30% |
| *In re Oppenheimer Rochester Funds*, 2014 WL 12768451, at *2 (D. Colo. July 31, 2014) (Kane, J.) | $89,500,000 | 30% |
| *In re: Westar Energy, Inc. Securities Litigation*, 2005 WL 8153009, at *3 (D. Kan. Sept. 1, 2005) | $30,000,000 | 30% |
| *In re Molycorp, Inc. Securities Litigation*, 2017 WL 11598681, at *2 (D. Colo. June 16, 2017) (Moore, J.) | $20,500,000 | 30% |
| *In re Rhythms Securities Litigation*, 2009 WL 10690662, at *4 (D. Colo. Apr. 3, 2009) (Kane, J.) | $17,500,000 | 30% |
| *In re Crocs, Inc. Securities Litigation*, 2014 WL 4670886, at * 5 (D. Colo. Sept. 18, 2014) (Brimmer, J.) | $10,000,000 | 30% |
| *In re Sun Healthcare Group Inc. Sec. Litig.* (Sun Healthcare Group II), 6:99-cv-00269-MV-LCS, ECF No. 116 at 1 (D. N.M. Dec. 13, 2004) | $5,000,000 | 30% |

116.     Similarly, a review of fee awards in securities and other complex class action settlements from around the country likewise supports the reasonableness of the fee request here:

| NATIONWIDE Comparable Securities and Other Complex Class Actions | Settlement Amount | Fee Award |
|---|---|---|
| *Haddock v. Nationwide Life Ins. Co.,* No. 3:01-cv-01552-SRU ECF No. 601 (D. Conn. Apr. 9, 2015) | $140 million | 35% |
| *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 505 (S.D.N.Y. 2009) | $586 million | 33.3% |
| *In re U.S. Foodservice, Inc. Pricing Litig.*, 2014 WL 12862264, at *3 (D. Conn. Dec. 9, 2014) | $297 million | 33.3% |
| *Osberg v. Foot Locker, Inc.*, No. 07-cv-01358-AT, ECF No. 423 (S.D.N.Y. June 6, 2018) | $290 million | 33.3% |
| *Hale v. State Farm Mut. Auto Ins. Co.*, 2018 WL 6606079, at *16 (S.D. Ill. Dec. 16, 2018) | $250 million | 33.3% |
| *In re Tricor Direct Purchaser Antitrust Litig.*, No. 1:05-cv-00340-SLR, ECF No. 543, (D. Del. Apr. 23, 2009) | $250 million | 33.3% |
| *DeLoach v. Phillip Morris Co.*, 2003 WL 23094907, at *1, 11 (M.D.N.C. Dec. 19, 2003) | $212 million | 33.3% |
| *In re Titanium Dioxide Antitrust Litig.,* 2013 WL 6577029, at *1 (D. Md. Dec. 13, 2013) | $163.5 million | 33.3% |
| *In re Flonase Antitrust Litig.,* 951 F. Supp. 2d 739, 746 (E.D. Pa. 2013) | $150 million | 33.3% |
| *In re Apollo Group Inc. Sec. Litig.,* 2012 WL 1378677, at *7 (D. Ariz. Apr. 20, 2012) | $145 million | 33.3% |
| *In re: Southeastern Milk Antitrust Litig.,* 2012 WL 12875983, at *6 (E.D. Tenn. July 11, 2012) | $140 million | 33.3% |
| *In re Loestrin 24 Fe Antitrust Litig.,* 2020 WL 4035125, at 6-7 (D. R.I. July 17, 2020) | $120 million | 33.3% |
| *Cabot East Broward 2 LLC v. Cabot*, 2018 WL 5905415, at *2, 9 (S.D. Fla. Nov. 9, 2018) | $100 million | 33.3% |
| *In re Prograf Antitrust Litig.,* No. 11-md-2242, ECF No. 678 (D. Mass. May 20, 2015) | $98 million | 33.3% |
| *In Re Celebrex (Celecoxib) Antitrust Litigation*, 2018 WL 2382091, at *5 (E.D. Va. Apr. 18, 2018) | $94 million | 33.3% |
| *Landmen Partners Inc. v. Blackstone Grp.*, 2013 WL 11330936, at *3 (S.D.N.Y. Dec. 18, 2013) | $85 million | 33.3% |
| *Gutter v. E.I. Dupont De Nemours & Co.*, No. 1:95-cv-02152, ECF No. 626 at 7 (S.D. Fla. May 30, 2003) | $77.5 million | 33.3% |
| *In re J.P. Morgan Stable Value Fund ERISA Litig.*, 2019 WL 4734396, at *6 (S.D.N.Y. Sep. 23, 2019) | $75 million | 33.3% |
| *In re Remeron Direct Purchaser Antitrust Litig.*, 2005 WL 3008808, at *17 (D.N.J. Nov. 9, 2005) | $75 million | 33.3% |
| *In re Skelaxin (Metaxalone) Antitrust Litig.,* 2014 WL 2946459, at *3 (E.D. Tenn. June 30, 2014) | $73 million | 33.3% |
| *In re Solodyn Antitrust Litig.,* 2018 WL 7075881, at *2 (D. Mass. July 18, 2018) | $72.5 million | 33.3% |
| *Krakauer v. Dish Network*, 2019 WL 7066834, at *7 (M.D.N.C. | $61.3 million | 33.3% |

