**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:17-cv-00304-WJM-NRN

PEACE OFFICERS' ANNUITY AND BENEFIT FUND OF GEORGIA, Individually and on Behalf of All Others Similarly Situated, and
JACKSONVILLE POLICE AND FIRE PENSION FUND, Individually and on Behalf of All Others Similarly Situated,

Plaintiffs,

v.

DAVITA INC.,
KENT J. THIRY,
JAMES K. HILGER, and
JAVIER J. RODRIGUEZ,

      Defendants.

---

**LEAD PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS'**
**FEES AND REIMBURSEMENT OF LITIGATION EXPENSES, AND**
**MEMORANDUM OF LAW IN SUPPORT**

---

## TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................. 1

II.     ARGUMENT .................................................................................................... 4

        A.      The Tenth Circuit Has an "Implicit Preference" for the Percentage of the
                Fund Method of Awarding Attorneys' Fees in Common Fund Cases ................... 4

        B.      The *Johnson* Factors Support the Reasonableness of the Fee Request ................. 5

                1.      The Time and Labor Expended by Plaintiffs' Counsel ............................. 5

                2.      The Novelty and Difficulty of Questions Raised by the Litigation ........... 6

                3.      The Amount Involved and Results Obtained .............................................. 8

                4.      A 30% Fee Award is Customary and in Accordance with Other
                        Similar Cases in this District and the Tenth Circuit ................................... 9

                5.      The Contingent Nature of the Fee, Undesirability of the Action,
                        and Preclusion of Other Employment ........................................................ 12

                6.      The Skill Required to Perform the Legal Service Properly and the
                        Experience, Reputation, and Ability of the Attorneys ............................. 13

        C.      Lead Plaintiffs' Endorsement of, and the Class's Reaction to, Lead
                Counsel's 30% Fee Request Further Supports the Reasonableness of the
                Request .................................................................................................... 14

        D.      Lead Counsel's Litigation Expenses, and Lead Plaintiffs' Reimbursement
                Awards Are Reasonable and Should Be Granted ................................................. 15

III.    CONCLUSION ............................................................................................. 15

## **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Allapattah Services, Inc. v. Exxon Corp.*,
   454 F. Supp. 2d 1185 (S.D. Fla. 2006)................................................................ 10

*Anderson v. Merit Energy Co.*,
   2009 WL 3378526 (D. Colo. Oct. 20, 2009)....................................................... 8

*Cabot East Broward 2 LLC v. Cabot*,
   2018 WL 5905415 (S.D. Fla. Nov. 9, 2018)...................................................... 10

*City of Pontiac Gen. Employees' Ret. Sys. v. Walmart Stores, Inc.*,
   2019 WL 1529517 (W.D. Ark. Apr. 8, 2019)................................................... 10

*Cook v. Rockwell Int'l Corp.*,
   2017 WL 5076498 (D. Colo. Apr. 28, 2017) ............................................. 4, 9, 10

*DeLoach v. Phillip Morris,*
   *Co.*, 2003 WL 25683496 (M.D.N.C. Dec. 19, 2003)......................................... 10

*Diaz v. Lost Dog Pizza, LLC,*
   2019 WL 2189485 (D. Colo. May 21, 2019) ...................................................5, 9

*Hale v. State Farm Mut. Auto Ins. Co.*,
   2018 WL 6606079 (S.D. Ill. Dec. 16, 2018)..................................................... 10

*In re (Bank of America) Checking Account Overdraft Litig.*,
   830 F. Supp. 2d 1330 (S.D. Fla. 2011)........................................................10, 12

*In re Apollo Group Inc. Sec. Litig.,*
   2012 WL 1378677 (D. Ariz. Apr. 20, 2012)..................................................... 10

*In re Crocs, Inc. Sec. Litig.*,
   306 F.R.D. 672 (D. Colo. 2014)......................................................................... 8

*In re Crocs, Inc. Sec. Litig.*,
   2014 WL 4670886 (D. Colo. Sept. 18, 2014) ........................................... *passim*

*In re DaVita Healthcare Partners, Inc. Deriv. Litig.*,
   2015 WL 3582265 (D. Colo. June 5, 2015) ................................................11, 15

*In re Dole Food Co., Inc. Stockholder Litig.*,
   2016 WL 541917 (Del. Ch. Feb. 10, 2016)...................................................... 11

*In re Flonase Antitrust Litig.,*
  951 F. Supp. 2d 739 (E.D. Pa. 2013) ..................................................... 10

*In re Genworth Fin. Sec. Litig.,*
  210 F. Supp. 3d 837 (E.D. Va. 2016) ................................................... 9, 13

*In re Genworth Fin. Sec. Litig.,*
  2016 WL 7187290. (E.D. Va. Sept. 26, 2016) ......................................... 14

*In re Ikon Office Solutions, Inc. Sec. Litig.,*
  194 F.R.D. 166 (E.D. Pa. 2000) ............................................................ 11

*In re Initial Pub. Offering Sec. Litig.,*
  671 F. Supp. 2d 467 (S.D.N.Y. 2009) ..................................................... 10

*In re Linerboard Antitrust Litig.,*
  2004 WL 1221350 (E.D. Pa. June 2, 2004) ............................................. 10