| NATIONWIDE<br>Comparable Securities and Other Complex Class Actions | Settlement Amount | Fee Award |
|---|---|---|
| Dec. 23, 2019) | | |
| *Erica P. John Fund, Inc. v. Halliburton Co.*, 2018 WL 1942227, at *17 (N.D. Tex. Apr. 25, 2018) | $100 million | 33.3% |
| *Standard Iron Works v. ArcelorMittal,* 2014 WL 7781572, at *1 (N.D. Ill. Oct. 22, 2014) | $163.9 million | 33% |
| *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1204 (S.D. Fla. 2006) | $1.06 billion | 31.3% |
| *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 149692, at *1 (N.D. Cal. Jan 14, 2013), 2011 WL 7575003, at *1 (N.D. Cal. Dec. 27, 2011) | $473 million | 30% |
| *In re (Bank of America) Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1366 (S.D. Fla. 2011) | $410 million | 30% |
| *Schuh v. HCA Holdings, Inc.,* 2016 WL 10570957, at *1 (M.D. Tenn. Apr. 14, 2016) | $215 million | 30% |
| *In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *15-16 (E.D. Pa. June 2, 2004) | $202.5 million | 30% |
| *In re (Chase Bank) Checking Account Overdraft Litig.*, No. 1:09-md-02036, ECF No. 3134 (S.D. Fla. Dec. 19, 2012) | $162 million | 30% |
| *City of Pontiac General Employees' Retirement System v. Walmart Stores, Inc.,* 2019 WL 1529517, at *1 (W.D. Ark. Apr. 8, 2019) | $160 million | 30% |
| *In re Polyurethane Foam Antitrust Litig.*, 2015 WL 1639269, at *7 (N.D. Ohio Feb. 26, 2015) | $147.8 million | 30% |
| *In re (Citizens Bank) Checking Account Overdraft Litig.*, No. 1:09-md-02036, ECF No. 3331 (S.D. Fla. Mar. 12, 2013) | $137.5 million | 30% |
| *In re Regions Morgan Keegan Secs., Deriv., and ERISA Litig.,* 2016 WL 8290089, at *8 (W.D. Tenn. Aug. 2, 2016) | $125 million | 30% |
| *In re Dole Food Co., Inc. Stockholder Litig.*, 2016 WL 541917 (Del. Ch. Feb. 10, 2016) | $113 million (approx..) | 30% |
| *In re Ikon Office Solutions, Inc. Sec. Litig.,* 194 F.R.D. 166, 197 (E.D. Pa. 2000) | $111 million | 30% |
| *Marcus v. J.C. Penney Company, Inc.,* 2018 WL 11275437, at *1 (E.D. Tex. Jan. 5, 2018) | $97.5 million | 30% |
| *In re Starz Stockholder Litigation*, 2018 WL 6515452, at *4 (Del.Ch. Dec. 10, 2018) | $92.5 million | 30% |
| *Local 703, I.B. of T. Grocery & Food Emps. Welf. Fund v. Regions Fin. Corp.*, 2015 WL 5626414, at *1 (N.D. Ala. Sept. 14, 2015) | $90 million | 30% |
| *In re Rayonier Securities Litigation*, 2017 WL 4542852, at *3 (M.D. Fla. Oct. 5, 2017) | $73 million | 30% |
| *In re: The Bank of New York Mellon ADR FX Litigation*, No. 1:16-cv-00212, ECF No. 161 (S.D.N.Y. June 17, 2019) | $72.5 million | 30% |
| *Anwar v. Fairfield Greenwich Limited,* No. 1:09-cv-00118, ECF No. 1569 (S.D.N.Y. May 6, 2016) | $55 million | 30% |
| *In re HD Supply Holdings, Inc., Securities Litigation,* 2020 WL 8572953, at *1 (N.D. Ga. July 21, 2020) | $50 million | 30% |
| *Shah v. Zimmer Biomet Holdings Inc.*, 2020 WL 5627171, at *13 (N.D. Ind. Sept. 18, 2020) | $50 million | 30% |
| *In re BHP Billiton Limited Securities Litigation*, No. 1:16-cv-01445, ECF No. 139 (S.D.N.Y. Apr. 10, 2019) | $50 million | 30% |