*In re Molycorp Inc. Sec. Litig.,*
  2017 WL 11598681 (D. Colo. June 16, 2017) ......................................... 12

*In re NU Skin Enter., Inc.,*
  2016 WL 6916486 (D. Utah Oct. 13, 2016) .............................................. 7

*In re Oppenheimer Rochester Funds Grp. Sec. Litig.,*
  2014 WL 12768451 (D. Colo. July 31, 2014) .................................... *passim*

*In re Rayonier Inc. Sec. Litig.,*
  2017 WL 4542852 (M.D. Fla. Oct. 5, 2017) .............................................. 8

*In re Spectranetics Corp. Sec. Litig.,*
  2011 WL 13238696 (D. Colo. Apr. 4, 2011) ........................................... 12

*In re Syngenta AG MIR 162 Corn Litig.,*
  357 F. Supp. 3d 1094 (D. Kan. 2018) .......................................... 9, 10, 11, 13

*In re TFT-LCD Antitrust Litig.,*
  2013 WL 149692 (N.D. Cal, Jan. 14, 2013) ........................................... 10

*In re Titanium Dioxide Antitrust Litig.,*
  2013 WL 6577029 (D. Md. Dec. 13, 2013) ............................................. 10

*In re U.S. Foodservice, Inc. Pricing Litig.,*
  2014 WL 12862264 (D. Conn. Dec. 9, 2014) .......................................... 10

*In re Urethane Antitrust Litig.*,
    2016 WL 4060156 (D. Kan. July 29, 2016) ...................................................... 10, 11

*In re Veeco Instruments Inc. Sec. Litig.*,
    2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ........................................................ 14

*Johnson v. Ga. Highway Express, Inc.*,
    488 F.2d 714 (5th Cir. 1979) .................................................................................. 5

*McKeon v. Int. Pizza LLC*,
    2020 WL 6782238 (D. Colo. Nov. 18, 2020) ...................................................... 14

*Nakkhumpun v. Taylor*,
    2016 WL 11724397 (D. Colo. June 13, 2016) ...................................................... 9

*Ramos v. Banner Health*,
    2020 WL 6585849 (D. Colo. Nov. 10, 2020) ...................................................... 11

*Schuh v. HCA Holdings, Inc.*,
    2016 WL 10570957 (M.D. Tenn. Apr. 14, 2016) ................................................ 10

*Shaw v. Interthinx, Inc.*,
    2015 WL 1867861 (D. Colo. Apr. 22, 2015) ........................................................ 8

*Standard Iron Works v. ArcelorMittal*,
    2014 WL 7781572 (N.D. Ill. Oct. 22, 2014) ...................................................... 10

*Tennille v. W. Union Co.*,
    2014 WL 5394624 (D. Colo. Oct. 15, 2014) ..................................................... 3, 9

*Thorpe v. Walter Inv. Mgmt. Corp.*,
    2016 WL 10518902 (S.D. Fla. Oct. 17, 2016) .................................................... 12

**STATUTES**

15 U.S.C. § 78u-4(a) ......................................................................................... 4, 15

**RULES**

Fed. R. Civ. P. 23 ................................................................................................... 1

**OTHER AUTHORITIES**

D.C.COLO.LCivR 7.1(a) ........................................................................................ 1

H.R. Conf. Rep. No. 104-369 (1995) .................................................................... 14

Lead Plaintiffs respectfully move this Court pursuant to Fed. R. Civ. P. 23 for: (i) an award of attorneys' fees in the amount of 30% of the Settlement Fund; (ii) reimbursement of $547,409.27 in litigation expenses; and (iii) Representative Reimbursements of $10,000 to Lead Plaintiffs for their efforts in representing the Settlement Class, as authorized by the PSLRA.[1]

## I.   <u>INTRODUCTION</u>

After more than four years of hotly contested litigation, Lead Counsel achieved an extraordinary result for the Settlement Class: a $135 million recovery that represents ***the second largest*** all-cash federal securities class action settlement ever obtained in this District's history, and is among the ***top five*** such recoveries in Tenth Circuit history. Significantly, the Settlement recovers a meaningfully high percentage of between 31% and 43% of the Settlement Class's likely maximum damages at trial, which is ***eight to eleven times greater*** than the median 3.9% recovery in similarly-sized cases nationally. Lead Counsel achieved this historic result through extensive effort and expense, without the benefit of any government or regulatory action, and in the face of considerable challenges from formidable opposition—all while bearing the substantial risk of receiving either very little or no compensation at all.

Moreover, while courts have uniformly recognized that securities class actions are notoriously complex and risky, this case was uniquely so, and the Settlement is exceptional when considering the potential pitfalls presented by this Action—risks that would have persisted through trial and the inevitable appellate practice. For example, at the pleading stage, the Court sustained only 5 out of the 27 alleged misstatements in the case, and withheld judgment on the

---

[1] Unless otherwise indicated, all capitalized terms have the meanings set forth in the Stipulation (ECF No. 103-1), all citations and internal quotations are omitted, and all emphasis is added. This motion is supported by the Declaration of Joseph E. White, III in Support thereof (the "White Declaration" or "White Decl."), and citations to "¶" or "Ex." are to paragraphs in, and exhibits to, the White Declaration. Pursuant to D.C.COLO.LCivR 7.1(a), Lead Counsel has conferred with Defendants, and Defendants take no position on the relief requested herein.

falsity of the remaining 22 statements, or over 80% of Plaintiffs' case, because they were predicated on a finding of illegality. Significantly, months after the Court's order, the DOJ declined to intervene in a *qui tam* action against DaVita, leading to the voluntary dismissal of that action and prompting Defendants to file a reconsideration motion seeking dismissal of the non-adjudicated statements. As such, the viability of these statements remained very much in doubt, and to date, no regulator or government agency has found or even accused DaVita of engaging in illegal steering conduct.  Such facts would potentially make it extremely difficult for Plaintiffs to establish at summary judgment or trial that Defendants' conduct was "illegal."