| NATIONWIDE<br>Comparable Securities and Other Complex Class Actions | Settlement Amount | Fee Award |
|---|---|---|
| *KBC Asset Mgmt. v. 3D Systems Corp.*, 2018 WL 3105072, at *1 (D.S.C. June 25, 2018) | $50 million | 30% |

117.   Furthermore, a lodestar "cross-check" also confirms the reasonableness of Lead Counsel's fee request.   As set forth in Exhibits F and G, Plaintiffs' Counsel expended a total of 31,813.60 hours in the investigation, prosecution, and resolution of this Action from inception up through February 16, 2021. The resulting lodestar is $14,717,351.25. In light of this, the requested fee of 30% of the Settlement Fund yields a multiplier of 2.75—which is well within, and indeed at the lower end of, the range of multipliers awarded by courts in this Circuit and around the country in comparable contingent securities class actions.   *See, e.g., DaVita Healthcare Partners*, 2015 WL 3582265, at *5 (multiplier of 3 "in line with the multipliers awarded in similar cases"); *Crocs*, 2014 WL 4670886, at *4 (referencing District cases approving multipliers ranging from 2.5 to 4.6); *Urethane*, 2016 WL 4060156, at *7 (approving 3.2 multiplier in megafund case, finding multipliers of 4 or 5 have been "accepted by a number of courts in megafund cases"); *Marcus v. J.C. Penney Company, Inc*., 2018 WL 11275437, at *2 (E.D. Tex. Jan. 5, 2018) (awarding a 30% fee representing a 3.18 lodestar multiplier in a $97.5 million securities settlement); *Schuh*, 2016 WL 10570957, at *1 (M.D. Tenn. Apr. 14, 2016) (awarding a 30% fee representing 4.3 lodestar multiplier in a $215 million securities settlement).