Furthermore, even if Plaintiffs were successful in establishing liability, Defendants asserted credible arguments that Plaintiffs failed to establish loss causation for their claims. For example, Defendants argued that the truth regarding DaVita's alleged steering practices, and the Company's relationship with the AKF, were fully disclosed nearly one year before the end of the Class Period—when the *St. Louis Post Dispatch* published a detailed article on such practices, and DaVita subsequently disclosed that it was suspending the Medicaid Opportunity and the financial ramifications from doing so (which caused DaVita's stock price to *increase*)— requiring the Class Period to end as a matter of law on that date.  While Plaintiffs had strong counterarguments on these points, if the Court or jury lent credence to Defendants' arguments, the Class's recovery would have been dramatically reduced, if not eliminated altogether.

Despite these significant arguments, and as set forth in greater detail below and in the White Declaration, Lead Counsel's vigorous prosecution of the Action produced a remarkable recovery for the Settlement Class. Indeed, absent Lead Counsel's efforts, the Class would have almost certainly recovered nothing for their claims, as Saxena White initiated this Action and was **the only law firm** to submit a leadership application at the lead plaintiff stage.  Moreover,

Plaintiffs' Counsel's extensive litigation efforts included, among other things, an exhaustive investigation that uncovered critical internal documents and confidential witnesses, and culminated in the filing of a highly detailed, 111-page amended Complaint; successfully opposing a motion to dismiss that challenged every major element of Plaintiffs' claims; and intensive fact, expert and class-certification discovery, including reviewing 845,000 pages of documents produced by Defendants and over twenty third parties, and defending and taking multiple Plaintiff and expert depositions. Lead Counsel also engaged in extensive settlement negotiations, including six mediation sessions before one of the most respected mediators in the country—former Federal District Judge Layn R. Phillips, who sat by designation on the Tenth Circuit and who has endorsed both the Settlement and Lead Counsel's fee request.

In light of the outstanding recovery, and the significant efforts undertaken in achieving it, Lead Counsel respectfully requests a fee award of 30% of the Settlement—an award that is well in-line with fee awards in this District, in the Tenth Circuit, and around the country in similar securities and complex class actions. *See*, *e.g.*, *Tennille v. W. Union Co.*, 2014 WL 5394624, at *4 (D. Colo. Oct. 15, 2014) (Kane, J.), *aff'd* 809 F.3d 555 (10th Cir. 2015) (30% fee award in $135 million recovery); *In re Oppenheimer Rochester Funds Grp. Sec. Litig.*, 2014 WL 12768451, at *2 (D. Colo. July 31, 2014) (Kane, J.) (30% fee award in $89.5 million recovery). Moreover, a lodestar "cross-check" fully supports this award, as the requested fee equates to a "multiplier" of just 2.75, which is on the low end of the typical lodestar multiples awarded. *See, e.g., In re Crocs, Inc. Sec. Litig.*, 2014 WL 4670886, at *4 (D. Colo. Sept. 18, 2014) (Brimmer, J.) ("collecting District of Colorado cases approving multipliers ranging from 2.5 to 4.6").

In addition, Lead Plaintiffs—two sophisticated institutional investors who have actively supervised this Action from its inception—fully endorse Lead Counsel's fee request, and not a

single objection to the fee request has been filed even though the February 16, 2021 deadline for doing so has now passed, which is particularly significant given that 87% of the Class consists of institutional investors with the resources to object, if warranted. The overwhelming endorsement of the Class weighs heavily in support of the requested fee award. *See, e.g. Crocs*, 2014 WL 4670886, at *5 (lack of objections "is significant and weighs in favor of the requested award").

Finally, Plaintiffs request reimbursement of $547,409.27 in litigation expenses—a reasonable amount that is well in-line with what is typically expended in similar cases. *See, e.g., Oppenheimer*, 2014 WL 12768451, at *3 (awarding over $3.5 million in expenses). Similarly, Lead Plaintiffs' $10,000 Representative Reimbursement awards are fair and reasonable, as they are expressly contemplated by the PSLRA and routinely awarded in securities class actions.

## II.   **ARGUMENT**

### A.   **The Tenth Circuit Has an Implicit Preference for the Percentage of the Fund Method of Awarding Attorneys' Fees in Common Fund Cases**

In the Tenth Circuit, an award of attorneys' fees in connection with the settlement of a class action should be calculated using the percentage of the fund method where a "common fund [was] created for the benefit of the Class[]." *Oppenheimer*, 2014 WL 12768451, at *1 ("recogniz[ing] the propriety of the percentage-of-the-fund method when awarding fees" in securities class action settlements).[2]  In preferring this method, courts in the Tenth Circuit have "long recognized that class counsel and the class should have aligned interests in this type of matter, such that counsel are both compensated for risk and rewarded for success, where, as here, the Class receives significant benefit." *See Cook v. Rockwell Int'l Corp.*, 2017 WL 5076498, at *1 (D. Colo. Apr. 28, 2017) (Kane, J.).  Accordingly, the percentage method applies here.