118.   Furthermore, Plaintiffs' Counsel's hourly rates are the same as, or comparable to, the rates submitted by comparable firms for lodestar cross-checks in other securities class action fee applications that have been granted in this District, Circuit and others.   *See, e.g., Ramos v. Banner Health*, 15-cv-2556, 2020 WL 6585849 (D. Colo. Nov. 10, 2020) (Martínez, J.) and ECF No. 504 (approving rates ranging from $490 to $1,060 per hour); *Crocs*, 2014 WL 4670886, at *4 (approving fee request where hourly rates were "higher than the rates charged by attorneys of

similar skill and experience in the Denver legal market"); *Chieftain Royalty Co. v. Marathon Oil Co.*, 2019 WL 7758915, at *12 (E.D. Ok. Mar. 8, 2019) (recognizing "partner rates ranging from $850 - $1,150 per hour" in shareholder and other complex litigation and citing cases and studies supporting the propriety of such rates).

119.    In addition, while this Court previously expressed concerns regarding non-Denver-based law firm rates in a prior shareholder representative action, the Court ultimately awarded a fee that represented a lodestar multiplier of 3.0 and a blended hourly rate of $600. *See DaVita*, 2015 WL 3582265, at *4-5.   Here, Lead Counsel's fee request represents a lodestar multiplier of just 2.75, and Lead Counsel's blended hourly rate is just $457, which is significantly lower than blended hourly rates approved by this Court and others in the Tenth Circuit.   *See Oppenheimer*, 2014 WL 12768451, at *3 (approving 30% fee request with blended rate of $512 per hour); *Syngenta*, 357 F. Supp. 3d at 1115 (approving 33.3% fee in $1.51 billion settlement with average rate of $500 per hour).

120.    Each attorney that prosecuted this Action performed substantive work that directly benefitted the Settlement Class. The time spent by each attorney was reasonable, non-duplicative, beneficial to effective and efficient litigation, and was important to Lead Counsel's and Lead Plaintiffs' ability to understand the strengths and weaknesses of the case in order to negotiate intelligently and evaluate the Settlement, which ultimately led to the successful and favorable resolution of the case.

### E.    The Contingent Nature of the Fee, the Undesirability of the Action, and Preclusion of Other Employment

121.    As with all contingency fee cases, Plaintiffs' Counsel faced a substantial risk that they would obtain no fee whatsoever.   However, given the magnitude and complexity of this Action, this risk was particularly acute here. From the outset, Lead Counsel understood that they

were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. Indeed, Lead Counsel not only initiated this litigation by filing the initial complaint on behalf of Georgia Peace Officers, but was the only law firm to submit a leadership application at the lead plaintiff stage—a fact that underscores the perceived "undesirability" and difficulty of the Action. Had Saxena White not willingly and vigorously undertaken the responsibility of representing the Class's interests here, the Class would almost certainly have recovered nothing for their claims.

122.   Additionally, securities class actions such as this one are not only time- and labor-intensive, but require substantial up-front cost outlays. In undertaking that responsibility, Lead Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable litigation costs that a case like this requires. Lead Counsel not only had to pay for its standard overhead expenses during the entirety of the litigation, but had to cover costs and expenses, including substantial electronic discovery costs and the fees of various healthcare, tax, economic and market efficiency experts, all without guarantee of any recovery. With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis, which heavily supports the requested fee.

123.   Courts have repeatedly recognized that it is in the public interest to have experienced and qualified counsel privately enforce the securities laws. However, as recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private plaintiffs, and particularly institutional investors, take an active role in protecting the interests of investors. If this important public policy is to be carried

out, Plaintiffs' Counsel should be adequately compensated, taking into account the substantial risks undertaken in prosecuting securities class actions.

124.    At each step of the process, Plaintiffs' Counsel faced a substantial risk that the litigation could end either without remuneration to them or with remuneration far less than the time, effort, and expense put in by Lead Counsel.  Lead Counsel could have had the Complaint dismissed by the Court after expending the substantial effort and expense required to complete their investigation and draft the Complaint.  And even after surviving that hurdle, were litigation to continue, Plaintiffs could have faced an adverse determination on reconsideration, at class certification, on summary judgment, a total loss at trial, or—even in the event of a victory at trial—a minimal recovery or a reversal on appeal.  Any of these occurrences would have deprived Lead Counsel of the opportunity to earn any fee whatsoever for their four years of work and expenditure—efforts that necessarily precluded other projects.