---

[2] The PSLRA supports this preference, stating: "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a *reasonable percentage* of the amount of any damages and prejudgment interest actually paid to the class." 15 U.S.C. § 78u–4(a)(6).

### B.        The *Johnson* Factors Support the Reasonableness of the Fee Request

To determine a reasonable fee award percentage, the Court considers the *Johnson* factors:

(1) The time and labor required by counsel; (2) the novelty and difficulty of the legal question presented; (3) the skill required to represent the class appropriately; (4) the preclusion of other employment by the attorneys due to the acceptance of this case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) any time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Diaz v. Lost Dog Pizza, LLC*, 2019 WL 2189485, at *5 (D. Colo. May 21, 2019) (Martínez, J.)

(citing *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1979)).  Because

"rarely are all of the *Johnson* factors applicable," "a court need not specifically address each

*Johnson* factor."[3]  *Crocs*, 2014 WL 4670886, at *2.  Here, each factor supports the fee request.

### 1.        The Time and Labor Expended by Plaintiffs' Counsel

The time and labor expended by Lead Counsel in prosecuting this Action firmly supports

the requested fee. As described in the White Declaration (¶¶19-24), these efforts included an

extensive and extremely comprehensive investigation, which included locating numerous

internal documents and confidential witnesses that proved critical in drafting a highly-detailed

Complaint sufficient to defeat Defendants' motion to dismiss. Furthermore, Lead Counsel

engaged in comprehensive discovery, including consulting with various economic and industry

experts; reviewing 845,000 pages of documents produced by Defendants and over twenty third

parties; collecting and producing over 25,000 pages in response to Defendants' document

requests; extensive class certification-related briefing and discovery, including defending Lead

Plaintiffs' depositions and the deposition of Plaintiffs' expert on market efficiency, and deposing

Defendants' rebuttal expert; and opposing Defendants' motion for partial reconsideration.  In

---

[3] Lead Counsel respectfully submits that two *Johnson* factors—the time limitations imposed by the client or the circumstances, and the nature and length of the professional relationship with the client—are not relevant in this securities class action, and therefore not addressed herein.

addition, the extensive settlement negotiations were substantially time-consuming, including submitting detailed mediation statements and presentations over the course of six formal mediations that culminated in the Settlement. In total, prosecuting this Action necessitated Plaintiffs' Counsel to expend more than 31,000 hours, equivalent to $14.7 million in attorney and staff time, over the course of more than four years of vigorous litigation.[4]

Accordingly, Lead Counsel's extensive litigation efforts were reasonable and necessary to secure a historic monetary recovery, and fully support the requested fee award. *See Oppenheimer*, 2014 WL 12768451, at *3 (finding over 24,000 hours reasonable).

### 2. The Novelty and Difficulty of Questions Raised by the Litigation

"Litigating an action under the PSLRA is not a simple undertaking, especially given the specificity required to plead such claims." *Crocs*, 2014 WL 4670886, at *3. This holding was even more acute here, as the novelty and difficulty of the legal and factual questions at issue in this Action were exceedingly complex. Indeed, Lead Counsel spent substantial hours familiarizing themselves with the numerous federal and state healthcare laws implicated in this Action, including developing a deep understanding of the interplay between DaVita's dialysis business and Medicare, Medicaid, COBRA and EGHP health plans, as well as the application of various healthcare rules and regulations, such as a formal CMS Request for Information and responses thereto issued during the Class Period, and the OIG Advisory Opinion issued to DaVita more than 20 years earlier. This knowledge was crucial in pleading Defendants' alleged fraud with the requisite specificity and required in-depth consultation with various experts.

Furthermore, these complex issues quickly became a serious and uncertain point of contention in the Action. Indeed, at the pleading stage, this Court found that the falsity of 22 of

---

[4] Lead Counsel will continue to expend additional time and out-of-pocket expenses in connection with the settlement administration process, the fairness hearing, and, if the Settlement is approved, assisting with implementation of the Settlement.

the 27 misstatements alleged in the Complaint was "premised on the impropriety or illegality of DaVita's relationship with AKF," and reserved judgment on whether the Complaint stated a claim as to these statements.  ECF No. 53 at 22.  Thereafter, the DOJ declined to intervene in a *qui tam* case against DaVita, which was later voluntarily dismissed, leading Defendants to file a motion for reconsideration seeking the dismissal of the "illegality" statements because the DOJ's decision purportedly "negat[ed] the sole basis for Plaintiffs' claim of illegality."  ECF No. 91 at 1-2.  Had Defendants prevailed on this motion, the Class's recoverable damages could have been virtually eliminated.  Even if Defendants' motion would have ultimately been denied, the fact that no regulator or government agency has found DaVita's conduct to be illegal would have remained a significant threat to the litigation at summary judgment or trial.