### F.    The Skill Required and the Experience, Reputation and Ability of the Attorneys

125.    Lead Counsel are highly skilled and experienced securities litigators, who expended a substantial amount of time and effort litigating the Action—an Action that presented unique and difficult challenges that were not easy to overcome.  The attorneys who were principally responsible for leading the prosecution of this case have prosecuted securities claims throughout their careers, overseen numerous litigations, and recovered billions of dollars on behalf of investors over the course of decades. [4]

---

[4]  Recent securities class action settlements obtained by Lead Counsel include *In re Wilmington Tr. Sec. Litig.*, 2018 WL 6046452, at *8 (D. Del. Nov. 19, 2018) ($210 million common fund in securities class action); *In re Rayonier Inc. Sec. Litig.*, 2017 WL 4542852, at *1 (M.D. Fla. Oct. 5, 2017) ($73 million common fund in securities class action); *In re HD Supply Holdings, Inc. Sec. Litig.*, 2020 WL 8572953 (N.D. Ga. Jul. 21, 2020) ($50 million common fund).

126.   Informed by this experience, they developed and implemented strategies to overcome myriad obstacles raised by Defendants.  We respectfully suggest that Plaintiffs' Counsel's depth of skill and experience, including their experience in this District and throughout the country successfully prosecuting securities class actions, allowed Lead Plaintiffs and the Settlement Class to achieve a result that might not have been achieved by less skillful or experienced counsel.

127.   As an initial matter, while Plaintiffs believe they developed an exceedingly strong case, Defendants' fraud was not obvious at the outset.  Plaintiffs' case remained very much in doubt, and to date, not only has the DOJ Investigation concluded with no action, but in fact no regulator or government agency has found that DaVita engaged in illegal steering conduct. Thus, the case required an extensive investigation, sophisticated motion practice, in-depth discovery, and highly skilled advocacy to obtain the achieved result.

128.   Furthermore, the fact that no other movant or law firm sought appointment as lead plaintiff and lead counsel suggests that Defendants' fraud was not plain to see.  Indeed, Plaintiffs likely could not sufficiently have pleaded fraud based on public facts alone, and it was only through Lead Counsel's intensive investigation uncovering internal documents and obtaining credible testimony by numerous confidential witnesses that Plaintiffs learned the facts necessary to survive Defendants' motion to dismiss.

129.   Successfully pleading securities fraud—always a challenging and complex endeavor under the PSLRA—presented special challenges here that required skilled lawyering. This Action involved complex and intricate legal and factual issues, and the numerous federal and state healthcare laws implicated in this Action also added a significant level of difficulty

unique to this case.  Lead Counsel, therefore, continually consulted with experts throughout the litigation.

130.    In addition, the quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition.  Here, Defendants were represented by Morgan, Lewis & Bockius LLP and Faegre Baker Daniels LLP, two of the country's most prestigious and experienced defense firms.

131.    Lead Counsel believe that all of these factors support the requested fee award.

**G.    The Reaction of the Settlement Class to the Fee and Expense Application**

132.    The wholly positive reaction of the Settlement Class to the Fee and Expense Motion further supports its approval.  The Notice advised Settlement Class Members that Lead Counsel would apply for fees not to exceed 30% of the Settlement Fund, and that the deadline for filing objections to the fee application was February 16, 2021.  That deadline has now passed and not one member of the Settlement Class has filed an objection to the Settlement, Plan of Allocation, or the Fees and Expense Motion.  Ex. D, ¶¶12-13.  This reaction is particularly significant given that the vast majority of the Settlement Class, approximately 87%, is comprised of sophisticated institutional investors who have the resources, professional staff and financial motivation to object to the requested fee, if an objection was warranted.  *See* ECF No. 83-1 at ¶72; *see also In re Crocs Sec. Litig.*, 2014 WL 4670886, at *5 (D. Colo. Sept. 18, 2014) ("the fact that none of the class members objected to the requested attorneys' fees is significant and weighs in favor of the requested award"); *McKeon v. Integrity Pizza LLC*, 2020 WL 6782238, at *2 (D. Colo. Nov. 18, 2020) (same).  Accordingly, all relevant factors support the fee request here.