In addition, Plaintiffs faced highly contentious loss causation issues that further threatened the viability of their claims.  Specifically, Defendants argued that the Class Period should be cut from 32 to 17 months because, among other reasons, the truth regarding DaVita's steering practices was purportedly fully disclosed approximately one year before the end of the Class Period in a DaVita press release issued on October 31, 2016, after which DaVita's stock price *increased* rather than decreased in value.  *See* ECF No. 102 at 23.  Furthermore, Defendants had credible arguments that Plaintiffs could not establish loss causation for several alleged corrective disclosures because such disclosures did not contain new information, and the resulting stock price declines were attributable to non-fraudulent, confounding information. Absent the Settlement, these loss causation disputes would have remained at issue throughout the litigation, and could have resulted in a far inferior recovery for the Class, or no recovery at all.

Accordingly, Lead Counsel's ability to successfully navigate these and other complex legal and factual obstacles fully supports the requested fee award. *See In re NU Skin Enter., Inc.*,

2016 WL 6916486, at *2 (D. Utah Oct. 13, 2016) (noting the risks presented by "Defendants' defenses concerning the falsity of their statements, scienter, loss causation, and damages" weighed in favor of fee award); *Crocs*, 2014 WL 4670886, at *3 (same).

### 3.     The Amount Involved and Results Obtained

Courts in this District have repeatedly found that, when determining the amount of fees to be awarded, the "***greatest weight*** should be given to the monetary results achieved for the benefits of the class." *Anderson v. Merit Energy Co.,* 2009 WL 3378526, at *4 (D. Colo. Oct. 20, 2009) (Babcock, J.); *see also Shaw v. Interthinx, Inc*., 2015 WL 1867861, at *7 (D. Colo. Apr. 22, 2015) (Blackburn, J.) ("The degree of success . . . is a critical factor in determining the amount of fees to be awarded."). The monetary result here is exceptional by any measure.

As noted *supra*, the $135 million recovery represents the ***second-largest*** all-cash securities class action recovery ever obtained in this District, is among the ***top five*** such settlements in Tenth Circuit history, and is more than ***twenty*** times larger than the $6.7 million median securities class action settlement in the Tenth Circuit from 2010 to 2019.  ¶¶4, 109-11; *see In re Rayonier Inc. Sec. Litig.*, 2017 WL 4542852, at *3-4 (M.D. Fla. Oct. 5, 2017) (granting 30% fee, noting settlement that was "the second largest recovery from a securities class action" in the district was "objectively outstanding" and "exceptional"). Significantly, the Settlement's recovery also far outpaces recoveries in virtually all other securities class actions. Indeed, given the issues discussed in §II(B)(2), the likely maximum damages at trial in the Action ranged from $312 million to $432 million, and therefore the Settlement recovers between 31% and 43% of the Class's damages—***eight to eleven times greater*** than the median 3.9% recovery in similar actions, further supporting Lead Counsel's fee request. *In re Crocs, Inc. Sec. Litig.*, 306 F.R.D. 672, 691 n.20 (D. Colo. 2014) (Brimmer, J.) (approving settlement representing "approximately

1.3% of the amount of damages that could be achieved").

Moreover, the Settlement Amount is not only comprised of the proceeds from Defendants' insurance tower, but also includes a substantial monetary contribution from Defendant DaVita—a rare occurrence in securities class actions that underscores the exceptional nature of the recovery and the tenacity of Lead Counsel in achieving it. ¶111; *see In re Genworth Fin. Sec. Litig.*, 210 F. Supp. 3d 837, 842 (E.D. Va. 2016) (company's contribution "of its own cash to the Settlement" "strongly demonstrate[d] the adequacy of the Settlement").

### 4. A 30% Fee Award is Customary and in Accordance with Other Similar Cases in this District and the Tenth Circuit

Lead Counsel's 30% fee request is eminently reasonable when considering the customary awards in similar cases in this District and the Tenth Circuit.  Indeed, "[c]ourts in the Tenth Circuit have noted that the typical fee award in complex cases is around ***one third of the common fund.***"  *Crocs*, 2014 WL 4670886, at *3; *see also Diaz*, 2019 WL 2189485, at *5 ("33% fee award falls within the norm"); *Nakkhumpun v. Taylor*, 2016 WL 11724397, at *5 (D. Colo. June 13, 2016) (Arguello, J.) (same). Moreover, courts in the Tenth Circuit have repeatedly found that a 30% fee award is reasonable even in the context of so-called "megafund" settlements, because applying an arbitrary sliding fee percentage scale in large settlements "fails to provide the proper incentive for counsel and ***is fundamentally at odds with the percentage-of-the-fund approach favored by the Tenth Circuit.***" *In re Syngenta AG MIR 162 Corn Litig.*, 357 F. Supp. 3d 1094, 1114 (D. Kan. 2018) (awarding 33.3% fee of $1.51 billion settlement); *Cook*, 2017 WL 5076498, at *4, n.6 (awarding 40% fee of $150 million settlement and collecting megafund cases with similar awards); *W. Union Co.*, 2014 WL 5394624, at *4 (30% fee on $135 million settlement); *Oppenheimer*, 2014 WL 12768451, at*2 ("fee award of 30% of [$89.5 million settlement] is consistent with awards made within this District and in similar cases").