**H.     Lead Counsel's Request for Reimbursement of Litigation Expenses**

133.    Plaintiffs' Counsel seeks reimbursement of $547,409.27 in litigation expenses. Lead Counsel respectfully submits that these expenses were reasonable and necessary in light of the length and complexity of the litigation, and that reimbursement of these expenses would be appropriate and fair to the Class.

134.    Courts in this District and nationwide have held that counsel in complex class actions are entitled to be reimbursed for reasonable expenses of the exact type incurred here, such as "court and court reporter fees; legal research; document and database reproduction and analysis; expert witnesses; travel for meetings, depositions, and document review and production; and other customary expenditures." *Columbus Drywall & Insulation, Inc. v. Masco Corp.,* 2008 WL 11234103, at *6 (N.D. Ga. Mar. 4, 2008); *see also Crocs*, 2014 WL 4670886, at *5 (D. Colo. Sept. 18, 2014) ("Fees for computer research, investigation, and experts/consultants appear to be among the largest expenditures, which, given the nature of this case, is an appropriate use of resources"); *Oppenheimer*, 2014 WL 12768451, at *3 (finding approximately $3.5 million of expenses to be reasonably incurred in prosecuting securities class action).

135.    The requested expense reimbursement of $547,409.27 is also significantly less than the $750,000 upper limit set forth in the Notice, and no Settlement Class Member has objected to the reimbursement request, further supporting its reasonableness.

**I.     Lead Plaintiffs' Representative Reimbursement Requests**

136.    In accordance with the PSLRA, Lead Plaintiffs seek reimbursement of their reasonable costs and expenses incurred directly in connection with their representation of the Settlement Class, in the amount of $10,000 per Lead Plaintiff—an amount that is less than the total estimated value of the time that the Lead Plaintiffs spent in overseeing and participating in the Action.  The amount of time and effort devoted to this Action by the representatives of Lead

Plaintiffs—who expended considerable time and effort in actively supervising the litigation over a multi-year period, including by collecting and producing numerous documents and responding to interrogatories; preparing for and attending their depositions; and participating in ongoing settlement discussions—is detailed in the accompanying Lead Plaintiff Declarations.  Exs. B and C, ¶¶3-7, 15-17.

137.    Lead Plaintiffs respectfully submit that the reimbursement requested is fully consistent with congressional intent, as expressed in the PSLRA, of encouraging institutional and other highly experienced plaintiffs to take an active role in bringing and supervising actions of this type.  As set forth in the Lead Plaintiff Declarations, each of the Lead Plaintiffs has, throughout the litigation of the Action, been fully committed to pursuing the interests of the Settlement Class.  Lead Plaintiffs have actively and effectively complied with all of the many demands that arose during the litigation and the Settlement of this Action.  Lead Plaintiffs' efforts are precisely the type that courts have found to warrant reimbursement to class representatives, and fully supports Lead Plaintiffs' reimbursement request.

## V.    **CONCLUSION**

138.    For all the reasons discussed above and in the Final Approval Motion, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate. In addition, as set forth above and in the Fee and Expense Motion, Lead Plaintiffs and Plaintiffs' Counsel further submit that the requested 30% fee award should be approved as fair and reasonable; the request for reimbursement of litigation expenses in the total amount of $547,409.27 should be approved; and Lead Plaintiffs' Representative Reimbursements of $10,000 each should also be approved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 23rd day of February, 2021, at Boca Raton, FL.

/s/ Joseph E. White, III
Joseph E. White, III