As demonstrated below and in the White Declaration (¶¶113-16), numerous courts in the

Tenth Circuit and nationwide have awarded 30% fees or higher in large complex class actions:

| Comparable Securities and Other Complex Cases: Tenth Circuit and Nationwide | Settlement Amount | Fee Award |
|---|---|---|
| *Cook v. Rockwell International Corporation*,  2017 WL 5076498, at *1 (D. Colo. Apr. 28, 2017) (Kane, J.) | $375 million | 40% |
| *Haddock v. Nationwide Life Ins. Co.,* No. 3:01-cv-01552-SRU ECF No. 601 (D. Conn. Apr. 9, 2015) | $140 million | 35% |
| *In re Syngenta AG MIR 162 Corn Litig.*, 357 F. Supp. 3d 1094, 1110 (D. Kan. 2018) | $1.51 billion | 33.3% |
| *In re Urethane Antitrust Litig.*, 2016 WL 4060156, at *8 (D. Kan. July 29, 2016) | $835 million | 33.3% |
| *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 505 (S.D.N.Y. 2009) | $586 million | 33.3% |
| *In re U.S. Foodservice, Inc. Pricing Litig.*, 2014 WL 12862264, at *3 (D. Conn. Dec. 9, 2014) | $297 million | 33.3% |
| *Hale v. State Farm Mut. Auto Ins. Co.*, 2018 WL 6606079, at *16 (S.D. Ill. Dec. 16, 2018) | $250 million | 33.3% |
| *In re Tricor Direct Purchaser Antitrust Litig.*, No. 1:05-cv-00340-SLR, ECF. No. 543, (D. Del. Apr. 23, 2009) | $250 million | 33.3% |
| *DeLoach v. Phillip Morris Co.*, 2003 WL 23094907, at *1, 11 (M.D.N.C. Dec. 19, 2003) | $212 million | 33.3% |
| *In re Titanium Dioxide Antitrust Litig.,* 2013 WL 6577029, at *1 (D. Md. Dec. 13, 2013) | $163.5 million | 33.3% |
| *In re Flonase Antitrust Litig.,* 951 F. Supp. 2d 739, 746 (E.D. Pa. 2013) | $150 million | 33.3% |
| *In re Apollo Group Inc. Sec. Litig.,* 2012 WL 1378677, at *7 (D. Ariz. Apr. 20, 2012) | $145 million | 33.3% |
| *Cabot East Broward 2 LLC v. Cabot,*  2018 WL 5905415 *2, 9 (S.D. Fla. Nov. 9, 2018) | $100 million | 33.3% |
| *Standard Iron Works v. ArcelorMittal,* 2014 WL 7781572, at *1 (N.D. Ill. Oct. 22, 2014) | $163.9 million | 33% |
| *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1204 (S.D. Fla. 2006) | $1.06 billion | 31.3% |
| *In re TFT-LCD Antitrust Litig.,* 2013 WL 149692, at *1 (N.D. Cal, Jan. 14, 2013); 2011 WL 7575003, at * 1 (N.D. Cal., Dec.27, 2011) | $473 million | 30% |
| *In re (Bank of America) Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1366 (S.D. Fla. 2011) | $410 million | 30% |
| *Schuh v. HCA Holdings, Inc.,* 2016 WL 10570957, at *1 (M.D. Tenn. Apr. 14, 2016) | $215 million | 30% |
| *In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *15-16 (E.D. Pa. June 2, 2004) | $202.5 million | 30% |
| *In re (Chase Bank) Checking Account Overdraft Litig.*, No. 1:09-md-02036, ECF No. 3134 (S.D. Fla. Dec. 19, 2012) | $162 million | 30% |
| *City of Pontiac Gen. Employees' Ret. Sys. v. Walmart Stores, Inc.,* 2019 WL 1529517, at *1 (W.D. Ark. Apr. 8, 2019) | $160 million | 30% |
| *In re (Citizens Bank) Checking Account Overdraft Litig.*, No. 1:09- | $137.5 million | 30% |

| Comparable Securities and Other Complex Cases: Tenth Circuit and Nationwide | Settlement Amount | Fee Award |
|---|---|---|
| md-02036, ECF No. 3331 (S.D. Fla. Mar. 12, 2013) | | |
| *In re Dole Food Co., Inc. Stockholder Litig.*, 2016 WL 541917 (Del. Ch. Feb. 10, 2016) | $113 million | 30% |
| *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 197 (E.D. Pa. 2000) | $111 million | 30% |

Although not required in the Tenth Circuit, a lodestar "cross-check" also wholly supports the fee request.  Here, Plaintiffs' Counsel's total lodestar is $14,717,351.25, and the requested 30% fee equates to a multiplier of 2.75, which is at the very low end of the typical range of multipliers routinely approved by courts in this District and the Tenth Circuit. *See, e.g., In re DaVita Healthcare Partners, Inc. Deriv. Litig.*, 2015 WL 3582265, at *5 (D. Colo. June 5, 2015) (Martínez, J.) (multiplier of 3 "in line with the multipliers awarded in similar cases"); *Crocs*, 2014 WL 4670886, at *4 (referencing District cases approving multipliers ranging from 2.5 to 4.6); *Urethane*, 2016 WL 4060156, at *7 (approving 3.2 multiplier in megafund case, finding 4 or 5 multipliers "accepted by a number of courts in megafund cases").

Furthermore, while six years ago this Court expressed concerns regarding non-Denver-based law firm rates in a prior shareholder action, the Court ultimately awarded a fee that represented a lodestar multiplier of 3.0 and a blended hourly rate of $600. *See DaVita*, 2015 WL 3582265, at *4-5.  Here, Lead Counsel's fee request represents a lodestar multiplier of just 2.75, and Lead Counsel's blended hourly rate is just $457, which is significantly lower than blended hourly rates approved by this Court and others in the Tenth Circuit.  *See Oppenheimer*, 2014 WL 12768451, at *3 (approving 30% fee request with blended rate of $512 per hour); *Syngenta*, 357 F. Supp. 3d at 1115 (approving 33.3% fee in $1.51 billion settlement with average rate of $500 per hour).  Moreover, Lead Counsel's hourly rates—ranging from $365 to $895 for attorneys, and $250 to $275 for support staff—are lower than hourly rates approved by this Court and others within the District.  *See Ramos v. Banner Health*, 2020 WL 6585849 (D. Colo. Nov. 10,

2020) (Martínez, J.) and ECF No. 504 (approving rates ranging from $490 to $1,060 per hour); *In re Molycorp Inc. Sec. Litig.,* 2017 WL 11598681, at *1-2 (D. Colo. June 16, 2017) (Moore, J.) (approving 30% fee request in securities class action where attorney hourly rates ranged from $435 to $955 per hour); *Crocs*, 2014 WL 4670886, at *4, ECF No. 208 at 95 (awarding 30% fee where attorney hourly rates were up to $935 per hour and were "higher than the rates charged by attorneys of similar skill and experience in the Denver legal market").

### 5.   The Contingent Nature of the Fee, Undesirability of the Action, and Preclusion of Other Employment

"Federal securities class actions require plaintiffs' counsel to expend substantial time and effort with no guarantee of success." *Crocs,* 2014 WL 4670886, at *5.  As a result, "[s]uch cases are often seen as undesirable."  *In re Spectranetics Corp. Sec. Litig.*, 2011 WL 13238696, at *2 (D. Colo. Apr. 4, 2011) (Blackburn, J.). The record establishes the "undesirability" of the Action.

Indeed, the vast majority of securities class actions draw multiple applications for appointment as lead plaintiff and lead counsel—that is the very purpose of the PSLRA provision requiring notice to be disseminated advising shareholders of the lead plaintiff deadline.  This is particularly true of DaVita, which is a widely traded NYSE stock with over 120 million shares outstanding. Tellingly, ***not one law firm*** other than Saxena White submitted a leadership application in the Action—a fact that underscores the perceived "undesirability" and difficulty of the case.  Courts have "recognize[d] that counsel should be rewarded for taking on a case from which other law firms shrunk . . . the proper incentive here is a 30% fee."  *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1364 (S.D. Fla. 2011); *see also Thorpe v. Walter Inv. Mgmt. Corp.*, 2016 WL 10518902, at *10–11 (S.D. Fla. Oct. 17, 2016) (undesirability shown where "Counsel was the only counsel willing to take on this litigation").

Moreover, not only did the Action not follow a formal regulatory action from which to

glean operative facts and claims, but the opposite was true here: the DOJ declined to intervene in a related *qui tam* action, and that action was subsequently voluntarily dismissed. Despite these facts, Lead Counsel took on a risky, complex, and protracted litigation requiring them to expend extensive funds and resources against formidable opposition with no guarantee of success, which heavily supports the requested fee. *Genworth*, 210 F. Supp. 3d at 845 ("[l]ooking at the complexity of the litigation and the fact that the plaintiffs did not bring this case as a tag-along suit to a government investigation, the substantial attorneys' fees award in this case is justified").

Importantly, the risk that Lead Counsel "would recover no compensation for their extensive efforts was not merely hypothetical, especially where, as here, Plaintiffs were subject to the PSLRA's heightened pleading standard and faced the immediate possibility of an adverse decision." *Crocs*, 2014 WL 4670886, at \*5. To date, Lead Counsel has received no compensation for its prosecution of this case, and since the extensive commitment of time and resources devoted here necessarily entailed the preclusion of other projects, the primary focus of this factor is to acknowledge this incongruence by permitting a higher recovery to compensate for the risk of recovering nothing.  As courts in this District have held, "[a] contingent fee arrangement often weighs in favor of a greater fee because [s]uch a large investment of money [and time] place[s] incredible burdens upon law practices." *Crocs*, 2014 WL 4670886, at \*4. The significant burdens inherent in a contingent fee arrangement in a case of this magnitude "weighs heavily in support of a substantial fee award."  *Syngenta*, 357 F. Supp. 3d at 1113.

### 6.     The Skill Required to Perform the Legal Service Properly and the Experience, Reputation, and Ability of the Attorneys

Lead Counsel has extensive experience prosecuting securities class actions and other complex litigation. ¶¶79, 125-26; Ex. F at Ex. 3.  As set forth in the declarations supporting this fee application, and as addressed above, Lead Counsel marshaled their considerable collective

experience and skill in successfully prosecuting and resolving this Action—advocacy capabilities that former District and Tenth Circuit Judge Phillips, who presided over six mediation sessions in the Action, recognized as "of the highest caliber" in endorsing the fee request. Ex. A at ¶¶23, 26. Additionally, the fact that Morgan Lewis—among the most preeminent and sophisticated class action defense firms in the country—served as Defendants' counsel in the Action provides further support for Lead Counsel's requested fee award. *E.g., Crocs*, 2014 WL 4670886, at *3 (finding fact that "Defendants' counsel is equally skilled" favored approval of 30% fee award).

### C. Lead Plaintiffs' Endorsement of, and the Class's Reaction to, Lead Counsel's 30% Fee Request Further Supports the Reasonableness of the Request

Lead Plaintiffs—who have actively supervised Lead Counsel and participated in this Action from its inception—are precisely the type of sophisticated institutional investors Congress had envisioned would "participate in the litigation and exercise control over" Lead Counsel (H.R. Conf. Rep. no. 104-369, at *32 (1995), reprinted in 1995 U.S.C.C.A.N. 730-731), and their endorsement heavily supports the requested fee. Ex. B, ¶¶1, 7; Ex. C, ¶¶1, 7; *see also In re Veeco Instruments Inc. Sec. Litig.,* 2007 WL 4115808, at *8 (S.D.N.Y. Nov. 7, 2007) ("a fee request which has been approved and endorsed by a properly-appointed lead plaintiff is presumptively reasonable, especially where the lead plaintiff is a sophisticated institutional investor"); *In re Genworth Fin. Sec. Litig.,* 2016 WL 7187290, at *2. (E.D. Va. Sept. 26, 2016).

Furthermore, courts around the country, including this Court, routinely find that "the fact that none of the class members objected to the requested attorneys' fees is significant and weighs in favor of the requested award." *Crocs*, 2014 WL 4670886, at *5; *see also McKeon v. Int. Pizza LLC*, 2020 WL 6782238, at *2 (D. Colo. Nov. 18, 2020) (Martínez, J.) (same). Here, not a single Settlement Class Member has objected to the requested fee award, and only one valid exclusion request was received. This reaction is particularly significant here given that approximately 87%

of the Class consists of sophisticated institutional investors with the resources and motivation to object, if warranted. ¶¶15, 132.  Accordingly, the Class's overwhelming endorsement provides substantial support for approval of the fee request.

      **D.**    **Plaintiffs' Counsel's Litigation Expenses, and Lead Plaintiffs' Reimbursement Awards Are Reasonable and Should Be Granted**

Plaintiffs' Counsel seeks reimbursement of $547,409.27 in litigation expenses reasonably incurred in litigating the Action, which expenses are routinely awarded in similar actions, including expert fees, mediation expenses, discovery-related costs, and investigation expenses. *E.g.*, *Oppenheimer*, 2014 WL 12768451, at *3 ($3.5 million of expenses found reasonable in securities class action).  The White Declaration contains a full breakdown of the litigation expenses.  *See* White Decl. Exs. E, F at ¶8, and G at ¶9.  Notably, the requested expenses are significantly less than the $750,000 amount set forth in the Notice, and no objections have been lodged thereto—further supporting the expense reimbursement request.  ¶¶134-35.

Lastly, Lead Plaintiffs also seek Representative Reimbursements of $10,000 each as an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class"—awards that are specifically envisioned in the PSLRA and routinely awarded by courts nationwide. *See* 15 U.S.C. §78u-4(a)(4); *DaVita*, 2015 WL 3582265, at *5 (finding $10,000 award "reasonable" considering plaintiff's extensive participation in the case); ¶¶136-37; Exs. B and C (detailing Lead Plaintiffs' approximate time spent in the Action).

## III.   <u>CONCLUSION</u>

For the foregoing reasons, Lead Plaintiffs respectfully request that the Court award: (i) attorneys' fees in the amount of 30% of the Settlement Fund; (ii) reimbursement of $547,409.27 in litigation expenses; and (iii) PSLRA reimbursement awards of $10,000 to each Lead Plaintiff.

Dated: February 23, 2021

Respectfully submitted,

*s/Rusty E. Glenn*
Rusty E. Glenn

**SHUMAN, GLENN & STECKER**
600 17th Street, Ste. 2800 South
Denver, CO 80202
Telephone: 303-861-3003
303-536-7849 (fax)
rusty@shumanlawfirm.com

-and-

Kip B. Shuman
One Montgomery Street, Ste. 1800
San Francisco, CA 94104
Telephone: 303-861-3003
303-536-7849 (fax)
kip@shumanlawfirm.com

*Liaison Counsel for Lead Plaintiffs and the
Proposed Settlement Class*

**SAXENA WHITE P.A.**
Maya Saxena
Joseph E. White, III
Lester R. Hooker
Dianne M. Pitre
7777 Glades Road
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com
dpitre@saxenawhite.com

-and-

Steven B. Singer
Kyla Grant
Sara DiLeo
10 Bank Street
8th Floor
White Plains, NY 10606

Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com
kgrant@saxenawhite.com
sdileo@saxenawhite.com

*Lead Counsel for the Lead Plaintiffs and the
Proposed Settlement Class*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 23, 2021, I caused to be electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all registered participants.

<u>*/s/ Rusty E. Glenn*</u>
Rusty E. Glenn